# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HERITAGE GENERAL AND COLORECTAL, PA; HERITAGE LAPAROSCOPY AND ACUTE CARE SURGERY, PC; HERITAGE SURGICAL GROUP, LLC; AESTHETIC & RECONSTRUCTIVE SURGEONS, L.L.C.; ASP SURGICAL, LLC; EAST COAST AESTHETIC SURGERY, P.C.; GREGORY J. GALLINA MD PC D/B/A GALLINA COLON & RECTAL; GARDEN STATE BARIATRICS & WELLNESS CENTER, LLC; JERSEY INTEGRATIVE HEALTH & WELLNESS, PC; JL SURGICAL LLC; MARTA GENERAL SURGERY LLC; NEW JERSEY SPINAL MEDICINE AND SURGERY, P.A.; ONE SURGICAL SPECIALISTS LLC; PREMIER SPINE AND SPORTS MEDICINE PC; PROFESSIONAL ORTHOPAEDIC ASSOCIATES, P.A.; SOMERSET AMBULATORY SURGICAL CENTER, L.L.C.; SOMERSET ORTHOPEDIC ASSOCIATES, P.A.; SPINE SURGERY ASSOCIATES & DISCOVERY IMAGING, PC; SURGXCEL, LLC; UROLOGY GROUP, P.A.; VANGUARD ASC LLC; and WEIGHT LOSS AND WELLNESS SOLUTIONS LLC. | Civil Action No.: _____ <br><br> [Related to 1:24-cv-06795 (Judge Kennelly)] <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMAND** |
|      Plaintiffs, | |
| v. | |
| MULTIPLAN CORP.; MULTIPLAN, INC.; VIANT, INC.; VIANT PAYMENT SYSTEMS, INC.; NATIONAL CARE NETWORK, LP; NATIONAL CARE NETWORK, LLC; MEDICAL AUDIT & REVIEW SOLUTIONS, INC.; HORIZON HEALTHCARE SERVICES, INC. D/B/A HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY; AETNA, INC.; THE CIGNA GROUP; UNITEDHEALTH GROUP, INC.; UNITED MEDICAL RESOURCES INC.; ELEVANCE HEALTH, INC. F/K/A/ ANTHEM, INC.; and ANTHEM BLUE CROSS, INC. F/K/A EMPIRE BLUE CROSS. | |
|      Defendants. | |

Plaintiffs Heritage General and Colorectal, PA; Heritage Laparoscopy and Acute Care Surgery, PC; Heritage Surgical Group, LLC; Aesthetic & Reconstructive Surgeons, L.L.C.; ASP Surgical, LLC; East Coast Aesthetic Surgery, P.C.; Gregory J. Gallina MD PC d/b/a Gallina Colon & Rectal; Garden State Bariatrics & Wellness Center, LLC; Jersey Integrative Health & Wellness, PC; JL Surgical LLC; Marta General Surgery LLC; New Jersey Spinal Medicine and Surgery, P.A.; One Surgical Specialists LLC; Premier Spine and Sports Medicine PC; Professional Orthopaedic Associates, P.A.; Somerset Ambulatory Surgical Center, L.L.C.; Somerset Orthopedic Associates, P.A.; Spine Surgery Associates & Discovery Imaging, PC; Surgxcel, LLC; Urology Group, P.A.; Vanguard ASC LLC; and Weight Loss and Wellness Solutions LLC (collectively, "Plaintiffs," "Providers," or "Doctors"), by and through their attorneys, McKool Smith, P.C., allege as follows in support of their Complaint against Defendants MultiPlan Corp.; MultiPlan, Inc.; Viant, Inc.; Viant Payment Systems, Inc.; National Care Network LP; National Care Network, LLC; Medical Audit & Review Solutions, Inc. (collectively, "MultiPlan"); Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon"); Aetna, Inc. ("Aetna"); The Cigna Group ("Cigna"); UnitedHealth Group, Inc.; ("United"); United Medical Resources Inc. ("UMR"); Elevance Health, Inc. f/k/a Anthem, Inc.; and Anthem Blue Cross, Inc. f/k/a Empire Blue Cross ("Elevance," collectively with Horizon, Aetna, Cigna, United, UMR, and Anthem the "Health Insurer Defendants" or "Insurer Defendants"). Defendants are jointly and severally liable for the acts alleged as co-conspirators that entered into out-of-network repricing services agreements with MultiPlan.

**INTRODUCTION**

1. The Plaintiff Doctors are in the business of saving lives. Practicing in a range of specialties, the Doctors and staff treat a diverse set of debilitating and life-threatening conditions, including severe nerve problems, chronic pain, obesity, and myriad cancers, among many others. Leaders in their fields, the Doctors are out-of-network providers their patients seek out for their most important medical needs. Their patients want the best care, and they are willing to pay higher insurance premiums for the right to choose out-of-network providers. When given that choice, they choose the Doctors.

2. This case seeks redress for injuries Defendants' anti-competitive price fixing conspiracy caused the Doctors. Health Insurers[1] (including but not limited to the Health Insurer Defendants) have orchestrated a multi-year, ongoing scheme with MultiPlan (MultiPlan, with the Health Insurers, including Health Insurer Defendants, the "Cartel") to drive down payments for medical care rendered by out-of-network healthcare providers, including the Doctors. As a direct result of the Cartel's unlawful depression of payments, Defendants often earn more in fees than the Doctors receive for the rendered care. The Health Insurer Defendants, in furtherance of the Cartel and through other fraudulent schemes and tactics, have induced the Doctors to provide care to their insureds under false pretenses of payment in full, only to wrongly deny, or drastically underpay, the Doctors' claims for reimbursement. Through this scheme, the Defendants have stolen millions from the Doctors.

---

[1] "Health Insurers" refers to all major commercial health insurance companies, also known as "payors," operating in the United States, including but not limited to all of the Defendants.

3

3. The Cartel, in which all Defendants participate, is a buyer-side cartel targeted at suppressing the amounts paid to the Doctors. It is embodied in a series of written agreements entered into between Health Insurer Defendants and MultiPlan. MultiPlan concedes the existence of these written agreements.

4. MultiPlan itself operates multiple nationwide networks of "preferred" healthcare providers, known as Preferred Provider Organization ("PPO") networks. It recruits healthcare providers, negotiates reimbursement rates with them, and sets certain quality and credentialing expectations for the healthcare providers in its network. MultiPlan sells access to its PPO network to other Health Insurers.

5. As competitors, MultiPlan and competing Health Insurers are supposed to make independent decisions about how much to pay for out-of-network medical services like those the Doctors provide. While each Health Insurer is financially incentivized to minimize payments, they are also incentivized to ensure payment of a reasonable amount to ensure healthcare providers would continue to provide out-of-network services to Defendants' insureds.

6. Health Insurers universally began viewing their obligation to pay out-of-network healthcare services as a "pain point" and "major area of concern" that cut into their exorbitant profits. In an effort to avoid legal liability, Health Insurers sought out third parties to drive down out-of-network costs. For the scheme to work, it was essential that all major Health Insurers used the same third-party repricing service. That was the only way to drive down reimbursement rates while ensuring their insureds continued to have access to the very out-of-network providers being underpaid. MultiPlan presented as the perfect solution.

4

7.     MultiPlan markets its suite of repricing tools as an out-of-network "cost containment" solution.  MultiPlan markets itself, and the products it offers, as having industry-wide adoption, which allows it to suppress out-of-network reimbursement payments.  Today, virtually every major Health Insurer, including each of the Health Insurer Defendants, participates in the Cartel.

8.     The scheme's mechanics are straightforward.  MultiPlan and competing Health Insurers agree to share their respective confidential, highly detailed claims data with MultiPlan for use in its repricing algorithm.  When a Health Insurer receives a provider's claim for reimbursement for out-of-network services, it sends the claim to MultiPlan and MultiPlan uses its repricing algorithm to generate a reimbursement amount, typically far below the amount the Health Insurer would otherwise pay and far lower than the patients' plan-specific out-of-network benefit requires the plan to pay.  MultiPlan then "proposes" the new price to the healthcare provider, giving the provider only days to respond to the "repriced" claim.  As a condition of accepting the repriced claim, the provider must agree to forego seeking reimbursement from any other source, effectively locking in the harm caused by the collusive underpayment.  MultiPlan receives a cut of the money the Health Insurer withholds from the healthcare provider as a percentage of the "savings."  Because all major Health Insurers participate in the Cartel, providers have no leverage and are left with two options: (i) accept the repriced claim, or (ii) engage in a protracted, expensive, and often dead-end appeals process.

9.     Even when MultiPlan offers to "negotiate," that negotiation is a farce.  As a result of being bombarded with a constant stream of "repriced" reimbursement demands, and because the services have already been rendered under false pretense of payment, it is impossible for healthcare providers to negotiate meaningfully or to pursue dispute resolution with respect to

5

individual claims. Any "negotiation" with a Health Insurer starts from the position of the Cartel's collusive offer to underpay healthcare providers for services provided and invariably ends with the healthcare provider capitulating to an extreme underpayment. This is because the providers are in a comparatively weak bargaining position—faced with the choice of either keeping the lights on or dedicating precious time and resources fighting for the amount of money they are actually entitled to with no guaranteed payment in sight. The inevitable result is what the Cartel is designated to achieve: collusive and systematic underpayment. According to MultiPlan, out-of-network providers accept its reduced reimbursement offers 99.4 percent of the time.

10.     By so conspiring, the Health Insurer Defendants are able to pay far below the reasonable and customary rate for services. As of 2020, the MultiPlan repricing tool was underpaying 370,000 out-of-network claims submitted by all providers by more than $50 million *per day*. That equates to an annual underpayment of approximately $19 billion.

6

11.    To be clear, MultiPlan and the other Health Insurers are not white knights.  The money they withhold from healthcare providers is not passed on to patients.  Since the outset of the Cartel, Americans' health insurance costs have continued to rise dramatically[2]:



12.    Even though the Doctors are out of network, insured patients routinely seek care from the Doctors because they are leaders in their field.  This should not be a surprise.  The critical services the Doctors provide are not inexpensive, but the impact those services have on patients' lives is priceless.  Yet, the Health Insurer Defendants habitually refuse to compensate Doctors for these life-changing services.

---

[2]    *2023 Employer Health Benefits Survey*, Kaiser Fam. Found. (Oct. 18, 2023), https://www.kff.org/report-section/ehbs-2023-section-1-cost-of-health-insurance/#figure114.

13.     As out-of-network providers, the Doctors do not have written agreements with the Health Insurer Defendants and are thus subject to the Cartel's repricing scheme.  That is not to say the Doctors have no right to a specific payment.  The employers that sponsor the medical-benefit plans for many of the Doctors' patients provide their employees and family members access to out-of-network healthcare providers.  This allows beneficiaries the option to choose, for an additional cost, the best available care like the Doctors', even if that provider is not in the Health Insurer's network.  Such plans typically define the rate that the Health Insurer Defendants shall reimburse out-of-network providers using reference payment levels published by third parties such as FAIR Health, Inc. ("FAIR Health").

14.     The Health Insurer Defendants' fraudulent and illegal practices—many of which are straight from the Cartel playbook—have cost the Doctors millions.  The Doctors generally bill for their services at the 80th percentile of the FAIR Health benchmark.  After taking into account patient paid co-insurance, cost-share and deductibles, the Doctors were paid less than $65 million of the more than $771 million they billed.  The Health Insurer Defendants, in concert with each other and with MultiPlan, underpaid the Doctors by more than $706 million.  Put differently, the Doctors were paid only [8] percent of what they billed for the services they provided.

15.     Defendants prioritized illegal profits over patients and providers.  The Plaintiff Doctors bring this suit to hold Defendants accountable for their concerted misconduct.

**THE PARTIES**

16.     Plaintiffs are New Jersey provider groups that care for and treat the Health Insurer Defendants' insureds.  At all relevant times and for all claims at issue in this Complaint, Plaintiffs did not have contracts with the Health Insurer Defendants.

17.     Plaintiff Heritage General and Colorectal Surgery, PA ("Heritage General"), a general, colon, and rectal-surgery practice, is a professional association organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

18.     Plaintiff Heritage Laparoscopy and Acute Care Surgery, PC ("Heritage Laparoscopy"), a general-surgery practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

19.     Plaintiff Heritage Surgical Group, LLC ("Heritage Surgical"), a general, colon, and rectal-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

20.     Plaintiff Aesthetic & Reconstructive Surgeons, L.L.C. ("Aesthetic"), an aesthetic and reconstructive surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

21.     Plaintiff ASP Surgical, LLC ("ASP"), a gastrointestinal surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

22.     Plaintiff East Coast Aesthetic Surgery, P.C. ("East Coast Aesthetic"), a general plastic surgery practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

23. Plaintiff Gregory J. Gallina MD PC d/b/a Gallina Colon & Rectal ("Gallina"), a colon- and rectal-surgery practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

24. Plaintiff Garden State Bariatrics and Wellness Center, LLC ("Garden State Bariatrics"), a bariatric-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

25. Plaintiff Jersey Integrative Health & Wellness, PC ("Jersey Integrative"), a sports-medicine and spinal-care practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

26. Plaintiff JL Surgical LLC ("JL Surgical"), a general-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

27. Plaintiff Marta General Surgery LLC ("Marta"), a general-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

28. Plaintiff New Jersey Spinal Medicine and Surgery, P.A. ("New Jersey Spinal"), a neck- and back-surgery practice, is a professional association organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

29. Plaintiff One Surgical Specialists LLC ("One Surgical"), a robotic- and general-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

30.     Plaintiff Premier Spine and Sports Medicine PC ("Premier"), a pain management practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

31.     Plaintiff Professional Orthopaedic Associates, P.A. ("Professional Orthopaedic"), an orthopedic-surgery and sports medicine practice, is a professional association organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

32.     Plaintiff Somerset Ambulatory Surgical Center, L.L.C. ("Somerset Ambulatory"), predecessor of Plaintiff Spine Surgery Associates & Discovery Imaging, PC and a pain management, urology, gastroenterology, orthopedic, and general-surgery practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

33.     Plaintiff Somerset Orthopedic Associates, P.A. ("Somerset Orthopedic"), an orthopedic-surgery practice, is a professional association organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

34.     Plaintiff Spine Surgery Associates & Discovery Imaging, PC ("Spine Surgery"), successor to Plaintiff Somerset Ambulatory and a spinal-surgery practice, is a professional corporation organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

35.     Plaintiff Surgxcel, LLC ("Surgxcel"), a physician-assistant-services practice, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

36.     Plaintiff Urology Group, P.A. ("Urology Group"), a urology practice, is a professional association organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

37.     Plaintiff Vanguard ASC LLC ("Vanguard"), a surgical center, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

38.     Plaintiff Weight Loss and Wellness Solutions LLC ("Weight Loss and Wellness"), a surgical and non-surgical practice treating weight-related conditions, is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business in New Jersey.

39.     Defendant MultiPlan Corp., the corporate parent of MultiPlan, Inc., is a provider of healthcare data and analytics products and services, incorporated in Delaware and headquartered in New York. Its principal place of business is located in New York, NY 10003.

40.     Defendant MultiPlan, Inc. is a New York corporation. Its principal place of business is the same as MultiPlan Corp.'s. According to MultiPlan Inc.'s website, MultiPlan Inc. has an office located in Naperville, Illinois with more than 300 employees. In filings with Secretaries of State, MultiPlan Inc. lists its mailing address as 535 E. Diehle Road, Naperville, Illinois, 60563. MultiPlan Inc.'s Naperville, Illinois office is its largest office by number of employees. In New Jersey, MultiPlan, Inc., and its subsidiaries Beech Street Corporation and Private Healthcare Systems, Inc., are certified to operate as an Organized Delivery System ("ODS"), including as a PPO through which insureds can get care from any in-network provider

without a referral from a primary-care doctor.[3]

41.     Defendant MultiPlan, Inc. offers regional PPO networks, including HealthEOS and Health EOS Plus Networks, that service Illinois and neighboring states.

42.     Defendants Viant, Inc. and its affiliate, Viant Payment Systems, Inc. ("Viant") are payment solutions companies incorporated in Delaware and headquartered in Naperville, Illinois. MultiPlan acquired Viant in 2010.  Viant, and therefore MultiPlan Corporation, offers auditing and reimbursement services for medical claims and pre-payment services such as facility bill review and professional negotiation with Doctors and MultiPlan employees in Illinois.

43.     Defendants National Care Network, LP and its affiliate, National Care Network, LLC (together, "NCN"), are healthcare cost management companies incorporated in Delaware and headquartered in Texas.  MultiPlan acquired them in 2011.  This acquisition included the Data iSight repricing tool, which provides reimbursement repricing services to Health Insurers and customers and is a trademark of NCN.

44.     Defendant Medical Audit and Review Solutions, Inc. ("MARS") is a Delaware corporation headquartered in Naperville, Illinois, specializing in technology-based medical payment repricing and medical necessity determinations.  MultiPlan acquired MARS in 2014.

45.     Defendant Horizon Healthcare Services, Inc. d/b/a/ Horizon Blue Cross Blue Cross Blue Shield of New Jersey ("Horizon") is the only Blue Cross and Blue Shield Association licensee authorized to operate in New Jersey.  Its principal place of business is in Newark, New Jersey. Horizon is the largest health insurance company in the State of New Jersey.  It provides health insurance coverage and services to more than three million New Jersey residents and has repricing

---

[3]     *Organized Delivery Systems*, State of N.J. Dep't of Banking & Ins., https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (last visited Nov. 19, 2024).

agreements with MultiPlan. Through the BlueCard program and other agreements with Blue Cross Blue Shield of Illinois, Horizon's New Jersey-based clients and licensees have access to providers located in Illinois. Further, upon information and belief, Horizon provides health insurance to insureds living in Illinois.

46.     Defendant Aetna, Inc. ("Aetna") is a Pennsylvania corporation headquartered in Hartford, Connecticut. Aetna is one of the largest commercial health insurers in the United States, New Jersey, and Illinois.

47.     Defendant The Cigna Group ("Cigna") is a Delaware corporation headquartered in Broomfield, Connecticut. Cigna is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans that operate throughout the United States, including in New Jersey and Illinois.

48.     Defendant UnitedHealth Group, Inc. ("United") is a Delaware corporation headquartered in Minnetonka, Minnesota. United is the largest health insurance company in the United States. In Illinois alone, United provides health coverage to approximately 1.5 million individuals across employer-sponsored, individual, Medicare, and Medicaid plans.[4]

49.     Defendant United Medical Resources Inc. ("UMR") is a wholly owned subsidiary of United headquartered in Wausau, Wisconsin. According to United, "UMR is the nation's largest third-party administrator (TPA), serving more than 3,800 benefits plans and their 6 million members."[5]

---

[4]     Jakob Emerson, *UnitedHealthcare's total membership by state*, Becker's Payer Issues (Oct. 31, 2023), https://www.beckerspayer.com/payer/unitedhealthcares-total-membership-by-state.html.

[5]     UMR, https://www.umr.com/about-umr (last visited Dec. 2, 2024).

50.     Defendant Elevance Health, Inc. f/k/a Anthem, Inc. ("Elevance") is an Indiana corporation headquartered in Indianapolis, Indiana.  Elevance is the parent company, or otherwise affiliated or related company, to various commercial health insurance plans that operate in the United States, including Anthem Blue Cross, Inc. f/k/a Empire Blue Cross.

51.     Defendant Anthem Blue Cross, Inc. f/k/a Empire Blue Cross ("Anthem") is a wholly owned subsidiary of Elevance with a principal place of business in New York.

52.     In addition to each of the Defendants listed in the paragraphs above, those complicit with the Defendants include the Health Insurers and any other person or entity who has entered into an out-of-network repricing agreement with MultiPlan, used MultiPlan's out-of-network claim repricing tools to process claims for out-of-network healthcare services, or otherwise participated with Defendants in the alleged anticompetitive conduct.  The exact number of such co-conspirators is unknown at present but Defendants are jointly and severally liable for all acts or omissions of all such co-conspirators.

## JURISDICTION AND VENUE

53.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; ERISA, 29 U.S.C. §§ 1104, 1109, and 1132; and various state laws.

54.     This Court has subject matter jurisdiction under 15 U.S.C. § 15 (antitrust), 28 U.S.C. § 1337(a) (antitrust), 29 U.S.C. § 1132(e)(1) (ERISA), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1367 (supplemental jurisdiction), and the doctrine of pendent jurisdiction.

55.     This Court has personal jurisdiction over MultiPlan because it transacts business throughout the United States, including in this District, and is engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business

or property of persons and entities residing in, located in, or doing business in this District.

56.     This Court has personal jurisdiction over the Health Insurer Defendants because each transacts substantial business activities in this District (including providing reimbursements for out-of-network claims for healthcare services performed in this District). Additionally, by engaging MultiPlan with the knowledge that MultiPlan's services would result in underpayment or non-payment in this District each Health Insurer Defendant has participated in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District, and/or by taken actions in furtherance of the conspiracy within this District.

57.     Venue is appropriate in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters), 29 U.S.C. § 1132(e)(2) (ERISA venue provision), and 28 U.S.C. § 1391(b) and (c) (general venue provisions). The Defendants reside or transact business within this District; are licensed to do business in this District; transact their affairs, carry out interstate trade and commerce, in substantial part, in this District; have an agent and/or can be found in this District; and/or participated in an alleged conspiracy that caused injury in this District. The ERISA plans at issue in this action (the "Plans") were, at least in part, administered in this District and the alleged breaches took place in this District.

## FACTUAL ALLEGATIONS

## I.     THE PLAINTIFF DOCTORS' PRACTICES

### A.     BACKGROUND

58.     The Plaintiff Doctors are industry-leading surgeons who provide life-altering care for their patients. Patient reviews confirm the profound impact the Doctors have had on their patients' lives. One patient, for instance, wrote that Heritage Surgical Group "made a very unpleasant time in [his] life bearable with honest, compassionate care." Another patient described

16

Jersey Integrative Health and Wellness as "the most comprehensive, most detailed, and patient doctor [she had] ever been to!" Jersey Integrative Health and Wellness gave this patient the "attention [she] needed when . . . [she] was in the most pain." A third patient, speaking about Garden State Bariatrics and Wellness Center, said that of her "nine surgeries, [] this by far was my best experience." "[E]ven though [Garden State Bariatrics] w[as] a bit far from [her] home," she was "so glad that" she chose them.

59.     These testimonials confirm patients seek out the Doctors because they want the best care for themselves and their families. That choice is important. The Health Insurers require their insureds to pay higher health insurance premiums, and in some case higher deductibles and co-payments, for the right to choose their own doctor.

60.     At all relevant times, the Plaintiff Doctors were out-of-network providers under the Health Insurer Defendants' plans (the Plans). As out-of-network providers, the Doctors did not have written contracts with the Health Insurer Defendants. The Doctors made this decision deliberately. They sought to ensure that they were compensated at the prevailing market rate to sufficiently cover their high operational costs, including, among other things, staff, facilities, equipment, and insurance. In-network providers, *i.e.*, doctors who do contract with a health insurance company and accept a negotiated rate as payment for covered services, by contrast, are often forced to accepted inadequate rates that fail to cover their expenses. Indeed, as one recent study by the American Medical Group Association reports, the median loss for in-network medical groups was $249,000 per physician.[6]

---

[6]     Press Release, Advancing High Performance Health, New Survey Finds Medical Group Operating Costs Continue to Outpace Revenue (Dec. 18, 2023), https://www.amga.org/about-amga/amga-newsroom/press-releases/12182023/.

61. As out-of-network providers, the Doctors depend upon reimbursements from insurers to stay in business. Typically, providers collect only nominal amounts from patients, usually in the form of "co-pays" or "cost share." The Doctors then submit the bill or "claim" for services rendered to the patient's insurer for the remainder of the payment. The amount collected from Health Insurers is critical to the Doctors' survival.

62. The Health Insurer Defendants market and sell medical insurance coverage and related services to individuals, large and small businesses, unions, religious organizations, and government entities through "fully insured" plans or by administering "self-funded" plans on behalf of large employers. As part of this process, they prepare Summary Plan Descriptions or "SPDs" that generally set forth whether the plan includes coverage for services provided by out-of-network providers and, if so, the payment terms on which out-of-network providers are to be compensated. *E.g.*, Ex. B, Merck Employee Medical Plan SPD, Released Oct. 4, 2022. The SPDs are provided to plan participants but typically not out-of-network providers.

63. To entice out-of-network providers to provide services to Health Insurer Defendant insureds, each Health Insurer Defendant represents that it will fairly and reasonably compensate out-of-network medical professionals with the knowledge and expectation that out-of-network providers, like the Doctors, will rely upon that representation and provide services to the Health Insurer Defendant insureds.

64. Upon information and belief, the primary benchmark Health Insurer Defendants use to calculate the Plans' payments to out-of-network providers is the FAIR Health rate.[7]

---

[7] FAIR Health, discussed in more detail at paragraphs 95–98, collects data from billions of medical claims per year from more than 60 health plans, insurance carriers, and third-party administrators. Relying on its database of more than 75 billion billed medical services from all 50 States, FAIR Health arranges charges for 10,000 services from low to high and calculates the cost percentiles for a particular service in a specific geographic area.

18

Horizon, for example, represents it "uses many sources to calculate its reimbursement rate [for out-of-network providers] . . . including industry resources provided by entities such as FAIR Health, the Centers for Medicare & Medicaid Services ("CMS"), and other databases [e.g., OptumInsight]." Similarly, Cigna,[8] Aetna,[9] Elevance,[10] and United[11] have directed—and continue to direct—their insureds to the FAIR Health website to estimate the costs of out-of-network care (and in-network care).

65. Upon information and belief, the Plans that rely on FAIR Health have typically provided for out-of-network reimbursement rates at the higher "percentiles" of billed charges. The exact percentile depends on the particular enrollee's Plan. For example, one of Merck, Inc.'s publicly available SPDs provides:

> Out-of-Network Benefit: If you or your Covered Dependents receive care from an Out-of-Network provider, the Medical Plan will pay 80% of covered expenses up to the Reasonable and Customary (R&C) Limit and you will be responsible to pay 20% of covered expenses up to the R&C Limit and 100% of covered expenses over the R&C Limit.

Ex. B, Merck SPD at 37. That SPD defines the "Reasonable & Customary Limit" for out-of-network providers as the payment rates at 90% percent of FAIR Health. *Id.* at 40 n.2.

---

[8] *New Jersey Out-of-Network Consumer Protection, Transparency, Cost, Containment and Accountability Act*, Cigna, 4 https://www.cigna.com/static/www-cigna-com/docs/new-jersey-out-of-network-consumer-protection-transparency-cost-containment-and-accountability-act.pdf (last visited Nov. 19, 2024).

[9] *State-specific information about your insurance plan*, Aetna, https://www.aetna.com/individuals-families/member-rights-resources/rights/state-specific-information.html (last visited Nov. 19, 2024).

[10] *Frequently asked questions (FAQ) in New York*, Anthem BlueCross, https://www.anthembluecross.com/faqs (last visited Nov. 19, 2024).

[11] *Out-of-network costs New Jersey insurance plans*, United Healthcare, https://www.uhc.com/legal/required-state-notices/new-jersey/fairhealth-notice-nj (last visited Nov. 19, 2024).

19

66.     As out-of-network providers, the Doctors rely on these representations, along with pre-approval confirmations, when determining whether to provide services to Health Insurer Defendants' insureds and to determine the amount of the patient's cost share.

67.     Some insureds are covered by Plans that provide for the Health Insurer Defendants to compensate out-of-network providers at a percentage multiple of the rates published by the Centers for Medicare and Medicaid Services ("CMS").

**B.      THE PLAINTIFF DOCTORS COMPLY WITH BEST PRACTICES WHEN PROCESSING MEDICAL CLAIMS**

68.     Before treating a patient in a non-emergent situation, the Doctors' practice is to obtain confirmation from the Health Insurer Defendant that the treatment is covered before providing the treatment.  The Doctors verify the patient's eligibility, obtain pre-authorization for the treatment from the Health Insurer Defendant, obtain information regarding the patient's financial responsibility (co-pay and cost-share), and are informed by the Health Insurer Defendant of the patient's maximum financial responsibility for the treatment.  This occurs via a HIPAA-governed EDI transaction that includes a payor-assigned pre-authorization number.  *See* Paragraphs 71–80.

69.     After a Doctor treats their patient, a treatment record is created and a standard billing form—CMS-1500 Health Insurance Claim Form or "HCFA"—is prepared.  This is essentially a bill prepared by a Doctor that is submitted to the Health Insurer Defendant.  The HCFA form contains a check-box—No. 27—to indicate whether the bill is submitted pursuant to an accepted assignment.  Each Health Insurer records on its internal systems whether the claim is pursuant to a valid assignment.

20

70.     The services provided by the Doctors are extraordinarily complex and require incredible and unique skill.  The amount that the Doctors billed for those services is generally in line with 80th percentile of FAIR Health and, upon information and belief, is equal to or less than the amount the Doctors, as an out-of-network providers, are entitled to under the Plans.

71.     Each Doctor follows the industry standard Current Procedural Terminology ("CPT") coding system when billing the Health Insurer Defendants for the care and treatment of the Health Insurer Defendant insured.  The CPT coding system is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, and payors.  Each five-digit CPT code corresponds to a particular medical, surgical, or diagnostic service provided, and each Health Insurer Defendant requires that the Doctors identify the applicable CPT codes on the claim.

72.     In parallel, and increasingly more common, the information in the HCFA form is translated into a specific, regulation-required ANSI X12 5010 format EDI data set referred to as an "837," which is electronically transmitted to the Health Insurer Defendant.  In so doing, each Doctor complies with the Health Insurer Defendants' Companion Guides that provide instructions for submitting claims.

73.     All the claims at issue have an associated 837.  The 837 data structure required by each Health Insurer Defendant includes an entry for that Health Insurer Defendant's own generated pre-authorization number for the specific claim being submitted.

74.     Once the HCFA or 837 is transmitted to the insurance company, the insurance company must acknowledge receipt within two days.  Upon receiving the 837, the Health Insurer Defendant has two options:  accept the claim from the out-of-network provider or reject the claim.

21

75.     If the Health Insurer Defendant accepts and processes the transaction (claim(s) and incurred charges), then it generates a document known as an "Electronic Remittance Advice" or an "835," which is a record of claims adjudication or adjustment and payment for the submitted claim.  An 835 is not a rejection of the claim.  The 835 then must be transmitted to the Doctor's office and maintained by the Health Insurer Defendant in the standard or original format for auditability.

76.     An 835 was provided by a Health Insurer Defendant for each of the claims.  The Health Insurer Defendants conceal or hide the name of the employer or Plan sponsor on the forms they return to the Doctors for each claim.  For fully insured claims, the Health Insurer Defendants do not disclose the identity of the purchasers of the fully insured policy.

77.     If a Health Insurer Defendant rejects a claim, then no 835 is generated. Instead, it generates an EDI data record referred to as a "999" and transmits that to the Doctor's office.[12]  A rejected claim also triggers the creation of a CCD+ Addenda in the amount of $0.00.  None of the Doctors received a 999 for any of the Health Insurer Defendants' claims or a CCD+ Addenda for $0.00.

78.     Nonetheless, a Health Insurer Defendant's so-called "acceptance" of a claim for processing does not mean that the Health Insurer Defendant honors its representation and pays the Doctors the amount on the 837s.  Instead, the Health Insurer Defendants' policy and practice is to accept the 837 and then negotiate down the claim amount to well-below the prices the Health Insurer Defendants agreed to pay, in an amount determined by the Cartel.

---

[12]     *See Companion Guide for Transaction and Communications/Connectivity Information*¸ Horizon Blue Cross and Blue Shield of New Jersey, 12, (2019), https://www.horizonblue.com/sites/default/files/2019-02/External_Companion_Guide.pdf [hereinafter *Horizon's Companion Guide*] ("A 999 will be utilized to indicate functional acknowledgement when a file/transaction is rejected for non-compliance.").

79.     The claims at issue in this case are primarily for medically necessary, covered, elective services, rendered to the Health Insurer Defendant insureds.

80.     Health Insurer Defendants ignore the Plan terms and legal requirements for prompt/reasonable payment, purposefully underpaying the Doctors, amongst others, and intentionally delaying the claims adjudication process in the hope that the Doctors will, out of desperation, borne of the Doctors' relative lack of negotiating power vis-à-vis the Defendants, accept a substantially reduced payment to free themselves from the endless appeals process.

## II.     DEFENDANTS ARE ENGAGED IN A NATIONWIDE PRICE FIXING SCHEME DESIGNED TO THWART OUT-OF-NETWORK PROVIDERS' ABILITY TO COLLECT THE AMOUNTS TO WHICH THEY ARE ENTITLED

81.     The Cartel is a buyers' cartel dating back to at least 2015 between horizontal competitors designed to reduce out-of-network claims reimbursement rates.  To achieve this goal, Cartel members agree to: (1) outsource their competitive out-of-network reimbursement rate system to a common repricer, MultiPlan; and (2) exchange among themselves and MultiPlan competitively sensitive data regarding their reimbursement rates and pricing strategies.  This joint delegation and exchange of anticompetitive information allows Defendants to coordinate Health Insurer behavior and minimize industry-wide reimbursement rates.

82.     Prior to the Cartel, MultiPlan and the Health Insurer Defendants competed against each other, independently setting reimbursement rates for out-of-network services provided to patients enrolled in their respective networks.  This pricing competition served as a market-wide check on out-of-network reimbursement prices.  All Health Insurers had a competitive incentive to keep their out-of-network reimbursement rates at reasonable levels to ensure providers remained willing to provide out-of-network services to plan participants and to preserve the possibility that out-of-network providers would ultimately agree to join their networks.

23

83.     The Cartel extinguished this horizontal competition by, in effect, agreeing to delegate to MultiPlan industry-wide pricing.  For healthcare providers, this agreement dramatically suppressed out-of-network reimbursement rates and made recovering the amounts to which they are otherwise entitled a virtual impossibility.

84.     As federal antitrust regulators have explained, "replac[ing] once-independent pricing decisions with a shared algorithm," like the Cartel has done, "constitutes illegal price-fixing."  When "competitors jointly delegat[e] key aspects of their decision-making to a common algorithm," they "deprive the marketplace of independent centers of decision-making" in violation of Section 1 of the Sherman Act.

85.     Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the Doctors' claims arising from the conspiracy prior to the four-year period immediately preceding the date this Complaint was filed. The Doctors were first put on inquiry notice of the Cartel, at the earliest, on April 7, 2024, when an article published by *The New York Times* raised concerns about MultiPlan's practices based on confidential documents that recently been unsealed in other litigation.

A.     **Cartel Background**

i.     *Usual and Customary Rates*

86.     For decades, and until the late 1990s, Health Insurers based out-of-network reimbursements on statistical benchmarks for medical costs based on prevailing market rates, *i.e.*, the retail prices charged by doctors in particular geographic areas (UCR rates). The "UCR" rate refers to the "the prevailing rate doctors charge when they have not negotiated a lower rate with

24

the insurer on an in-network basis."[13]  Because out-of-network providers do not receive the promise of increased patient volume and other benefits (like prompt and predictable payment) that come with a network contract with an insurer, out-of-network providers do not offer discounts to payors on the billed amount.  Pre-negotiated, discounted, in-network rates have never represented reasonable rates of reimbursement for out-of-network claims.

87.     To properly calculate UCR rates, Health Insurers historically used aggregated, retail medical charge data for like out-of-network healthcare services performed in the same geographic markets.  Based on this data, each Health Insurer exercised its own independent judgment to determine the applicable UCR rate for a particular medical service (often referred to as the "allowed amount").  Each Health Insurer then independently determined what proportion of the UCR rate to pay for plan insureds, which the Health Insurer included in its plan documents to notify insureds.

88.     Historically, many Health Insurers use 80th percentile of FAIR Health rates to calculate UCR rates.  This method is based on the distribution of charges for similar medical services within a specific geographic area; it pegs the UCR rate to the charge amount below which 80 percent of all submitted charges fall.

89.     Once a healthcare provider receives notice from a Health Insurer of the allowed amount of a claim, that provider has the option of seeking additional reimbursement from the patient for that amount above the allowed amount.  This is known as "balance billing."

---

[13]     *Deceptive Health Insurance Industry Practice: Are Consumers Getting What They Paid For?* (Part I): *S. Hr'g. 111-37 Before S. Comm. on Com., Sci., & Transp.*, 111th Cong. 5 (2009).

ii.   *Prior Industry Collusion: The Ingenix Cartel (1997-2009)*

90.    The Cartel is a reincarnation of a prior collusive effort by Health Insurers to suppress out-of-network reimbursement rates: the Ingenix Cartel.

91.    Between 1997 and 1998, a United Healthcare subsidiary called Ingenix purchased the two, then-existing claims databases used for the calculation of UCR: MDR and PHCS. It then consolidated those databases in 2001. With United's acquisition of all UCR claims databases, one of the largest insurance companies in the nation became functionally responsible for setting UCR rates and, in turn, nationwide reimbursement levels for out-of-network claims.

92.    Allowing an insurance company to control the nation's sole UCR database created an obvious and massive conflict of interest. Ingenix was financially incentivized to skew its aggregate claims data downwards to reduce overall UCR rates. That is precisely what happened. For more than a decade, the Health Insurers exploited Ingenix data to depress reimbursement rates artificially for out-of-network claims.

93.    By the late 2000s, providers and consumers began to complain about uncharacteristically low out-of-network claims reimbursement rates, which led to doctors to balance bill patients for huge sums. The complaints spurred several investigations and lawsuits over Ingenix's practices, which ultimately revealed that Ingenix was systematically manipulating its data with the purpose and effect of reducing apparent UCR rates.

94.    In 2000, the American Medical Association ("AMA") filed a class action against United alleging that Ingenix improperly reduced out-of-network reimbursements to healthcare providers in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and antitrust laws. The suit settled in 2009, with United agreeing to pay $350 million to class members.

iii.     *FAIR Health, Inc.*

95.     In February 2008, the NYAG announced an investigation "into a scheme by health insurers to defraud consumers by manipulating reimbursement rates."  In January 2009, a settlement was announced between the NYAG and United.  United agreed to shut down Ingenix and to contribute $50 million to the formation of an independent non-profit organization, FAIR Health, to take ownership of the Ingenix UCR database.  United further agreed to use FAIR Health for determining out-of-network reimbursement rates for at least five years.

96.     Similar settlements followed.  Aetna agreed to pay $20 million for the creation of FAIR Health, to contribute untainted data to the new database, and to use FAIR Health for five years.  Cigna and WellPoint, Inc. (later known as Anthem and then Elevance) agreed to pay $10 million and to use FAIR Health for five years.

97.     FAIR Health was incorporated in October 2009 and became available for use in mid-2010.  Under the terms of its NYAG settlement, United was required to shut down the Ingenix database within 60 days of the date on which FAIR Health became available for use.  As FAIR Health became operational sometime in 2010, the obligation of the settling Health Insurers (including the Health Insurer Defendants) to use FAIR Health expired sometime in 2015 or early 2016.

98.     FAIR Health began the gradual process of correcting the skewed UCR database it inherited from United.  Over the next seven years, UCR rates rose some 26 percent, reflecting a normalization of the UCR database and a return to a dataset that accurately reflected prevailing market rates free from manipulation.  As a result, patients and physicians received more accurate and fair reimbursements from Health Insurers for the medical care they received or provided.  But it did not last.

3212.000/2106158.1

B.    **MultiPlan Enters the Fray**

99.    Since its founding in 1980 as a New York-based hospital network, MultiPlan has evolved into a nationwide PPO network of over 1.3 million providers.  Health Insurers, including some of the Defendant Health Insurers, "rent" MultiPlan's provider network to decrease the number of claims that fall out-of-network.  MultiPlan refers to its PPO network business as "MultiPlan 1.0" and touts it as its major "competitive advantage."  Through its network rental business, MultiPlan has aggregated more than 10 petabytes[14] of claim and reimbursement data reflecting what healthcare providers charge, and also what those physicians are willing to accept as payment for those services.  MultiPlan refers to this cache of data as the "crown jewels" of its company.

100.    As Ingenix was being investigated for antitrust violations and fraud in the late 2000s, MultiPlan began offering a new service to its insurance company clients: "repricing" out-of-network claims.  This is a euphemism for working with Health Insurers to reduce payments to providers who perform out-of-network services for insured patients.

101.    In August of 2009, mere months after the NYAG settlements closed Ingenix, MultiPlan acquired Viant.  U.S. antitrust regulators expressed concerns regarding this acquisition. The acquisition of Viant "added analytics-based services" and "repricing solutions" to MultiPlan's business portfolio.

102.    In June 2011, MultiPlan acquired NCN and its "Data iSight" repricing tool, which would become central to the Cartel's scheme.  According to MultiPlan's former CEO, Data iSight soon "became the foundation of [MultiPlan's] analytics business."  In 2014, MultiPlan added an

---

[14]    To put this in context, a single petabyte is roughly equivalent to 20 million tall filing cabinets or 500 billion pages of printed text.  This is A LOT of data.

additional company, MARS, once again purchasing a repricing technology provider. Around June 2023, MultiPlan introduced a new "AI-enabled" out-of-network claim repricing methodology known as "Pro Pricer." MultiPlan claims that Pro Pricer will reprice out-of-network claims for competing Health Insurers using over 40 years of pricing data.

103.    Through these acquisitions, MultiPlan became the "leader in out-of-network cost containment." In 2019, MultiPlan claimed to process over 135 million out-of-network healthcare claims, totaling $106 billion in billed charges, and generating north of $19 billion in "savings" for its customers.[15]   In 2022, MultiPlan claimed to process 546 million claims totaling over $155 billion in billed charges, and to identify $22.3 billion in savings for payor clients. By contrast, its next closest competitor, Zelis, a company that reprices out-of-network claims based on a UCR benchmark, reprices only about 2 million out-of-network claims a year.

104.    MultiPlan's analytic tools, Pro Pricer, Viant, MARS, and Data iSight, are used by the Cartel to "reprice" out-of-network insurance claims. These products calculate a reimbursement amount for out-of-network healthcare services that is far less than the insurance company would otherwise pay and far less than the healthcare provider's claim for reimbursement, in a manner that coordinated and standardized between and among the Health Insurers. MultiPlan presented the perfect vehicle for collusion. By using MultiPlan as the sole (or the primary) repricer, Health Insurers, including the Health Insurer Defendants, could fix pricing and avoid (or at least try to avoid) the liability of running their own repricing system like United's Ingenix.

---

[15]    *Churchill Capital Corp III Proxy Statement Schedule 14A (Form DEFA14A)*, SEC, https://www.sec.gov/Archives/edgar/data/1793229/000110465920096934/tm2028994-2_defa14a.htm (last visited Nov. 19, 2024).

105.    Large insurers like Aetna, Cigna, and United ran out the clock on their mandatory five-year obligation to use FAIR Health and then promptly abandoned FAIR Health's accurate, transparent, and impartial pricing mechanisms in favor of Data iSight's sham algorithm that allowed Health Insurers to, in effect, jointly set their own low prices for medical care.  Indeed, Health Insurers flocked to MultiPlan's claims repricing services almost immediately after the FAIR Health agreements lapsed:

- In 2015, Cigna completed its five-year obligation to use FAIR Health.  In 2015, it contracted with MultiPlan to use its claims repricing services.

- In 2015, Aetna completed its five-year obligation to use FAIR Health.  On May 1, 2015, Aetna contracted with MultiPlan to use its claims repricing services.

- In 2016, United completed its five-year obligation to use FAIR Health.  In 2016, United contracted with MultiPlan to use its claims repricing services for parts of its business, and further expanded such use in 2017.

- Other Health Insurers also began using MultiPlan to reprice their out-of-network claims around the same time.

106.    MultiPlan has entered into contracts with over 700 healthcare payors, including with the top 15 largest Health Insurers, and has told investors that it "is a Core Strategic Partner to All Top Commercial Payors."[16]  This shift reflected an understanding among major Health Insurers that they all had to undertake their scheme together to ensure its success.

107.    These agreements set forth how Health Insurers will transmit the out-of-network claims they receive to MultiPlan, how MultiPlan will handle the claims once it receives them, and what repricing method would be used.  In other words, Defendants have entered into agreements that explicitly discuss the methodology they will use to fix prices for out-of-network services.

---

[16]    *MultiPlan Q2 2020 results and Business update*, MultiPlan (Nov. 12, 2020), https://s26.q4cdn.com/607044225/files/doc_financials/2020/q3/MultiPlan-Q3-Earnings-Presentation_11-12-2020.pdf.

C.    **Market Definitions and Market Effects**

108.    The relevant product market for purposes of the Doctors' claims is the market for reimbursements paid by commercial insurers to healthcare providers for claims processed as out-of-network medical services.  In this market and its submarkets, healthcare providers like the Doctors function as sellers of out-of-network medical care, while the Defendants function as buyers of those services.  While healthcare providers can receive reimbursement payments from governmental sources, such as Medicare, Medicaid, and Tricare, those sources of payment are not viable alternatives for commercial reimbursements and do not compete against commercial health insurance.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *5–6, *9 (N.D. Ala. June 28, 2017) (noting that "[s]ellers of healthcare goods and services are not in a position to forgo sales to commercial buyers," in part, because "the prices paid to healthcare providers by the government programs . . . are lower than the prices paid for the commercial health plans").

109.    A widely accepted method for determining the scope of a relevant antitrust market is to assess whether a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market.  The tests employed by antitrust enforcement agencies in the United States, Canada, and European Union use a 5 percent increase in SSNIP, which is widely considered the appropriate value to identify a monopoly.  Despite decreasing reimbursement rates for out-of-network services substantially from the prior FAIR Health and UCR charges that existed in the pre-conspiracy period, healthcare providers continued to provide out-of-network services.  This suggests that a SSNIP would not result in a sufficient number of healthcare providers switching to other forms of reimbursement, such as services for government payors or in-network services.

31

110.    The relevant geographic market for purposes of the Doctors' claims is the United States.  Medical providers in the United States cannot practically turn to payors in other countries, where medical insurance is uncommon and nearly all medical care is administered by governments, for reimbursement for out-of-network services.  Healthcare providers can, however, practically turn to commercial insurers located in other parts of the United States.

**D.      How the Conspirators Depress Reimbursement Rates**

111.    MultiPlan markets Data iSight as a highly accurate, fair, and transparent way to calculate rates based on certain reasonable benchmarks.  In reality, MultiPlan manipulates Data iSight to generate artificially low reimbursement rates.  The reimbursement amounts offered to physicians are not a result of any defensible algorithm.  There is no adjustment for the local cost-of-living where the provider is located.  Defendants do not negotiate with providers dissatisfied with the reimbursement offered despite claiming that they do.  It is an iron-fisted repricing scheme.

112.    MultiPlan (like Ingenix) includes in its dataset payments made pursuant to network agreements.  As discussed above, in-network rates are heavily discounted and do not represent reasonable benchmarks for the reimbursement of out-of-network claims because a significant reason for accepting discounted in-network rates is the benefits that come with being in-network, *e.g.*, increased patient volume attributable to advertising and referral services.  No such ancillary value flows to out-of-network providers.  These in-network reimbursements are nonetheless fed to Data iSight by MultiPlan for the purposes of suppressing apparent "typical" or "median" reimbursement levels for out-of-network care.  Data iSight then formulates an "initial target reimbursement amount" that is detached from the "median" reimbursement rate for out-of-network providers.  The result is a "garbage in, garbage out" offered payment amount.

32

113.    After MultiPlan uses Data iSight to calculate this "fair" reimbursement value based on junk data, it "overrides" the algorithm by instructing Health Insurers to enter manual overrides, like caps and floors on payment.  These pre-agreed upon reimbursement rates are far less than the Health Insurer would otherwise pay, far less than the healthcare provider's claim for reimbursement, and far less than the UCR rate, *i.e.*, Fair Health, for the often life-improving services provided by practitioners such as the Doctors.  Overriding provides MultiPlan an additional means to control and coordinate Health Insurer behavior, thereby reducing member and provider "abrasion" and accelerating the Cartel's goal of suppressing industry-wide out-of-network reimbursement rates.  As discussed in Paragraphs 114–15, MultiPlan and the Health Insurer Defendants implement these overrides in concert.

114.    When a Health Insurer receives a claim from an out-of-network provider, the Health Insurer sends the claim to MultiPlan.  Next, MultiPlan can instruct Health Insurers to apply additional overrides to determine the final reimbursement amount.  Particularly critical here, the rate determinations generated by these overrides often do not take into account geographical differences in the cost of key inputs like labor.[17]  For example, paying around 120 percent of the government-set Medicare rate "sounds fair, maybe even generous," one MultiPlan document states, but this is "inherently misleading" because "the average consumer does not understand just how low Medicare rates are."[18]  Data iSight often recommends prices between 160 to 260 percent of Medicare rates, amounts former MultiPlan employees described as "ridiculously low" and

---

[17]    Any legitimate manner of calculating out-of-network reimbursements would take into account the geographic differences in the cost of providing medical care.  The cost of living, and therefore wages, varies widely state-by-state; and within states, it varies according to whether an area is urban, suburban, or rural.

[18]    *See* Chris Hamby, *In Battle Over Health Care Costs, Private Equity Plays Both Sides*, N.Y. Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-private-equity.html.

"crazy low."[19]

115.    After determining a payment amount via the Data iSight methodology, MultiPlan, on behalf of the Health Insurers, "negotiates" payment with providers on a take-it-or-leave-it basis.  If the medical biller tries to negotiate for a higher rate with MultiPlan then MultiPlan says it is not the Health Insurer and does not have authorization to increase the payment offer.  If the biller asks the Health Insurer how MultiPlan reprices its claims, the Health Insurer explains it is not responsible for MultiPlan's pricing.

116.    But it is not enough simply to force providers to accept the low payment amounts calculated by Data iSight.  To avoid patient backlash and subscriber loss for its Health Insurer clients, the Cartel must also ensure that providers will not seek to collect the unpaid portion of the bill from the patient.  So, MultiPlan conditions all offers of payment on the provider's promise not to "bill the Patient, or financial responsible party, for the difference between the Billed Charges and the Proposed Amount [*i.e.*, the payment offer]."

117.    Because virtually every major commercial healthcare payor in the United States is in on the repricing conspiracy, out-of-network providers are left with no practical option but to accept the reimbursement amount imposed by the Cartel.

### E.    Evidence of a Horizontal Price Fixing Scheme

118.    The conspiracy by the Cartel is supported by both direct evidence of a conspiracy (such as the written agreements, information shared and communications between co-conspirators, and public statements to healthcare providers and investors), and circumstantial evidence (such as their prior history of collusion, the high levels of concentration in the health insurance market, and the Cartel's many opportunities to collude).

---

[19]    *Id.*

34

119.    The Cartel members conspired to fix prices for the reimbursement of out-of-network medical services, because the lower prices were suppressed, the more money the Cartel members stood to make.  The Cartel members agreed, in writing, to coordinate their reimbursement strategies rather than to compete and agreed, in writing, on a common methodology by which to do so.  They exchanged confidential business information which, in a competitive market, they would (and were required to) have guarded from their competitors.  They capitalized on numerous opportunities to collude, often meeting to discuss openly how to further their scheme.

    i.    *MultiPlan and the Health Insurers Are Competitors*

120.    MultiPlan and the Health Insurer Defendants operate competing PPO networks.

121.    In an August 2020 presentation, MultiPlan's then-Chief Revenue Officer Dale White explained that MultiPlan "compete[s] with regional PPOs . . . and network aggregators[.]" In his more recent role as CEO, Mr. White admitted that "Our clients are our competitors; our competitors are our clients."

    ii.    *MultiPlan and the Health Insurers Nonetheless Agree to Fix Prices*

122.    As part of their anticompetitive agreements, *see* Paragraphs 123–36, the Health Insurers agree to work with MultiPlan to select a price it will use to "compensate" providers.  The agreement contemplates that this rate will be determined according to business criteria mutually agreed upon between the Health Insurer and MultiPlan.  That rate either could be a fixed dollar value or benchmarked to a percentage of the prevailing Medicare reimbursement rates.  Each agreement incorporates by reference MultiPlan's "Data iSight Preferences form," which sets forth the "overrides" that the Health Insurers and MultiPlan selected to apply to their claims.  Some versions contain an exhibit or amendment titled "Repricing Services" that allows the competing

35

Health Insurer to route its out-of-network claims to MultiPlan for repricing via a direct electronic data interchange or a web-based interface.

123.    One such example is the January 1, 2011, Network Rental Agreement between Aetna and MultiPlan, which was made public on December 22, 2021, when Aetna filed it with the Washington State Insurance Commissioner.   *See* Ex. C, Aetna Agreement Attachment 1 ("Statement of Work and Services").   That agreement reads, in relevant part, that MultiPlan will provide Aetna with an "integrated health cost containment program . . . .   The program will utilize proprietary and non-proprietary cost-savings methods which include: Entity Networks, Negotiation Services, Network Management Services . . . ." *Id.*

124.    Similarly, in 2014, Cigna and MultiPlan entered into Master Services Agreements that have been amended several times.   On April 1, 2015, Cigna and MultiPlan entered into Statement of Work No. 4, which was made public in November 2023 in *TML Recovery, LLC v. Cigna Corp.*, 8:20-cv-00269-DOC-JDE (C.D. Cal.).   This Statement of Work covered repricing of inpatient and outpatient services using MultiPlan's Data iSight product.   The publicly filed version of the Cigna Statement of Work is redacted and does not reflect the percent of savings MultiPlan gets paid on repriced claims.

125.    Beginning on July 1, 2017, United and MultiPlan entered into an explicit agreement to suppress out-of-network health insurance reimbursement prices.   United and MultiPlan implemented this agreement by means of an Amendment to the Network Access Agreement (originally entered by United and MultiPlan on January 1, 2010) stating that United would send out-of-network claims to MultiPlan via an electronic data interchange, MultiPlan would use its pricing methodology to "reprice" those submitted claims, MultiPlan would take over the negotiation of those submitted out-of-network claims, and finally United and MultiPlan would

36

split the revenue generated by underpaying providers for their out-of- network claims.

126.     MultiPlan has entered into additional such contracts with many other competing Health Insurers, including Horizon.  MultiPlan is Horizon's primary repricing company, engaging the Doctors to "negotiate" claims for services the Doctors rendered to Horizon insureds.  Horizon has publicly disclosed that it contracts with MultiPlan.  *See Cost Containment Express, LLC v. Horizon Healthcare Servs., Inc.*, 2017 WL 5951619, at *3 (D.N.J. Nov. 30, 2017) (noting in this discovery dispute that Horizon "already provided Plaintiff with information on its contract with MultiPlan, Inc.").

127.     A June 1, 2017, Administrative Services Agreement between Owens & Minor Medical, Inc. and a subsidiary of Elevance states that Elevance had begun using MultiPlan to set prices for out-of-network goods and services.  Specifically, Elevance began using MultiPlan's Data iSight pricing formula.

128.     MultiPlan openly admits to entering into these agreements with its competitors.  In its SEC financial filings and in investor calls, MultiPlan touts the number and scope of its contracts:

> We believe we have strong relationships with our customers, which include substantially all of the largest health plans and their [administrator] platforms.  Contract terms with larger customers are often three years and as many as five years, while mid- to small-sized customer contracts are often annual and typically include automatic one-year renewals.

129.     In 2021, Sean Crandell, the Senior Vice President of Healthcare Economics at MultiPlan, testified under oath that "all of the top 10 insurers in the U.S." are MultiPlan customers.  MultiPlan told investors the same thing in a 2020 presentation.

130.     As of October 24, 2024, MultiPlan touts on its website that "700 healthcare payors—including all 15 of the nation's top 15 healthcare payors" in the country have agreed to use MultiPlan's "payment" services and contribute to "bending the cost curve in healthcare"

through MultiPlan.[20]  Each of these "top 15" Health Insurers compete with MultiPlan's PPO networks to attract healthcare providers to become in-network and to induce healthcare providers to treat out-of-network patients through the payment of competitive reimbursement rates.[21]

131.    Health Insurers, too, admit to the existence of these agreements to healthcare providers, informing providers that they have "contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim."

132.    The Defendants' plan disclosures acknowledge the existence of the agreements. For instance, Aetna's May 2022 disclosures state that MultiPlan is one of its external pricing vendors and that it will use Data iSight to price out-of-network claims, including using a MultiPlan "advocate" to negotiate with providers on a member's behalf.  United also provides a disclaimer regarding out-of-network providers in which it states that one methodology that may be used to establish the reimbursement amount for out-of-network claims is Viant, a subsidiary of MultiPlan.

133.    Upon information and belief, every Cartel member knows that its competitors have entered into substantially the same agreement with MultiPlan.  They know these agreements require their competitors to use the same methodology—deploying the Data iSight "algorithm" to reduce claims according to their handpicked overrides—to fix the price of out-of-network

---

[20]    MultiPlan, https://www.multiplan.us/company/ (last visited Nov. 19, 2024).

[21]    According to the AMA's 2024 report on competition in health insurance markets, the commercial market for health insurance in the United States is highly competitive.  Ninety-five percent of the Metropolitan Statistical Areas tested have "highly concentrated" markets, and 47 percent are dominated by a single health insurer with 50 percent or more of the market share. *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n, 2, https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf (last visited Nov. 21, 2024).  Nationwide, the "Combined Blues" control approximately 42 percent of the United States market share, followed closely by United (15 percent), Elevance (12 percent), Aetna (12 percent), and Cigna (11 percent)—together, 92 percent of the U.S. market. *Id.* at 11.  The study concluded that "[t]he majority of health insurance markets are ripe for the exercise of health insurer market power."  *Id.* at 16.

healthcare.

134.    From the language of the agreements, they know that MultiPlan colludes with their competitors, the same way MultiPlan colluded with them, to ensure that the Cartel picks essentially the same (even if not identical) overrides of Data iSight's "fair" reimbursement rate.  Each of the members of the Cartel leveraged the agreements with MultiPlan to set reimbursement rates well below both (a) the amount a competitive market would bear, and (b) the amount of the out-of-network reimbursement rates set forth in the patients' SPDs.

135.    They know their competitors have all agreed to share their data with MultiPlan to facilitate Data iSight's operations.  So they know that they will benefit from their competitors' data in the same way that their competitors will benefit from theirs.

136.    Cartel members know how their competitors are exercising their rights under their agreements because, as described below, they regularly meet to discuss their efforts on behalf of the Cartel.

    iii. *Communications Between Cartel Members*

     a. Industry Meetings

137.    MultiPlan maintains a Client Advisory Board that hosts annual multi-day retreats for Health Insurer executives and regularly schedules other events with Cartel Defendants. MultiPlan's 30(b)(6) witness testified in *LD v. United Behavioral Health*, 4:20-cv-02254-YGR (N.D. Cal.), that the meetings bring clients together to discuss "industries" and so "the group that comes can talk amongst their peers."

138.    In 2019, MultiPlan hosted a Client Advisory Board meeting at the luxury spa resort Montage Laguna Beach in Orange County, California.  Executives from MultiPlan, United, Aetna, Cigna, Humana, and several other Health Insurers attended.

139.     John Haben, the former Vice President of Networks for United, and Rebecca Paradise, Vice President of Out-of-Network Strategy for United, attended.  Under oath, Ms. Paradise agreed that "a lot of people in the insurance industry" were also at the meeting.[22]  At the meeting, MultiPlan's then Vice President of Sales and Account Management, Dale White, presented on ways that commercial Health Insurers could "overcom[e] obstacles" with respect to cutting out-of-network pricing.  MultiPlan's presentations at Client Advisory Board retreats regularly cover cost reductions achieved through its claims repricing service.

140.     MultiPlan also uses the Client Advisory Board meetings to draw new members into the Cartel.  According to a 2017 MultiPlan document, the 2015 Client Advisory Board meeting featured prospective clients seated next to existing clients at dinner for this purpose.

141.     From September 26 to 28, 2021, MultiPlan's Client Advisory Board returned to the Montage Laguna Beach resort for another retreat.

142.     MultiPlan has hosted other such Client Advisory Board meetings on a regular basis, facilitating collusion among the members of the Cartel.  For example, the road shows hosted by MultiPlan provide additional opportunities for the members of the Cartel to conspire.

143.     Members of the Cartel have extensive additional opportunities to conspire through other industry linkages, for example, as members of industry associations such as AHIP (formerly "America's Health Insurance Plans").  Health Insurers including Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, Horizon, and many others are members of AHIP.

---

[22]     *Fremont Emergency Servs. (Mandavis) Ltd. v. United Healthcare Ins. Co.*, No. A-19-792978-B (Nev. Dist. Ct.), Trial Tr. vol. 11, at 229.

144.     As AHIP states, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests."  Indeed, AHIP's Board of Directors is a "who's who" of Health Insurer executives, including:

- David Cordani, Chairman and CEO of Cigna;

- Gary St. Hilaire, President & CEO of Horizon;

- Gail K. Boudreaux, President and CEO of Elevance;

- Sarah London, CEO of Centene;

- Bruce D. Broussard, President and CEO of Humana; and

- Maurice Smith, President, CEO and Vice Chair of Health Care Services Corporation.

145.     In addition, AHIP's 2024 Advisory Board includes, among other Health Insurer insiders:

- David J. Brailer, Executive Vice President & Chief Health Officer of Cigna Group;

- Bechara Choucai, Executive Vice President & Chief Health Officer of Kaiser Permanente;

- Kourtney Cruz, Senior Vice President, Government Markets of Independence Blue Cross;

- M. Catharine Moffit, Senior Vice President & Chief Medical Officer of Aetna; and

- Shawn Wang, Chief AI Officer of Elevance.

146.     It is no surprise that AHIP's chief executive, Mike Tuffin, came from United—the largest health insurer in the Country and architect of the Ingenix scheme.  Mr. Tuffin served as head of communications at AHIP from 2003 to 2012 before joining United as Senior Vice President of External Affairs from 2015 until December 2023 when he returned to lead AHIP.

147. AHIP hosts conferences, committee meetings, and board meetings multiple times a year where its members participate in private, closed-door meetings. In 2023, MultiPlan sponsored AHIP's Annual Conference. MultiPlan representatives also attended AHIP's 2023 Annual Conference from June 13 to 15 in Portland, Oregon.

148. The fact that members of the Cartel regularly gather together at closed door retreats such as MultiPlan's Client Advisory Board meetings, at MultiPlan's road shows, and at industry events such as AHIP's conferences, board meetings, and committee meetings is circumstantial evidence that their parallel conduct is part of a common scheme to suppress reimbursement rates.

149. A California federal court examining the Ingenix scheme held that plaintiffs challenging Ingenix's relationship with many of the same Cartel members sufficiently alleged a *per se* horizontal price-fixing agreement, in significant part based upon the opportunities to conspire provided by their concurrent membership in AHIP and attendance at AHIP events. *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1028 (C.D. Cal. 2011).

b. Communications with United

150. On or around October 1, 2015, MultiPlan sent United a presentation titled, "Data iSight: Maximize Savings Using a Patented Methodology." This presentation argued that United would substantially increase its revenues if it stopped independently pricing out-of-network reimbursements to healthcare providers and used MultiPlan's pricing methodology instead.

151. In 2016, Dale White wrote in an email to United executives stating that seven of United's top 10 competitors were using MultiPlan's repricing services. Mr. White urged that: "[i]mplementation of these initiatives in 2016 will go a long way to bring United back into alignment with its primary competitor group [*i.e.*, Blue Cross Blue Shield licensees, Cigna, Aetna] on managing out-of-network costs."

42

152.     Indeed, one of the recipients of Mr. White's email, Rebecca Paradise, explained that a key factor in United's decision to agree to use MultiPlan's out-of-network reimbursement suppression technology was that the technology "was widely used by our competitors."

153.     Mr. White told another United executive, John Haben, that by agreeing to use the 350 percent of Medicare rates formula in Data iSight, United would "be in line with another competitor" and "leading the pack along with another competitor." This information about competitor-pricing practices exploited competitively sensitive data that would not have been shared among Health Insurers but for the Cartel.

154.     In a September 8, 2016, email to Lauren Paidosh (another United employee), Mr. Haben wrote that "MultiPlan said seven of our top ten competitors use the tool today." He continued: "BCBS [Blue Cross Blue Shield] is even more aggressive and is accessing the option of moving DIS [Data iSight] up even higher to have IPR/OPR (R&C repricing) which is option 3 . . . ." In this email, Mr. Haben demonstrated specific knowledge of the pricing "option" adopted by United's competitive rival, Blue Cross Blue Shield, in MultiPlan's Data iSight program.

155.     In a non-public presentation that MultiPlan provided to United, MultiPlan explained that its proprietary pricing methodology would generate "significant savings," *i.e.*, underpayments to providers, "on non-contracted bills." MultiPlan also noted that, although its pricing methodology is "configurable," it is guaranteed to set out-of-network prices that are lower than the UCR prices for out-of-network claims that existed prior to the Cartel.

156.     After instructing Health Insurer Defendants on being in "alignment" at 350 percent of CMS, MultiPlan pushed to cut out-of-network reimbursement rates further. For example, in a September 29, 2019, presentation to United titled "Competitive Landscape for Cost Management," MultiPlan told United that it was 10 years behind its competitors in cutting out-of-network

43

reimbursements and urged United to cut its reimbursement rates further.

157. Mr. Haben later testified that United initially agreed with MultiPlan to suppress out-of-network claims in a less aggressive manner that put United in the "the pack of its peers." Over time, United became more aggressive and agreed with MultiPlan to implement lower reimbursement formulas in Data iSight, consistent with others in the industry. United reduced its payment ceiling from 500 percent of Medicare rates in 2016, to 350 percent in 2018, and 250 percent thereafter.

158. MultiPlan and United knew this was a substantial cut relative to FAIR Health and UCR out-of-network prices that predominated prior to the Cartel. In a secret August 2019 white paper that was disseminated to United and others, MultiPlan confided that Medicare-referenced pricing was "inherently misleading" because most people "do[] not understand how low Medicare rates are." The white paper continued, "[t]he gap between [billed charges] and the barebones Medicare reimbursement can be significant." In other words, Defendants price-fixing scheme was intentionally misleading, and calculated to generate significant underpayments for providers.

159. MultiPlan routinely shares these white papers with other members of the Cartel.

160. Recent reporting by *The New York Times* confirmed that MultiPlan acts as a middle man for the Cartel members to communicate. Its April 7, 2024, exposé stated that MultiPlan "told insurers what unnamed competitors were doing, documents and interviews show." *The Times* quoted Lisa McDonnel, a United executive, who wrote that "[MultiPlan] did not specifically name competitors but from what he did say we were able to glean who was who."

c. Communications with Cigna

161. In March 2016, officials from MultiPlan and Cigna met to discuss ways they could reduce out-of-network reimbursement rates. Cigna displayed a slide deck outlining how it planned

44

to work with MultiPlan to slash its out-of-network reimbursements. This meeting was attended by, among others, Terri Cothron, Cigna's Manager of National Ancillary & Non-Par Management, who was responsible for overseeing Cigna's contractual relationship with MultiPlan.

162. In advance of that meeting, MultiPlan sent Cigna an email with an attached presentation titled, "2016 Network Development Meeting: A Client's Perspective on Out-of-Network Costs." The presentation outlined how Cigna could redirect billions of dollars in out-of-network claims from providers to itself and MultiPlan. During the meeting, MultiPlan explained how Viant and Data iSight worked and how they could significantly lower reimbursements paid to providers for out-of-network claims.

163. After attending MultiPlan's presentation, Ms. Cothron confided to a co-worker that MultiPlan's Data iSight and Viant pricing methodology, "scares me."

164. Nevertheless, Cigna contracted to use MultiPlan's pricing methodology for Cigna's out-of-network claims shortly thereafter. Cigna used internal "Whitebook Reports" to keep track of how much money it earned by underpaying providers using MultiPlan's pricing methodology. Those reports contain line items for each out-of-network claim and the corresponding amount of "savings" generated by using MultiPlan's pricing methodology.

165. MultiPlan's communications with members of the Cartel shows how the price-fixing conspiracy unfolds in practice. They show that MultiPlan discloses pricing levels among competitors, recommends that they adopt parallel pricing, and then implements that pricing on behalf of the Health Insurers.

166. As it did with United, MultiPlan regularly shared competitive pricing data with Cigna. During a deposition in an ERISA litigation, when asked whether there was "any information that MultiPlan would not provide for Cigna if Cigna asked," the Cigna witness

responded: "from my experience, if I asked for information, they would provide it to me."

167.    Upon information and belief, MultiPlan has engaged in similar communications with Aetna, Horizon (along with other Blues), as well as the other members of the Cartel. This is confirmed by the fact that MultiPlan is providing the very same repricing services on behalf of Aetna, Horizon, and Elevance for the Doctors' claims. The claims at issue in this litigation were repriced, or at least repricing was attempted, by MultiPlan.

> d.    Defendants Use MultiPlan Tools As a Conduit to Exchange
>       Competitive Pricing Information Despite Being Competitors

168.    MultiPlan sends regular reports to competing Health Insurers about how little a healthcare provider is paid for out-of-network claims as a result of the Cartel's repricing. From these reports, the Health Insurer Defendants (and Cartel members more broadly) can monitor how well co-conspirators are adhering to their agreement to cause healthcare providers to be underpaid for out-of-network claims.

169.    In addition, MultiPlan recently increased its ability to exchange real-time pricing data and benchmarking information. In June 2023, it announced a new product in its Data and Decision Science solution suite: PlanOptix.

170.    PlanOptix is marketed as a direct response to its Health Insurer-competitors' demands. The product enables "access" to 400 billion "fully indexed" records. For example, a Health Insurer can "search a CPT code and understand the price of that particular service . . . at a provider under a certain network." Health Insurers told MultiPlan that "[i]t's not enough to simply get to the data and information because the records are vast." They wanted direct competitor pricing information. MultiPlan obliged.

171.    When MultiPlan first announced PlanOptix, it had already "ingested data on over 70 [Health Insurers]," including "all of the national major carriers as well as many of the regional

46

ones."

172.   At the Health Insurers' direction, MultiPlan enhanced PlanOptix to show competitor pricing data—"not just at a global level, but even at a service level right, labs and X-rays versus inpatient, inpatient versus outpatient."  MultiPlan explained that, using PlanOptix, Health Insurers would be able to answer questions such as: "Where do I sit versus my competitor?" and "How do I ensure that I'm negotiating correctly when I measure myself against my competitors?"

173.   In other words, PlanOptix enables the members of the Cartel to monitor one another's adherence to their agreement to suppress out-of-network reimbursements by eliminating price competition on out-of-network claims.  It does so by allowing Health Insurers to compare directly how much each competitor pays to a particular provider for a particular type of service.

174.   At the November 28, 2023, Bank of America Leveraged Finance Conference, Mr. White stated that the purpose of PlanOptix is to "enable payers to benchmark themselves against their competitors."

iv.   *The Cartel Has a Motive to Collude*

175.   Health Insurers, including all Health Insurer Defendants, were motivated to conspire with MultiPlan to get the benefit of Ingenix style-price fixing, under the "cover" of using a third party.  In an internal Cigna email, Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)."  Rather, Cigna "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates.  MultiPlan gladly, greedily, and anticompetitively complied.

176.   In exchange for its role in the price fixing scheme, MultiPlan receives a percentage of the spread, *i.e.*, the underpayment to healthcare providers (ordinarily between 5-7 percent, but as much as 9.75 percent, of the "savings" obtained by MultiPlan).  MultiPlan only makes money

for its "repricing" and "data integrity" services if the Cartel is successful in suppressing out-of-network rates.

177.    Similarly, the Health Insurer Defendants have an incentive to suppress payments to healthcare providers.  For clients serving as administrators of self-funded plans, the Health Insurer Defendants receive a "shared savings fee" or "processing fee" representing a percentage of the spread between the "billed amount" and the artificially suppressed "paid amount."  For fully funded plans, the insurance company makes money by spending less than MultiPlan's fee and by pocketing the high premiums their members pay for the right to choose their doctor.  The more the Health Insurer Defendants collude to suppress claim payment amounts, the more they make.  It is not uncommon for the Health Insurer and Multiplan to earn a "savings fee" that far exceeds the amount the provider receives for rendered care and treatment.  In the below example, for instance, Cigna's own data shows that Cigna collected three times more in "savings" fees from the employees' claim payment funds than the providers received for rending care.[23]

---

[23]    *TML Recovery, LLC v. Cigna Life & Health Ins. Co.*, 20-cv-00269 (DOC) (C.D. Cal.).

Employer Paid:      $4,123,512
Provider Received:   $1,021,875
Cigna Received:     $3,101,637

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE_A MT | SUM_CST_CNTMT_S AV_AMT | SUM_VNDR_AM |
| 3046 | $2,481,927.00 | $996,325.66 | $875,809.76 | $ 11,020,546.00 | $ 2,524,898.98 | $ 7,177,507.39 | $ 677,943.68 |

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE AMT | SUM_CST_CNTM T_SAV_AMT | SUM_VNDR_AM T |
| 579 | $524,694.89 | $100,400.30 | $94,409.69 | $ 1,369,662.00 | $ 243,044.39 | $ 708,977.54 | $ 56,510.77 |

| | BD | BE | BG | HR | HU | HV | HW |
|---|---|---|---|---|---|---|---|
| 1 | CHRG_AMT | ALLOWED_AMT | PAID_AMT | SUM_BILLED | SUM_ACCT_FEE_A MT | SUM_CST_CNTMT_ SAV_AMT | SUM_VNDR_AM |
| 306 | $392,367.00 | $78,033.22 | $51,655.53 | $ 1,190,955.00 | $ 333,695.10 | $ 942,481.62 | $ 84,903.12 |

Such fees, by definition, are "unreasonable."

> v.     *The Health Insurers' Repricing Activities Only Make Sense if There Is Collusion*

178.    A rational actor in a competitive market would not act against its own economic self-interest. Yet, the Health Insurers that joined the Cartel have engaged in actions that, without collusion, act against their self-interest in at least two ways.

179.    First, competitors like the members of the Cartel would not agree to exchange large volumes of competitively sensitive pricing information in the absence of a Cartel-like agreement. Yet, the Health Insurers have agreed to exchange data regarding claims submitted by healthcare providers, reimbursement offers made by Health Insurers in response to those submitted claims, and the actual amount paid in response to those claims, and allow that information to be shared with their competitors knowing that, by so agreeing, they too would gain access to their competitors data.

180.    In regular non-collusive relationships, Health Insurers jealously guard their pricing data as "business trade secrets." For example, a January 1, 2023, Administrative Services

Agreement between Blue Cross and Blue Shield of Alabama and the City of Orange Beach prohibits disclosure of the Health Insurer's "Proprietary Data," including "valuable trade secret[s]" such as "UCR limits" and "negotiated provider payments."[24]  A similar agreement between United and the Suwannee County School Board, effective May 1, 2023, prohibits disclosure of "Confidential Information," which includes "pricing, discounts, reimbursement terms, payment methodologies and payment processes, compensation arrangements, and any similar commercial information."[25]  Another agreement between Aetna and Webb County, effective January 1, 2017, prohibits disclosure of Aetna's "Business Confidential Information," including "rates, fees, [and] provider discount or payment information."[26]  All Health Insurer Defendants have similar provisions in their agreements with clients and other contracting parties.

181.    The data exchanged is voluminous.  In December 2021, MultiPlan had access to "over 3 petabytes of structured claims data from across 700 payer customers."  By June 2023, MultiPlan touted that it had "10+ petabytes of [claims] data."  As discussed, MultiPlan uses this data to share confidential pricing information among members of the Cartel in order to fix prices.

---

[24]    Administrative Services Agreement between Blue Cross and Blue Shield of Alabama and City of Orange Beach art. IV(B)(4) https://www.orangebeachal.gov/AgendaCenter/ViewFile/Item/815?fileID=6572 (last visited Nov. 19, 2024).

[25]    Administrative Services Agreement between United Healthcare Services, Inc. and Suwannee County School Board §§ 1, 7.2, https://digitalbell-bucket.s3.amazonaws.com/05017F03-5056-907D-8DE1-3CD69D226D7B.pdf (last visited Nov. 19, 2024).

[26]    Master Services Agreement between Aetna Life Insurance Company and Webb County § 9(A), https://agenda.webbcountytx.gov:8085/mindocs/2017/REG/20170626_724/149_Master%20Service%20Agreement%20-%20Aetna%20-%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%20%2335.pdf (last visited Nov. 19, 2024).

182.    The information exchange operated by the Cartel mirrors an agreement to restrain trade. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anticompetitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001) (Sotomayor, J.) ("Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive.").

183.    Second, such downward pressures on pricing should have had the effect of reducing Health Insurer members' access to out-of-network providers.  That does not appear to have happened.  The fact that it did not happen indicates collusion.  If a single Health Insurer entered into an agreement with MultiPlan to drastically underpay out-of-network claims, then healthcare providers would simply refuse to treat insureds of that Health Insurer.  As a result, the Health Insurer would face serious harm to the value and breadth of its insurance offering because out-of-network healthcare providers would refuse to provide treatment to plan participants, ultimately leading to a loss of customers for its insurance network.  The collusion across the largest Health Insurers in the nation means that providers have no such course of action.

184.    MultiPlan claims its tools are "a much better mechanism" for repricing claims "versus [Health Insurers] doing it themselves."  As MultiPlan's President of New Markets, Paul Galant, put it: "[I]f a payer decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours."  MultiPlan acknowledges that, without industry coordination, an independent Health Insurer cannot single-handedly depress reimbursements to providers.  But, through MultiPlan, which "can talk to the entire industry," all Health Insurers can agree to join the Cartel and eliminate the risk of individual conduct.  As MultiPlan explained in an internal presentation to members of the Cartel: The Cartel's incentives

51

are "completely aligned."

185.     Accordingly, the Health Insurers that have joined the Cartel have refrained from engaging in self-interested conduct that would destabilize the Cartel.  For example, MultiPlan's competitor-clients have abandoned efforts to in-source claims repricing activities despite the vast savings such efforts would generate and, in at least one case, spending considerable sums developing an alternative claims repricing product.

186.     As the nation's single largest commercial health insurance provider, United could analyze its own historical claims database to ascertain the most efficient pricing levels for out-of-network reimbursements.  It could then reprice claims received from healthcare providers based upon that data.  This would allow United to eliminate MultiPlan as a middle man, saving as much as 9.75 percent on each repriced out-of-network claim, an amount equal to hundreds of millions of dollars per year.

187.     In 2021, United created a product to do just that.  It was known internally as Naviguard, which one analyst described as "an in-house replacement for MultiPlan."  United developed a "roadmap" to terminate its contract with MultiPlan by 2023 in anticipation of Naviguard coming online.  Instead of following through with Naviguard, however, United abandoned the project and instead recommitted to the Cartel in January 2023 when it renewed its contract with MultiPlan.  This decision makes no economic sense absent a conspiracy.

188.     By the same token, MultiPlan was willing to sacrifice short-term revenues and profits to stabilize the Cartel and to keep the largest Cartel members in the fold.  As a result of MultiPlan's efforts to keep United in the Cartel by offering United discounted services, in the first quarter of 2023, MultiPlan experienced a 20.6 percent drop in revenues versus the first quarter of 2022 and a 30.7 percent drop in earnings before interest, taxes, depreciation, and amortization

versus the first quarter of 2022.[27]  MultiPlan's willingness, in the words of its CEO, to sacrifice "near-term financial impact" for its "long-term growth strategy," does not make economic sense absent its knowledge that United was important to the conspiracy.

vi.    <i>The Health Insurance Market Presents High Barrier to Entry</i>

189.    There are high barriers to entry into the health insurance market.  New entrants must be able to bear the expenditures of time and money required to develop a robust network of healthcare providers large enough to compete as a commercial healthcare insurer.  Even without developing an insurance network, significant capital outlays are required to establish and to operate as a commercial healthcare payor.  New entrants must also contend with the economies of scale and name recognition that incumbent Health Insurers possess.

190.    There are also steep regulatory hurdles to market entry.  The provision of health insurance is highly regulated and each state has its own varying regulations for the industry, leading to a patchwork system of licensing and compliance requirements that new entrants must navigate.

191.    The repricing services themselves also present a high barrier to entry.  To start a third-party repricing service, a new entrant would need to spend copious sums to develop source data and algorithms that effectively reprice out-of-network claims without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software.  As a result, it is unlikely that any company could effectively disrupt the Health Insurer's repricing

---

[27]    In an apparent effort to sweeten the deal and keep United in the cartel, on June 27, 2023, MultiPlan announced that John Prince, the former President and Chief Operating Officer of Optum, UnitedHealth Group's health services subsidiary, would join MultiPlan's board of directors.

53

scheme.

192.     These barriers to entry further solidify the dominance of the members of the Cartel by ensuring that any entity that tries to enter the market but rejects the Cartel's price-fixing scheme cannot undermine the Cartel members' ability to impose repriced reimbursement rates on healthcare providers for out-of-network services.  These barriers to entry are further circumstantial support for the existence of the alleged conspiracy herein.

### F.     Alternatively, the Cartel Constitutes a "Hub and Spoke" Conspiracy

193.     If the Cartel is found not to be a *per se* illegal "horizontal" price-fixing scheme between competitors, then the contract, combination, or conspiracy to unreasonably restrain trade and commerce as alleged would qualify as a "hub-and-spoke" scheme that is likewise *per se* illegal under the Sherman Act.  When viewed under this lens, MultiPlan serves as the "hub" of the conspiracy and the Health Insurers' agreements with MultiPlan to reprice their claims are the "spokes."  The "rim" of the conspiracy is the tacit agreement between the Health Insurers to all use MultiPlan's repricing methodologies to suppress out-of-network reimbursement payments.

### G.     Through Their Scheme, MultiPlan and the Health Insurer Defendants Illegally Restrained Compensation Rates for the Doctors

194.     Through the Cartel, MultiPlan and the Health Insurers drive up the costs of healthcare to line their own pockets.

195.     As discussed in Paragraph 11, medical healthcare costs are increasing nationwide and are projected to increase even more.[28]  Horizon itself has represented publicly that "rising inflation continues to impact spending for the foreseeable future."[29]  In fact, Horizon demanded of its largest client, the State of New Jersey's Employee Benefit Plan, a "24% increase for medical and a 3.7% increase for pharmacy benefits for active public workers, as well as a 15.6% increase in medical and a 26.1% increase in pharmacy benefits for public workers who retired before the age of 65."[30]  Presumably, Horizon provided some type of historical analysis or projection to justify such a brazen request.

196.     These price hikes are being passed down to patients.  In 2022, the New Jersey State Health Benefits Commission increased insurance premiums for public employees by 20 percent.[31] In July 2024, not long after Aetna joined Horizon as administrator of New Jersey's plans, the State recommended increasing premiums by an additional 17 percent on average.[32]

197.     The Health Insurer Defendants are all increasing costs nationwide.  In Georgia, for example, the rates for Cigna's individual medical plans were set to increase by an average of 39.7

---

[28]     *NHE Fact Sheet*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NHE-Fact-Sheet (last modified Feb. 17, 2023).

[29]     *Hearing on Horizon Blue Cross Blue Shield Application to Reorganize into a Not-for-profit Mutual Holding Company System*, State of N.J. Dep't of Banking and Ins. (2022) (written Testimony of Jennifer Velez, Executive V.P. for Health and Network Solutions).

[30]     Derek Hall, *N.J. public workers face big increase in health insurance rates in coming year*, NJ.Com (Jul. 23, 2022), https://www.nj.com/news/2022/07/nj-public-workers-face-big-increase-in-health-insurance-rates-in-coming-year.html.

[31]     Katie Sobko, *NJ local government employees face soaring health costs. What's happening*, Bergen Rec. (Oct. 29, 2024, 1:36 PM), https://www.northjersey.com/story/news/new-jersey/2024/10/29/nj-local-government-health-benefit-costs-soar/75904285007/.

[32]     Nikita Biryukov, *Rate hikes loom for public health plan premiums*, N.J. Monitor (Aug. 27, 2024, 6:58 AM),  )https://newjerseymonitor.com/2024/08/27/rate-hikes-loom-for-public-health-plan-premiums/.

percent in 2024. To justify this increase, Cigna blamed "the prices charged by doctors, hospitals, and other providers."[33] In Delaware, Aetna recently requested a 34.53 percent rate hike for its Affordable Care Act ("ACA") Marketplace plans, before settling for an average increase of 11.7 percent, while United requested an 18.2 percent increase for its small-group plan.[34] In Illinois, ACA Marketplace plans went up by an average of 10 percent in 2024, with some of the highest increases by Aetna (18 percent) and United (20 percent).[35] In Elevance's case, the insurer reported an operating revenue increase of $1.5 billion compared to the prior year quarter that was "driven by higher premium yields . . . and premium rate increases . . . ."[36]

198. While Health Insurer Defendants demand more money from insured and self-funding employers, that money is not going to pay the Doctors for their life-changing care for Health Insurer Defendant insureds. To the contrary, for the same services, under the same Plan terms, the Health Insurer Defendants pay less and less. The Doctors' annual reimbursement rates from the Health Insurer Defendants have plummeted.

199. The scope of total underpayment to healthcare providers is staggering:

- In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $15.6 billion;

---

[33] *Written Description Justifying the Rate Increase*, Cigna, 1, https://www.cigna.com/static/www-cigna-com/docs/ifp/m-23-fly-ga-georgia-part-ii-rate-justification.pdf (last visited Nov. 19, 2024).

[34] *Health Insurance Marketplace Data Released; Rates Finalized*, Del. News (Sept. 16, 2024), https://news.delaware.gov/2024/09/16/health-insurance-marketplace-data-released-rates-finalized/.

[35] 2024 Analysis of Illinois On-Exchange Plans, Ill. Dep't of Ins., 14, https://idoi.illinois.gov/content/dam/soi/en/web/insurance/companies/documents/2024-illinois-exchange-plan-analysis-eng.pdf (last visited Nov. 19, 2024).

[36] *Elevance Health Reports Third Quarter 2024 Results*, Elevance Health, 3, https://www.elevancehealth.com/content/dam/elevance-health/documents/earnings/3Q2024ELVEarningsRelease.pdf (last visited Nov. 19, 2024).

- In 2019, MultiPlan reported "savings" of $19.1 billion;

- In 2020, it reported "savings" of $18.8 billion;

- In 2021, it reported "savings" of $21.7 billion;

- In 2022, it reported "savings" of $22.3 billion; and

- In 2023, it reported "savings" of $22.9 billion.

200. These numbers are the tip of the iceberg in showing how devastating this scheme has been for healthcare providers and to the healthcare industry.

201. As discussed, out-of-network healthcare providers cannot avoid the anticompetitive effects of the Cartel. Providers have no practical ability to reject the Cartel's take-it-or-leave-it terms and attempt to negotiate a better reimbursement rate. According to MultiPlan on their own website, 99.4 percent of all out-of-network claims for inpatient treatment that are repriced by Data iSight are accepted by healthcare providers. MultiPlan claims that as little as 2 percent of Data iSight's repricing recommendations are appealed for all claim types.[37]

202. In short, the Health Insurer Defendants' tactics, which are straight from the Cartel's playbook, have worked. The Health Insurer Defendants, acting in concert with MultiPlan, simply do not pay the Doctors what they are owed.

203. Since 2018 and continuing through the present, the Health Insurer Defendants have refused to pay or underpaid the Doctors for medical services rendered to Health Insurer Defendant insureds who had out-of-network benefits. Each of the Health Insurer Defendant claims at issue in this case corresponds to a particular CPT code billed to a Health Insurer Defendant for services or supplies provided to that Health Insurer Defendant's insured.

---

[37]    MultiPlan, *Tackling Out-of-Network Medical Bills With Data iSight*, (June 23, 2023), https://www.multiplan.us/tackling-out-of-network-medical-bills-with-data-isight/.

204.     In total, the Doctors invoiced the Health Insurer Defendants more than $771 million for the services rendered to Plan members, which is consistent with 80th percentile FAIR Health for the services rendered.   After taking into account co-pays, co-insurance, cost-share and deductibles, the Doctors were paid around 8 percent of that amount.   The Health Insurer Defendants underpaid the Doctors by more than $706 million.[38]   The Doctors will identify the claims that were underpaid as a result of Defendants' participation in the Cartel's scheme in their initial disclosures.[39]

205.     More specifically, each Plaintiff estimates that Defendants' respective share of the more than $706 million underpayment is:

- $18.9 million for Heritage General and Colorectal Surgery, PA;

- $9.3 million for Heritage Laparoscopy and Acute Care Case Surgery, PC;

- $48.3 million for Heritage Surgical Group, LLC;

- $84.9 million for Aesthetic & Reconstructive Surgeons, L.L.C.;

- $3.7 million for ASP Surgical, LLC;

- $10.4 million for East Coast Aesthetic Surgery, P.C.;

- $7.4 million for Gregory J. Gallina MD PC;

- $73.0 million for Garden State Bariatrics & Wellness Center, LLC;

- $36.1 million for Jersey Integrative Health & Wellness, PC;

---

[38]     The threshold for claims at issue in this litigation are those with a date of service on or after May 17, 2018, which (1) were billed at or above $1,000 and underpaid by more than 50 percent or (2) were underpaid by $10,000 or more.

[39]     Attached to the Complaint as Exhibit A is a summary chart showing, for each Doctor, and each Defendant Insurer, the cumulative billed amount, the cumulative paid amount, and the cumulative underpaid amount for the claims at issue.   Upon execution of a HIPAA-qualified protective order, Plaintiff will disclose the underlying claims data.

- $2.0 million for JL Surgical LLC;

- $4.1 million for Marta General Surgery LLC;

- $11.5 million for New Jersey Spinal Medicine and Surgery, P.A.;

- $33.4 million for One Surgical Specialists LLC

- $4.3 million for Premier Spine and Sports Medicine PC;

- $95.2 million for Professional Orthopaedic Associates, P.A.;

- $21.4 million for Somerset Ambulatory Surgical Center, L.L.C.;

- $66.3 million for Somerset Orthopedic Associates, P.A.;

- $9.0 million for Spine Surgery Associates & Discovery Imaging, PC;

- $12.9 million for Surgxcel, LLC;

- $69.9 million for Urology Group, P.A.;

- $84.0 million for Vanguard ASC LLC; and

- $6.0 million for Weight Loss and Wellness Solutions LLC.

## III. THE HEALTH INSURER DEFENDANTS HAVE BREACHED THEIR ERISA FIDUCIARY OBLIGATIONS

### A. The Health Insurer Defendants Are ERISA Fiduciaries

206.    Each Health Insurer Defendant serves as the named claims administrator for one or more of the Plans and has discretion over the payment of claims. As the designated claims administrator, the Health Insurer Defendants act as an "administrator" under ERISA. 29 U.S.C. § 1002(16)(A)(i). The Health Insurer Defendants also each offer fully insured Plans, which are funded by the Health Insurer Defendant itself, not the sponsoring employers or other entities. For government-sponsored or church-sponsored Plans, which are not subject to ERISA, each Health Insurer Defendant also acts as a fiduciary.

59

207. ERISA provides that a "person" is a "fiduciary" with respect to a plan to the extent that "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Person" is defined broadly and encompasses corporations such as the Health Insurer Defendants. *Id.* § 1002(9).

208. The Health Insurer Defendants each qualify as a fiduciary of their ERISA-covered Plans, *i.e.*, both those for which they serve as an administrator and those that they fully insure, because, in both cases, the Health Insurer Defendant exercises authority and/or control respecting management or disposition of the Plan assets.

209. ERISA requires that each Health Insurer Defendant, as a fiduciary, must "discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries," including the Doctors, as assignees of the Health Insurer Defendant insureds. 29 U.S.C. § 1104(a)(1)(A)(i). Fiduciary status under ERISA may exist even if the plan documents purport to disclaim that the Health Insurer Defendant is a fiduciary.

210. In performing services for its ERISA Plans, a Health Insurer Defendant must not cause those Plans to engage in a transaction for which the Health Insurer Defendant knows or should know constitutes a transfer to, or use by or for the benefit of, the Health Insurer Defendant of the ERISA Plans' assets. 29 U.S.C. § 1106(a)(1)(D).

211. As fiduciary of its Plans, a Health Insurer Defendant must not "deal with the assets of the plan in [its] own interest or for [its] own account . . . ." 29 U.S.C. § 1106(b)(1).

212. Each Health Insurer Defendant has been assigned discretionary authority, as administrator of its respective Plans, to perform an ERISA-required full and fair review of each

60

claim denial that has been appealed by one of the Doctors or a Doctor's duly authorized representative. 29 U.S.C. § 1133(2). Accordingly, the ERISA regulations require that the Health Insurer Defendants also provide, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Doctors' individual claims for benefits. 29 C.F.R. § 2560-503.1(h)(2)(iii).

213.    The applicable regulations require additional information be provided beyond the above information, and provide that any review does not afford deference to any initial adverse benefit decision and is conducted by an appropriate named fiduciary who is neither the individual who made the adverse benefit decision that is the subject of the appeal nor the subordinate of such individual. 29 C.F.R. § 2560-503.1(h)(3).

## B.    The Health Insurer Defendants Refuse to Pay in Violation of ERISA

214.    The Health Insurer Defendants employed and continue to employ myriad strategies and tactics to avoid paying medical providers, including but not limited to:

- Forcing providers to re-submit otherwise completely proper claims;

- Reprocessing otherwise properly submitted claims;

- Falsely accusing providers of engaging in fraud or other misconduct to cut off any obligation to pay the provider and subject the provider to unjustified and pre-textual investigations by its Special Investigations Unit ("SIU")[40] (never referring the matter to prosecuting authorities, which New Jersey law requires);

- Making agreements and promises to pay the provider but never, in fact, making payment;

- Paying claims outside the required ACH transfer protocol required by HIPAA, including sending hard copy cash redemption cards for each claim to providers that would require them to either manually enter the cash

---

[40]    SIU is the name for the special investigation departments used by both Horizon and Aetna. Cigna refers to its special investigations department as the Special Investigations ("SI") team. For convenience, the Complaint refers to all such departments as "SIU."

redemption card 16-digit ID number or pay the 2-4 percent transaction fee for using the card—which the Doctors have come to learn would also net the Health Insurer Defendant a 1-2 percent fee for the use of the cards;

- Forcing providers to engage in unjustified and baseless appeals and then failing to respond to the appeals;

- Converting appeals to "inquiries" to avoid federal and state notice and documentation requirements;

- Threatening to make a payment directly to the patient in an effort to extract a concession from the provider to accept a lower than required payment;

- Conjuring improper and unjustified problems with the claims submitted to justify either non-payment or reduced payment;

- Wrongfully processing claims by out-of-network providers as if they were claims submitted by in-network providers or wrongfully categorizing an entire out-of-network practice as an in-network practice, allowing the Health Insurer Defendant to apply an improper "discount" to reduce the payment amount or to justify non-payment; and

- Falsely representing that Plans require the Health Insurer Defendant to treat out-of-network providers as in-network providers.

215. Upon information and belief, the Health Insurer Defendants' refusal to comply with applicable regulations, the Plans, and procedures governing the payment of claims, is institutionalized activity undertaken with the full knowledge and ratification, and at the direction, of all levels of management of the Health Insurer Defendants, including their officers and their Boards of Directors.

216. Each claim for non-payment or underpayment is being brought within six years after the Doctors were notified by the Health Insurer Defendants that it was rejecting or dramatically underpaying the Doctors' claims for the services provided to Health Insurer Defendant insureds, or otherwise within six (6) years after each of the Doctors' claims against the Health Insurer Defendants accrued, after accounting for any tolling agreements.

i.    *The Health Insurer Defendants Abuse the Repricing Process to Prevent Payments to the Doctors*

217.    As detailed above, the Health Insurer Defendants engage "repricing" companies to coerce, harass, induce, and threaten the Doctors' billing staff in order to delay payment until the Doctors relent and agree to accept an amount well below the incurred amount.[41]  As set forth at Paragraphs 115–17, this repricing "negotiation" is a feature of the Cartel's anti-competitive conspiracy.

218.    The Health Insurer Defendants will almost always process these repriced claims as if the Doctors are in-network providers and have already agreed to participate in their "negotiation" process[42]—another tactic commonly used by the Cartel.  *See* Paragraph 214.

219.    Each Doctor has been forced to engage in thousands of these negotiations despite the fact that the Health Insurer Defendants routinely pre-authorize treatments and accept the Doctors' claims when submitted for payment.

ii.    *The Health Insurer Defendants Wrongfully Engage in Pre-Payment Audits and Refer the Doctors' Claims to Their "Special Investigations Unit" or "Special Investigations" Team*

220.    In addition to improperly participating in the Cartel, which is itself a violation of their fiduciary duties, the Health Insurer Defendants also initiated SIU pre-payment "audits," or pre-payment review generally, for purposes of delaying payment and coercing the Doctors to accept severely reduced payments during the "negotiation" process with the repricing companies.

---

[41]    Zelis is MultiPlan's main competitor.  As a testament to the success of the Cartel, according to a June 28, 2023, MultiPlan presentation, in 2022 MultiPlan processed around 546 million claims for repricing, while Zelis processed around 2 million.  Using these numbers as an estimate of market share, Zelis holds less than 0.4 percent of the market compared to MultiPlan's 99.6 percent market share.

[42]    The Health Insurer Defendants will also process the Doctors' claims as "in-network" claims in the 835 and deny or delay payment on the claim on that basis.  Representatives of the Health Insurer Defendants have admitted this in recorded phone calls with the Doctors' employees.

221.   By way of example, after attempting to negotiate several claims with Horizon, Jersey Integrative received a "retrospective review" letter from Horizon's SIU department in May 2021 requesting all medical records with respect to over 135 outstanding medical claims worth nearly $1 million.  Seven of the largest of these claims had billed a total of $277,240 alone, with Horizon offering only $17,224.35, or just 6 percent of the billed amount.  In response to Horizon's SIU letter, Jersey Integrative stated that HIPAA prohibits such blanket, non-particularized requests for medical records.

222.   The Health Insurer Defendants have substantially limited their payments, and in some instances stopped paying the Doctors altogether, for the treatment and care of the Health Insurer Defendants' patients.  Almost every time a Doctor submits a claim, the Health Insurer Defendant's response is to send a letter requesting additional information.  This exemplar from Horizon is substantially similar to the letters the Doctors receive from Aetna and Cigna:

> Dear Provider (Facility Greeting) or Health Care Professional (Professional Greeting):
>
> Horizon Blue Cross Blue Shield of New Jersey received the above-noted claim on [date].  We need additional information before we can process this claim.
>
> **For tracking and timeliness, you must send a copy of this letter and the following documentation.**  If the requested information is not received by **05-25-2023**, we will not consider the claim for payment.
> - Copies of Patient Intake forms
> - Daily Chart notes / Progress notes
> - Laboratory testing results / requisition forms
> - Diagnostic testing results
> - Operative reports
> - Anesthesia records
> - Consultant records /reports
> - Nursing notes

64

223. The Health Insurer Defendants also engage third-party companies, like TurningPoint HealthCare Solutions, to send similar pre-payment audit requests. Often these requests demand a substantial amount of medical records and threaten to deny claims unless a response is provided within a limited timeframe, often 10 days. The Health Insurer Defendants subject providers, including the Doctors, to these pre-payment audits even after the Health Insurer Defendant has represented that no pre-authorization is required and even after the Doctors sought and/or obtained pre-authorization (including medical record review) from the Health Insurer Defendant. Even after a Doctor complies with the Health Insurer Defendants' arbitrary requests for voluminous amounts of medical data, the Health Insurer Defendants further delay payment by demanding additional information.

224. For instance, in April 2021, Dr. Christoudi of Heritage Surgical performed a laparoscopic surgery to remove United insured Patient 1's ovary or fallopian tube. The Doctor obtained pre-authorization and confirmed the patient's maximum allowable contribution for the applicable CPT codes. Following the surgery, the Doctor submitted a claim for $20,055.00, consistent with the 80th percentile of the FAIR Health rate. In April 2021, MARS offered to settle the claim for a mere $280.13, which the Doctor rejected. On July 25, 2021, United sent a letter demanding additional medical information before it would pay the claim. In January 2022, even after receiving the requested information, United paid the Doctor just $96.02. In August 2023, United sent a second repricer, MultiPlan, who offered $6,362.00. The Doctor counteroffered $16,044.00, a more than reasonable discount (and one to which the provider was under no obligation to agree). Following these negotiations, United paid an additional $1,985.06 (less than MultiPlan's offer) with a note stating "we paid the provider according to your benefits and data provided by Data iSight." In total, United paid just $4,162.16 for this procedure—just 20 percent

65

of the billed amount.

225.    In September 2023, Dr. Radvinsky of Heritage Laparoscopy performed an emergency laparoscopic hernia surgery on Patient 2, a Cigna insured.  The No Surprise Act applied and pre-approval was not required.  Following the surgery, the Doctor submitted a claim for $37,936, consistent with the 80th percentile of the FAIR Health rate.  On November 2, 2023, MultiPlan sent a negotiation offer of $294.07 and, in blatant violation of the No Surprises Act, claimed that one of the two CPT codes were not covered by Cigna.  The Doctor rejected the offer, MultiPlan countered with $310.29, and the Doctor countered with $30,348.80—a reasonable reduction in the billed amount.  After the MultiPlan negotiations failed, Cigna issued an EOB reasserting the claim was not covered and paid Heritage $294.07.  The EOB falsely stated that the Doctor had agreed to a $37,173.04 "discount," indicating the claim was wrongly processed as in network.  In a subsequent recorded call, Cigna claimed that its reimbursement rate was "repriced" by MultiPlan.  The Doctor promptly appealed.  On April 1, 2024, without responding to the appeal, Cigna requested all medical records for the service.  The Doctor responded that HIPAA prevented the Doctor from sharing the patient's entire medical record.  Rather than particularize its request as required under HIPAA, Cigna contracted with MARS to negotiate a final offer of $398.95, which Heritage again rejected.  To date, Cigna has paid just $4,101.89 for this claim—11 percent of the billed charges.

226.    Interposing unilateral deadlines and delay, demanding substantial amounts of (irrelevant) information for many of the Doctors' requests for payment, even after pre-authorization is provided, and sending "negotiated" claims to the Health Insurer Defendant's SIU are inconsistent with applicable regulations and each Health Insurer Defendant's published requirements for perfecting a submission for payment.  On information and belief, the sole purpose

66

of this activity by the Health Insurer Defendants is to delay or reduce claims and to manufacture an additional non-substantive, artificial basis to deny and force severe underpayment of the Doctors' claims.

227.    The Health Insurer Defendants sent each Doctor dozens and dozens of these pre-payment audit letters, far more than their meagerly staffed SIUs could ever hope to process.  Given the nature and frequency of the SIU letters that the Doctors received, it seems unlikely, if not impossible, that the Health Insurer Defendants are engaged in a manual review of these claims submitted.  On information and belief, the Doctors believe that the SIU letters and pre-payment review letters are being generated automatically.

iii.    *The Health Insurer Defendants' Payment of Claims Is Arbitrary and Unrelated to What Their Own Plans Require*

228.    When a Doctor engages on claim-specific discussions or claim-specific negotiations with the Health Insurer Defendant or its representatives, the specific terms of the SPD or the Health Insurer Defendant's payment obligations associated with those terms are never referenced or discussed.  Instead, each Health Insurer Defendant refuses to pay the amounts the underlying Plans require and makes payment decisions based on arbitrary and inapplicable standards.

229.    For example, in June 2023, Dr. Christoudias of Heritage Surgical performed a non-emergent colectomy on Patient 3, a Horizon insured.  Prior to commencing the surgery, the Doctor obtained pre-authorization to confirm coverage and the patient's maximum allowable contribution for the applicable CPT codes.  Following the surgery, the Doctor submitted a claim requesting payment of $39,195.00, consistent with the 80th percentile of the FAIR Health rate.  On July 27, 2023, the Doctor received an offer from MultiPlan for $2,263.  The Doctor counteroffered for $33,315.75.  The Doctor appealed the payment decision by letter on July 27, 2023.  In response,

67

Horizon falsely claimed that "the services were rendered as a result of emergency room care" subject to the Out-of-Network Consumer Protection, Transparency, Cost Containment and Accountability Act, and therefore the Doctor is "prohibited from balance billing" the patient. Horizon stated that because the Doctor had rejected MultiPlan's offer, its final offer for payment was $460.66. Horizon ultimately paid just $2,179.12—less than 6 percent of the billed amount.

230. In another example, in October 2023, Dr. Marta of Marta performed a non-emergent gallbladder removal surgery on Patient 4, a Horizon insured, at the Doctor's outpatient facility. Horizon pre-approved the CPT codes and confirmed the patient's maximum allowable contribution, directly with both the provider and the member. The Doctor submitted a claim requesting $25,818.00, consistent with the 80th percentile of the FAIR Health rate for the services. On November 11, 2023, MultiPlan offered to pay the Doctor $833 to settle the claim. The Doctor responded with a counteroffer of $21,945.30. MultiPlan countered with $874, and on a subsequent recorded call notified the Doctor that $874 was Horizon's maximum, even though the services were covered, and stated Horizon did not give a reason for the underpayment. On November 24, 2023, Horizon returned an EOB offering a mere $920.63—less than 5 percent of the billed amount—and falsely claiming the services were subject to the No Surprises Act. Both the Doctor and the member appealed. On March 11, 2024, Horizon admitted in its response "that the claim does not apply to the No Surprises Act Mandate" but nonetheless refused to make any additional payment.

231. In yet another example, in May 2023, Dr. Christoudias of Heritage Surgical performed a non-emergent laparoscopic hernia surgery on Patient 5, a United insured. The Doctor received pre-approval from United that the CPT codes were each covered under the patient's plan, and the patient's maximum allowable contribution. After the surgery, the Doctor submitted a

68

claim for $121,808.00, consistent with the 80th percentile of the FAIR Health rate. Nonetheless, United contracted with MARS to offer a mere $14,579.76. The Doctor countered with $103,536.80. On a recorded phone call, MARS told the Doctor that, according to United, half of the billed charges were not covered under the Plan. The Doctor explained that United approved all CPT codes as covered. The MARS employee admitted the reimbursement process "is getting bad," like "trying to get blood out of a turnip." The employee explained that providers get pre-approval "yet the claims will come to us and there are non-covered charges on here, and I am going OK, where is the disconnect?" "Nothing surprises me about it anymore," she added. After the Doctor rejected MARS's offer, United offered a mere $1,393.68—just over 1 percent of the billed amount.

232. Cigna is no different. In January 2024, Dr. Radvinsky of Heritage Laparoscopy performed a non-emergency abdominal surgery on Patient 6, a Cigna patient. Prior to the surgery, the Doctor obtained authorization for the at-issue CPT codes and confirmed the patient's maximum allowable contribution. The Doctor submitted a claim for $36,641.00, consistent with the 80th percentile of the FAIR Health rate. MARS offered $1,804.40, and the Doctor generously countered with $31,144.85. On a recorded phone call, a MARS employee complained about the general state of reimbursement negotiations, stating "we just can't keep going down this" road. "Everything was fine" when the payors were all using FAIR Health, she explained, but "now, all of a sudden, [FAIR Health] isn't good enough anymore." "It's insanity right now, something has to change," she added. Cigna ultimately paid $1,804.40 (5 percent of the billed amount), the maximum offered by MARS.

233.    The Health Insurer Defendants have also refused to pay the Doctors for claims citing to the Doctors' failure to comply with the No Surprises Act.  This Act only applies to emergency and ambulance services and is thus inapplicable to the vast majority of the Doctors' claims.

234.    When the Health Insurer Defendants do pay, their payment patterns are completely unjustified and wholly arbitrary.

### C.    The Health Insurance Defendants' Actions Have Rendered the Appeals Process to a Farce

235.    Each Plan administered by a Health Insurer Defendant has procedures for administrative appeal of claim adjudication.  After receiving rejections and/or offers to pay substantially below the charged amount, each Doctor exhausted the available appeals or such appeals have been rendered futile given the Health Insurer Defendants' refusal to process appeals consistent with 29 C.F.R. § 2560.503-1.  Each Doctor filed internal appeals, with the result being that the Health Insurer Defendants adhere to their initial decision or, more commonly, mischaracterize the appeal as an "inquiry" and punt the matter to a repricing company.

236.    Since 2018, each Doctor has initiated appeals on the at-issue claims.  By significantly underpaying the Doctors' claims, each Health Insurer Defendant forces the Doctors to engage in an appeals process.  Each of the Health Insurer Defendants have largely rejected the Doctors' appeals, affirming their original adjudication or making a nominally higher additional payment.  This is by design.  As the appeals serve as a pre-textual basis for delaying and denying payment on otherwise valid claims.

237.    The Health Insurer Defendants refuse to provide any meaningful response to these appeals or, in many cases, simply reaffirm their initial reimbursement without explanation.  Even if a Doctor reaches an agreement with the Health Insurer Defendant, the Health Insurer Defendant

70

often fails to pay the amount demanded on appeal.  It is futile for the Doctors to continue to seek internal or external appeals with the Health Insurer Defendants for any further claims payments.

238.    Often after a Doctor has initiated an appeal, the Health Insurer Defendant will freeze the appeal until a "signed member authorization" is received.  Even after a Doctor provides a member authorization, the Health Insurer Defendant will often reject the authorization claiming it is "not valid for the member's Home Plan."

239.    For some claims for Blue Cross insureds, the Health Insurer Defendants also send appeals to members' "Home Plans" for review and advise the Doctors to "contact the member" directly if no response is provided from the member's Home Plan within a certain period of time.

240.    To the extent some of the claims at issue are covered by non-ERISA Plans, each Doctor has likewise completed the internal appeals.  The Health Insurer Defendants, however, simply affirm their initial decisions or pay slightly higher amounts, providing little or no analysis, and leaving the claims still grossly underpaid.  Accordingly, any additional attempts to appeal any of the Health Insurer Defendants' claims would be futile.

241.    Because seeking appeals results in little to no adjustment to the initial payment, and because each Health Insurer Defendant refuses to provide any meaningful response to the Doctors' appeals, or in most cases, simply reaffirms its initial payment amount without explanation, it would be futile for the Doctors to continue to seek internal or external appeals with the Health Insurer Defendants.

242.    Moreover, the Health Insurer Defendants have failed to follow the notice and appeal requirement that they explain the basis for its dramatic underpayments to the Doctors.  *See* 29 C.F.R. § 2560.503-1(g).  In particular, each Health Insurer Defendant has issued adverse benefit determinations as defined under 29 C.F.R. § 2560.503-1(m) for the Health Insurer Defendant

71

claims and has failed or refused to: (a) provide the reasons for the denial of claims; (b) provide the specific Plan provisions relied upon to support the denials; (c) provide the specific rule, guideline or protocol relied upon in making the decision to deny claims; (d) describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; and (e) notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims.

243.     Exhaustion is therefore futile pursuant to 29 C.F.R. § 2560.503-1(l) because the Health Insurer Defendants have failed to follow the minimum standards required under ERISA and its regulations.

244.     In addition, in their appeals to the Health Insurer Defendants for the at-issue claims, each Doctor has requested the following information related to each denial: (a) all contracts detailing any and all contractual obligations with the Health Insurer Defendant; (b) Plan documents specifically identifying a "Legislative Fee" schedule; (c) the identity of the "Originating Payer" [the Plan]; (d) the "reassociation" and trace information associated with the claim from the Plan; (e) Plan documents specifically identifying the adjustment reason utilized in the EOB; (f) the Health Insurer Defendant's definition and/or explanation of all standardized Claim Adjustment Reason Code utilized in its ERA; (g) the identity of the "Plan" [Tax ID #] and its Originating Depository Financial Institution ("ODFI") information; (h) the HIPAA required Electronic Data Interchange policy and procedures; (i) the claims processing manual which identifies the provider requirements for submission if different than HIPAA standards; (j) all adjustments codes utilized if the standardized "CARC," "RARC" and Group Codes are not used; and (k) all anti-assignment provisions consistent with State and Federal regulations. Each Health Insurer Defendant has refused to provide the above requested information in violation of 29 U.S.C. § 1133(2) and 29

72

C.F.R. §§ 2560.503-1(h), (m)(8).

245.     Exhaustion is therefore futile pursuant to 29 C.F.R. § 2560.503-1 because the Health Insurer Defendants have failed to provide the requested documents necessary for the Doctors to evaluate the claim denials and otherwise failed to follow the minimum standards required under ERISA and its regulations.  The Health Insurer Defendants have thus offered no meaningful administrative process for challenging their underpayment and denial of claims.

**D.     The Health Insurer Defendants Waived the Applicability of Any Anti-Assignment Clause**

246.     It is also the Doctors' practice to obtain from the patient an assignment of benefits. Through this assignment, the Doctors obtain the right to seek reimbursement or payment from an insurer for covered services provided to the patient.  Each Doctor obtained an assignment for its respective at-issue claims.  As part of the pre-approval process, the relevant Health Insurer Defendant acknowledges that each Doctor has a valid assignment of benefits.

247.     An excerpt of an assignment of benefits signed by each patient reads as follows for Plaintiff Heritage Surgical Group:

**PATIENT FINANCIAL RESPONSIBILITY, CONSENT &
ASSIGNMENT OF BENEFITS FORM
Assignment of Benefits**

I hereby assign and convey directly to the above designated provider [Plaintiff Heritage Surgical Group], as my Statutory Derivative Beneficiary (SDB), commonly known as designated authorized representative or assignee, all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services, treatments, therapies, and/or medications rendered or provided by the above named health care provider, regardless of its managed care network participation status. I understand that I am financially responsible for all charges regardless of any applicable insurance or benefit payments. I hereby authorize above designated provider to release all medical information necessary to conduct Treatment, Payment and Healthcare Operations (TPO) to the fullest extent allowed under HIPAA. I authorize the use of this signature on all my insurance and/or employee health benefits claim submissions.

. . . .

I hereby consent to any and all causes of action allowed under applicable state and federal laws related to my health care benefit plan, employee benefit plan, plan administrator, insurance carrier or fiduciary in my name, with derivative standing, at provider's expense. This includes but is not limited to; 1) pursuing claims, causes of action or right against any liable party, insurance company, employee benefit plan, health care benefit plan, plan administrators or plan fiduciaries; and 2) claim any applicable statutory penalties and fee's on behalf of the plan participant, beneficiary or the plan to the extent of state and federal law(s).

This assignment is valid for any and all administrative and judicial reviews under PPACA (health care reform legislation), ERISA, Medicare, and applicable federal and state law(s).

248.    For each claim at issue, the Doctors possess a valid assignment of benefits, which will be produced in discovery. On information and belief, the Plans do not prohibit the Health Insurer Defendant insureds from assigning their Plan benefits to the Doctors.  Indeed, most expressly permit the Health Insurer Defendant insureds to assign their benefits to health care providers; others are silent on the issue.  *See N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 372-73 (3d Cir. 2015) ("We hold that as a matter of federal common law, when a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a).  An assignment of the right to payment logically entails the right to sue for non-payment.").  Plans that prohibit assigning benefits or the right to benefits under any plan administered by a Health Insurer Defendant to any third party are the exception and not the rule.

249.    If a Plan has an anti-assignment clause or provision, then that clause or provision appears in a Plan's SPD.

250.    Health Insurers can waive the applicability of any anti-assignment clause that a plan document may impose through their conduct or omissions.

3212.000/2106158.1

251.     The Health Insurer Defendants, through their conduct and through the conduct of their agents, waived the applicability of, and/or are estopped from enforcing, any anti-assignment clause to prevent, interfere, or otherwise obstruct the payment of any claim directly to the Doctors. The Health Insurer Defendants and their agents have done so through verbal representations, written representations, and conduct.

252.     The purpose of the anti-assignment clause has nothing to do with payment of providers who care for, treat, or cure Health Insurer Defendants' insureds.  Its purpose is to prevent the insureds from sharing their health insurance card with non-insured or under-insured people to obtain coverage for care or treatment.  The Health Insurer Defendants have intentionally misinterpreted this restriction to interfere with the obligation to pay for properly rendered medical services.

253.     The Health Insurer Defendants have waived their right to invoke, or alternatively, are estopped from invoking, any anti-assignment clause for the following reasons:

- Each Health Insurer Defendant acknowledged before patients were treated that the patients had insurance coverage through that Health Insurer Defendant and identified the maximum amount of patient out-of-pocket responsibility for each service;

- When each Health Insurer Defendant accepted the original HCFA or 837 EDI transaction, it was identified as being submitted for payment pursuant to an assignment.  None of the Health Insurer Defendants ever rejected an HCFA or 837 EDI transaction for any claim at issue on the basis that it was submitted pursuant to an improper "assignment";

- In the last six years, no Health Insurer Defendant has ever rejected any Doctor's claim, including those at issue, on anti-assignment grounds;

- On information and belief, and discovery will confirm, each Health Insurer Defendant identifies each relevant claim or claim line as being a claim submitted pursuant to a proper assignment.  Such treatment would be consistent with the manner in which other large health insurance companies track claim-specific data internally.  None of the Health Insurer Defendants have ever rejected any Doctor's claim at issue on the grounds that it was

75

subject to an anti-assignment clause;

- None of the Health Insurer Defendants track, nor do they have the ability to track for purposes of claims adjudication, whether a claim submitted relates to a Plan that may have an anti-assignment clause in its SPD;

- None of the Health Insurer Defendants refer to any particular Plan's SPD when adjudicating claims, much less any specific clause or section;

- On information and belief, and discovery will confirm, none of the Health Insurer Defendants' claims adjudication rules or claim processing rules for the largest Plans contain descriptions or notations that the Plan is subject to an anti-assignment clause;

- For the past six years, each Health Insurer Defendant has regularly made payments directly to the Doctors, whether the patient was in a Plan with an anti-assignment provision in the Plan's SPD or not;

- Each Health Insurer Defendant has an affirmative, regulatory obligation to notify the Doctors of *all* grounds for adjustment or non-payment. When generating 835s or Electronic Remittance Advice to return to the Doctors in connection with each claim, the Health Insurer Defendants have never included a comment, statement, or justification that the claim was accepted, adjusted, or paid less than the charged amount as a result of a Plan-specific anti-assignment clause;

- As discussed at Paragraphs 235–45, each Doctor has engaged in countless appeals, inquiries, and negotiations regarding the claims at issue. No appeal, inquiry, or negotiation has been rejected by any Health Insurer Defendant or by any repricing company acting on its behalf as a result of an anti-assignment clause in any Plan;

- Further, in connection with any specific appeal, inquiry, or negotiation, no representative of any Health Insurer Defendant, or agent of any Health Insurer Defendant working for the repricing companies, has ever invoked the anti-assignment clause as a justification for the resolution of or position regarding any claim-specific appeal, inquiry, or negotiation. To the contrary, in innumerable hours of recordings of these negotiations, the Health Insurer Defendant's employees or the employees of the repricing companies acting on the Health Insurer Defendant's behalf, always freely admit that they do not have before them and have never reviewed the SPD of the Plan to which the claim may pertain. Many case representatives even admit that they do not know what an SPD is;

- None of the Health Insurer Defendants responded to the Doctors' claims by rejecting the claims as being in violation of the anti-assignment provision of any Plan, but instead by (a) initiating a Special Investigations Unit

76

inquiry before any claim was paid; (b) requesting additional information related to the claim, including a request for patient medical records; or (c) trigging some other type of pre-payment review or condition.

254.     No Doctor is aware of a single claim at issue that a Health Insurer Defendant rejected because of an anti-assignment clause.

**E.     HIPAA Requires the Health Insurer Defendants to Deal with and Pay Doctors Irrespective of Any Anti-Assignment Provision**

255.     HIPAA governs transactions among health plans, health insurers, and providers. The applicable statutes and regulations cannot be avoided or abrogated by agreement—including a provision in a health plan being invoked for reasons other than its intended purpose—to avoid a payment obligation.

256.     Each Health Insurer Defendant has represented to licensing bodies and regulatory agencies that it complies with all applicable HIPAA regulations.

257.     Each Health Insurer Defendant has represented and warranted in agreements with its insureds that it will comply with all HIPAA regulations.

258.     The HIPAA regulations *require* the Health Insurer Defendants to pay the Doctors independent of any potentially applicable anti-assignment clause.

259.     HIPAA, as augmented by the Affordable Care Act and supporting regulations, requires health care transactions to be conducted in a certain manner and requires certain standard EDI transactions of all participants in the health care ecosystem.  42 U.S.C. § 1320d-1(a).  This "Administrative Simplification" is mandatory.   The EDI data sets are known as "standard transactions."  45 C.F.R. § 162.103.

260.     The regulation provides that "[i]f an entity requests a health plan to conduct a transaction as a standard transaction, *the health plan must do so*."  45 C.F.R. § 162.925(a)(1) (emphasis added).  In addition, health plans must "[a]ccept *and promptly process* any standard

transaction that contains codes that are valid, as provided in subpart J of this part." *Id.* § 162.925(c)(1) (emphasis added); *see id.* § 162.923(a) ("[I]f a covered entity conducts, with another covered entity that is required to comply with a transaction standard adopted under this part (or within the same covered entity), using electronic media . . . the covered entity must conduct the transaction as a standard transaction.").

261.    Under this regulation, each Health Insurer Defendant is a "health plan."  "Health plan means an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(2) of the PHS Act, 42 U.S.C. 300gg-91(a)(2))."  That includes "health insurance issuer."  45 C.F.R. § 160.103 (defining "health plan").  A health insurance issuer "means an insurance company, insurance service, or insurance organization (including an HMO) that is licensed to engage in the business of insurance in a State and is subject to State law that regulates insurance."  *Id.*  Each Health Insurer Defendant is an "insurance company."  And each Health Insurer Defendant is licensed to engage in the business of insurance in the State of New Jersey.

262.    Each Doctor is a "covered entity."  *See* 45 C.F.R. § 160.103 (defining "covered entities" to include "health care providers," which includes "a provider of medical or health services . . . and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business").

263.    A request for payment by submission of an 837 is a request to "conduct a transaction as a standard transaction."  45 C.F.R. § 162.925(a)(1).  It is a "transaction," defined as "the transmission of information between two parties to carry out financial or administrative activities related to health care.  It includes the following types of information transmissions: (1) Health care claims or equivalent encounter information.  *(2) Health care payment and remittance advice* . . . (4) Health care claim status . . . (10) Health claims attachments.  *(11) Health*

*care electronic funds transfers (EFT) and remittance advice.*" 45 C.F.R. § 160.103 (emphases added).

264. The transmission of a request for payment/remittance advice in the form of an 837 is a "standard transaction." A "standard transaction" is "a transaction that complies with an applicable standard and associated operating rules adopted under this part [Part 162 – Administrative Requirements]." 45 C.F.R. § 162.103. Compliance with the applicable standard and operating rules are mandatory for "covered entities," which includes health plans like the Health Insurer Defendants'. 45 C.F.R. § 162.100 ("Covered entities (as defined in § 160.103 of this subchapter) *must comply with the applicable requirements of this part*." (emphasis added)). Pursuant to 45 C.F.R. § 162.1101, the "health care claims or equivalent encounter information transaction is the transmission of either of the following: (a) *A request to obtain payment, and the necessary accompanying information from a health care provider to a health plan, for health care . . . .*" 45 C.F.R. § 162.1101(a) (emphasis added). The standard for a request for payment submitted by a health care provider providing professional health care claims after January 1, 2012, is defined, by regulation, as the "ASC X12 Standards for Electronic Data Interchange Technical Report Type 3 - Health Care Claim: Professional (837), May 2006, ASC X12N/005010X222. 45 C.F.R. § 162.1102(b)(2)(iii), (c); *see id.* § 162.920.

265. Anti-assignment provision or not, the Health Insurer Defendants have to accept and process a claim for payment submitted pursuant to the 837. The Health Insurer Defendants have done so for all of the claims at issue because, for each, the Health Insurer Defendant transmitted a corresponding and responsive 835. *See* 45 C.F.R. § 162.1602 (Standards for health care electronic funds transfers (EFT) and remittance advice transaction – requiring use of "the ASC X12 Standards for Electronic Data Interchange Technical Report Type 3, Health Care Claim

79

Payment/Advice (835), April 2006, ASC X12N/005010X221.").  In short, because the regulatory framework requires the Health Insurer Defendants to accept and process transactions submitted by out-of-network doctors, including to make payments on properly submitted claims, they cannot rely on an anti-assignment clause to avoid that legal obligation.

## CLAIM I

### CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE
### *PER SE* VIOLATION (15 U.S.C. § 1)
### (ASSERTED AGAINST ALL DEFENDANTS)

266.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

267.    Plaintiffs seek monetary and injunctive relief under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

268.    Beginning no later than July 1, 2017, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

269.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool to set reimbursement rates for out-of-network healthcare services.  This conspiracy has caused Plaintiffs to receive artificially suppressed reimbursements for out-of-network healthcare services.

270.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, the Health Insurer Defendants, and a potential competitor, MultiPlan, in the commercial health insurance market in the United States

271.    In the alternative, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the United States' commercial health

insurance market.

272.     In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts alleged above as well as:

     i.    The Health Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tool;

    ii.    MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

   iii.    Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

    iv.    The Health Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

    v.    The Health Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

    vi.    Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool; and

vii.   Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

273.   Defendants possess market power in the relevant antitrust market, as alleged herein: The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the United States.

274.   Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

275.   As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, each Plaintiff has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what it would have received absent Defendants' conspiracy, and is entitled to damages in amounts to be proven at trial.

276.   Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act.

82

## CLAIM II

### CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE
### QUICK LOOK OR RULE OF REASON (15 U.S.C. § 1)
### (ASSERTED AGAINST ALL DEFENDANTS)

277.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

278.    The contract, combination, or conspiracy to unreasonably restrain trade and commerce as alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and the Health Insurers to use MultiPlan's claim repricing tool served as the spokes, and the agreement between the Health Insurer Defendants and MultiPlan to use MultiPlan's repricing tool to reprice reimbursement rates for out-of-network healthcare services served as the rim.  This conduct violates Section 1 of the Sherman Antitrust Act.

279.    Plaintiffs seek monetary and injunctive relief under Section 4 of the Clayton Antitrust Act for this violation.

280.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool.  This conspiracy has caused each Plaintiff to receive artificially suppressed reimbursements on claims for out-of-network healthcare services.

281.    To further this contract, combination, or conspiracy, Defendants committed various acts, including the acts alleged above as well as:

    i.      The Health Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

83

ii.     MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

iii.    Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

iv.     The Health Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

v.      The Health Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

vi.     Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool; and

vii.    Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

84

282.    Defendants possess market power in the relevant antitrust market, as alleged herein: The relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the United States.

283.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

284.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, each Plaintiff has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what it would have received absent Defendants' conspiracy, and is entitled to damages in amounts to be proven at trial.

285.    There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

286.    Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick-look or rule-of-reason analysis.

## CLAIM III

### MONOPOLIZATION (15 U.S.C. § 2)
### (ASSERTED AGAINST MULTIPLAN)

287.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

288.    As alleged herein, from at least July 1, 2017, to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing.  No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time

period. MultiPlan had and has the ability to control commercial health insurance repricing and exclude competitors.

289. MultiPlan willfully and unlawfully maintained its market power in the commercial health insurance repricing market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. MultiPlan's monopoly has been maintained by its anticompetitive misconduct and not as a result of providing a superior product, business acumen, or historical accident.

290. MutliPlan's course of anticompetitive misconduct, as alleged herein, required the Health Insurer Defendants to use MultiPlan's repricing tool exclusively or effectively exclusively. MultiPlan has substantially foreclosed the market from actual and potential competition.

291. There are no valid procompetitive justifications for MultiPlan's exclusionary conduct in the commercial health insurance repricing market. Even if there were (and there are not), any such ostensible procompetitive benefit could have been obtained through less restrictive means.

292. As a result of this scheme, each Plaintiff received artificially suppressed reimbursements for the healthcare services it provided. Each Plaintiff has been injured by MultiPlan's antitrust violations, and is entitled to damages in amounts to be proven at trial. Such injury is of the type the antitrust laws were designed to prevent and flows from that which makes MultiPlan's misconduct unlawful.

293. Plaintiffs are the proper entities to bring a private case concerning this conduct. The direct purchasers of MultiPlan's repricing services—Health Insurers—are all subject to MultiPlan's control with respect to out-of-network claims repricing, are MultiPlan's co-conspirators, and benefit from the scheme.

294.    MultiPlan's anticompetitive acts violate Section 2 of the Sherman Antitrust Act.

## CLAIM IV

## CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)
## (ASSERTED AGAINST ALL DEFENDANTS)

295.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

296.    As alleged herein, from at least July 1, 2017, to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing.  No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time period.  MultiPlan had and has the ability to control commercial health insurance repricing and excludes competitors.

297.    Defendants conspired to unlawfully maintain MultiPlan's monopoly.  In return for their participation in the conspiracy, each and every Defendant received a share of the difference between what amount a Doctor submitted and what a Doctor was ultimately paid.

298.    The goal, purpose, and effect of the MultiPlan-directed conspiracy was to maintain and extend MultiPlan's monopoly over the commercial health insurance repricing market so as to ensure continued monopoly profits and control.

299.    As a direct and proximate result of the conspiracy to monopolize, each Plaintiff received artificially suppressed reimbursements for the healthcare services it provided and was harmed as a result, and is entitled to damages in amounts to be proven at trial.  These injuries are of the type the Sherman Antitrust Act was designed to prevent, and flow from that which makes MultiPlan's misconduct unlawful.

300.    By engaging in the foregoing misconduct, Defendants have intentionally and wrongfully conspired to monopolize in violation of the Sherman Antitrust Act.

3212.000/2106158.1

301.    But for Defendants' unlawful conspiracy to monopolize, each Plaintiff would have received more fair reimbursements for the healthcare services it provides.

## CLAIM V

### BENEFITS DUE UNDER ERISA § 502(A)(1)(B)
### (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)
### (NON-GOVERNMENT AND NON-CHURCH SPONSORED PLANS)

302.    Plaintiffs repeat and incorporate by reference all preceding paragraphs and allegations.[43]

303.    Each Plaintiff provided services to the Health Insurer Defendants' insureds for the claims at issue in this lawsuit.

304.    Each Plaintiff has an assignment of benefits from its respective patients for each claim at issue.  As an assignee, each Plaintiff has standing to pursue payment for the medical services provided to the Health Insurer Defendants' insureds.

305.    None of the Health Insurer Defendants prohibit their Plan members from assigning their rights to benefits to Plaintiffs, including the right of direct payment of benefits.  To the extent any of the Health Insurer Defendants purport to prohibit the assignment of benefits to Plaintiffs, each Health Insurer Defendant waived any anti-assignment provisions, ratified the assignment of benefits, and waived or is estopped from using any anti-assignment provisions against Plaintiffs due to each Health Insurer Defendant's course of dealing with and representations to Plaintiffs.

306.    Each Plaintiff's unrecovered charges are consistent with 80th percentile of the FAIR Health benchmark.

307.    Each Plaintiff's charges for treatments provided should have been paid in full.

---

[43] This Complaint does not include certain non-antitrust claims asserted by certain plaintiffs against certain defendant Cigna affiliates in *Advanced Gynecology & Laparoscopy of North Jersey, P.C. v. Cigna Health & Life Insurance Co.*, Case No. 19-22234 (ES) (D.N.J.).

88

308.    At all relevant times, each Plaintiff was an out-of-network provider.

309.    Each of the services were medically necessary and covered by the Plans.

## CLAIM VI

**BREACH OF FIDUCIARY DUTIES UNDER ERISA §§ 1104(A), 1109(A) & 1132(A)(3)
(ASSERTED AGAINST HEALTH INSURER DEFENDANTS)
(FOR NON-GOVERNMENT AND NON-CHURCH SPONSORED PLANS)**

310.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

311.    Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

312.    Each Plaintiff, as an assignee of ERISA members and beneficiaries under the Plans, is entitled to assert a claim for relief for the Health Insurer Defendants' breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) and (B).

313.    The Health Insurer Defendants are ERISA fiduciaries of their respective Plans within the meaning of 29 U.S.C. § 1002(21)(A) because, at a minimum, each exercises authority or control respecting management or disposition of Plan assets.

314.    As ERISA fiduciaries, each Health Insurer Defendant was required to make claim payment decisions under the Plans for the exclusive purpose of providing benefits to participants and beneficiaries, including Plaintiffs as their assignees, and defray reasonable expenses in administering the Plans.  29 U.S.C. § 1104(a)(1)(A).  This duty requires each Health Insurer Defendant to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of its beneficiaries.

3212.000/2106158.1

315.     As ERISA fiduciaries, each Health Insurer Defendant also owed each Plaintiff a duty of loyalty, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  29 U.S.C. § 1104(a)(l)(B).

316.     Each Health Insurer Defendant violated its fiduciary duty of loyalty and care, and engaged in prohibited transactions, through myriad acts of self-dealing, described more fully above.  Among other things, each Health Insurer Defendant retained Plan funds that should have been paid to each Plaintiff and used them to pay itself and third-party repricing companies unjustified, undisclosed, and improper "cost containment fees."

317.     Pursuant to 29 U.S.C. § 1132(a)(3), each Plaintiff is entitled to equitable relief to remedy the Health Insurer Defendants' self-dealing and other violations of their ERISA fiduciary duties, including declaratory and injunctive relief.  Each Plaintiff is also entitled to seek equitable relief under 29 U.S.C. § 1109(a), including for breach of fiduciary duty by not providing covered for benefits to beneficiaries' assignees.

## CLAIM VII

### BREACH OF CONTRACT
### (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)

318.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

319.     To the extent that claims related to benefits or payments owed by the Health Insurer Defendants are not associated with an ERISA-governed Plan and/or are not preempted by ERISA, each Plaintiff is entitled, as the assignee of rights and benefits held by insureds of the Health Insurer Defendants, to maintain a breach of contract claim under New Jersey law.

90

320.     As a result of its course of dealings, including direct communications between Plaintiffs and the Health Insurer Defendants regarding the treatment of and payment for treatment of a patient, including the Health Insurer Defendants' pre-approvals, some orally over the telephone and others in writing, direct contracts were created between Plaintiffs and each Health Insurer Defendant for the provision of Plaintiffs' services to the covered patients at the respective rate schedules published by that Health Insurer Defendant.

321.     For most patients, before each Plaintiff treats them, an authorized representative of each Plaintiff communicates directly with an authorized representative of the relevant Health Insurer Defendant.  Those communications may be verbal or electronic.  Those communications confirm, among other things, that the patient is covered by a Plan, that the treatment recommended by Plaintiffs is covered by the Plan, that a Plaintiff is authorized to provide the treatment as an out-of-network provider, that a Plaintiff will be paid consistent with the Plans for such services, and the amount of any patient financial responsibility for the treatment proposed.  By providing the patient-responsibility amount, each Health Insurer Defendant made clear that it would pay a Plaintiff the difference between the patient responsibility and the amount a Plaintiff bills.

322.     Each Plaintiff accepted the terms and, in reliance upon the agreed terms, provided the proposed treatments to the patients, and complied with the terms of the implied contract by following the Health Insurer Defendants' procedures and submitting invoices consistent and within the parameters of the Health Insurer Defendants' guidelines and published rate schedules.

323.     After the treatments were provided to the insureds of the Health Insurer Defendants, each Plaintiff submitted claims to them.

324.     The Health Insurer Defendants did not pay the submitted claims as agreed to by them and Plaintiffs.  Rather, the Health Insurer Defendants materially breached the agreements by

91

causing unwarranted delay, then refusing to pay the claims Plaintiffs submitted, or grossly underpaying the claims consistent with their own guidelines in breach of the agreed terms.

325.    Each Plaintiff complied with the terms of the contracts with the Health Insurer Defendants, including provision of medical services to their insureds, except those excused by the Health Insurer Defendants' material breaches.

326.    As a direct and proximate result of the Health Insurer Defendants' material breaches of the direct contractual agreements with Plaintiffs, including without limitation the non-payment or unexcused underpayment of Plaintiffs' bills for services provided, each Plaintiff suffered damages, in amounts to be proven at trial.

327.    As the result of the Health Insurer Defendants' failure to comply with the terms of the Plans, each Plaintiff, as an assignee, has suffered damages and lost benefits for which it is entitled to recover damages from the Health Insurer Defendants, including unpaid benefits, restitution, interest, and other contractual damages sustained by each Plaintiff.

## CLAIM VIII

## BREACH OF IMPLIED CONTRACT
## (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)

328.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

329.    Each Plaintiff has implied contracts with each Health Insurer Defendant premised on both the Health Insurer Defendant's published reimbursement calculations for out-of-network providers and its numerous discussions with the Health Insurer Defendant's employees regarding the medical services provided.

330.    Each Plaintiff provided services to insureds of each Health Insurer Defendant with the expectation that the Health Insurer Defendant would compensate it in accordance with the

Health Insurer Defendant's published guidelines and, in some instances, communications with the Health Insurer Defendant's representatives.

331.    Each Plaintiff's billing practices are consistent with each Health Insurer Defendant's guidelines such that the entire incurred amount should have been paid.  Each Plaintiff bills its services at a reasonable and customary rate.  Each Health Insurer Defendant generally agrees to pay reasonable and customary rates for services out-of-network providers, like Plaintiffs, provide to insureds of the Health Insurer Defendants.

332.    Each Health Insurer Defendant breached the implied contract by failing to make payment of benefits to Plaintiffs in the manner and amounts required under the terms of the Plans or as otherwise conveyed by the Health Insurer Defendant's representatives to Plaintiffs.

333.    Each Plaintiff complied with the terms of its implied contracts with the Health Insurer Defendants, including provision of medical services to insureds of the Health Insurer Defendants, except those excused by the Health Insurer Defendants' material breaches.

334.    As a direct and proximate result of the Health Insurer Defendants' failure to comply with the terms of the plans, each Plaintiff has suffered harm and lost benefits for which it is entitled to recover damages from the Health Insurer Defendants, including unpaid benefits, restitution, interest, and other contractual damages sustained, in amounts to be proven at trial.

### CLAIM IX

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)

335.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

336.    Each of the agreements pleaded above exists and contains an implied duty of good faith and fair dealing.

337.     As set forth more fully above, upon information and belief, the Plans require payment of medical expenses incurred for treating insureds of the Health Insurer Defendants.

338.     For those contracts not directly between a Plaintiff and a Health Insurer Defendant, a Plaintiff received an assignment of benefits for each of the claims at issue.  Each Plaintiff was assigned the right to receive payment under the Plans for the services rendered to the Health Insurer Defendant's insureds.   Pursuant to said assignments, the Health Insurer Defendants were contractually obligated to pay Plaintiffs for these services.

339.     Upon information and belief, the non-ERISA Plans did not prohibit the members from assigning their rights to benefits to Plaintiffs, including the right of direct payment of benefits. If some ERISA Plans prohibited the assignment of benefits to Plaintiffs, then each Health Insurer Defendant waived any anti-assignment provisions, ratified the assignment of benefits, and waived or is estopped from using any anti-assignment provisions against Plaintiffs due to each Health Insurer Defendant's course of dealing with and representations to each Plaintiff.

340.     Section 17:29B-3 *et seq.* of the New Jersey code defines the public interests of New Jersey and prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

341.     The Health Insurer Defendants breached their duty of good faith and fair dealing owed to each Plaintiff, as an assignee of rights and benefits under the Plans, in a number of ways, described more fully above.

342.     In undertaking the wrongful conduct described in the preceding paragraph, each Health Insurer Defendant acted in bad faith with the purpose of depriving each Plaintiff of the reasonable expectations and benefits of the contracts, both the direct contracts between each Plaintiff and Health Insurer Defendant, as well as those between each Health Insurer Defendant

94

and Plaintiffs' assignors.

343.     The Health Insurer Defendants' wrongful conduct, in derogation of their duty of good faith and fair dealing under the contracts, caused each Plaintiff to suffer damages, in amounts to be proven at trial.

## CLAIM X

### UNJUST ENRICHMENT
### (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)

344.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

345.     Each Plaintiff is entitled to maintain an unjust enrichment claim against each Health Insurer Defendant for payment owing for services rendered to the insureds of each Health Insurer Defendant.

346.     By and through its failure to process claims and issue benefits for services rendered by each Plaintiff in accordance with the Plans through which the insureds received benefits, each Health Insurer Defendant has retained monies to which it is not entitled and to which each Plaintiff is entitled for services rendered to the insureds of that Health Insurer Defendant.

347.     Retention of this benefit is unjust and inequitable.

348.     Each Plaintiff have suffered damages as a direct and proximate result of the Health Insurer Defendants' actions.

## CLAIM XI

### QUANTUM MERUIT
### (ASSERTED AGAINST HEALTH INSURER DEFENDANTS)

349.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

350. Each Plaintiff provided services and other things of value to each Health Insurer Defendant and the insured patients.

351. The Health Insurer Defendants have not paid for such services and things of value.

352. Each Plaintiff, therefore, is entitled to payment from the Health Insurer Defendants for the reasonable value of the services rendered in an amount to be proven at trial.

## JURY DEMAND

353. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants as follows:

A. Declaring that Defendants have violated Section 1 of the Sherman Act;

B. Declaring that Defendants have violated Section 2 of the Sherman Act;

C. Declaring that the Health Insurer Defendants have breached the terms of the Plans with regard to out-of-network benefits;

D. Awarding each Plaintiff all benefits due and owing to it;

E. Awarding injunctive relief to prevent Defendants from continuing to engage in the alleged conduct that is unauthorized and prohibited by the Plans and applicable law and governing Plans;

F. Plaintiffs' administrative claims have been exhausted;

G. Declaring that the Health Insurer Defendants violated their fiduciary duties under 29 U.S.C. § 1104, and awarding injunctive, declaratory and other equitable relief to redress such violations with respect to the non-government and non-religious health Plans;

H.      Awarding profits, contractual damages, and compensatory damages in such amounts as the proofs at trial shall show;

I.      Awarding restitution and/or disgorgement for payments improperly withheld by the Health Insurer Defendants;

J.      Declaring that the Health Insurer Defendants have violated the terms of the relevant Plans and/or policies of insurance covering the insureds;

K.      Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, Plan documents, or equity, including 29 U.S.C. § 1132(g) and the Clayton Act, 15 U.S.C. § 15.

L.      Awarding costs of suit;

M.      Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity;

N.      Awarding applicable, treble, multiple, punitive, and/or other damages, in the amount to be determined at trial; and

O.      Awarding all other relief to which each Plaintiff is entitled.

Date: December 5, 2024

**BARTKO LLP**

By:   /s/ Jason A. Zweig
Jason A. Zweig
jzweig@bartkolaw.com
One S. Wacker Dr., 36th Floor
Chicago, IL 60606
T: (415) 956-1900

97

**MCKOOL SMITH, P.C.**

Jon Corey (*pro hac vice* to be filed)
jcorey@mckoolsmith.com
1717 K Street NW, 10th Floor
Washington, D.C. 20006
T: (202) 370-8300
F: (202) 370-8344

David Schiefelbein (*pro hac vice* to be filed)
dschiefelbein@mckoolsmith.com
Hal M. Shimkoski (*pro hac vice* to be filed)
hsimkoski@mckoolsmith.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10001
T: (212) 402-6400
F: (212) 402-9444

***Attorneys for Plaintiffs***

98

# EXHIBIT A

| DOCTOR | AETNA | | CIGNA | | EMPIRE | | HORIZON | | UMR | | UNITED | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BILLED | PAID | BILLED | PAID | BILLED | PAID | BILLED | PAID | BILLED | PAID | BILLED | PAID |
| Heritage General | 1,557,909.60 | 38,136.94 | 1,799,657.00 | 45,624.78 | - | - | 9,777,668.74 | 500,774.87 | - | - | 6,400,762.01 | 128,207.98 |
| Heritage Laparo. | 565,723.20 | 14,693.15 | 1,000,894.00 | 22,128.61 | - | - | 7,219,082.60 | 394,226.29 | - | - | 880,379.00 | 20,968.99 |
| Heritage Surg. | 11,136,568.80 | 339,946.39 | 5,042,601.00 | 66,382.27 | 264,982.00 | 5,176.50 | 27,134,576.16 | 1,504,194.82 | - | - | 6,687,663.16 | 147,231.67 |
| Aesthetic | 7,199,098.74 | 351,063.19 | 3,909,345.16 | 172,794.87 | - | - | 85,562,173.50 | 11,697,728.47 | - | - | 63,154.87 | - |
| ASP | - | - | - | - | - | - | 4,097,208.17 | 354,723.14 | - | - | - | - |
| East Coast | 3,614,118.00 | 491,447.58 | 1,678,400.00 | 124,769.53 | - | - | 4,275,472.00 | 390,919.61 | - | - | 1,677,127.00 | 84,069.07 |
| Gallina | 2,988,325.00 | 70,016.67 | 516,250.00 | 18,701.03 | - | - | 3,828,785.00 | 199,371.00 | 88,825.00 | 6,965.20 | 209,850.00 | 1,885.15 |
| Garden State | 13,713,378.03 | 716,752.19 | 3,585,971.00 | 115,046.62 | - | - | 53,440,026.03 | 3,804,272.12 | 833,171.00 | 27,442.50 | 6,020,580.00 | 129,417.73 |
| Jersey Integrative | 5,597,548.00 | 260,454.11 | 1,571,560.00 | 96,822.54 | - | - | 26,701,550.00 | 3,483,865.32 | 23,829.00 | 1,365.09 | 5,935,553.00 | 60,995.29 |
| JL Surg. | - | - | - | - | - | - | 2,216,200.41 | 190,355.78 | - | - | - | - |
| Marta | 529,844.60 | 10,917.56 | 1,301,556.00 | 31,231.25 | 24,922.00 | - | 2,153,069.33 | 149,621.77 | - | - | 211,581.00 | 3,443.01 |
| NJ Spinal | 3,733,213.80 | 145,765.70 | 104,600.00 | 2,328.44 | - | - | 7,588,382.23 | 586,632.82 | - | - | 848,700.41 | 32,788.55 |
| One Surg. | 23,361,271.50 | 1,077,372.45 | 3,345,965.20 | 93,247.99 | 47,620.00 | - | 7,549,324.75 | 242,470.36 | 41,875.00 | 868.27 | 336,933.16 | 7,914.52 |
| Premier | 590,510.43 | 33,588.08 | 417,996.71 | 43,317.75 | - | - | 3,187,939.97 | 551,897.40 | - | - | 672,205.24 | 80,657.50 |
| Pro. Ortho. | 27,097,101.41 | 1,826,083.90 | 2,615,807.51 | 105,527.64 | - | - | 62,553,343.65 | 7,658,176.43 | 657,846.92 | 37,335.42 | 12,169,318.37 | 433,258.84 |
| Somerset Ambul. | 6,607,093.94 | 588,396.40 | 700,505.00 | 124,150.52 | - | - | 12,314,939.89 | 728,448.66 | 384,663.40 | 56,270.45 | 2,942,007.79 | 276,043.22 |
| Somerset Ortho. | 18,324,231.75 | 1,242,881.07 | 2,481,947.00 | 35,640.49 | - | - | 41,199,977.42 | 1,657,334.08 | 251,864.00 | 25,034.85 | 7,114,665.50 | 170,620.60 |
| Spine Surg. | 3,431,969.00 | 338,509.50 | 127,400.00 | 3,903.26 | - | - | 5,298,657.20 | 326,371.60 | - | - | 852,392.00 | 9,128.44 |
| Surgxcel | 3,986,560.42 | 93,207.49 | 1,768,725.80 | 4,486.39 | - | - | 5,983,173.55 | 58,109.80 | - | - | 1,264,895.05 | 5,030.36 |
| Urology Group | 15,861,082.71 | 1,330,094.93 | 8,051,772.40 | 985,201.34 | - | - | 33,271,936.50 | 3,232,481.35 | - | - | 17,526,911.16 | 1,273,421.73 |
| Vanguard | 4,865,707.48 | 497,384.27 | 2,581,015.98 | 482,441.27 | 943,440.54 | 8,373.11 | 72,816,117.59 | 10,569,576.44 | 406,422.04 | 55,909.47 | 13,994,429.95 | 934,212.88 |
| Weight Loss | 1,859,957.99 | 153,592.04 | 477,627.89 | 10,937.24 | - | - | 3,905,889.52 | 133,355.37 | - | - | - | - |
| TOTALS | 156,621,214.40 | 9,620,303.61 | 43,079,597.65 | 2,584,683.83 | 1,280,964.54 | 13,549.61 | 482,075,494.21 | 48,414,907.50 | 2,688,496.36 | 211,191.25 | 85,809,108.67 | 3,799,295.53 |

| | |
|---|---|
| BILLED | 771,554,875.83 |
| PAID | 64,643,931.33 |
| UNPAID | 706,910,944.50 |

| Doctor Abbreviation (Ex. A) | Doctor (Complaint) |
|---|---|
| Heritage General | Heritage General and Colorectal Surgery, PA |
| Heritage Laparo. | Heritage Laparoscopy and Acute Care Surgery, PC |
| Heritage Surg. | Heritage Surgical Group, LLC |
| Aesthetic | ASP & Reconstructive Surgeons, L.L.C. |
| ASP | ASP Surgical, LLC |
| East Coast | East Coast Aesthetic Surgery, P.C. |
| Gallina | Gregory J. Gallina MD PC d/b/a Gallina Colon & Rectal |
| Garden State | Garden State Bariatrics and Wellness Center, LLC |
| Jersey Integrative | Jersey Integrative Health & Wellness, PC |
| JL Surg. | JL Surgical LLC |
| Marta | Marta General Surgery LLC |
| NJ Spinal | New Jersey Spinal Medicine and Surgery, P.A. |
| One Surg. | One Surgical Specialists LLC |
| Premier | Premier Spine and Sports Medicine, PC |
| Pro. Ortho. | Professional Orthopaedic Associates, P.A. |
| Somerset Ambul. | Somerset Ambulatory Surgical Center, L.L.C. |
| Somerset Ortho. | Somerset Orthopedic Associates, P.A. |
| Spine Surg. | Spine Surgery Associates & Discovery Imaging, PC |
| Surgxcel | Surgxcel, LLC |
| Urology Group | Urology Group, P.A. |
| Vanguard | Vanguard ASC LLC |
| Weight Loss | Weight Loss and Wellness Solutions LLC |

# EXHIBIT B

# MERCK
# MEDICAL PLAN FOR EMPLOYEES
# SUMMARY PLAN DESCRIPTION

(For certain active, inactive and former employees)

Effective Jan. 1, 2023

Released Oct. 4, 2022

MED



**This Summary Plan Description (SPD)** describes the medical benefits provided under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan as it applies to:

- U.S.-based[1] employees of the wholly owned U.S. subsidiaries of Merck & Co., Inc. excluding employees of companies listed in the "Excluded From This SPD" section below  and excluding employees subject to a collective bargaining agreement with the United Steelworkers Union Local 10-00086[2], and

- U.S. Expatriates on assignment in a U.S. territory and residents of a U.S. territory on assignment in the U.S.

A list of the collective bargaining units whose members are eligible to participate in medical benefits under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan as described in this SPD is included as Exhibit A.

## Frequently Used Terms

Key words that are frequently used in the SPD are capitalized and defined in the Glossary.

The medical benefits described in this SPD provided under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan are collectively referred to herein as the "Medical Plan" or the "Plan."

## About This SPD

This SPD does not apply to any employee or former employee of Merck & Co., Inc. or its subsidiaries or joint ventures other than those specified above.

This SPD merely summarizes the benefits and benefit coverage levels provided under the Merck Medical Plan effective Jan. 1, 2023, to the employees described above. Decisions regarding appropriate treatment are always left to the discretion of the patient and the patient's health care provider.

This SPD reflects the provisions of the Medical Plan in effect as of Jan. 1, 2023. It replaces the SPD effective Jan. 1, 2022, titled "Merck Medical Plan Summary Plan Description (For Certain Active, Inactive and Former Employees)" and all summaries of material modifications applicable to it dated before Jan. 1, 2023.

---

[1]  A U.S.-based employee is an employee whose home country is designated in Merck's employee database as one of the 50 U.S. states or District of Columbia (and includes employees on temporary international assignment outside one of the 50 U.S. states or District of Columbia) and excludes employees whose home country is designated in Merck's employee database as a U.S. territory (e.g., Puerto Rico, Guam and U.S. Virgin Islands) or a country outside one of the 50 U.S. states or District of Columbia even if the employee is on temporary international assignment in one of the 50 U.S. states, District of Columbia or in a U.S. territory.

[2]  Note that **with respect to survivor benefits** only, the following groups are also eligible: (i) former employees subject to a collective bargaining agreement with the United Steelworkers Union Local 10-00086 who die before Jan. 1, 2017, and (ii) former U.S.-based[1] employees of the wholly owned subsidiaries of Merck & Co., Inc. (excluding Antimicrobial Stewardship, LLC and Merck Global Health Innovation Fund, LLC and each of their subsidiaries) who are employed outside the U.S. by Merck & Co., Inc. or its wholly owned subsidiaries who are considered "Localized Employees" who die on or after Jan. 1, 2015 while employed by the Company. Also note that **with respect to "LTD-like" benefits** only, the following group is also eligible: former employees subject to a collective bargaining agreement with the United Steelworkers Union Local 10-00086 (or its predecessor) whose employment terminated on or after Jan. 1, 2004 and before Jan. 1, 2017, due to disability retirement, who on the date their employment terminated had 10 years of service but were not eligible for subsidized retiree medical benefits.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Excluded From This SPD

Medical benefits are also provided under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan to:

- U.S.-based[1] employees of the wholly owned U.S. subsidiaries of Merck & Co., Inc. (excluding employees from companies listed below) who are on assignment outside the U.S., other than those on assignment in a U.S. territory, which benefits are insured by Cigna Global Health Benefits, and

- Non-U.S.-based[1] employees of the wholly owned subsidiaries of Merck & Co., Inc. (excluding employees from companies listed below) who are on assignment outside their home country, including in the U.S., other than those who are residents of a U.S. territory on assignment in the U.S., which benefits are insured by Cigna Global Health Benefits.

- Employees of the following entities, including their subsidiaries and their successors and assigns are excluded:

  - Antimicrobial Stewardship, LLC.

  - Merck Global Health Innovation Fund LLC.

  - Viralytics Services, Inc.

  - Antelliq Corporation

  - Tilos Therapeutics

  - Peloton Therapeutics

  - ArQule Therapeutics

  - Quantified Ag

  - IdentiGEN Therapeutics

  - VelosBios

  - Pandion

Retiree medical benefits are provided under the Merck Retiree Medical Plan and are also not described in this SPD:

- For eligible Retirees and their Eligible Dependents and certain surviving dependents of Eligible Employees, in each case, who are under age 65 or not Medicare-eligible, the Merck Retiree Medical Plan provides group retiree medical benefits as described in the Group Retiree Medical Plan Summary Plan Description (SPD) and

- For eligible Retirees and their Eligible Dependents and certain surviving dependents of Eligible Employees, in each case who are at least age 65 and Medicare-eligible, the Merck Retiree Medical Plan provides a health reimbursement account as described in the Merck Retiree Health Reimbursement Account (HRA) SPD

In addition, for information on retiree medical benefits effective Jan. 1, 2023, applicable to certain former non-U.S.-based employees who are eligible retirees and their dependents eligible for retiree medical benefits insured by Cigna Global Health Benefits, see the *Merck Medical and Dental Plan for Employees on International Assignment SPD* (formerly known as the *Cigna International Medical and Dental SPD*).

For convenience only, this SPD may describe eligibility, if any, for retiree medical coverage for certain employees (or their surviving Eligible Dependents) whose eligibility for coverage under the Medical Plan ends. To the extent this SPD describes terms and conditions of the Merck Retiree Medical Plan (including eligibility therefor) and such description is

---

[1] A U.S.-based employee is an employee whose home country is designated in Merck's employee database as one of the 50 U.S. states or District of Columbia (and includes employees on temporary international assignment outside one of the 50 U.S. states or District of Columbia) and excludes employees whose home country is designated in Merck's employee database as a U.S. territory (e.g., Puerto Rico, Guam and U.S. Virgin Islands) or a country outside one of the 50 U.S. states or District of Columbia even if the employee is on temporary international assignment in one of the 50 U.S. states, District of Columbia or in a U.S. territory.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

inconsistent with the terms and conditions of the Merck Retiree Medical Plan, the terms of the Merck Retiree Medical Plan — and not those set forth in this SPD — shall govern.

To receive a copy of the SPDs that describe the benefits provided to these other employees and retiree groups, contact the Merck Benefits Service Center at Fidelity at **800-66-MERCK (800-666-3725)**.

## Right to Amend or Terminate the Plan

The Plan Sponsor reserves the right to amend the Merck Medical, Dental, Life Insurance and Long Term Disability Plan, including but not limited to the medical benefits under the Plan, in whole or in part, or to completely discontinue the Merck Medical, Dental, Life Insurance and Long Term Disability Plan or the Medical Plan at any time.

---

Your privacy is important: Merck takes the privacy of your information very seriously. No individually identifiable personal health information related to your participation in any of the plans or programs herein will be shared with Merck. Merck will only receive aggregated, anonymous health data needed to evaluate the success of the plans and to design programs that meet employees' health and wellness needs. Information about your participation in the plans and programs may be shared by the third-party vendors with other organizations that support Merck health plans. When approved by Merck, third-party vendors may occasionally share de-identified, anonymous information about our workforce's participation with Merck's researchers and third-party research organizations that seek to improve public health. For more information, please review the Merck Health Plans Notice of Privacy Practices available online at **www.merck.com/privacy** or contact the Merck Privacy Office at **merck_privacy_office@merck.com**.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# TABLE OF CONTENTS

**Introduction** .............................................................................................................................................. 1

  Your Medical Coverage ............................................................................................................................ 1

    Your Medical Plan Options .................................................................................................................... 1

  Benefits Contacts and Resources ........................................................................................................... 3

    Merck Benefits Service Center at Fidelity ............................................................................................ 6

    Highlights of Additional Benefits .......................................................................................................... 7

**General Information** ................................................................................................................................ 14

  About Medical Coverage ........................................................................................................................ 14

    Medical Eligibility ................................................................................................................................. 14

    Eligible Dependents ............................................................................................................................ 15

    Enrolling in Medical Benefits .............................................................................................................. 17

    How to Enroll ...................................................................................................................................... 19

    When Coverage Begins ...................................................................................................................... 20

    ID Cards .............................................................................................................................................. 20

    Paying for Medical Coverage ............................................................................................................. 20

    Special Enrollment Under HIPAA for Eligible Employees ................................................................. 22

    Merck Couples and Family Members ................................................................................................. 23

    Making Changes to Your Coverage ................................................................................................... 25

    When Life Changes ............................................................................................................................ 26

    When Medical Coverage Ends ........................................................................................................... 29

    Continuing Your Coverage Through COBRA ..................................................................................... 31

    Coverage for Surviving Covered Dependents on the Covered Employee's Date of Death — *Covered Employees Who Died Before Jan. 1, 2017* ........................................................................................... 31

    Coverage for Surviving Eligible Dependents Who Were Not Surviving Covered Dependents on the Eligible Employee's Date of Death — *Eligible Employees Who Died Before Jan. 1, 2017* ............................... 33

    Coverage for Surviving Covered Dependents on the Covered Employee's Date of Death — *Covered Employees Who Die on or After Jan. 1, 2017* .................................................................................... 34

    Coverage for Surviving Eligible Dependents Who Were Not Surviving Covered Dependents on the Eligible Employee's Date of Death — *Eligible Employees Who Die on or After Jan. 1, 2017* .......................... 35

    Contributions for Retiree Medical Required by Surviving Eligible Dependents .................................. 35

    LTD-Like Continuing Coverage for Certain Legacy Merck Disability Retirees and Their Survivors ... 37

    U.S. Territory Employees .................................................................................................................... 37

**The Merck PPO** ....................................................................................................................................... 38

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

About the Merck PPO ............................................................................................................38

    Key Features ....................................................................................................................38

    Merck PPO Coverage ......................................................................................................39

    The Merck PPO at a Glance ............................................................................................40

    Precertification.................................................................................................................46

    In Case of an Emergency ................................................................................................47

    How to File a Claim .........................................................................................................48

**Covered Services** ...................................................................................................................**49**

    What's Covered................................................................................................................49

**Services Not Covered** ...........................................................................................................**63**

    What's Not Covered .........................................................................................................63

**Hawaii HMO** ..........................................................................................................................**69**

    For More Information ........................................................................................................69

    How to File a Claim .........................................................................................................69

        Appealing a Claim ......................................................................................................69

**Managed Prescription Drug Program** ..................................................................................**70**

    About the Managed Prescription Drug Program ..............................................................71

    Managed Prescription Drug Program at a Glance ...........................................................71

    How to Get Your Prescription Filled ................................................................................73

        Participating Pharmacies.............................................................................................73

        Non-Participating Pharmacies .....................................................................................73

        How to File a Claim for Non-Participating Pharmacy Benefits ......................................73

        Home Delivery Service and Smart90 Retail .................................................................74

        How to Order Refills ...................................................................................................74

    Express Scripts' Prescription Drug Management Programs ..............................................75

        Prior Authorization Program ........................................................................................75

        Managed Rx Program .................................................................................................77

        Express Scripts' Specialty Pharmacy Program Managed by Accredo Health Group, Inc. ................................80

        Specialty Drug ...........................................................................................................80

    Covered Medications and Supplies..................................................................................81

    Medications and Supplies That Are Not Covered ............................................................82

    Claims and Appeals ........................................................................................................83

**Behavioral Health**..................................................................................................................**84**

    How Behavioral Health Works .........................................................................................84

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

  In Case of an Emergency ...................................................................................................... 84

 Behavioral Health Covered Services ............................................................................................. 85

 Behavioral Health Services Not Covered ...................................................................................... 85

**Important Information About the Plan** ............................................................................................ **88**

 Administrative Information ............................................................................................................. 88

  Coordination of Benefits ............................................................................................................ 88

  Recovery Provisions .................................................................................................................. 91

  COBRA ....................................................................................................................................... 93

  Continuation of Health Care Coverage for Domestic Partners ................................................ 101

  Your Rights Under Newborns' and Mothers' Health Protection Act ....................................... 102

  Your Rights Under Women's Health and Cancer Rights Act ................................................... 102

  Your Rights Under USERRA .................................................................................................... 102

  Your Rights Under ERISA ........................................................................................................ 103

  Your Rights and Protections Against Surprise Medical Bills .................................................. 104

 Claims and Appeals ...................................................................................................................... 106

  How to File a Claim .................................................................................................................. 106

  Appealing a Claim .................................................................................................................... 106

  Plan Disclosure Information ...................................................................................................... 113

**Glossary** ............................................................................................................................................ **117**

**Exhibit A** ........................................................................................................................................... **129**

# INTRODUCTION

## YOUR MEDICAL COVERAGE

This section provides a brief overview of all the Medical Plan options and resources that are available to you as an Eligible Employee.

### Your Medical Plan Options

Eligible Employees may enroll themselves and their Eligible Dependents for coverage under the Medical Plan. Each Medical Plan option offers the same basic plan components (including prescription drug and behavioral health care benefits); however, the way benefits are delivered, clinical policies, the costs for coverage and services and the provider networks may vary by medical option. For details about your coverage, see the applicable section of this SPD or contact the Claims Administrator.

The Medical Plan offers the following coverage options:

- Merck Preferred Provider Organization — Horizon BCBS (the Merck PPO) — Administered by Horizon Blue Cross Blue Shield (Horizon BCBS), this Medical Plan option uses the national BlueCard® PPO network and offers you the freedom to visit any licensed health care provider you choose, including In-Network or Out-of-Network providers.

- Health Plan Hawaii Plus HMO — This is the only Medical Plan option available to Eligible Employees who reside in Hawaii and is not available to Eligible Employees who reside outside of Hawaii.

- No Coverage — Eligible Employees may waive coverage under the Medical Plan by electing this option.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## HOW THE NO COVERAGE OPTION UNDER THE MEDICAL PLAN MAY AFFECT YOUR RETIREE MEDICAL COVERAGE

If you are currently enrolled in the No Coverage option under the Medical Plan, you may benefit from enrolling in coverage if you or your Eligible Dependent will be **at least age 65** and Medicare-eligible on the date your employment ends, and you will be:

- Eligible for subsidized retiree medical coverage on the date your employment ends, or
- Separated from employment are eligible for continuation coverage on the date your coverage under the Medical Plan ends.

***What Happens If You Are Enrolled in the No Coverage Option?***

If you are eligible for subsidized retiree medical coverage, for the year in which you turn age 65 and become Medicare-eligible, you and your Eligible Dependents will have the opportunity to supplement Medicare with a wide variety of medical and prescription drug plans, such as Medicare Supplement (Medigap), Medicare Part D and Medicare Advantage Plans, available through Alight Retiree Health Solutions. However, if you are currently enrolled in the No Coverage option for group medical coverage under the Medical Plan or the Merck Retiree Medical Plan, your choices for coverage through Alight Retiree Health Solutions may be limited. For example, you may be subject to underwriting and you may not be able to enroll in the Medicare exchange through Alight Retiree Health Solutions until the next Medicare Open Enrollment period, which may result in a gap in your coverage or Medicare late enrollment penalties if not enrolled elsewhere.

**To avoid these limitations, consider enrolling in group medical coverage under the Medical Plan during annual enrollment, so that you have coverage beginning on Jan. 1 of the year in which you or your Eligible Dependents will turn 65 and become eligible for Medicare.**

Generally, you may only enroll in the Medical Plan during the annual enrollment for coverage effective the following Jan. 1. You may enroll mid-year only if you experience a Life Event that allows you to make a Permitted Plan Change.

See the *Merck Group Retiree Medical Plan SPD* or the *Merck Retiree Health Reimbursement Account SPD* for more information on retiree medical coverage. See the *Merck U.S. Separation Benefits Plan SPD* or your collective bargaining agreement, if applicable, for more information on benefits continuation in the event of separation from employment.

## Prescription Drug Coverage

When you enroll in a Medical Plan option (except the No Coverage option), you are automatically covered under the Managed Prescription Drug Program, which is administered by Express Scripts®.

## KEY POINT — THE PPO NETWORK



**Horizon BCBS**
The Horizon BCBS national provider networks are referred to as BlueCard PPO and BlueCard Traditional. The Merck PPO uses the BlueCard PPO network.

BlueCard PPO is a national provider network and is the only network in which providers will be considered In-Network under the Merck PPO. In general, if you are enrolled in this option, you will receive the highest level of benefits when you receive treatment from an In-Network provider.

To locate a Horizon BCBS provider, you may contact Horizon BCBS by phone at **877-663-7258** or online at **www.horizonblue.com/merck**.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## BENEFITS CONTACTS AND RESOURCES

Several vendors administer and help answer questions about the Medical Plan. This chart will help you decide whom to contact, depending on your needs.

| Benefits Provider | If You Need Help to/Information About… | Contact Information |
|---|---|---|
| **Merck Benefits Service Center at Fidelity** | • Compare Plan options<br>• Obtain Plan literature and forms<br>• View the SPDs<br>• Eligibility-related questions<br>• If you're an Eligible Employee:<br>  – Enroll in your benefits when first hired or during annual enrollment or when making changes to your coverage<br>  – Report a Life Event change or HIPAA special enrollment event<br>  – Update dependent information<br>• Access information and updates about all of your health and insurance benefits | **http://netbenefits.com/merck**<br><br>**800-66-MERCK (800-666-3725)**<br><br>TTY: Use 711 relay<br><br>Customer Service Representatives are available Monday through Friday (excluding New York Stock Exchange holidays) between 8:30 a.m. and 8:30 p.m. ET.<br><br>Overseas: Dial your country's toll-free AT&T USADirect® access number, then enter **800-666-3725**. To determine your access code, call your local operator or visit **www.business.att.com/collateral/access.html**. |
| **Horizon BCBS**<br><br>**Horizon Health Guide** | **Merck PPO**<br>• Ask questions, get claim information or precertify both In- and Out-of-Network (including behavioral health)<br>• Find In-Network doctors, Hospitals and other providers<br>• Request a new ID card<br>• Connect you to care you need<br>• Help set up routine and preventive health care appointments<br>• Work closely with nurses, healthcare coaches and social workers to provide personalized consultative support<br>• Refer you to care management programs | **www.horizonblue.com/merck**<br>**Call Horizon Health Guide**<br>**877-663-7258**<br><br>Representatives are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |
| | **Horizon Clinical Health Guide**<br><br>Speak with a nurse who will help to manage all your chronic conditions and provide support for severe/complex episodes of care and assist in obtaining appropriate services and treatment plans | **www.horizonblue.com/merck**<br>**Call Horizon Clinical Health Guide**<br>**877-663-7258**<br><br>Clinical Health Guides are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefits Provider | If You Need Help to/Information About… | Contact Information |
|---|---|---|
| | **2nd.MD**<br><br>2nd.MD allows eligible employees and eligible dependents to speak with leading medical specialists via video or telephone to obtain a second opinion. Consultations are available through 2nd.MD for a range of medical conditions, spanning more than 120 American Board of Medical Specialties and more than 3,000 diseases and conditions.<br><br>Following the consultation, written notes and recommendations from the specialist will be available to the eligible employee or dependent via the 2nd.MD secure portal. | **877-663-7258** |
| | **WINFertility**<br><br>If you plan to use Merck fertility benefits, your first step should be to connect with a Horizon Health Guide. They will connect you with WINFertility's nurse care managers and behavioral health specialists.<br><br>WINFertility's mission is the same as yours – to build your family. We are here to guide you through every step of your family-building journey with medical expertise and emotional support. Our fertility nurse care managers and behavioral health specialists are available 24/7 to answer questions about procedures and medications, guiding you through every step of your journey. Call **877-663-7258** to access your WIN family-building benefits. | **877-663-7258** |
| **Health Plan Hawaii Plus** | **Health Plan Hawaii Plus HMO**<br><br>(Hawaii residents only) | **www.hmsa.com**<br><br>**808-948-6372**<br><br>Representatives are available Monday through Friday between 8:00 a.m. and 4:00 p.m. HAST. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefits Provider | If You Need Help to/Information About… | Contact Information |
|---|---|---|
| Express Scripts | **Merck Managed Prescription Drug Program**<br>• Order home delivery prescription drugs<br>• Locate a participating pharmacy<br>• Obtain prior authorization for prescription drugs | **www.Express-Scripts.com**<br><br>**800-RX-MERCK (800-796-3725)**<br>Representatives and licensed pharmacists are available 24 hours a day, 7 days a week. |
| | **Specialty Pharmacy (Accredo)**<br>• Order specialty prescription drugs<br>• Obtain prior authorization for specialty medications<br>• Questions about the Specialty Pharmacy | **800-803-2523**<br>Representatives are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET, and Saturday from 8:00 a.m. through 5:00 p.m. ET. |
| **24-Hour NurseLine** | **Clinical Health Guide**<br>Highly trained registered nurses available 24 hours a day, 7 days a week to help you with non-urgent concerns | **877-663-7258**<br>24 hours a day, 7 days a week. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Merck Benefits Service Center at Fidelity

The Merck Benefits Service Center at Fidelity ("Benefits Service Center") can help you with enrollment and eligibility information and questions. It is administered by Fidelity Investments and available online or by phone.

### Online

Fidelity NetBenefits® at **http://netbenefits.com/merck**

If you have an existing NetBenefits account, use the same username/login information you used previously.

You can also navigate NetBenefits hands free by using eSSENTIAL Accessibility, a free assistive technology app that helps people who have trouble typing, moving a mouse or reading a screen. To download the app, visit **www.essentialaccessibility.com**.

### By Phone

**800-66-MERCK (800-666-3725)**

TTY: Use 711 relay

Customer Service Representatives are available Monday through Friday (excluding New York Stock Exchange holidays), between 8:30 a.m. and 8:30 p.m. ET. If you are overseas, dial your country's toll-free AT&T USADirect® access code then **800-666-3725**. To determine your access code, call your local operator or visit **www.business.att.com/collateral/access.html**.

---

**KEY POINT — CONTACTING THE BENEFITS SERVICE CENTER**

To contact the Benefits Service Center, online or by phone, you will need a password. Your password provides security to ensure that only you can access your benefits information. Keep your password in a confidential place.

You can establish your password directly online or by calling the Benefits Service Center.

If you have an existing NetBenefits account, use the same username/password information you used previously. If you have forgotten your username or password, you will need to reset it using "Having trouble with your username or password?" on the login page. When you change your username or password, the change will apply to all your Fidelity accounts and services going forward.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Highlights of Additional Benefits

| Benefit | Details | Contact Information |
|---|---|---|
| **Horizon BCBS** | | |
| **Horizon Clinical Health Guide** | You or any Covered Dependent can ask to speak with a nurse, who will help to manage all your chronic conditions such as diabetes, asthma and heart disease in addition to providing support for severe and complex episodes of care, including cancer, high-risk pregnancies/NICU, transplants and infusion therapy as well as inpatient admissions and obtaining appropriate services and treatment plans, including mental health and pharmacy issues.<br><br>**Note:** Plan participants may be identified to participate in this program through claims data. As a result, participants may receive direct phone calls from a Merck-dedicated Clinical Health Guide. The nurses will be looking to engage participants and family members into this program, so they can work directly with you and your providers to help coordinate any health care needs. This program is completely confidential, voluntary and provided at no cost to participants. | **Call Horizon Clinical Health Guide 877-663-7258**<br><br>Clinical Health Guides are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |
| **24-Hour NurseLine** | **Horizon Clinical Health Guides**<br><br>Horizon Clinical Health Guides are available 24 hours a day, 7 days a week to help you with non-urgent concerns. Call the 24-hour NurseLine for:<br>• Answers to questions about symptoms or medications<br>• Explanation of a health condition, and<br>• Simple, self-care tips for non-urgent conditions. | **877-663-7258**<br><br>Available 24 hours a day, 7 days a week. |
| **Horizon CareOnline<sup>SM</sup>** | Horizon BCBS offers telehealth services[1] to members and their Covered Dependents. Telehealth is an easy, convenient and affordable alternative to an office or urgent care visit. | **www.horizonblue.com/merck** |

---

[1] Telemedicine is available in all states, though rules surrounding how treatment can be done (phone vs. video) may vary by state. To learn what applies in each state, visit **info.americanwell.com/where-can-I-see-a-doctor-online**.

The App Store<sup>SM</sup> is an online store and is a service mark of Apple, Inc. Google Play™ is a trademark of Google, Inc. Horizon CareOnline<sup>SM</sup> is a service mark of Horizon Blue Cross Blue Shield of New Jersey.

American Well is an independent company that supports Horizon Blue Cross Blue Shield of New Jersey in the administration of telemedicine services.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**How It Works**

You and your Covered Dependents can talk to a board-certified, licensed doctor by phone or online video chat (where available), any time, day or night, seven days a week. Simply call or log in to request a consultation, and you'll get connected with a Physician who is licensed in your state. They can diagnose and often prescribe certain medications[1], if appropriate for non-Emergency issues like:

- Sinus infections
- Bronchitis
- Allergies
- Colds and flu
- Urinary tract infection
- Respiratory infection
- And more

You can also use Horizon CareOnline to schedule an appointment with psychiatrists, psychologists and social workers for therapy and counseling for conditions such as anxiety, bipolar disorder, depression, attention deficit/hyperactivity disorder (ADHD) and more. You can schedule appointments between 7:00 a.m. and 11:00 p.m. ET, seven days a week.

To access Horizon CareOnline, you will need register for the Horizon BCBS secure member portal at **www.horizonblue.com/merck** if you haven't done so already. Contact your Horizon Health Guide if you need help.

**Cost**

Telehealth consultations cost considerably less than a typical office visit, and you can use your Health Care Flexible Spending Account (if enrolled) or other credit/debit card to pay for services received. You will be charged a consultation fee, which applies toward your Annual Deductible, Coinsurance and Out-of-Pocket Maximum.

The per-visit consultation fee depends on the type of care you are seeking. Please call a Horizon Health Guide at 877 663-7258 for claims pricing information.

Telehealth services are completely confidential and are not intended to replace

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefit | Details | Contact Information |
|---------|---------|---------------------|
| | the relationship you have with your Primary Care Physician (PCP). To take advantage of telehealth services, you must choose a provider who is part of your medical provider's telehealth network. Horizon BCBS participants must choose a doctor who is part of the Horizon CareOnline$^{SM}$ network. | |
| **AIM Advanced Imaging Program** | If you need an MRI or a CT scan, it's important to know that costs can vary quite a bit depending on where you go to receive the service. Sometimes the differences are significant – anywhere from $300 to $3,000 – but a higher price doesn't guarantee higher quality. If your benefit plan requires you to pay a portion of this cost (like a deductible or coinsurance), where you go for your MRI or CT scan can make a very big difference to your wallet.<br><br>Here's how the program works:<br>• Your doctor refers you to a radiology provider for an MRI or CT scan.<br>• Your doctor contacts AIM, who then works with your doctor to help make sure that you are receiving the right test – using evidence-based medical necessity guidelines.<br>• AIM also reviews the referral to see if there are other high-quality providers in your area who charge a lower price than the provider you were initially referred to.<br>• If AIM finds another provider that meets the quality and price criteria, AIM will call you to let you know.<br>• You will only receive a phone call if you meet the following criteria:<br>• Exam is for MRI/CT<br>• There is a $300 cost differential<br>• You are over 18 years of age<br>• Exam is for a non-cancer diagnosis<br>• You choose – You can see the radiology provider your doctor suggested, OR you can choose to see a provider that AIM suggests. AIM will even help you schedule an appointment with the new provider.<br><br>This program gives you the opportunity to reduce your health care expenses by providing you with options to receive the right advanced radiology services when they are necessary and to select high-quality, lower- | 877-663-7258<br><br>Representatives are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefit | Details | Contact Information |
|---------|---------|---------------------|
| | cost providers or locations whenever possible. No matter which provider you choose, there is no effect on your health care benefits. However, by choosing a lower-cost provider, you will save on out-of-pocket costs. This program gives you information you can use to make informed choices. | |
| **AIM Sleep Study Program** | Your plan includes benefits for a Sleep Study Program administered by Horizon BCBS and powered by AIM Specialty Health. The program helps your doctor understand the options available for your treatment under your health plan benefits. **The Sleep Study Program includes both outpatient and home sleep testing and therapy.**<br><br>If you require sleep testing, your doctor should contact AIM. Depending on your medical condition, you may be asked to complete the sleep study in your home. Home sleep studies provide the added benefit of reflecting your normal sleep pattern while allowing you to sleep in the comfort of your own bed versus going to an outpatient facility for the test.<br><br>As part of this Horizon BCBS administered program, your doctor should contact AIM, and AIM will work with your doctor on one or more of the following when necessary:<br>• Home sleep tests (HST)<br>• In-lab sleep studies (polysomnography or PSG, a recording of changes during sleep)<br>• Titration studies (to determine the right air pressure you need to keep your airways open)<br>• Treatment orders for equipment and supplies, including positive airway pressure devices (APAP, CPAP, BPAP), oral devices and related supplies<br><br>If you need continued treatment, AIM will review your care with your doctor on a quarterly basis to help ensure that you are receiving appropriate care and that the services you receive are consistent with evidence-based medical necessity criteria. Your equipment supplier or your doctor will be asked to provide ongoing information to AIM to ensure that your treatment remains in line with those criteria so that your claims for | **877-663-7258**<br><br>Representatives are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefit | Details | Contact Information |
|---------|---------|---------------------|
| | those services will be covered consistent with your health plan benefits. | |
| **AIM Musculoskeletal Program** | **Musculoskeletal Program**<br><br>The Musculoskeletal Program engages providers in the management of the complexities associated with musculoskeletal and interventional pain management services.<br><br>The program covers services in the outpatient setting, using evidence based clinical guidelines to help reduce inappropriate care, overtreatment, and excessive costs while helping to ensure safe and effective care.<br><br>The program offers a prospective review of certain services to promote improved quality of care for all plan beneficiaries and to assess whether the proposed services are Medically Necessary and appropriate when evaluated against AIM Specialty Health's evidence-based clinical criteria and guidelines.<br><br>To maximize the benefits achieved by this program, doctors and other health care professionals ordering outpatient musculoskeletal services for their patients should call AIM prior to such services being rendered to allow AIM's prospective review to occur and for the doctors and other health care professionals to receive the qualitative feedback afforded by these AIM quality improvement programs.<br><br>If the planned services do not meet AIM's guidelines for medical necessity, AIM may suggest that the doctor or other health care professional consider offering an alternative service or withdraw the requested service entirely. | Your Horizon BCBS ID card has the phone number your provider will use to contact AIM.<br><br>Call **877-663-7258** with questions.<br><br>Representatives are available Monday through Friday between 8:00 a.m. and 11:00 p.m. ET. |
| **Lyra Health** | | |
| **Lyra Health** | Lyra provides a confidential program designed to help you and your benefits eligible dependents connect with effective and convenient care for your mental, behavioral and emotional wellbeing.<br><br>Lyra can help address:<br><br>• Stress and anxiety<br>• Burnout | **merck.lyrahealth.com**<br><br>**844-737-9423**<br><br>The Lyra Care Team is available 24/7.<br><br>You must register with Lyra online or by phone before you can search for or connect with a provider. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Benefit | Details | Contact Information |
|---|---|---|
| | • Sleep disorders<br>• Family conflicts<br>• Grief and loss<br>• Marriage or relationship issues<br>• Alcohol and substance misuse<br>• Disordered eating<br>• Traumatic memories<br>• Other mental health concerns<br><br>Lyra provides you with access to its web-based platform to search for and, where applicable, schedule an appointment for services to support your mental, behavioral and emotional health.<br><br>Through Lyra's online platform, or by contacting a Lyra Representative at the number provided, you may receive suggestions for licensed behavioral health care professionals ("Provider") and/or other programs available through Lyra's partners, including Lyra Clinical Associates P.C. ("LCA"), a professional medical corporation.<br><br>Lyra, along with LCA, provides short-term, outpatient behavioral health services with LCA's group of top Providers in your area. Behavioral health services can be delivered through in-person sessions, video sessions and/or by phone, and include:<br><br>• Assessment of psychological disorders<br>• Individual psychotherapy<br>• Marital and couples counseling<br>• Family therapy<br>• Group therapy<br><br>The Lyra network of providers is separate from the Horizon Behavioral Health network but your Coinsurance for Lyra-covered services will be paid at 80% after you meet the Deductible. Note: While Lyra providers can support and treat many behavioral health needs, the service may not be appropriate for every situation. | |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**KEY POINT — CENTERS OF EXCELLENCE**

Centers of Excellence provide you and your Covered Dependents with high-quality, efficient care for transplant and specific complex conditions. You will receive access to a select group of hospitals and transplant centers that meet quality standards for the number of procedures performed and their outcomes. You will also receive support and assistance from specialized nurse care managers. If you need to travel certain distances to a Center of Excellence, you and one companion *may* be eligible for travel and lodging allowance benefits.

**Merck PPO**

If you are covered by the Merck PPO, and you want to use a Center of Excellence (also referred to as a Blue Distinction Center), you can either contact Horizon BCBS or use the online provider directory to obtain information regarding participating national facilities. Please note that some of the treatment services may require precertification by Horizon BCBS. For example, transplant services, including evaluation, and bariatric surgery must be precertified.

Horizon Health Guides are available to assist you throughout the process, including helping you and your Physician find the most appropriate Blue Distinction Center for you, regardless of its location. If you're having transplant surgery and need to travel 100 or more miles to use a Blue Distinction facility, the Medical Plan offers special transportation and lodging benefits for you and a companion.

If you're having bariatric surgery, you must use a Blue Distinction Center or Blue Distinction Center+ if there's a center within 50 miles of your home. If there are no centers within 50 miles of your home, you may go to any In-Network or Out-of-Network facility.

If you need help locating a Blue Distinction Center or Blue Distinction Center+, please call Horizon Health Guide at **877-663-7258**.

**Bariatric Surgery**

Bariatric surgery is a high-risk procedure. For you to qualify for this surgery, the Plan must consider it Medically Necessary because you meet certain clinical criteria such as a diagnosis of morbid obesity. The specific criteria are determined by the Claims Administrator according to the health plan's clinical policy. Bariatric surgeries are covered only if they are performed at Centers of Excellence. For more information, contact Horizon BCBS.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# GENERAL INFORMATION

## ABOUT MEDICAL COVERAGE

This section provides Eligible Employees with important information about medical coverage under the Medical Plan — including eligibility, enrollment, contributions and when you can make changes to your benefits.

## Medical Eligibility

If you are an Eligible Employee, you and your Eligible Dependents are eligible for coverage in the Medical Plan as of your date of hire, rehire or transfer.

You are *not eligible* for coverage under the Medical Plan if you are not an Eligible Employee or are an Excluded Employee or an Excluded Person.

**KEY POINT — ALL COVERED INDIVIDUALS MUST ENROLL IN THE SAME OPTION**

You and your Covered Dependents must be enrolled in the same Medical Plan option, even if you reside in different locations.

### Impact of the Patient Protection and Affordable Care Act on Eligibility

For purposes of the Patient Protection and Affordable Care Act of 2010 (the "PPACA") and the employer shared responsibility payment provisions, the Company has elected to use a monthly measurement period. The Company will measure each employee's hours of service on a monthly basis and in accordance with the requirements of the PPACA and will report this information to the Internal Revenue Service and to each employee. However, in general even if an Excluded Employee or Excluded Person is determined to be a full-time employee in accordance with the requirements of the PPACA, the Excluded Employee or Excluded Person will not become eligible for coverage under the Plan. If you have any questions about the Plan's compliance with the requirements of the PPACA or your status as an Eligible Employee, contact the Benefits Service Center.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Eligible Dependents

| KEY POINT — HOW YOUR ELIGIBLE DEPENDENTS MAY BE AFFECTED WHEN YOU RETIRE |
|---|
| If you are eligible for subsidized retiree medical coverage and you are covered under the Medical Plan — but all of your Eligible Dependents are not covered on the date your employment ends (or if you are separated and eligible for continuation coverage, on the date your coverage under the Medical Plan ends), and your Eligible Dependents will be age 65 and Medicare-eligible, your Eligible Dependents' choices for retiree medical coverage under the Merck Retiree Medical Plan may be limited. For example, they may be subject to underwriting and they may not be able to enroll in the Exchange until the next open enrollment period, which may result in a gap in their coverage and subject them to Medicare late enrollment penalties unless they have coverage elsewhere. |
| So, if you are planning to retire next year — or if you think your employment may end involuntarily next year — and your Spouse/Domestic Partner or other Eligible Dependents will turn age 65 and become eligible for Medicare next year, you should consider enrolling those Eligible Dependents in group medical coverage under the Medical Plan during annual enrollment, for coverage effective the following Jan. 1. |
| Generally, you may only enroll your Eligible Dependents in the Medical Plan during annual enrollment, for coverage effective the following Jan. 1. You may enroll them mid-year if you experience a qualified Life Event or HIPAA special enrollment event. |
| See the *Merck Group Retiree Medical Plan SPD* or *Merck Retiree Health Reimbursement Account SPD* for more information on retiree medical coverage and see the *Merck U.S. Separation Benefits Plan SPD* or your collective bargaining agreement, if applicable, for more information on benefits continuation in the event of separation from employment on or after Jan. 1, 2017. |

As an Eligible Employee, you can enroll your Eligible Dependents for coverage under the Medical Plan. For coverage to apply to your Eligible Dependents, they must be enrolled as Covered Dependents under the Medical Plan.

### Adding Eligible Dependents to Your Coverage

Between annual enrollment periods, you are permitted to add an Eligible Dependent or delete a Covered Dependent only if you have a Life Event that allows you to make a Permitted Plan Change or you experience a HIPAA special enrollment event. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for details.

### Domestic Partnerships

The Plan Sponsor extends coverage under the Medical Plan to Eligible Employees' Domestic Partners and Domestic Partners' Eligible Dependent Children. To elect Domestic Partner benefits under the Medical Plan, you and your partner must meet the Plan's definition of a Domestic Partnership.

**Tax Consequences**

Under current federal income tax laws, the value of providing medical benefits to a Domestic Partner and the Domestic Partner's Eligible Dependent Children is considered taxable to you — unless they are considered your Spouse/Tax-Qualified Domestic Partner or your dependents for purposes of federal income taxes. This means you will pay federal, state and local income taxes, as well as employment taxes, on the full value of coverage provided to your Domestic Partner and your Domestic Partner's Eligible Dependent Children by the Company or through your Before-Tax deductions throughout the year. This type of taxable income is known as imputed income, and your Employer will report it on your W-2 form at the end of each year. For more information about Domestic Partners and imputed income, see "Financial Considerations for Domestic Partner Coverage" and "About Imputed Income" sections on page 22.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| KEY POINT — IMPUTED INCOME — DOMESTIC PARTNERS AND THEIR CHILDREN |
|---|
| Coverage for Domestic Partners and their eligible children may be subject to imputed income for federal, state and local income tax purposes, unless they are a Tax-Qualified Domestic Partner or Covered Dependent of a Tax-Qualified Domestic Partner. |

If you believe your Domestic Partner and/or your Domestic Partner's Eligible Dependent Children are your dependents for federal tax purposes, please contact the Benefits Service Center.

It's important for you to understand the tax implications of covering a Domestic Partner and/or the Domestic Partner's Eligible Dependent Children. You may wish to consult a tax advisor to determine the full tax and financial effect of electing this coverage. For more information, see "Paying for Medical Coverage." You can obtain more information about Domestic Partner benefits by calling the Benefits Service Center.

## Right to Audit Dependents' Eligibility

By electing coverage for your dependents (either by affirmative election or through the default process), you are confirming that they meet the Plan's dependent eligibility requirements and agree to notify the Benefits Service Center within 60 days after an event that causes any of these Covered Dependents to no longer meet the definition of an Eligible Dependent.

The Plan Administrator, in its sole discretion, maintains the right to audit any and all dependent information on file and may require that you promptly provide sufficient documentation verifying your Covered Dependents' continued eligibility at any time.

When you enroll a new dependent, you will receive a dependent eligibility audit from HMS, a Gainwell Technologies company ("HMS"), the independent, third-party audit company chosen to verify dependent eligibility. The audit will ask you to provide HMS with copies of legal documents to verify your dependent's eligibility, such as marriage licenses, birth or adoption certificates, domestic partnership affidavits and tax returns.[1] The audit request you receive will give you specific information about the types of documents you should provide them.

If you do not promptly provide documentation sufficient to verify your Covered Dependents' continued eligibility or if the Plan Administrator determines that any of the information you provide (or provided) regarding your Covered Dependents is untrue, incomplete or misleading, or if you fail to promptly notify the Benefits Service Center of an individual's loss of eligibility, the Plan Administrator may determine, in its sole and absolute discretion, that your dependent does not satisfy the Plan's definition of an Eligible Dependent and take such action as it deems appropriate under the circumstances. If permitted by applicable laws, those actions may include, but are not limited to, requiring you to repay the Plan for any benefits/contributions paid with respect to your dependent the Plan Administrator determines is not an Eligible Dependent and requesting that your Employer subject you to disciplinary action. If you provide fraudulent information or make intentional misrepresentations regarding your Covered Dependents, the Plan Administrator may retroactively terminate benefits for those dependents that the Plan Administrator determines are not Eligible Dependents. In accordance with Patient Protection and Affordable Care Act, you will be provided with 30 days advance written notice of intent to retroactively terminate your benefits if this situation applies to you.

---

[1] For purposes of the Medical Plan, tax returns will not be required as evidence of proof of dependent status for an Eligible Dependent who is the Eligible Employee's biological child, adopted child, child placed for adoption with an Eligible Employee, step-child or foster child.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| KEY POINT — LOSING ELIGIBILITY FOR THE MEDICAL PLAN WILL AFFECT OTHER PLANS |
|---|
| A dependent eligibility audit will be conducted when you enroll a dependent for Medical Plan coverage. However, if the audit determines that your dependent does not meet the requirements to be an Eligible Dependent under the terms of the Medical Plan (either because you do not timely submit the required documentation or because the auditor determines that the documentation submitted is insufficient to verify your dependent's status as an Eligible Dependent under the terms of the Plan), that dependent will no longer be eligible for Medical Plan coverage and will be dropped from coverage under Company-sponsored dental and vision plans and dependent life insurance coverage as well. **Note:** If your dependent is no longer eligible for dependent life insurance, please call the Benefits Service Center to drop coverage. |

## Enrolling in Medical Benefits

### Coverage Tiers

For the Medical Plan, Eligible Employees may choose from one of four levels of coverage:

- Employee Only
- Employee + Spouse/Domestic Partner
- Employee + Child(ren), or
- Employee + Spouse/Domestic Partner + Child(ren).

If both you and your Spouse/Domestic Partner work, or worked, for an Employer, special provisions apply to the Coverage Tier you are eligible to elect. See "Merck Couples Enrollment Rules" for details.

### Medical Plan Options

In general, you may choose from the following Medical Plan options:

- Merck PPO
- Health Plan Hawaii Plus HMO (for residents of Hawaii only), or
- No Coverage.

| KEY POINT — OPTIONS MAY VARY BY LOCATION |
|---|
| The Medical Plan options you are eligible for depend on your geographic area, as determined by the home address you have on file with the Benefits Service Center. Generally, all Eligible Employees are eligible for the Merck PPO, except if you reside in Hawaii. If you reside in Hawaii, you are only eligible to participate in the Health Plan Hawaii Plus HMO. You may have only one address on record for you and your Covered Dependents. Please keep in mind that you and all Covered Dependents must be enrolled under the same Medical Plan option. |
| To find out the Medical Plan options that are available to you and their costs, review the Benefits Election page on **http://netbenefits.com/merck**. You may also call the Benefits Service Center to learn more about the Medical Plan options for which you are eligible. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Enrollment as a Newly Hired or Eligible Employee (excluding Transferred Employees)

As a Newly Hired or Eligible Employee, unless you take affirmative action during your 30-day Initial Enrollment Period, you are automatically enrolled for Employee Only coverage in the Merck PPO (or the Health Plan Hawaii Plus HMO if you reside in Hawaii) as of your date of hire or rehire, as applicable.

## If You Enroll in Medical Plan Coverage Within Your 30-Day Initial Enrollment Period

You may elect to enroll in medical coverage or waive coverage by electing the "No Coverage" option within your 30-day Initial Enrollment Period through the Benefits Service Center, online or by phone. As long as you enroll for coverage within your 30-day Initial Enrollment Period, the coverage you elect will be effective as of your hire, rehire or transfer date. See "How to Enroll" for more detailed instructions.

## Enrolling Your Dependents Within Your 30-Day Initial Enrollment Period

You may enroll your Eligible Dependents for coverage (with an effective date of your hire, rehire or transfer date) under the same medical option you choose within your 30-day Initial Enrollment Period. As long as you enroll your Eligible Dependents for coverage within your 30-day Initial Enrollment Period, their coverage will be effective as of your hire, rehire or transfer date.

## If You Do Not Enroll Within Your 30-Day Initial Enrollment Period

If you do not elect to change your Medical Plan option, waive coverage by electing the "No Coverage" option or enroll your Eligible Dependents within your 30-day Initial Enrollment Period, you will have Employee Only coverage under the Merck PPO (or the Health Plan Hawaii Plus HMO if you reside in Hawaii) for the remainder of the Plan Year. You will not be able to add your Eligible Dependents or change Medical Plan options until the next annual enrollment period, unless you experience a Life Event that allows you to make a mid-year Permitted Plan Change or circumstances permitting enrollment under HIPAA. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

## If You Are Rehired Within the Same Calendar Year

You will be automatically re-enrolled for coverage at the same coverage tier with the same Eligible Dependents (assuming they continue to meet the Plan's eligibility requirements) you had in effect on your last date of employment. If you choose to do so, you may elect a different coverage tier, add Eligible Dependents, drop Covered Dependents or waive coverage by selecting the No Coverage option, provided you do so within the 30-day time frame applicable to newly hired employees.

---

**KEY POINT — LIFE EVENTS**

You are permitted to make certain Plan changes during the year only if you have certain Life Events — for example:

- The birth or adoption of a child
- You get married or divorced (or meet the eligibility requirements for or end a Domestic Partnership)
- Your covered child reaches the maximum coverage age
- One of your dependents dies
- Your or your Spouse's/Domestic Partner's employment status changes, or
- You relocate out of your network service area.

See "When Life Changes" for information about how your medical coverage may be affected by certain Life Events.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

### Enrollment for Transferred Employees

If you are a Transferred Employee, you will automatically be enrolled for coverage as of your date of transfer in the Merck PPO (or the Health Plan Hawaii Plus HMO if you reside in Hawaii).

If, prior to your date of transfer, you were covered by another plan sponsored and administered by the Parent Company or one of its subsidiaries, and you had Eligible Dependents covered under your prior medical coverage, your Eligible Dependents will be automatically enrolled in the Medical Plan coverage option under which you are automatically enrolled. As discussed further below, if you were not previously enrolled in a plan sponsored and administered by the Parent or one of its subsidiaries, you may enroll your Eligible Dependents for coverage in the Medical Plan (with an effective date of your Transfer Date) within your 30-day Initial Enrollment Period.

### Changing Your Coverage Within 30 Days After Your Transfer Date

You may elect to change your Medical Plan coverage option, waive coverage or add an Eligible Dependent or drop a Covered Dependent from your coverage within your 30-day Initial Enrollment Period at **http://netbenefits.com/merck** or by calling the Benefits Service Center. See "How to Enroll" for more detailed instructions.

If you do not change your option within your 30-day Initial Enrollment Period, you will not be able to change your option until the next annual enrollment period, for coverage effective the following Jan. 1, unless you experience a Life Event that allows you to make a mid-year Permitted Plan Change or a HIPAA special enrollment event. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

## How to Enroll

You enroll in the Medical Plan through the Benefits Service Center, either online or by phone.

### Online

**http://netbenefits.com/merck**

If you have an existing NetBenefits account, use the same username/login information you used previously.

You can also navigate NetBenefits hands free by using eSSENTIAL Accessibility, a free assistive technology app that helps people who have trouble typing, moving a mouse or reading a screen. To download the app, visit **www.essentialaccessibility.com**.

| KEY POINT — COMPLETING ENROLLMENT IS YOUR RESPONSIBILITY |
| --- |
| When you enroll, it is your responsibility to complete all the required steps. A confirmation screen will display the elections you submitted. Print this page for your records as evidence of your successful enrollment. |

### By Phone

Customer Service Representatives can take your benefit elections by phone between 8:30 a.m. and 8:30 p.m. ET, Monday through Friday (excluding New York Stock Exchange holidays). Once you enroll by phone, it's a good idea to confirm your benefit elections online and print your confirmation statement. If you are unable to print your confirmation statement and would like to request a paper copy, you can contact the Benefits Service Center.

- In the U.S.: Call **800-66-MERCK (800-666-3725)**.
- TTY: Use 711 relay

**If you are overseas, dial your country's toll-free AT&T USADirect® access code then 800-666-3725. To determine your access code, call your local operator or visit www.business.att.com/collateral/access.html.**

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## When Coverage Begins

### Eligible Employees

Your participation in the Medical Plan begins on your date of hire, rehire or transfer. As long as you enroll your Eligible Dependents in coverage within your 30-day Initial Enrollment Period, your Eligible Dependents' coverage also begins on your date of hire, rehire or transfer.

## ID Cards

Unless you elected the No Coverage option, as soon as administratively feasible after you are enrolled for medical coverage, you will receive an ID card directly from the Claims Administrator. You will also receive a separate ID card for Merck's Managed Prescription Drug Program from Express Scripts.

## Paying for Medical Coverage

### Eligible Employees (other than Long-Term Disability (LTD) Employees)

If you are an Eligible Employee, you and the Employer share the cost of your medical coverage, with the Employer paying the majority of the cost. You pay your share of the cost through regular payroll deductions made on a Before-Tax basis. Your cost is based on the Medical Plan option and Coverage Tier you choose (Employee Only; Employee + Spouse/Domestic Partner; Employee + Child(ren); Employee + Spouse/Domestic Partner + Child(ren)) and your status as a Regular Part-Time or Regular Full-Time Employee.

Your employee contributions start the first of the month following or coincident with your date of hire, rehire or transfer, although your coverage begins as of your date of hire, rehire or transfer.

Current employee contributions for the different Medical Plan options are listed on the Benefits Election page online at **http://netbenefits.com/merck**. Employee contributions may change from year to year. The Plan Administrator will inform you, typically during the annual enrollment period, if there are any employee contribution changes.

### LTD Employees

If you are an LTD Employee, coverage in the Medical Plan will be available as follows:

- For Legacy Merck LTD Employees disabled and receiving LTD Benefits before Jan. 1, 2011, coverage in the Medical Plan is provided at no cost to you and your Covered Dependents.

- For Legacy Schering LTD Employees (other than Legacy OBS LTD Employees) disabled and receiving LTD Benefits before Jan. 1, 2005, coverage in the Medical Plan is provided at no cost to you and your Covered Dependents.

- For Legacy OBS LTD Employees disabled and receiving LTD Benefits before Jan. 1, 2009, coverage in the Medical Plan is provided at no cost to you and your Covered Dependents.

- For all other LTD Employees, coverage in the Medical Plan is offered at the same rate as similarly situated active employees.

Becoming an LTD Employee is not a Life Event that allows you to make a Permitted Plan Change.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

If you are an LTD Employee who is eligible for and elects medical coverage, you will receive an invoice directly from the Benefits Service Center for the cost of your medical coverage. Generally, contributions made by an LTD Employee toward the cost of medical coverage are made on an After-Tax basis. In all events, it is your responsibility to be sure that you pay the required cost on a timely basis to continue your coverage. If you fail to pay for your coverage on a timely basis, your coverage will end, and you will not be eligible to reenroll for coverage until the next annual enrollment period for coverage effective the following Jan. 1 or mid-year if you have a Life Event that allows you to make a Permitted Plan Change.

**Note:** Merck reserves the right to amend the Plan at any time, including the right to amend the eligibility rules described above applicable to LTD Employees.

## Employees on Leaves of Absence or Layoff

If you take a leave of absence or go on layoff, see "Making Changes to Your Coverage" for more information.

If you are an employee on a **paid** leave of absence, your Employer will continue to deduct your portion of the cost of medical coverage through Before-Tax payroll deductions.

If you are an employee on an **unpaid** leave of absence who is eligible for and elects medical coverage, you will receive an invoice directly from the Benefits Service Center for the cost of your medical coverage. Generally, contributions made by employees on a leave of absence toward the cost of medical coverage are made on an After-Tax basis. In all events, it is your responsibility to be sure that you pay the required cost on a timely basis to continue your coverage. If you fail to pay for your coverage on a timely basis, your coverage will end, and you will not be eligible to re-enroll for coverage until the next annual enrollment period for coverage effective the following Jan. 1 or mid-year if you have a Life Event or HIPAA Special Enrollment Event that allows you to make a Permitted Plan Change.

---

### KEY POINT — A WORD ABOUT LTD MEDICAL PLAN OPTIONS AND MEDICARE

The Medical Plan coordinates with Medicare Parts A and B as primary coverage whenever it is legally permitted to do so. Generally, you are eligible for Medicare when you reach age 65 or prior to age 65 due to disability or end-stage renal disease (ESRD). All of the Medical Plan options available to you require you and your Covered Dependents who are eligible for Medicare to enroll in Medicare — Parts A and B — when you or your Covered Dependents, as applicable, are first eligible. Once you are eligible for Medicare, if you are eligible for the Merck Medical Plan but have not been in active employment for at least six months, Medicare becomes the primary payer for you and your Covered Dependents who qualify for Medicare and the Merck Medical Plan is secondary. In this case, participation in Medicare Parts A and B is required if applicable because the Medical Plan will coordinate with Medicare Parts A and B even if you don't enroll in Medicare. Participation in Medicare Part D prescription drug coverage, however, is voluntary and Merck does *not* require that you or your Covered Dependents sign up for Medicare Part D.

If you are an LTD Employee who has been on a disability leave of absence for at least six months and you and your Covered Dependents are eligible for benefits under the Merck Medical Plan, and you or your Covered Dependents are eligible for Medicare due to age or disability, Medicare Parts A and B will be primary and the Merck Medical Plan will provide secondary coverage. That means if you do not enroll in Medicare Parts A and B before you have been absent for six months or when first eligible for Medicare, if later, you will have a gap in coverage because the Merck Medical Plan will not pay those charges that would have been paid by Medicare and you may be subject to Medicare late enrollment penalties when you later enroll in Medicare.

For more information, see "Coordinating Benefits with Medicare."

To avoid gaps in coverage and Medicare late enrollment penalties, if you think you or your Covered Dependents will become eligible for Medicare due to age or disability you should review your options and ensure you enroll in Medicare on a timely basis to avoid a gap in coverage and any Medicare late enrollment penalties.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Before-Tax Contributions**

If you receive a paycheck from your Employer, your contributions toward the cost of medical coverage are deducted from your paycheck on a Before-Tax basis. This means your contributions come out of your pay before federal income and Social Security taxes are deducted. Before-Tax contributions save you money by reducing your gross salary, which lowers your taxable income and, therefore, the amount of income tax you must pay. In most states (except, for example, New Jersey), you also pay no state taxes on your contributions.

Please note that paying for your medical coverage on a Before-Tax basis could slightly reduce your future Social Security benefits since the earnings used to calculate your Social Security benefits at retirement will not include these payments. However, your savings on current taxes under the Medical Plan will normally be greater than any eventual reduction in Social Security benefits.

**Financial Considerations for Domestic Partner Coverage**

You and the Employer share the cost of covering a Domestic Partner and/or the Domestic Partner's Eligible Dependent Children —the same as you would for coverage of a Spouse and your own Eligible Dependent Children. However, there are additional financial and tax implications to consider. For example, if you elect medical coverage for your Domestic Partner and/or your Domestic Partner's Eligible Dependent Children, in most cases you will pay more in taxes than you would if you were covering a Spouse and your own Eligible Dependent Children. In other words, coverage for Domestic Partners may be subject to imputed income for federal, state and local income tax purposes, unless they are a Tax-Qualified Domestic Partner or Covered Dependent of a Tax-Qualified Domestic Partner.

**About Imputed Income**

Under the Internal Revenue Code, the tax treatment of employer and employee contributions toward the cost of medical coverage varies based on who is covered. Employer costs for coverage of:

- Employees and their Eligible Dependents (as defined under the federal tax code) are not considered taxable income to the employee.

- Domestic Partners and their Eligible Dependent Children are considered taxable income to the employee — unless the individuals are the employee's dependents for federal income tax purposes. If you believe your Domestic Partner (or your Domestic Partner's Eligible Dependent Children) is your dependent for federal tax purposes, please contact the Benefits Service Center.

As a result, the full cost of medical coverage (employee and employer contributions) for your Domestic Partner and your Domestic Partner's Eligible Dependent Children is, in most cases, added to your income and subject to federal, state and local taxes — as well as applicable employment and payroll taxes. These additions are known as imputed income and represent the value of the coverage provided through your contributions and the Employer's contributions. They are determined based on the Plan's COBRA coverage rates minus the 2% administrative fee (see "COBRA").

Your contributions for coverage for your Domestic Partner and/or your Domestic Partner's Eligible Dependent Children will appear on your pay stub as Before-Tax. However, the full value of these benefits — including the amounts you paid on a Before-Tax basis, plus those contributions provided by the Employer — will be taxed and shown as imputed income on your paycheck and your year-end W-2 statement.

Imputed income is not included in your Base Pay for purposes of calculating your benefits or contributions under pay-related benefits (such as, but not limited to, medical Out-of-Pocket Maximum, life insurance, 401(k)/Savings Plan contributions, Retirement Plan benefits, etc.).

# Special Enrollment Under HIPAA for Eligible Employees

Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), you have special enrollment rights under certain circumstances. If you decline enrollment in the Medical Plan because you had alternative health

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

coverage, you may be eligible to enroll in the Medical Plan without waiting until the next annual enrollment period for yourself and your Eligible Dependents if:

- You initially declined coverage for yourself and your Eligible Dependents because you had alternative health coverage and that alternative health coverage has been terminated because:

  - The coverage was continuation coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) and that coverage has been exhausted (The special enrollment option is not available if COBRA coverage terminates because of failure to pay employee contributions or for cause.), or

  - You lost eligibility for coverage you had elsewhere (including as a result of legal separation, divorce, death, termination of employment, reduction in hours or for reasons other than failure to pay employee contributions or for cause) or employer contributions toward the cost of coverage terminated.

- You have gained an Eligible Dependent (Spouse or child) through marriage, birth, adoption or placement for adoption or foster care.

However, you must request enrollment within 30 days after the occurrence of any of the events described above. The effective date of coverage as a result of the special enrollment right will be the date of the event itself, but changes to your contribution amount will take effect the first of the month following or coincident with the date of notification.

In addition, you may be able to enroll yourself and your Eligible Dependents in this Plan if you or your Eligible Dependents' coverage under a Medicaid plan or a State Children's Health Insurance Program (CHIP) plan terminates due to loss of eligibility for such coverage or if you or your Eligible Dependents become eligible for premium assistance under a Medicaid plan or a CHIP plan. However, you must request enrollment within 60 days after the date your or your Eligible Dependents' Medicaid or CHIP coverage terminates or the date you or your Eligible Dependents are determined to be eligible for such assistance.

Please note that the timeframes referenced in this section may be extended until the end of the COVID-19 national public health emergency.

Please note that while existing federal law does not extend HIPAA rights to your Domestic Partner and their children who are Eligible Dependents, the Plan Sponsor does permit Domestic Partners and their children who are Eligible Dependents to enroll under the HIPAA special enrollment provision.

To request special enrollment through HIPAA, you must contact the Benefits Service Center within the required timeframes outlined above. Note that the rules regarding Life Event changes may be more generous than those under HIPAA. See "Making Changes to Your Coverage."

## Merck Couples and Family Members

If both you and either your Spouse/Domestic Partner (or your former Spouse/Domestic Partner or that person's Spouse/ Domestic Partner) or dependent child work, or worked, for the Company, there are certain rules about the coordination of dependent medical coverage. If you are a Merck couple or in a parent/child relationship, call the Benefits Service Center for assistance.

| KEY POINT — DOMESTIC PARTNERS |
|---|
| In general, for purposes of the rules related to Merck couples under the Medical Plan, your Domestic Partner is treated as your Spouse — and as stepparent to your Eligible Dependent Children. And, your Domestic Partner's Eligible Dependent Children are treated as your stepchildren. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

## No Duplicate Merck Coverage

If you, your Spouse/Domestic Partner (or your former Spouse/Domestic Partner or that person's Spouse/Domestic Partner) and/or your Dependent Children are eligible for medical coverage under a medical plan sponsored by Parent or one of its subsidiaries, you may not select duplicate coverage under any of those plans. In other words, no one may be covered under a medical plan sponsored by Parent or one of its subsidiaries as both a participant and a dependent. Furthermore, no two people may cover the same Eligible Dependent Children under a medical plan sponsored by Parent or one of its subsidiaries.

## Merck Couples Enrollment Rules

If you and your Spouse/Domestic Partner both participate in a medical plan sponsored by the Company, you must decide who will cover your Spouse/Domestic Partner and/or your Eligible Dependents for purposes of the Medical Plan. You and your Spouse/Domestic Partner each may enroll in Employee Only coverage or one Spouse/Domestic Partner may enroll as the Eligible Dependent of the other.

However, special rules apply if your Spouse/Domestic Partner is a Non-Eligible Union Employee, LTD Employee or Retiree (see below).

---

**KEY POINT — ENROLLMENT ELECTIONS FOR MERCK COUPLES**

If you elect the No Coverage option because you plan to be covered as an Eligible Dependent under your Spouse's/Domestic Partner's coverage, it is your responsibility to ensure that your Spouse/Domestic Partner elects the correct Coverage Tier. You will not be able to make enrollment changes until the next annual enrollment period, unless you experience a Life Event or HIPAA special enrollment event that allows you to make a Permitted Plan Change, even if you elected No Coverage in error.

---

## Covering Your Eligible Dependents

If you wish to cover your Spouse/Domestic Partner and any Eligible Dependent Children, you must choose Employee + Spouse/Domestic Partner + Child(ren). Remember, the Employee + Child(ren) Coverage Tier allows your Spouse/ Domestic Partner to cover an Eligible Dependent child without providing coverage for you. In no event can you and your Spouse/Domestic Partner each cover the same Eligible Dependent Children.

You and your Spouse/Domestic Partner may choose to cover different Eligible Dependent Children under different benefit plans by selecting different Coverage Tiers. For example, you can choose Employee Only to cover yourself under a Company-sponsored medical plan and Employee + Spouse/Domestic Partner + Child(ren) to cover all Eligible Dependents under the Company-sponsored Dental Plan.

## If Your Spouse/Domestic Partner Is a Non-Eligible Union Employee

If you are an Eligible Employee who is married to (or in a Domestic Partnership with) an employee of the Company who is a Non-Eligible Union Employee, your Spouse/Domestic Partner does not qualify as an Eligible Dependent and may not be covered under your coverage. Likewise, you are not an Eligible Dependent under your Spouse's/Domestic Partner's coverage.

This provision also applies if the Non-Eligible Union Employee who is your Spouse or Domestic Partner is not actively at work, for example is on a leave of absence (including LTD leave) or layoff from Parent or one of its subsidiaries.

For your children:

- If you elect dependent coverage, your Eligible Dependent Children may be covered under the option you select for yourself under the Medical Plan, but your Spouse/Domestic Partner must consent to this choice by calling the Benefits Service Center.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- If you choose Employee Only coverage, your Spouse/Domestic Partner must actively enroll the children under your Spouse's/Domestic Partner's medical coverage sponsored by Parent or one of its subsidiaries.

Please note the provisions listed above also apply if your current Spouse/Domestic Partner and ex-Spouse/ ex-Domestic Partner both work for the Company. For example, if your current Spouse/Domestic Partner is an Eligible Union Employee and your former Spouse/Domestic Partner is a Non-Eligible Union Employee, they cannot both cover your Eligible Dependent Children.

### If Your Spouse/Domestic Partner Is an LTD Employee

If you are an Eligible Employee married to, or in a Domestic Partnership with, an LTD Employee, you and your Eligible Dependents are eligible for coverage under your Spouse's/Domestic Partner's coverage option as Eligible Dependents.

If you are an Eligible Employee and married to, or in a Domestic Partnership with, an employee who is eligible for LTD Benefits but who is a Non-Eligible Union Employee, your Spouse/Domestic Partner does not qualify as an Eligible Dependent under your coverage. Likewise, you are not an Eligible Dependent under that person's coverage. To determine eligibility for your Eligible Dependent Children, see "If Your Spouse/Domestic Partner Is a Non-Eligible Union Employee."

### If Your Spouse/Domestic Partner Is a Retiree

If you are an Eligible Employee married to a person considered to be a Retiree of the Company, you and your Eligible Dependents may be eligible for coverage under the Retiree's coverage as a dependent. For more information, see the *Merck Group Retiree Medical Plan SPD*.

## Making Changes to Your Coverage

### Annual Enrollment

Each year during annual enrollment, you may elect to make changes to your Medical Plan coverage or keep your current medical election, subject to its continued availability, for coverage effective the following Jan. 1. Generally, the benefit elections you make will remain in effect for the entire Plan Year (Jan. 1 - Dec. 31) unless your Eligible Dependent no longer qualifies as your Eligible Dependent or you or your Eligible Dependents experience a Life Event that allows you to make a Permitted Plan Change or circumstances permitting enrollment under HIPAA. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

Changes made during the annual enrollment period are effective Jan. 1 of the following year. If you do not make a change during annual enrollment, your Medical Plan coverage for the new Plan Year will automatically default to your current Medical Plan option (subject to its continued availability) and Coverage Tier (subject to the continued eligibility of your Covered Dependents).

Each year, you will be notified of the annual enrollment procedures, coverage costs and timeframes for enrolling in or changing your elections for the upcoming Plan Year. Since the Plan Sponsor may make changes to the Medical Plan at any time, it is important to review your annual enrollment materials carefully when you receive them. You may access annual enrollment materials, obtain contact information, review Plan design changes and confirm most benefits through **http://netbenefits.com/merck** or by calling the Benefits Service Center at **800-666-3725**.

Between annual enrollment periods, you and your Eligible Dependents may change or enroll in (if you elected the "No Coverage" option) medical coverage only if you or your Eligible Dependents experience a Life Event that allows you to make a Permitted Plan Change and the Plan Administrator permits you to make a change in coverage or circumstances permitting enrollment under HIPAA. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# When Life Changes

## Life Events & Permitted Plan Changes

During the Plan Year, you may be eligible to make certain changes to your Medical Plan coverage if you, or your Spouse/Domestic Partner or Eligible Dependents, experience a Life Event that allows you to make Permitted Plan Changes. Any requested change to your coverage must be consistent with the Life Event.

In general, Life Events may include:

- A change in your legal marital status, including marriage, divorce or legal separation/annulment (in states where legal separation is recognized)
- Starting a Domestic Partnership (by meeting all the criteria as defined by the terms of the Plan), or ending a Domestic Partnership
- Gaining a new Eligible Dependent through birth, adoption or placement for adoption or foster care
- Your Eligible Dependents losing eligibility as a result of reaching the maximum coverage age
- The death of your eligible Dependent Child or Spouse/Domestic Partner
- A change to the employment status of you, your Spouse/Domestic Partner or eligible Dependent Child, including the beginning or end of an unpaid leave of absence, an FMLA leave or a change in work status (such as a switch from salaried to hourly pay or full-time to part-time hours)
- You, your Spouse/Domestic Partner or eligible Dependent Child terminating or commencing employment, or
- A change in the place of residence which includes a ZIP code change for you, your Spouse/Domestic Partner or eligible Dependent Child that causes you to lose eligibility for your current Medical Plan option. In this case, you can change only your medical election

Permitted Plan Changes may also include changes to certain benefits resulting from other events such as:

- If another employer's medical plan allows for a change in your Eligible Dependents' coverage (either during that plan's annual enrollment period or due to a mid-year election change permitted under that employer's plan), you may be able to make a corresponding election change under the Medical Plan.
- If the Medical Plan receives a Qualified Medical Child Support Order (QMCSO) requiring the Plan to provide health coverage to your child or foster child. In this instance, the Plan will automatically change your benefit elections to provide coverage for the child. In the case of a child whom you are required to cover pursuant to a QMCSO, coverage will begin on the date specified in the order, or if none is specified, the date of the order. You may decrease your coverage for that child if the court order requires the child's other parent to provide coverage and your Spouse's or former Spouse's plan actually provides that coverage.
- If your Eligible Dependent becomes entitled to, or loses entitlement to, coverage under a government institution, Medicare, Medicaid or state children's health program, you may make corresponding changes to your benefit elections under the Medical Plan. This event may also qualify as a HIPAA special enrollment event. See "Special Enrollment Under HIPAA for Eligible Employees" for more information.

---

**KEY POINT — A PROVIDER NETWORK CHANGE IS NOT CONSIDERED A LIFE EVENT**

If you are an Eligible Employee and your health care provider or facility decides to drop out of — or start participating in — a participating network of providers, this change in access is not considered a Life Event that would allow you to change your medical election mid-year. If you wish to change your Medical Plan option, you must wait until the next annual enrollment period.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

### How to Make a Permitted Plan Change

If you have a Life Event that allows you to make a Permitted Plan Change, you must request your change within the first 30 days after the event by contacting the Benefits Service Center — either online or by phone. Any requested change to your coverage generally must be due to an event that impacts eligibility for coverage and must be consistent with the Life Event. If you do not make your request within 30 days after the event — except for adding a new child through birth or adoption (see below) — you will have to wait until the next annual enrollment period, for coverage effective the following Jan. 1 to change your medical coverage, subject to any annual enrollment limitations.

### When Permitted Plan Changes Go Into Effect

If you experience a Life Event that permits you to change your Medical Plan coverage during the Plan Year, the effective date for the change will be the date of the event itself, provided you notify the Benefits Service Center within 30 days after the event, except if you are adding a new child through birth or adoption (see below). Any changes to your contribution amount will take effect the first of the month following or coincident with the date of notification. If you fail to notify the Benefits Service Center within the first 30 days after the event, you will not be permitted to make a change until the next annual enrollment period, subject to any annual enrollment limitations.

### Special Timeframes for Adding a New Child Through Adoption, Birth or Foster Care Placement

If you request coverage for a new child, the following special coverage and contribution effective dates apply:

- *Within 30 days.* If you request coverage for your new child within 30 days after the date of the birth, adoption or placement, the coverage effective date will be the date of the event — with contributions effective the first of the month following the date of notification.

- *After 30 days, but within 90 days.* If you request coverage for your new child after 30 days — but within 90 days — after the date of the birth, adoption or placement, the coverage effective date will be the date of the event — with contributions effective as of the first day of the month following the event.

- *After 90 days.* If you request coverage for your new child after 90 days following the date of the birth, adoption or placement, the coverage effective date — and the contribution effective date — will be the first of the month following the date of notification.

To add a new child to your medical coverage, you must notify the Benefits Service Center online or by phone.

For more information see "Special Enrollment Under HIPAA for Eligible Employees"

---

**KEY POINT — HOW TO ENROLL A NEW CHILD**

To enroll your new child under your Medical Plan coverage option, you must contact the Benefits Service Center online at **http://netbenefits.com/merck** or by calling **800-66-MERCK (800-666-3725)**. You cannot enroll your child by calling your Claims Administrator directly. Even if your Coverage Tier will not change, for example if you already have Employee + Child(ren) coverage, you must timely enroll your new dependent in the Plan within the timeframes listed above. You may be asked to provide proof of your child's eligibility.

---

### If You Take a Leave of Absence

- **Approved Paid Leave of Absence.** If you take an approved paid leave of absence, your Employer will continue to deduct your portion of the cost of medical coverage through Before-Tax payroll deductions.

- **Approved Unpaid Leave of Absence.** If you take an approved unpaid leave of absence, you will have the option when your leave begins to cancel coverage or continue coverage under the Medical Plan during your unpaid leave. If you elect to continue coverage, you will be billed by the Benefits Service Center starting the first of the month following commencement of your leave for coverage during your leave. For employees who

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

return to work at the expiration of a leave, unpaid amounts for coverage for the period prior to the first day of the month after your leave will be payable by you upon your return from leave by payroll deduction.

- If you fail to pay contributions to continue coverage during your leave in the time and manner specified by the Plan Administrator, your coverage will end and you will not be able to re-enroll for coverage until the next annual enrollment (for coverage effective the following Jan. 1) or mid-year if you have a Life Event that allows you to make a Permitted Plan Change. If you elect to cancel coverage under the Medical Plan when you begin your unpaid leave, you will not be able to re-enroll for coverage until the next annual enrollment (for coverage effective the following Jan. 1) or mid-year if you have a Life Event that allows you to make a Permitted Plan Change.

While on leave, you will continue to pay the same rates as similarly situated active employees.

## If You Are an Eligible Union Employee Who Goes on Layoff

If you are placed on layoff, there are two different ways to continue coverage:

**Continue Your Current Medical Coverage.** You may continue the medical coverage you had on the date your layoff begins for the duration of your layoff. If you decide to continue your benefits coverage under this option, you will receive a monthly billing invoice for 100% of the cost to continue your coverage, as well as a 2% administrative fee. Payment for continued coverage is due on the first of the month to maintain coverage for that month. If you want to elect this option, you must call the Benefits Service Center within 30 days from the date of your benefits continuation letter to make your election. If you do not call within the 30 days, you will not be able to continue coverage under this option. If you fail to pay contributions to continue coverage in the time and manner specified by the Plan Administrator, your coverage will end and you will not be able to re-enroll for coverage until the next open enrollment (for coverage effective the following Jan. 1) or mid-year if you have a Life Event that allows you to make a Permitted Plan Change.

**Continue Your Medical Coverage Under COBRA.** As an alternative, you may elect to continue your medical coverage for a period of 18 months under COBRA. If you want to elect this option, you must call the Benefits Service Center and make your elections within 60 days from the date your layoff begins or the date of your COBRA notification, whichever is later. If you do not call the Benefits Service Center and make your election by this date, you will not be eligible to continue your medical coverage under the COBRA option. For more information about your COBRA rights, see "COBRA" in the "Administrative Information" section.

If at the time you go on layoff you are eligible for continuation of medical benefits while on layoff under the terms of the separation program described in the collective bargaining agreement applicable to you, the terms of the collective bargaining agreement — and not the terms described in this section above — apply to continuation of your medical benefits while on layoff.

## If You Receive LTD Benefits

If you are or become an LTD Employee, your medical coverage in effect on the date you become eligible for LTD Benefits may continue while you are receiving LTD Benefits. (See "LTD Employees" for additional information.) While you are an LTD Employee, you may make changes to your medical coverage — elect a new Medical Plan option, add an Eligible Dependent or drop a Covered Dependent — only during the annual enrollment period, unless you experience a Life Event that allows you to make a Permitted Plan Change or circumstances permitting enrollment under HIPAA. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

### If You Had Elected No Coverage

If you had elected No Coverage at the time you qualified for LTD Benefits, you will not receive medical coverage, unless you enroll for coverage during the next annual enrollment or experience a Life Event that allows you to make a Permitted Plan Change or circumstances permitting enrollment under HIPAA. See "When Life Changes" and "Special Enrollment Under HIPAA for Eligible Employees" for more information.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**A Word About LTD Medical Plan Options and Medicare**

All of the Medical Plan options available to you require you and your Covered Dependents who are eligible for Medicare to enroll in Medicare — Parts A and B — when you are first eligible. Medicare is the primary payer for LTD Employees who are no longer considered to have been in active employment for at least six months due to a disability and their Covered Dependents who qualify for Medicare. The Medical Plan is the secondary payer and will coordinate benefits with Medicare. For more information, see "Coordinating Benefits with Medicare."

Please note that while participation in Medicare Parts A and B is required, participation in Medicare Part D prescription drug coverage is voluntary and Merck does not require that you or your Covered Dependents sign up for Medicare Part D.

**If Your Employment Ends While You Are an LTD Employee**

**End of Employment on or Before Aug. 25, 2015.** If you were an LTD Employee and your employment with the Company terminated on or before Aug. 25, 2015 and you were not eligible for subsidized retiree medical coverage on that date, you are eligible to continue medical coverage under the Medical Plan on the terms and conditions applicable to LTD Employees (as such coverage and eligibility therefor may be amended from time to time or terminated) whose employment has not terminated for so long as you continue to be eligible for long term disability benefits under Merck's Long Term Disability Plan as determined by the Claims Administrator for that plan.

If your employment ended on or before Aug. 25, 2015, and on the date your employment ended you were eligible for subsidized retiree medical coverage, your coverage under the Medical Plan ended on the date that you became eligible for subsidized retiree medical coverage — you were not eligible to continue coverage under the Medical Plan on terms and conditions applicable to LTD Employees.

**End of Employment After Aug. 25, 2015.** If you were, are or become an LTD Employee and your employment with the Company terminated or terminates after Aug. 25, 2015, your coverage under the Medical Plan ended or ends on the same terms applicable to any other Eligible Employee. In this case, coverage will generally end as of the end of the month in which your employment ended or ends. See "When Medical Coverage Ends." When your coverage ended or ends under the Medical Plan you may be eligible for retiree medical coverage under the Merck Retiree Medical Plan if you met or meet the age and service requirements on the date your employment ended or ends. See the *Merck Group Retiree Medical Plan SPD* and the *Merck Retiree Health Reimbursement Account SPD* for more information on retiree medical coverage.

# When Medical Coverage Ends

Your coverage in the Medical Plan ends on the earliest of:

- The end of the month in which your employment terminates, unless (a) your employment ends on or after Jan. 1, 2017, and you are eligible for subsidized group retiree medical coverage as described in the Merck *Group Retiree Medical Plan SPD*, or are eligible to participate in the Merck Retiree Health Reimbursement Account, as described in the SPD applicable to that coverage, or (b) your employment ends on or after Jan. 1, 2017 and you are eligible for medical continuation coverage due to your separation from employment as described in the *Merck U.S. Separation Benefits Plan SPD* or your collective bargaining agreement, if applicable, or (c) you were a Legacy Merck employee whose employment ended on or after Jan. 1, 2003 (Jan. 1, 2004, if you were a Non-Eligible Union Employee) and before Jan. 1, 2017, due to an approved disability retirement and on that date you had at least 10 years of service with the Company, but were not otherwise eligible for subsidized retiree medical coverage. In the case of clause (c) described above, your participation in the Medical Plan will continue in accordance with the special provisions of the Medical Plan applicable to you

- The end of the month following the month in which your employment terminates if your employment ends on or after Jan. 1, 2017, and you are eligible for subsidized group retiree medical coverage as described in the *Merck*

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

*Group Retiree Medical Plan SPD*, or are eligible to participate in the Merck Retiree Health Reimbursement Account as described in the SPD applicable to that coverage

- The last day of your medical benefits continuation period as described in the *Merck U.S. Separation Benefits Plan SPD* or your collective bargaining agreement, if applicable, if your employment terminates on or after Jan. 1, 2017, and you are eligible for medical continuation coverage due to your termination of employment as described in the *Merck U.S. Separation Benefits Plan SPD* or your collective bargaining agreement; however, if you are subsidized retiree medical eligible as of the date of separation, then your Medical Plan coverage will terminate at the end of the month in which your benefit continuation period end date occurs

- The date the Plan is amended to change your eligibility for coverage

- The end of the month in which you are no longer eligible to participate

- The day immediately prior to the day your No Coverage option goes into effect

- The date the required contributions for coverage are not paid, or

- The date the Medical Plan is terminated by the Plan Sponsor

Your Covered Dependents' coverage ends on the earliest of:

- The date your coverage ends for any reason. Coverage may continue under the terms applicable to survivor coverage (see the "Coverage for Surviving Covered Dependents on the Covered Employee's Date of Death" sections below)

- The date your Covered Dependent no longer qualifies as an Eligible Dependent under the Medical Plan (e.g., the date of divorce from your Spouse or the date of the end of your Domestic Partnership)

- The end of the month in which your Covered Dependent Child(ren) no longer qualifies as an Eligible Dependent under the Medical Plan — such as the date your child turns age 26 (see "Eligible Dependents" in the "About Medical Coverage" section)

- The date on which you are notified of your failure to complete the dependent audit request or your dependent is determined to be ineligible based on the audit

- The date the required employee contributions for coverage are not paid, or

- The date the Medical Plan is terminated by the Plan Sponsor

### If a Covered Dependent Loses Eligibility Status

You must notify the Plan Administrator when a Covered Dependent is no longer eligible for coverage by changing your dependent's status online or by phone by contacting the Benefits Service Center. If you do not notify the Plan Administrator when a Covered Dependent becomes ineligible for coverage, you may be required to reimburse the Medical Plan for any or all costs incurred by the Plan to cover your ineligible dependent. If permitted by applicable law, you may also be subject to disciplinary action by your Employer. Additionally, if you fail to notify the Plan Administrator within 60 days of the event, your dependent may lose eligibility to continue coverage under COBRA (or if applicable, continuation coverage available to Domestic Partners and their eligible Dependent Children).

Please note that coverage for that dependent will end in accordance with the Plan's provisions regardless of whether you have notified the Plan Administrator. For example, if you cover your Spouse as a dependent under the Medical Plan and become divorced, your Spouse's medical coverage will end as of the date of the divorce regardless of when you notify the Benefits Service Center by phone or online.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| KEY POINT — IN THE EVENT OF YOUR DEATH |
|---|
| If you die while you are a participant in the Medical Plan, your Eligible Dependents may be eligible to enroll for or continue to receive medical coverage under the Plan. See the "Coverage for Surviving Eligible Dependents on the Covered Employee's Date of Death" sections below. |

## Continuing Your Coverage Through COBRA

If you or your Covered Dependents lose medical coverage under the Medical Plan, you may be eligible to continue your coverage through COBRA. For more information, see "COBRA."

Note that if you drop a Covered Dependent during annual enrollment by reducing your Coverage Tier, the dropped dependent is not eligible to continue coverage through COBRA.

Although existing federal law does not extend rights to COBRA coverage to your Domestic Partner and your Domestic Partner's Covered Dependent Children, the Plan Sponsor offers continuation of medical coverage in certain cases. For continuation of coverage options available to Domestic Partners and their eligible Dependent Children, see "Continuation of Health Care Coverage for Domestic Partners" in the "Administrative Information" section of this SPD.

## Coverage for Surviving Covered Dependents on the Covered Employee's Date of Death — *Covered Employees Who Died Before Jan. 1, 2017*

If a Covered Employee died **before Jan. 1, 2017,** while employed by the Employer, any Surviving Covered Dependents on the date of the Covered Employee's death were eligible to continue coverage under the Medical Plan as described in the following section.

**As of the Covered Employee's Date of Death:**

- **COBRA:** Surviving Covered Dependents were eligible to continue coverage under the Medical Plan as it applied to active employees at no cost to them for as long as they continued to meet the requirements of an Eligible Dependent up to a maximum of two years, provided they elected to continue coverage in accordance with COBRA. Coverage provided to Surviving Covered Dependents ran concurrently with the continuation period available under COBRA. (For more information, see "COBRA.")

  During the COBRA period, Surviving Covered Dependents may have added Eligible Dependents who were not Surviving Covered Dependents in accordance with rules under COBRA. However, the Plan Administrator reserved the right to require full payment of COBRA contributions to cover Eligible Dependents who were eligible under COBRA rules but were not considered to be Surviving Covered Dependents.

  Coverage for Surviving Covered Dependents must have been under the option in which they were enrolled at the time of the Covered Employee's death until the next annual enrollment unless they experienced a Life Event or HIPAA Special Enrollment Event that would have allowed them to make a Permitted Plan Change. During the next annual enrollment, Surviving Covered Dependents could have elected any available option or remained in the same coverage. All Surviving Covered Dependents must have been enrolled in the same option. However, if during the COBRA period, Surviving Covered Dependents opted out of coverage, they would not have been allowed to enroll during the next annual enrollment or at a later date during the COBRA period.

**Special Transition Rule:** The maximum two-year period of no-cost coverage was extended one additional year to a maximum three-year period for those Surviving Covered Dependents who met each of the following requirements:

(a) The Surviving Covered Dependent was enrolled for coverage under the Medical Plan as of Dec. 31, 2016,

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

(b) The Surviving Covered Dependent's initial two-year period of no-cost coverage had not expired as of Dec. 31, 2016, and

(c) The Surviving Covered Dependent was at least age 65 and Medicare-eligible during the initial two-year period of no-cost coverage

If a Surviving Covered Dependent satisfied each of these requirements and either covered other Surviving Covered Dependents or was covered by another Surviving Covered Dependent, the extension applied to the entire Coverage Tier. This extension ran concurrent with COBRA.

**At the expiration of the up to two-year (or three-year, if applicable) COBRA period:**

- **Retiree Medical Coverage – Eligibility:**
  - If, on the day before the Covered Employee's death, the Covered Employee satisfied the age and service requirements to be a Retiree eligible for subsidized retiree medical coverage:
    - And the Surviving Covered Dependents were under age 65 or not Medicare-eligible, the Surviving Covered Dependents were eligible for subsidized group retiree medical coverage, in accordance with the terms of the Merck Group Retiree Medical Plan. In this case, coverage provided to Surviving Covered Dependents under the Merck Group Retiree Medical Plan lasted as long as they qualified as Eligible Dependents or until they became age 65 and Medicare-eligible, whichever happened first.
    - And the Surviving Covered Dependents were at least age 65 and Medicare-eligible, the Surviving Covered Dependents were eligible to purchase supplemental Medicare coverage through Alight Retiree Health Solutions and may have been eligible to participate in the Merck Retiree Health Reimbursement Account. **Note:** In this case, the Surviving Covered Dependents were not eligible for coverage under the Merck Group Retiree Medical Plan.
  - If, on the day before the Covered Employee's death, the Covered Employee satisfied the age and service requirements to be a Retiree eligible for unsubsidized retiree medical coverage (and did not have at least 25 years of service as of the Covered Employee's death),
    - And the Surviving Covered Dependents had not completed the full COBRA coverage period and were not at least age 65 and Medicare-eligible, the Surviving Covered Dependents were eligible to continue coverage in accordance with the rules applicable to COBRA for up to the remainder of the COBRA period, if any, provided they paid the full COBRA contribution.
    - And the Surviving Covered Dependents had completed the full COBRA coverage period and, effective Jan. 1, 2017, were not at least age 65 and Medicare-eligible on the last day of that period, they had a one-time opportunity to elect unsubsidized retiree medical coverage under the terms of the Merck Group Retiree Medical Plan.
    - And the Surviving Covered Dependents had not completed the full COBRA coverage period, but were at least age 65 and Medicare-eligible and Medicare eligibility occurred during the COBRA continuation coverage period, the Surviving Covered Dependents were not be eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan, nor were they eligible to purchase supplemental Medicare coverage through Alight Retiree Health Solutions or participate in the Merck Retiree Health Reimbursement Account.
    - And the Surviving Covered Dependents had not completed the full COBRA coverage period and were at least age 65 and Medicare-eligible, but Medicare eligibility occurred prior to eligibility for COBRA, then the Surviving Covered Dependents was eligible to continue coverage in accordance with the rules applicable to COBRA for up to the remainder of the COBRA period, if any, provided they paid the full COBRA contribution.
- **Required Retiree Contributions:** See the section "Contributions for Retiree Medical Required by Surviving Eligible Dependents."
- **More Information on Retiree Medical** — See the Merck Group Retiree Medical Plan SPD and the Merck Retiree Health Reimbursement Account SPD.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- **Continued COBRA**: If, on the day before the Covered Employee's death, the Covered Employee did not satisfy the age and service requirements to be a Retiree eligible for subsidized or unsubsidized retiree medical coverage (and did not have at least 25 years of service as of the date of death), any Surviving Covered Dependents were eligible to continue coverage in accordance with the rules applicable to COBRA for the remainder of the applicable COBRA period, if any, provided they paid the full COBRA contribution. **Note:** Surviving Covered Dependents who were eligible for the retiree coverage described above were also eligible to continue coverage through the remainder of the COBRA period, if any, in lieu of such retiree coverage.

## Coverage for Surviving Eligible Dependents Who Were Not Surviving Covered Dependents on the Eligible Employee's Date of Death — *Eligible Employees Who Died Before Jan. 1, 2017*

- If an Eligible Employee died while employed by the Employer and before Jan. 1, 2017, and the Eligible Employee's Surviving Eligible Dependents were not Surviving Covered Dependents, or if the Eligible Employee was not a Localized Employee and died on or after Jan. 1, 2015 and before Jan. 1, 2017, while employed by the Company or a Non-Eligible Union Employee and died while employed by the Company and before Jan. 1, 2017, any Surviving Eligible Dependents, in each case, on the date of the Eligible Employee's death were eligible to enroll in coverage under the Medical Plan. If the Eligible Employee was a Localized Employee who died before Jan. 1, 2015 while employed by the Company, any survivors were not eligible for benefits under the Medical Plan.

- **COBRA:** An Eligible Employee's Surviving Eligible Dependents who were not the Eligible Employee's Surviving Covered Dependents were not eligible to continue coverage under COBRA and are therefore not eligible for two years of coverage under COBRA at no cost described above.

- **Retiree Coverage — Eligibility:**

  - If on the day before death, the Eligible Employee satisfied the age and service requirements to be eligible for subsidized retiree medical coverage,

    - And any Surviving Eligible Dependents were under age 65 or not Medicare-eligible, the Surviving Eligible Dependents were eligible for subsidized retiree medical coverage as of the Eligible Employee's date of death in accordance with the terms of the Merck Group Retiree Medical Plan. Coverage for the Surviving Eligible Dependents under the Merck Group Retiree Medical Plan would last as long as the Surviving Eligible Dependents qualified as Eligible Dependents or until they became age 65 and Medicare-eligible, whichever happened first.

    - And any Surviving Eligible Dependents who were at least age 65 and Medicare-eligible, the Surviving Eligible Dependents were not eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan. Instead, the Surviving Eligible Dependents may have been eligible to purchase supplemental Medicare coverage through Alight Retiree Health Solutions and may have been eligible to participate in the Merck Retiree Health Reimbursement Account, but note that their choices for coverage through Alight Retiree Health Solutions may have been limited.

  - If on the day before death, the Eligible Employee satisfied the age and service requirements to be eligible for unsubsidized retiree medical coverage (and did not have at least 25 years of service as of the date of the Eligible Employee's death), the Surviving Eligible Dependents had a one-time opportunity to elect unsubsidized retiree medical coverage. If the Surviving Eligible Dependents did not elect unsubsidized retiree medical coverage effective before Jan. 1, 2017, the Surviving Eligible Dependents were not eligible to elect unsubsidized retiree medical coverage.

  - **Required Retiree Contribution:** See the section "Contributions for Retiree Medical Required by Surviving Eligible Dependents."

  - **More Information on Retiree Medical** — See the Merck Group Retiree Medical Plan SPD and the Merck Retiree Health Reimbursement Account SPD.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- **Continued COBRA**: If, on the day before an Eligible Employee's death, an Eligible Employee did not satisfy the age and service requirements to be a Retiree eligible for subsidized or unsubsidized retiree medical coverage (and did not have at least 25 years of service as of your death), any Surviving Eligible Dependents were not eligible for COBRA coverage, and therefore, were not eligible for coverage under the Medical Plan as of the date of the Eligible Employee's death.

## Coverage for Surviving Covered Dependents on the Covered Employee's Date of Death — *Covered Employees Who Die on or After Jan. 1, 2017*

- If you are a Covered Employee and die on or after Jan. 1, 2017, while employed by the Employer, your Surviving Covered Dependents are eligible to continue coverage under the Medical Plan as described in the following section.

**As of the Covered Employee's Date of Death**

- **Continuation Coverage:** Surviving Covered Dependents are eligible to continue coverage under the Medical Plan as it applies to active employees (subject to the limitation on adding dependents described in "Other Important Information on Survivor Benefits") at no cost to them for as long as they continue to meet the requirements of an Eligible Dependent up to a maximum of two years.

**At the Expiration of the Up-to-Two-Year Continuation Period**

- **COBRA:** Surviving Covered Dependents who remain covered at the end of the two-year continuation period described above are eligible to continue coverage under the Medical Plan in accordance with COBRA, provided they timely elect and pay for such coverage.

- **Retiree Coverage:** If on the day before the Covered Employee's death the Covered Employee satisfied the age and service requirements to be eligible for subsidized retiree medical coverage or the Covered Employee had at least 25 years of service, Surviving Covered Dependents who remain covered at the end of the two-year continuation period are eligible for subsidized retiree medical coverage effective Jan. 1, 2017, in accordance with the terms of the Merck Retiree Medical Plan. That means that,

  – Surviving Covered Dependents who are under 65 or not Medicare-eligible will be eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan in accordance with the terms of that plan for so long as they qualify as Eligible Dependents or become age 65 and Medicare-eligible, whichever happens first.

  – Surviving Covered Dependents who are at least age 65 and Medicare-eligible will not be eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan, and instead, they will be eligible to purchase supplemental Medicare coverage through Alight Retiree Health Solutions and may be eligible to participate in the Merck Retiree Health Reimbursement Account.

- **Interaction with COBRA:** Surviving Covered Dependents cannot be covered under COBRA and in the group retiree medical coverage under the Merck Group Retiree Medical Plan or be a participant in the Merck Retiree Health Reimbursement Account at the same time. Surviving Covered Dependents who want retiree coverage must waive their coverage under COBRA.

- **Retiree Contributions:** See the section "Contributions for Retiree Medical Required by Surviving Eligible Dependents."

- **More Information on Retiree Medical:** See the Merck Group Retiree Medical Plan SPD and the Merck Retiree Health Reimbursement Account SPD.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Coverage for Surviving Eligible Dependents Who Were Not Surviving Covered Dependents on the Eligible Employee's Date of Death — *Eligible Employees Who Die on or After Jan. 1, 2017*

- If you are an Eligible Employee and die while employed by the Employer on or after Jan. 1, 2017, and your Eligible Surviving Dependents are not your Covered Dependents or you are a Localized Employee and die on or after Jan. 1, 2017, while employed by the Company, or a Non-Eligible Union Employee and die while employed by the Company on or after Jan.1 , 2017, your surviving Eligible Dependents, in each case, on the date of your death are eligible to enroll in coverage under the Medical Plan as described in the following section.

- **Continuation Coverage:** Your Surviving Eligible Dependents are not eligible for continuation coverage.

- **COBRA:** Your Surviving Eligible Dependents are not eligible to continue coverage under COBRA.

- **Retiree Coverage:** If on the day before your death, you satisfied the age and service requirements to be eligible for subsidized retiree medical coverage or you had at least 25 years of service, your Surviving Eligible Dependents are eligible for subsidized retiree medical coverage as of your date of death in accordance with the terms of the Merck Retiree Medical Plan. That means that,

  - Surviving Eligible Dependents who are under 65 or not Medicare-eligible will be eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan in accordance with the terms of that plan for so long as they qualify as Eligible Dependents or become age 65 and Medicare-eligible, whichever happens first.

  - Surviving Eligible Dependents who are at least age 65 and Medicare-eligible will not be eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan — instead, they may be eligible to purchase supplemental Medicare coverage through Alight Retiree Health Solutions and may be eligible to participate in the Merck Retiree Health Reimbursement Account, but note that their choices for coverage through Alight Retiree Health Solutions may be limited.

- **Required Retiree Contribution:** See the section "Contributions for Retiree Medical Required by Surviving Eligible Dependents."

- **More Information on Retiree Medical** — See the Merck Group Retiree Medical Plan SPD and the Merck Retiree Health Reimbursement Account SPD.

## Contributions for Retiree Medical Required by Surviving Eligible Dependents

- Regardless of your date of death, if your Surviving Eligible Dependents are eligible for group retiree medical coverage under the Merck Group Retiree Medical Plan and enroll for such coverage, the required contributions for subsidized (and unsubsidized if eligible) retiree medical coverage are determined by the Plan Administrator of the Merck Group Retiree Medical Plan and are subject to change from time to time.

- Surviving Eligible Dependents must contact the Benefits Service Center after the employee's death to enroll in coverage as described above. The timing of this enrollment request determines when coverage and contributions begin:

  - *Within 30 days.* If the enrollment request is made within 30 days after your death, the coverage effective date is one day following the date of your death, with contributions effective the first of the month following the date of your death.

  - *After 30 days, but within 90 days.* If the enrollment request is made after 30 days — but within 90 days — after your death, the coverage effective date is the date of your death, with contributions effective the first of the month following the date of your death.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

– *After 90 days.* If the enrollment request is made after 90 days following your death, the coverage effective date — and the contribution effective date — is the first of the month following the date of notification.

---

**KEY POINT — ARE YOU A SURVIVING ELIGIBLE DEPENDENT WHO IS ELIGIBLE FOR MEDICARE?**

The Medical Plan coordinates with Medicare Parts A and B as primary coverage whenever it is legally permitted to do so. Generally, you are eligible for Medicare when you reach age 65 or prior to age 65 due to disability. Medicare rules permit Parts A and B to be the primary payor (and employer-sponsored coverage to be the secondary payor) for former employees (including retirees) and their dependents who are Medicare-eligible. That means that Surviving Eligible Dependents who are eligible for Medicare for any reason (e.g., due to age or disability) and enrolled for coverage under the Medical Plan for a period of continuation coverage or under COBRA, must enroll in Medicare Parts A and B when first eligible because the Medical Plan will coordinate with Medicare Parts A and B, even if the Eligible Dependents fail to enroll. The Merck Medical Plan will not pay those charges that would have been paid by Medicare. Enrolling in Medicare Parts A and B also ensures that Eligible Surviving Dependents avoid a gap in coverage and any Medicare late enrollment penalties. For more information, see "Coordinating Benefits with Medicare."

While participation in Medicare Parts A and B is required to avoid a gap in coverage and Medicare late enrollment penalties, participation in Medicare Part D prescription drug coverage is not required while you are enrolled for continuation coverage or through COBRA under the Medical Plan because the Medical Plan does not coordinate with Medicare Part D.

For information on coordination with Medicare if you are covered for group retiree medical coverage under the Merck Retiree Medical Plan, see the *Merck Group Retiree Medical Plan SPD*.

---

**Other Important Information on Survivor Benefits:** You are eligible to be a Retiree as of your date of death for purposes of determining eligibility for medical benefits for your Surviving Eligible Dependents (including your Surviving Covered Dependents), if you meet the age and service requirements applicable to a non-disability retirement on your date of death as set forth in the definition of "Retiree" (see the Glossary for the definition of "Retiree"). For information on eligibility for subsidized and unsubsidized group retiree medical coverage under the Merck Group Retiree Medical Plan, see the *Merck Group Retiree Medical Plan SPD*. For information on eligibility for the retiree health reimbursement account, see the *Merck Retiree Health Reimbursement Account SPD*.

If your surviving Spouse/Domestic Partner is an Eligible Employee or Retiree of the Company, special rules apply. For more information, your Spouse/Domestic Partner should contact the Benefits Service Center.

Your surviving Spouse or Domestic Partner continues to qualify as your dependent even if your Spouse or Domestic Partner remarries or forms another Domestic Partnership. No new dependents may be added to your Surviving Covered Dependent's coverage (other than to the extent required under COBRA and only for the COBRA period). For example, should your surviving Spouse be eligible for retiree coverage under the Merck Group Retiree Medical Plan and remarry, your surviving Spouse would not be permitted to add a new Spouse or child as a dependent under the Merck Group Retiree Medical Plan.

---

**KEY POINT — REPORTING A DEATH**

To report the death of an Eligible Employee, Non-Eligible Union Employee, Localized Employee or Covered Dependents, please call the Benefits Service Center at **800-66-MERCK (800-666-3725)** from 8:30 a.m. to 8:30 p.m., ET, Monday through Friday.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## LTD-Like Continuing Coverage for Certain Legacy Merck Disability Retirees and Their Survivors

If you were a Legacy Merck employee and your employment terminated on or after Jan. 1, 2003 (Jan. 1, 2004 if you were a Non-Eligible Union Employee) but before Jan. 1, 2017, due to a disability retirement approved under the terms of the Company pension plan in which you participated, you are eligible to continue coverage under the Medical Plan applicable to LTD Eligible Employees if and only if you had at least 10 years of service with the Company on the date your employment ended and you did not otherwise satisfy the requirements to be eligible for subsidized retiree medical coverage.

In the event of your death, coverage for your Surviving Eligible Dependents may continue under the Medical Plan for so long as they qualify as Eligible Dependents. You or your Surviving Eligible Dependents, if applicable, may be required to contribute towards the cost of coverage under the Medical Plan. Required contributions for this coverage are determined by the Plan Administrator and are based on the contributions required for similarly situated LTD Eligible Employees. Note that your surviving Spouse or Domestic Partner continues to qualify as your dependent even if your surviving Spouse or Domestic Partner remarries or forms another Domestic Partnership. No new dependents may be added to your Surviving Covered Dependent's coverage. Note that eligibility for this continuation of coverage for you and your Surviving Eligible Dependents is subject to amendment or termination at any time.

## U.S. Territory Employees

If you are a U.S. Territory Employee, the provisions of the Medical Plan described in this SPD apply to you except as follows:

- **Medical Plan Options:** You are only eligible to enroll yourself and your Eligible Dependents in either the Merck PPO or the No Coverage option.

- **Deductible:** You and your Covered Dependents have a $0 Deductible.

- **Out-of-Network Benefit:** If you or your Covered Dependents receive care from an Out-of-Network provider, the Medical Plan will pay 80% of covered expenses up to the Reasonable and Customary (R&C) Limit and you will be responsible to pay 20% of covered expenses up to the R&C Limit and 100% of covered expenses over the R&C Limit. Amounts over the R&C Limit do not count toward the Out-of-Pocket Maximum.

- **Out-of-Pocket Maximum:** The Merck PPO Out-of-Pocket Maximum for both In-Network coverage and Out-of-Network coverage is $2,500 (individual) and $5,000 (family).

- If you are a U.S. Territory Employee who is a U.S. territory resident on assignment in the U.S.:

  - **Cost of Coverage:** Coverage for you and your Covered Dependents is provided under the Medical Plan at no cost to you.

  - **Survivor Benefits:** In the event of your death while on assignment in the U.S., the provisions of the Medical Plan applicable to Surviving Eligible Dependents do not apply to your survivors; coverage for your survivors may be available under the terms of your home country medical plan.

- If you are a U.S. Territory Employee who is a U.S. resident on assignment in a U.S. Territory:

  - **Cost of Coverage.** Coverage for you and your Covered Dependents is provided under the Medical Plan at the same cost as other U.S. expatriates.

  - **Survivor Benefits:** In the event of your death while on assignment in a U.S. Territory, the provisions of the Medical Plan applicable to Surviving Eligible Dependents do apply to your survivors.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# THE MERCK PPO

The Merck Medical Plan offers a preferred provider organization (PPO) administered by Horizon BCBS which includes prescription drug and behavioral health care benefits. The Merck PPO is not available to Eligible Employees who reside in Hawaii.

## ABOUT THE MERCK PPO

The Merck PPO, administered by Horizon BCBS, uses the national BlueCard PPO network. The Merck PPO covers you for a range of services, including preventive care, hospitalizations and emergency care.

When you visit a health care provider who participates in the PPO network, you will pay lower out-of-pocket costs than if you obtained care from an Out-of-Network provider. Under the Merck PPO you don't need to select a Primary Care Physician (PCP) and you don't need a referral to see a specialist. Horizon BCBS is the Claims Administrator for the Merck PPO.

| KEY POINT — IMPORTANCE OF SELECTING A PRIMARY CARE PHYSICIAN (PCP) |
|---|
| While you are not required to select a PCP under the Medical Plan, having a relationship with a PCP is an important first step toward managing your health care. Your PCP is your partner who is focused on keeping you healthy, knowing your personal health history and helping you through illness. You will visit your PCP for most medical needs, including wellness visit and routine screenings and non-emergency illnesses such as earaches and sore throats, and your PCP is the person to whom you will generally speak about your health questions and concerns. An added benefit is that it is typically much easier to schedule a non-routine appointment with a PCP once you have an established relationship. When choosing a PCP, select an In-Network provider with the expertise to meet your needs. If you need assistance selecting a PCP, contact your Claims Administrator. |

## Key Features

In general, under the Merck PPO:

- You may receive care from any licensed provider of your choice.

- Every time you need care, you have the choice to see an In-Network or Out-of-Network provider. However, if you do obtain care from an Out-of-Network provider, you will pay more for those services.

- Network providers have agreed in advance to accept specific negotiated fees, so you will never have to pay for fees in excess of negotiated fees if you use a network provider.

- Generally, you must meet an Individual Deductible or Family Deductible before the Plan pays for In-Network or Out-of-Network coverage, other than preventive care services. Eligible preventive care services are covered at 100% from In-Network providers with no Deductible required.

- If you receive care In-Network, your Coinsurance for most covered services will generally be paid at 80% after you meet the Deductible, up to your Annual Out-of-Pocket Maximum.

- If you receive care Out-of-Network, your Coinsurance for most covered services will generally be paid at 70% after you meet the Deductible, subject to Reasonable & Customary (R&C) Limits, up to your annual Out-of-Pocket Maximum. You are still responsible for payment of any expenses exceeding R&C, even if you have met your annual Out-of-Pocket Maximum.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

- You must precertify certain services, including, but not limited to, inpatient hospitalization, certain surgeries, certain maternity care, High Tech Imaging, Applied Behavioral Analysis therapy, sleep studies, and outpatient musculoskeletal procedures including pain management and outpatient surgeries.

### Prescription Drug Benefits

When you enroll in a Medical Plan option (except for the No Coverage option), you automatically receive coverage under Merck's Managed Prescription Drug Program. See the "Managed Prescription Drug Program" section for details.

## Merck PPO Coverage

Each time you receive care for covered expenses you have a choice of obtaining care In-Network, using PPO network providers, or Out-of-Network from any other provider of your choice. You pay an Annual Deductible each year for In-Network and Out-of-Network coverage (other than eligible preventive care), then the Medical Plan pays a percentage of your covered expenses. If you receive care Out-of-Network, the Medical Plan pays a percentage up to R&C Limits.

### In-Network Benefits

You receive the highest level of benefits available under the Merck PPO when you use an In-Network provider. For a list of In-Network providers, or to find out if your provider is In-Network, contact the Claims Administrator (see "Benefits Contacts and Resources"). Every time you visit a health care provider who participates in the PPO network, you have the potential to save money — and the Company does too. Since the In-Network provider's fees are negotiated (and generally lower), you are charged less. Plus, you have to satisfy a lower Deductible before the Plan begins to pay In-Network benefits than you do for Out-of-Network benefits. This means you pay less out of your own pocket for health care. Your In-Network provider files claims for you, so you don't have to do the paperwork or worry about being billed for costs that exceed the negotiated fees or R&C Limits.

Generally, preventive services that meet certain guidelines are covered at 100% with no Deductible. After you satisfy the annual In-Network Deductible, other services require you to pay a Coinsurance amount until you reach the annual Medical Plan Out-of-Pocket Maximum. Once you reach the Medical Plan Out-of-Pocket Maximum, the Medical Plan pays 100% of covered expenses for the remainder of the calendar year.

| KEY POINT — CHOOSE IN-NETWORK PROVIDERS FOR LAB AND RADIOLOGY SERVICES |
| --- |
| When you need a lab or radiology facility, use an In-Network provider. Your out-of-pocket costs are usually lower since you pay a percentage of an already pre-negotiated discounted rate. Check with Horizon BCBS to see which providers are considered In-Network for lab or radiology services. |
| There is no penalty if you fail to precertify. However, if your care is not Medically Necessary it will not be covered under the Medical Plan. |
| Participating labs can vary by geographical location. To find an In-Network laboratory near you, go to **www.horizonblue.com/merck**. |

### Out-of-Network Benefits

Each time you need care, you can choose to see a provider who does not belong to the PPO network. The difference is that you likely will pay more for Out-of-Network care. You are also responsible for any expenses above the R&C Limit (even if you have met your Medical Plan Out-of-Pocket Maximum for the year). You will be considered to have chosen to go Out-of-Network if you receive care from a provider who does not participate in the PPO network.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## The Merck PPO at a Glance

The charts on the following pages summarize the coverage levels for services under the Merck PPO (administered by Horizon BCBS). **For Out-of-Network services, there is no coverage for charges above the Reasonable and Customary (R&C) Limit.** In-Network preventive care services listed on the following pages are covered at 100%. For other services, the Coinsurance percentages apply after you have met any applicable Deductibles and assume you have not already reached the Medical Plan Out-of-Pocket Maximum. There is no coverage for services that the Claims Administrator determines are not Medically Necessary. In addition, not all services that are Medically Necessary are covered. See "What's Covered" for a complete list of covered services and any applicable additional limitations under the Merck PPO. In addition, more detailed information regarding the benefits that will be provided under the Medical Plan is available from Horizon BCBS.

| | In-Network Coverage[1] | | Out-of-Network Coverage[2] | |
|---|---|---|---|---|
| **COSTS** | | | | |
| Annual Deductible[3]<br>• Individual<br>• Family Maximum | $500<br>$1,000 | | $1,000<br>$2,000 | |
| Coinsurance | Plan pays: 80% of pre-negotiated discounted rate, after Deductible<br>You pay: 20%, after Deductible | | Plan pays: 70% of R&C Limit, after Deductible<br>You pay: 30% of R&C Limit plus any amounts in excess of R&C Limit, after Deductible | |
| Annual Medical Plan Out-of-Pocket Maximum[2] (includes Deductible)<br>Varies based on your Base Pay | Individual | Family Maximum | Individual | Family Maximum |
| • Under $60,000 | $1,500 | $3,000 | $3,000 | $6,000 |
| • $60,001 to $100,000 | $2,500 | $5,000 | $5,000 | $10,000 |
| • $100,001 to $150,000 | $3,500 | $7,000 | $7,000 | $14,000 |
| • $150,001 and over | $4,500 | $9,000 | $9,000 | $18,000 |
| Base Pay equals Base Pay as of Nov. 1 prior to the Plan Year plus COLA. | | | | |
| Lifetime Benefit Maximum | None[4] | | | |
| Reasonable and Customary (R&C) Limit | Not applicable | | Applies | |

---

[1]  If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2]  For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3]  Expenses incurred to satisfy your Deductible and Out-of-Pocket Maximum will be credited to both your In-Network and Out-of-Network Deductibles and Out-of-Pocket Maximums. Expenses in excess of the R&C Limit do not count toward your Deductible or Out-of-Pocket Maximum.

[4]  Certain treatment limits or lifetime maximums may apply to certain services such as fertility-related services.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

  
| | In-Network Coverage[1] | Out-of-Network Coverage[2] |
|---|---|---|
| **PREVENTIVE MEDICAL CARE — EXAMS[3]** | | |
| Well-Child Care *(up to age 6)* *Unlimited visits* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Annual Physical Exams *One exam per calendar year (over age 6)* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Immunizations and Inoculations | 100%, no Deductible | 100% of R&C Limit, no Deductible |
| Routine Immunization-Related Office Visits | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Preventive OB/GYN Exams *One exam per calendar year* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Eye Exams *One exam every 24 months* *Eyewear discounts may be available[4]* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Hearing Exams *One exam every 24 months* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Preventive Lab/X-ray [2,5] *Services related to routine annual physical exams limited to one per calendar year (over age 6)* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| **PREVENTIVE MEDICAL CARE — ROUTINE SCREENINGS, LABS AND X-RAY[4]** | | |
| Certain Preventive Services that Are Not Part of a Routine Annual Physical/Office Visit[4] | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Preventive Counseling for tobacco and alcohol/drug use and contraceptives[2] | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Mammography Screenings | 100%, no Deductible If additional screenings are prescribed by your Physician as Medically Necessary, 80% after Deductible | 70% of R&C Limit, no Deductible If additional screenings are prescribed by your Physician as Medically Necessary, 70% of R&C Limit, after Deductible |
| Routine Preventive Pap Test *One per calendar year* | 100%, no Deductible | 70% of R&C Limit, no Deductible |
| Routine Colonoscopy | 100%, no Deductible If additional screenings are prescribed by your Physician as Medically Necessary, 80% after Deductible | 70% of R&C Limit, no Deductible If additional screenings are prescribed by your Physician as Medically Necessary, 70% of R&C Limit, after Deductible |

[1]  If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2]  For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3]  All In-Network preventive services required to be covered by the Medical Plan pursuant to the Patient Protection and Affordable Health Care Act of 2010 will be covered by the Medical Plan with no cost-sharing requirement. For additional information about these preventive services and about specific guidelines and visit limits, contact Horizon BCBS.

[4]  For information about eyewear discounts, contact Horizon BCBS.

[5]  Coverage for routine preventive lab/X-ray is determined by the Claims Administrator. Contact Horizon BCBS for more information.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| | In-Network Coverage[1] | Out-of-Network Coverage[2] |
|---|---|---|
| **OUTPATIENT MEDICAL CARE (OTHER THAN PREVENTIVE MEDICAL CARE)** | | |
| Office Visits | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Telehealth Consultations[3] *Only applicable to providers in designated telehealth networks* | 80%, after Deductible | Not Covered |
| Outpatient Surgery *Performed in a doctor's office* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Outpatient Surgery[4] *Performed in a Hospital or Ambulatory Surgical Center* | 80%, after Deductible Includes Physician's charges | 70% of R&C Limit, after Deductible Includes Physician's charges |
| Allergy Testing | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Allergy Treatment *Injections, serum* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Fertility Benefits[5] *Artificial insemination, ovulation induction, advanced reproductive treatment (ART), medically necessary cryopreservation* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| | Note that a combined lifetime maximum of $25,000 applies for medical benefits across all non-HMO Medical Plan options in which you have participated since joining the Company | |
| Chiropractic Care *Up to 25 visits per calendar year per person; Maintenance therapy not covered* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Acupuncture *For pain, illness or injury when performed by an M.D., D.O. or state-licensed Physician or practitioner and is Medically Necessary* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Second Surgical Opinion | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Short-Term Rehabilitation[6] *Physical therapy, occupational therapy, speech therapy (Maintenance therapy not covered)* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Oral Surgery *Certain procedures if performed in a Hospital or ambulatory surgical facility due to medical necessity[7]* | 80%, after Deductible | 70% of R&C Limit, after Deductible |

[1] If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2] For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3] The healthcare provider will determine whether or not the condition being diagnosed and/or treated is appropriate for a telehealth encounter. Additionally, the scope of care is at the sole discretion of the provider with no guarantee of diagnosis, treatment or prescription.

[4] The No Surprises Act imposes certain requirements on non-emergency services performed by out-of-network providers at in-network facilities. You cannot be billed for more than the in-network cost sharing amount and cannot be balanced billed for emergency transport or care received from out-of-network providers when you receive care at in-network hospitals and surgical centers.

[5] Medical and prescription benefits for fertility are not available in excess of the lifetime maximums. The lifetime maximums are cumulative limits, meaning all fertility benefits you have received as a participant in any non-HMO Merck Medical Plan option since joining the Company count toward the limit, including costs incurred under a legacy Merck or legacy Schering sponsored non-HMO medical plan. (See "Key Point —Fertility Rules as of Jan. 1, 2011" for additional information). All drugs indicated for use in fertility require prior authorization through the Merck Managed Prescription Drug Program. You, your doctor or pharmacist must call Express Scripts at **800-RX-MERCK (800-796-3725)** to obtain authorization before your prescription is filled to receive coverage under the Merck Managed Prescription Drug Program.

[6] Short-term rehabilitation means physical, occupational and speech therapy for a limited period based on medical necessity if required to restore a function that was lost due to illness or injury or for the treatment of developmental delays, including a diagnosis of autism spectrum disorder. Coverage for developmental delays, including Applied Behavioral Analysis (ABA), is available for children based on medical necessity. Contact the Claims Administrator about medical necessity, preauthorization and precertification requirements.

[7] Oral surgery performed in a dental office, whether it is dental or medical in nature, will be considered for payment under dental benefits only. See the *Merck Dental Plan SPD* for information. Oral surgery that is not performed in a dental office which is dental or medical in nature may be considered for payment under medical benefits, provided the patient has a medical condition where medical necessity requires service outside of a dental office.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| | In-Network Coverage[1] | Out-of-Network Coverage[2] |
|---|---|---|
| **OUTPATIENT MEDICAL CARE** | | |
| Outpatient Hospice Care<br>*Contact the network for coverage details* | 80%, after Deductible<br>Precertification required[3] | 70% of R&C Limit, after Deductible<br>Precertification required[2] |
| **OUTPATIENT MEDICAL CARE — LABS AND X-RAY** | | |
| High Tech Imaging Services (CAT scans, PET scans, MRIs) | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Diagnostic Labs and X-Rays<br>*Performed in a Physician's office* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Diagnostic Labs and X-Rays<br>*Performed in an outpatient Hospital or other outpatient facility (including lab processing)*<br>**Note:** *Check with your health plan administrator to see which providers are considered In-Network for lab services.* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| **INPATIENT MEDICAL CARE[2]** | | |
| Inpatient Hospital Services[4]<br>*Includes inpatient surgery expenses, semi-private Room and Board, Physician expenses, routine nursery care, prescription drugs, all other inpatient care* | 80%, after Deductible<br>Precertification required[2] | 70% of R&C Limit, after Deductible<br>Precertification required[2] |
| Maternity Services[5]<br>*Delivery charges in a Hospital or approved, licensed Birthing Center* | 80%, after Deductible<br>Precertification required[2] | 70% of R&C Limit, after Deductible<br>Precertification required[2] |
| Inpatient Hospice Care | 80%, after Deductible<br>Precertification required[2] | 70% of R&C Limit, after Deductible<br>Precertification required[2] |
| **OTHER SERVICES** | | |
| Emergency Services[6]<br>• *Ambulance[6]*<br>• *Emergency Room[7]* | <br>80%, after Deductible<br>80%, after Deductible | <br>80%, after Deductible<br>80%, after Deductible |
| Non-Emergency Services<br>• *Non-emergent care*<br>• *Urgent Care* | <br>80%, after Deductible<br>80%, after Deductible | <br>70% of R&C Limit, after Deductible<br>70% of R&C Limit, after Deductible |

[1] If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2] For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3] You must precertify certain care, including but not limited to, all inpatient medical hospitalizations, including surgeries and certain maternity care. If you fail to precertify and care is deemed not Medically Necessary, you will have no coverage for the non-Medically Necessary care. Contact Horizon BCBS to precertify.

[4] The No Surprises Act imposes certain requirements on non-emergency services performed by out-of-network providers at in-network facilities. You cannot be billed for more than the in-network cost sharing amount and cannot be balanced billed for emergency transport or care received from out-of-network providers when you receive care at in-network hospitals and surgical centers.

[5] Maternity services include lactation consultant and prenatal counseling. Breast pumps are considered a preventive service under the Patient Protection and Affordable Care Act and are covered at 100%.

[6] Ambulance (including air ambulance) In-Network and Out-of-Network pays at 80% after Deductible. Due to network limitations, this benefit will always pay at an In-Network level of benefits. Participating ambulance providers are reimbursed according to their participating allowance; non-participating professional ambulance providers are reimbursed at charges.

[7] Horizon BCBS determines whether use of an emergency room meets the prudent layperson standard of Emergency. If you or a Covered Dependent are admitted, you must call Horizon BCBS to receive In-Network benefits, if applicable.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Durable Medical Equipment[1]<br>*Wheelchairs, walkers, etc.* | 80%, after Deductible<br>Precertification required[2] | 70% of R&C Limit, after Deductible<br>Precertification required[2] |
| --- | --- | --- |

---

[1] Excludes coverage for items otherwise covered under the Merck Managed Prescription Drug Program (for example, insulin, needles and syringes and other diabetic products, etc.). For details about coverage, visit **www.Express-Scripts.com** or call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| | **In-Network Coverage[1]** | **Out-of-Network Coverage[2]** |
|---|---|---|
| **OTHER SERVICES** | | |
| Transgender Care[3] <br> *Gender confirmation surgery, feminization/ masculinization-related procedures, behavioral health* | 80%, after Deductible <br> Precertification required | 80%, after Deductible <br> Precertification required |
| Foot Orthotics[4] | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Prosthetics and Appliances <br> *Artificial limbs, etc. (Certain limits may apply. Contact Horizon BCBS for details)* | 80%, after Deductible | 70% of R&C Limit, after Deductible |
| Skilled Nursing Facility <br> *Up to 120 days per calendar year* | 80%, after Deductible <br> Precertification required[4] | 70% of R&C Limit, after Deductible <br> Precertification required[4] |
| Home Health Care | 80%, after Deductible <br> Precertification required[5] | 70% of R&C Limit, after Deductible <br> Precertification required[4] |
| In-Home Drug Therapy | 80%, after Deductible <br> Precertification required | Not Covered |
| Custodial Care | Not covered | Not covered |
| Women's Contraceptive Device <br> *Diaphragms, IUDs, implants, injections* | 100%, no Deductible | 70% of R&C Limit, after Deductible |
| **PRESCRIPTION DRUG BENEFITS[6,]** | | |
| Inpatient | 80%, after Deductible <br> Merck- and Organon-brand drugs without a generic equivalent covered at 100%[7] | 70% of R&C Limit, after Deductible <br> Merck- and Organon-brand drugs without a generic equivalent covered at 100%[8] |
| Outpatient | Provided under the Merck Managed Prescription Drug Program (prescriptions filled through Retail Pharmacies or Express Scripts Pharmacy™, including Accredo Specialty Pharmacy) | |

---

[1] If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2] For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3] Transgender Care includes a comprehensive range of services and procedures required due to a diagnosis of gender dysphoria. Coverage follows guidelines from the World Professional Association of Transgender Health (WPATH). See Transgender Care under "What's Covered."

[4] Foot Orthotics refer to devices of rigid construction used to maintain the foot (and its superstructure) in a more efficient functional state in both standing (stance) and ambulating (gait) positions. Foot orthotics and orthopedic shoes are covered are covered, subject to medical necessity, for children under age 12. For anyone age 12 or older, up to one pair of orthopedic shoes is covered per calendar year.

[5] You must precertify certain care, including but not limited to, all inpatient medical hospitalizations, including surgeries and certain maternity care. If you fail to precertify and care is deemed not Medically Necessary, you will have no coverage for the non-Medically Necessary care. Contact Horizon BCBS to precertify.

[6] Medical and prescription benefits for fertility are not available in excess of the lifetime maximums. The lifetime maximums are cumulative limits, meaning all fertility benefits you have received as a participant in any non-HMO Merck Medical Plan option since joining the Company count toward the limit, including costs incurred under a legacy Merck or legacy Schering sponsored non-HMO medical plan. (See "Key Point —Fertility Rules as of Jan. 1, 2011" for additional information). All drugs indicated for use in fertility require prior authorization through the Merck Managed Prescription Drug Program. You, your doctor or pharmacist must call Express Scripts at **800-RX-MERCK (800-796-3725)** to obtain authorization before your prescription is filled to receive coverage under the Merck Managed Prescription Drug Program.

[7] Other Merck- and Organon-brand drugs with a generic equivalent. Those Merck- and Organon-brand drugs are subject to the Plan's Annual Deductible, Coinsurance and Out-of-Pocket Maximum.

| | In-Network Coverage[1] | Out-of-Network Coverage[2] |
|---|---|---|
| **MENTAL HEALTH AND SUBSTANCE ABUSE BENEFITS** | | |
| Coverage for Eligible Employees | Mental health and substance abuse benefits for employees who elect the Merck PPO are provided through Horizon Behavioral Health. Coverage is also provided for services received through Lyra.[3] | |
| Inpatient Mental Health and Substance Abuse Care[4] | 80%, after Deductible[5] Precertification required[6,7] | 70% of R&C Limit[8], after Deductible[4] Precertification required[5,6] |
| Outpatient Facility Mental Health and Substance Abuse Care | 80%, after Deductible[4] Precertification required[5,6] | 70% of R&C Limit[7], after Deductible[4] Precertification required[5,6] |
| Outpatient Mental Health and Substance Abuse Care<br>*Performed in a behavioral health care provider's office* | 80%, after Deductible[4] Precertification required[5,9] | 70% of R&C Limit[7], after Deductible[4] Precertification required[5,6] |

### KEY POINT — EXPANDED ACCESS TO BEHAVIORAL HEALTH CARE

Benefits for behavioral health care are provided through both Horizon Behavioral Health and Lyra. Providers from both networks are considered in-network by the Medical Plan, and the same rules surrounding covered services, eligibility and payment apply. Lyra providers are licensed in certain types of therapy and medication management and may not be appropriate for all treatment needs.

### KEY POINT — IMPORTANT BENEFIT TERMS

Important benefit terms, such as Annual Deductible, Coinsurance and Reasonable and Customary (R&C) Limit are defined in the Glossary.

## Precertification

If you or your Covered Dependents require High Tech Imaging, certain tests, procedures, outpatient surgery or inpatient hospitalization (other than for a maternity admission covered by the Newborns' and Mothers' Health Protection Act and

---

[1] If you are being treated for a serious or complex condition including pregnancy, inpatient care, nonelective surgery or terminal illness and your provider leaves the Horizon network benefits will continue to be treated as in-network for up to 90 days after the provider leaves the network. If the current Horizon provider directory incorrectly lists a provider that is not in the Horizon network as in-network with Horizon, then in-network cost sharing will apply for services provided by that provider. Out-network cost sharing will apply for services provided after notification that the provider is not in-network.

[2] For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit, which is set at 90% of FAIR Health. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[3] The Merck Employee Assistance Program (EAP) provides up to 12 visits of mental health therapy and/or coaching per calendar year at no cost to you. Mental health therapy provided by Lyra beyond what is available through EAP is covered in the Merck Medical Plan. Medication management is not an eligible EAP service but is covered in the Merck Medical Plan and cost sharing applies. Lyra coaching is not available in the Merck Medical plan. Lyra providers are not in-network with Horizon Behavioral Health, but your Coinsurance for Lyra-covered services will be paid at 80% after you meet the Deductible. Lyra providers are licensed in certain types of therapy and medication management and may not be appropriate for all treatment needs.

[4] Inpatient services apply to Medically Necessary hospital and residential treatment facility stays and Medically Necessary Emergency treatment.

[5] The same Deductible that applies to the Merck Medical Plan option in which you are enrolled applies to mental health and/or substance abuse treatment under the Behavioral Health Care Program. Your share of covered expenses counts toward the annual Out-of-Pocket Maximum under your Medical Plan option.

[6] You must precertify. See "Precertification."

[7] Expenses in excess of the R&C Limit do not count toward your Deductible or Out-of-Pocket Maximum.

[8] For Out-of-Network charges, you pay the Coinsurance amount plus the full amount of any charges above the Reasonable and Customary (R&C) Limit. Expenses in excess of the R&C Limit and expenses that are not covered do not count toward your Deductible or Out-of-Pocket Maximum.

[9] The following services and procedures also require precertification: psychological testing, neuropsychological testing, outpatient electroconvulsive therapy (ECT), biofeedback, hypnosis, psychiatric home health care services, outpatient detoxification and ABA services.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

emergency services covered by the No Surprises Act), including admission to a Hospital, treatment facility, Skilled Nursing Facility or hospice or certain behavioral health care services, you must obtain precertification in order to receive the highest level of benefits available under the Merck PPO.

| KEY POINT — PRECERTIFICATION OVERVIEW |
| --- |
| You must call the Claims Administrator to obtain precertification if you or your Covered Dependents require certain services. Contact Horizon BCBS at **877-663-7258**. <br><br> **Note:** Contact the Claims Administrator within 48 hours of an Emergency admission to a Hospital or other facility (even if you are discharged by then). |

### How to Precertify Inpatient Medical Services

To precertify an inpatient admission, or to determine if a particular service requires precertification, contact the Claims Administrator (see above). You must call at least 48 hours in advance for non-Emergency inpatient admissions.

You must follow precertification procedures for both In-Network and Out-of-Network care, even if your Physician is a network provider. Where no precertification is obtained, and the Claims Administrator determines that the care provided was not Medically Necessary, the services will not be covered at all. Any extra charges you incur for failure to precertify do not count toward your Annual Deductible or Out-of-Pocket Maximum.

### Lengthened Maternity Hospital Stays

If you expect your or your Covered Dependents' maternity Hospital stay to exceed 48 hours for a normal delivery or 96 hours for a Caesarian-section, you must precertify the continued hospitalization by calling the Claims Administrator.

## In Case of an Emergency

If you or a Covered Dependent has a medical or behavioral health Emergency, you should call 911 or immediately go to the nearest emergency room. Eligible emergency room services are covered at 80%, after you satisfy the Deductible, for both In-Network and Out-of-Network services. The Claims Administrator determines whether use of an emergency room meets the prudent layperson standard of Emergency.

| KEY POINT — HOW EMERGENCY IS DEFINED |
| --- |
| Emergency means a medical condition manifesting itself by acute symptoms of sufficient severity that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate attention could result in: <br><br> • Placing the health of the individual (or, with respect to a pregnant person, the health of the person or their unborn child) in serious jeopardy <br> • Serious impairment to bodily functions, or <br> • Serious dysfunction of a bodily organ. <br><br> For more details, please refer to the definition of "Emergency" in the Glossary. |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## How to File a Claim

### In-Network Care

If you or your Covered Dependents receive care from an In-Network provider, you do not have to file any claims. Your In-Network provider will file all claims for you. Your network provider bills the Medical Plan directly for its share of the cost of your care. Subsequently, your network provider bills you for your remaining share of the cost of your care (e.g., Deductible and Coinsurance).

However, if you have duplicate coverage, including Medicare, and the Medical Plan is secondary, you must first file claims with the primary plan and then submit your claims to the Medical Plan using the Out-of-Network address listed below — even if you received care from an In-Network provider. For more information when you have other coverage, see "Coordination of Benefits" in the "Administrative Information" section.

### Out-of-Network Care

When you or your Covered Dependents receive care from an Out-of-Network provider, you generally pay for services up front and then file a claim for reimbursement for the share of the cost covered by the Medical Plan. Here's how:

- Go to **www.horizonblue.com/merck** to download a Health Insurance Claim Form.
- Complete the claim form.
- Obtain an itemized bill from your provider that includes:
  - Patient's name
  - Dates of services
  - Condition being treated
  - Relationship to employee
  - Type of services rendered, and
  - The provider's name and Internal Revenue Service (IRS) tax identification number
- Attach a copy of your itemized bill to the claim form and submit both to the Claims Administrator. The address for the Claims Administrator is listed at the bottom of the form. If you prefer, you can work with a Horizon Health Guide who can assist you with your claim for submission. **Call 877-663-7258** to be connected.

In all cases, your claim must be submitted within 24 months from the date of service, unless you can show that it was not reasonably possible to file a claim within that time period. Claims submitted more than 24 months after the date of service are considered not valid and will not be paid.

| KEY POINT — KEEP COPIES OF CLAIMS FOR YOUR RECORDS |
|---|
| It's a good idea to keep copies of all claim forms and bills that you submit for reimbursement. Because Deductible amounts and other limitations apply separately to each covered person, it's important to keep separate records for each covered person. |

### Appealing a Claim

If you or your Covered Dependents believe you/they are entitled to a benefit, or to a greater amount of benefits, under the Medical Plan than the amount you received or are receiving, either in whole or in part, you and your Covered Dependents have the right to file an appeal with the Claims Administrator. For more information, see the "Claims and Appeals" section.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# COVERED SERVICES

## WHAT'S COVERED

This section provides an alphabetical list of Medically Necessary covered services and supplies for the Merck PPO, administered by Horizon BCBS. Clinical policies, which are incorporated into this SPD by reference, may affect coverage determinations including prescription drug and behavioral health care benefits.

Services that are not deemed Medically Necessary are not covered expenses (these include, but are not limited to, services that are deemed maintenance or custodial). In addition, certain services that may be deemed Medically Necessary may not be covered expenses. See "What's Not Covered" or contact the Claims Administrator (Horizon BCBS) for more details. For more information on coverage limits, see the "at a Glance" charts.

For additional information regarding what is covered or to verify coverage of a medical service or device, contact your Claims Administrator (Horizon BCBS).

Please note this section does not apply to the Health Plan Plus Hawaii HMO. For more information on what is covered under these options, contact the Plans directly.

---

**KEY POINT — HEALTH CARE REFORM**

Some language changes in response to recent changes under the Patient Protection and Affordable Care Act (PPACA) may not be included in this SPD. This may be because the language is still pending regulatory review and approval. However, please note the Claims Administrators are administering medical and outpatient prescription drug coverage in compliance with the applicable components of the PPACA.

---

**Acupuncture Treatments** when performed by a licensed M.D., D.O. or a state-licensed Physician for the treatment of pain, illness or injury.

**Allergy Testing and Treatment**, including serum and injections. See "Drug Therapy."

**Applied Behavioral Analysis (ABA) Therapy** when services have been pre-authorized, are for Eligible Employees and Covered Dependents with a diagnosis of autism spectrum disorder, and services meet medical necessity as deemed by the health plan's clinical policy. In addition, services for ABA must be rendered by a provider who is certified to provide pre-approved ABA services. Services that do not meet the criteria or those that are deemed not Medically Necessary will not be covered.

**Autism Benefits.** If a covered person's primary diagnosis is autism, in addition to coverage for certain therapy services, the Medical Plan also covers Medically Necessary and appropriate behavioral interventions based on Applied Behavioral Analysis (ABA) and related structured behavioral plans. Such interventions and programs must be prescribed in a treatment plan.

Any such treatment plan must:

- Be in writing
- Be signed by the treating Practitioner, and
- Include:
  - A diagnosis
  - Proposed treatment by type, frequency and duration
  - The anticipated outcomes stated as goals, and

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

– The frequency by which the treatment plan will be updated

With respect to the covered behavioral interventions and programs mentioned above, the term "Practitioner" also includes a person who is credentialed by the national Analyst Certification Board as either a Board Certified Behavior Analyst-Doctoral or a Board Certified Behavior Analyst.

The Medical Plan may request more information if it is needed to determine whether coverage will be provided. Submission of an updated treatment plan once every six months or more frequently may also be required.

**Bariatric Surgery** will be covered only if performed in a Center of Excellence (Blue Distinction Center). Medical necessity and pre-surgical review are required. The Plan considers bariatric surgery medically necessary only when certain selection criteria have been met such as a diagnosis of morbid obesity. The specific criteria are determined by the Claims Administrator according to the health plan's clinical policy. For more information, contact Horizon BCBS.

**Bereavement Counseling.** See "Hospice Care."

**Cancer Screenings.** The following screenings are covered once per calendar year at 100% with no cost sharing, if performed by an In-Network Provider:

- Colonoscopy
- Lung CT scan
- Routine mammograms
- Pap smear
- PSA testing
- Skin cancer screening

Any additional cancer screening services rendered during the same calendar year will be paid based on medical necessity and may be subject to deductible and coinsurance based on Horizon Medical Policy.

BRCA testing with In-Network Providers is covered at 100%, subject to Horizon Medical Policy.

**Chiropractic Services** (including the initial exam) performed by a licensed chiropractor, up to a maximum of 25 visits per calendar year. Chiropractic benefits are limited to the diagnosis and treatment only for a misalignment or dislocation of the spine (including any strained muscle or related ligament). Chiropractic maintenance therapy is excluded.

**Clinical Trial Therapies** *(Experimental or Investigational)* including charges made for **experimental or investigational** drugs, devices, treatments or procedures "under an approved clinical trial" only when you have cancer or a terminal illness, and *all* of the following conditions are met:

- Standard therapies have not been effective or are inappropriate
- The Claims Administrator determines, based on published, peer-reviewed scientific evidence that you may benefit from the treatment; and
- You are enrolled in an approved clinical trial that meets these criteria:
  - The FDA has approved the drug, device, treatment or procedure to be investigated or has granted it investigational new drug (IND) or group c/treatment IND status. This requirement does not apply to procedures and treatments that do not require FDA approval.
  - The clinical trial has been approved by an Institutional Review Board that will oversee the investigation.
  - The clinical trial is sponsored by the National Cancer Institute (NCI) or similar federal organization.
  - The trial conforms to standards of the NCI or other, applicable federal organization.
  - The clinical trial takes place at an NCI-designated cancer center or takes place at more than one institution.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- You are treated in accordance with the protocols of that study.

Covered expenses include charges made by a provider for "routine patient costs" furnished in connection with your participation in an "approved clinical trial" for cancer or other life-threatening disease or condition, as those terms are defined in the federal Public Health Service Act, Section 2709.

Not covered under this Plan are:

- Services and supplies related to data collection and record-keeping that is solely needed due to the clinical trial (i.e., protocol-induced costs)

- Services and supplies provided by the trial sponsor without charge to you, and

- The experimental intervention itself (except medically necessary Category B investigational devices and promising experimental or investigational interventions for terminal illnesses in certain clinical trials in accordance with Horizon BCBS claim policies).

---

**Important Note:**

1. Refer to the Schedule of Benefits for details about cost sharing and any benefit maximums that apply to the Clinical Trial benefit.

2. These Clinical Trial benefits are subject to all of the terms, conditions, provisions, limitations and exclusions of this Plan including, but not limited to, any precertification and referral requirements.

---

**Contraceptive Devices, Implants and Injectables** (other than oral contraceptives that may be covered under Merck's Managed Prescription Drug Program), including diaphragms, IUDs, implants and injectables.

**Dental Expenses** are primarily covered through the Dental Plan. For more information, see *The Merck Dental Plan SPD*. Covered dental expenses under the Medical Plan include:

- Any dental surgery or other dental service performed in a Hospital (inpatient or outpatient) or an ambulatory surgical facility, provided the covered person has a condition (e.g., diabetes, heart condition, etc.) that makes the provision of those services in that setting Medically Necessary

- Any restorative or corrective surgery or other dental services in the event of accidental injury to sound natural teeth, and

- Any surgery or other service for the reduction of dislocation or management of temporomandibular joint dysfunction (TMJ) provided the service is performed in a Hospital (inpatient or outpatient) or an ambulatory surgical facility. However, the TMJ appliance is not covered under the Medical Plan.

**Drug Therapy** administered in a doctor's office or in an outpatient surgical facility or provided by the doctor for in-home administration (for example, allergy shots and chemotherapy), unless covered through the Merck Managed Prescription Program. Merck-brand drugs and Organon-brand drugs without a generic equivalent administered in these settings are covered at 100%. Note that drugs that are subject to the Specialty Pharmacy Program managed by Accredo Health Group, Inc., a subsidiary of Express Scripts and as part of the Merck Managed Prescription Drug Program, are generally not covered under the Medical Plan option in which you are enrolled. In-home administration is not covered when services are performed by an Out-of-Network provider.

**Durable Medical Equipment.** Medically Necessary durable medical equipment may be considered a covered service. Examples of covered durable medical equipment may include the following:

- Apnea monitors

- Artificial limbs and eyes

- Casts and splints

- Trusses, braces, crutches, walkers and canes

- Rental of oxygen equipment for its administration

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Rental of wheelchair or Hospital-type bed

- Anesthesia and mechanical equipment for therapeutic treatment

- Rental of durable medical and surgical equipment

- Glucose monitors and infusion pumps, and

- Prescribed medical nutrition for the dietary treatment of a disease where the member has either:

  - A permanent non-function or disease of the structures that normally permit food to reach the small bowel, or

  - Disease of the small bowel that impairs digestion and absorption of an oral diet, either of which requires enteral or parenteral feedings.

**Fertility Benefits.** The Medical Plan covers services related to fertility including, but not limited to, the following:

- Artificial insemination

- Ovulation induction with menotropins

- Diagnosis and diagnostic tests

- Embryo transfer

- Gamete intrafallopian transfer (GIFT)

- In vitro fertilization

- Intracytoplasmic sperm injection

- Medications

- Surgery, and

- Zygote intrafallopian transfer (ZIFT)

Fertility services will be covered regardless of age, subject to the fertility Lifetime Benefit Maximum. Cryopreservation for egg, sperm and embryo is covered for individuals with the diagnosis of cancer, gender dysphoria or accidental injury, as well as individuals who are undergoing treatment that is germline toxic. Cryopreservation is subject to the $25,000 fertility Lifetime Benefit Maximum. Please note: Elective cryopreservation for the delay of childbearing is NOT covered.

Medical benefits for fertility in accordance with the Patient Protection and Affordable Care Act of 2010 are not considered essential health benefits under the Medical Plan. Medical benefits for fertility are limited to $25,000 per person per lifetime. Prescription drug benefits received through the Managed Prescription Drug Program for fertility are separate from the medical benefits limits and are limited to $10,000 per person per lifetime. The prescription drug benefit maximum excludes Merck- and Organon-brand fertility drugs, which do not have a generic equivalent, obtained through your pharmacist or Express Scripts Pharmacy™ home delivery service, which are covered at 100%.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**KEY POINT —FERTILITY RULES AS OF JAN. 1, 2011**

Effective Jan. 1, 2011, fertility benefits are limited to a $25,000 medical lifetime maximum per patient; $10,000 prescription lifetime maximum per patient (excludes Merck- and Organon-brand fertility drugs, which do not have a generic equivalent).

- If you are a legacy Merck employee who reached the lifetime limit on your fertility benefits under a legacy Merck-sponsored non-HMO Medical Plan option by Dec. 31, 2010, you became ineligible for future fertility benefits under any Merck-sponsored Medical Plan option as of Jan. 1, 2011. You can utilize the Managed Prescription Drug Program up to the prescription drug lifetime maximum of $10,000 for non-Merck and non-Organon brand fertility drugs provided you have not already reached the $10,000 lifetime limit.

- If you are a legacy Merck employee who did not reach the lifetime limit on your fertility benefits under a legacy Merck-sponsored non-HMO Medical Plan option as of Dec. 31, 2010, you became eligible for fertility benefits up to the medical lifetime maximum of $25,000 under the Merck Medical Plan as of Jan. 1, 2011, and you became eligible for fertility benefits under the Managed Prescription Drug Program up to the lifetime maximum of $10,000 for non-Merck and non-Organon brand fertility drugs. Any fertility benefits that you received before Dec. 31, 2010, do not count toward the fertility Lifetime Benefit Maximums under the Medical Plan and Prescription Drug Program that went into effect Jan.1, 2011. Any fertility benefits you received under any non-HMO Merck Medical Plan option since Jan. 1, 2011, count toward the Lifetime Benefit Maximums.

- If you are a legacy Schering employee who reached the lifetime limit on your fertility benefits under a legacy Schering sponsored Medical Plan option as of Dec. 31, 2010, you became ineligible for fertility benefits under any Merck-sponsored Medical Plan option as of Jan. 1, 2011. You can utilize the Managed Prescription Drug Program up to the lifetime maximum of $10,000 for non-Merck and non-Organon brand fertility drugs if you have not already reached the $10,000 lifetime limit.

- If you are a legacy Schering employee who did not reach the lifetime limit on your fertility benefits under a legacy Schering sponsored Medical Plan option as of Dec. 31, 2010, you became eligible for fertility benefits up to the lifetime maximum of $25,000 under the Merck Medical Plan as of Jan. 1, 2011. Any fertility benefits that you received before Dec. 31, 2010, count towards the fertility Lifetime Benefits Maximums under the Medical Plan that went into effect Jan. 1, 2011, as do any fertility benefits you received under any non-HMO Merck Medical Plan option since Jan. 1, 2011.

- If you are a legacy Schering employee who did not reach the lifetime limit for fertility benefits under your prescription drug coverage as of Dec. 31, 2010, you became eligible for fertility benefits under the Managed Prescription Drug Program up to the lifetime maximum of $10,000 for non-Merck and non-Organon brand fertility drugs. Any fertility benefits that you received before Dec. 31, 2010, count towards the fertility Lifetime Benefits Maximums under the Prescription Drug Program that went into effect Jan. 1, 2011.

**Foot Care**, including orthopedic shoes and foot orthotics used in the treatment of a condition affecting the foot. Foot orthotics refer to devices of rigid construction used to maintain the foot (and its superstructure) in a more efficient functional state in both standing (stance) and ambulating (gait) positions. Foot orthotics are covered if they are used to control a change in the shape of the foot during growth or to relieve pressure on an injured or inflamed part of the foot. Additional orthotics purchased only for your convenience are not covered (see also "What's Not Covered" for additional exclusions). Orthopedic shoes are covered, subject to medical necessity, for children under age 12. For Eligible Employees and Covered Dependents age 12 or older, up to one pair of orthopedic shoes is covered per calendar year.

**Gender Confirmation Surgery** will be covered under the Medical Plan in accordance with Merck's specific policy. Examples of covered services and procedures include chest/breast surgeries, voice and communication therapy, tracheal shave, liposuction, lipofilling, hair removal, hair implants, and facial bone reconstruction. All services must be precertified. In addition, travel and lodging benefits for the patient and one companion are covered if the facility is at least 100 miles from the patient's home, subject to a $3,000 maximum per calendar year. Please note, lodging is limited by IRS Guidelines to $50 per day per person, to a maximum of $100 per day.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

54

Travel and lodging requires precertification. Contact a Horizon Health Guide Transgender Specialist at **877-663-7258** for assistance in meeting the pre-authorization requirements. Also see Transgender Care under "What's Covered."

**Hearing Aids.** In accordance with the PPACA medical benefits for hearing aids are not considered essential health benefits under the Medical Plan. Medical benefits for hearing aids are limited to $3,000 per person per 36-month period. This means you cannot receive more than $3,000 in medical benefits within any 36-month timeframe. The 36-month period is measured each time you incur a covered expense by looking back 36 months from the date the covered expense was incurred.

---

**KEY POINT — EXAMPLE OF HOW THE MEDICAL PLAN PAYS BENEFITS FOR HEARING AIDS**

These two examples show how the Medical Plan pays benefits for covered In-Network hearing aid expenses, assuming you have met your deductible. Note that In-Network expenses are covered at 80% Coinsurance after the Annual Deductible. For covered hearing aid expenses, the Medical Plan's maximum benefit is $3,000 in any 36-month period.

**Example 1**
Suppose you incur expenses of $5,000 on June 30, 2023. The Medical Plan will pay 80% of those expenses, up to $3,000. In this case, you have reached the 36-month plan maximum, and the Medical Plan will not pay for any additional expenses until July 1, 2026.

**Example 2**
Suppose you incur expenses of less than $3,000. Here is an example of how coverage would work:

- On June 30, 2023, you incur $2,500 in expenses. The Medical Plan pays $2,000, its 80% share of the expenses. You will then have $1,000 remaining to use until June 29, 2026.

- On August 31, 2024, you incur another $1,875 in expenses. The Medical Plan's 80% share of the expenses is $1,500; however, the Medical Plan will pay only $1,000 since with this payment you will reach the $3,000 maximum in a 36-month period. The Medical Plan will not pay the remaining $500 because those expenses exceed the plan maximum.

- On August 31, 2026 you incur another $3,125 in expenses. This time the Medical Plan's 80% share of the expenses is $2,500. However, the Medical Plan will look back 36 months (from August 31, 2026 to August 31, 2023) to determine how much of the $2,500 it will pay. Because the Medical Plan paid $1,000 in connection with the expenses you incurred on August 31, 2024, it will now pay only $2,000. The Medical Plan will not pay the remaining $500 because those expenses exceed the plan maximum.

**Note:** Dates shown in this example are for illustrative purposes only. The Medical Plan will pay benefits only for eligible participants and dependents.

---

Covered expenses for hearing aids include hearing exams, prescribed hearing aids and hearing aid services as described below:

- Audiometric hearing aid exam and evaluation for a hearing aid prescription

- Electronic hearing aids, installed in accordance with a prescription written during a covered hearing exam

- Any other related services necessary to access, select and adjust or fit a hearing aid

For purposes of the plan, hearing aid means:

- Any wearable, non-disposable instrument or device designed to aid or make up for impaired human hearing

- Parts, attachments or accessories

Call Horizon BCBS for more information.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

55

**High Tech Imaging (Diagnostic Complex Imaging Expenses)**, including charges made on an outpatient basis by a Physician, hospital or a licensed imaging or radiological facility for complex imaging services to diagnose an illness or injury or for preoperative testing, such as:

- CAT scans

- Magnetic Resonance Imaging (MRI)

- Nuclear medicine imaging including positron emission tomography (PET) Scans, and

- Any other outpatient diagnostic imaging service where the recognized charge exceeds $500.

**Home Health Care.** As a general rule, the Medical Plan will pay covered medical expenses under home health care to the same extent it would have paid for similar services and supplies if you or a Covered Dependent had been hospitalized. Home health care must be administered by a certified Home Health Care Agency. Please note that home health care must be certified by Horizon BCBS.

The following services provided by a certified home health care agency are covered:

- Continuous or part-time nursing care by or under the supervision of a registered nurse

- Continuous or part-time home health aide services

- Medical social work, as well as physical, occupational, respiratory and speech therapy

- Medical supplies, drugs prescribed by a Physician, nutrition services and lab services

- Rental of durable medical equipment such as a Hospital-type bed, wheelchair, oxygen and suction machines

- Diagnostic, therapeutic and surgical services performed in a Hospital, a doctor's office, any other licensed health care facility or in the home, and

- Expenses associated with respite care that is needed if the patient's family is unable to attend to the patient's needs for a brief interval. Respite care must have been certified by hospice and the Claims Administrator and is limited to an aggregate maximum of ten days per calendar year.

**Home Health Care — Skilled Nursing Services**

- **Visiting Nurse Care** by an R.N. or L.P.N. for skilled nursing services that are Medically Necessary. Visiting nursing care means a visit of not more than four hours for the purpose of performing specific skilled (non-custodial) nursing tasks.

- **Private Duty Nursing** by an R.N. or L.P.N. if the person's condition requires skilled nursing care and visiting nursing care is not adequate. Each period of private duty nursing of up to eight hours will be considered one private duty nursing shift. Benefits are covered when Medically Necessary and approved by the Claims Administrator.

**Hospice Care** expenses are covered if you, or a Covered Dependent, are diagnosed by your Physician as terminally ill. Hospice care is an alternative to acute care hospitalization with emphasis on relieving pain rather than curing a patient. Its purpose is to help the family cope with the physical, psychological, spiritual and social stress associated with the illness and loss of a family member. Care can take place in the hospice unit of a Hospital or other health care facilities, in a free-standing hospice or in the patient's home. The Medical Plan will pay covered expenses under hospice care to the same extent it would have paid for similar services and supplies had you or a Covered Dependent been hospitalized.

The "hospice benefit period" begins on the date the patient is diagnosed as terminally ill and continues for six months (or longer if a Physician certifies that additional time is necessary). In addition, the hospice benefit period includes a one-year family bereavement period following the death of a Covered Dependent. Covered hospice care expenses must be provided by a medically-supervised team of professionals who must work with an independent hospice administration.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

The hospice administration must:

- Meet the standards of the National Hospice Organization

- Satisfy any applicable licensing requirements, and

- Be accredited by the Joint Commission on Accreditation of Hospitals.

The following expenses are covered when they are part of an approved hospice care program:

- Unlimited inpatient care in a hospice unit of a health care facility or in a free-standing Hospice (precertification is required). Charges for an inpatient hospice stay solely for palliative (pain relief) care will not be considered a covered hospice care expense unless your Physician certifies that the stay is Medically Necessary in place of hospice care provided at home or on an outpatient basis

- Home health care services

- Respite care in the home up to 10 days per calendar year

- Physician's services

- Emotional support services, including assistance in relieving stress, coping with anticipated losses and maintaining the patient in the most appropriate environment. Covered Hospice care expenses include charges for the professional services of a person having a Master's degree in social work or a Master's or PhD in the mental health counseling field, for up to one visit per week

- Bereavement services, including supportive services provided in counseling sessions with Covered Dependents following the death of the hospice patient. Covered hospice care expenses include charges for the professional services of a certified pastoral counselor, for up to six counseling sessions during the period of bereavement. Covered hospice expenses do not include charges for services provided by a certified pastoral counselor to a member of the certified pastoral counselor's congregation, and

- Special incidental services for the patient, including special dietary requirements and transportation by Medically Necessary professional ambulance to and from the nearest inpatient hospice facility.

Hospice care may be provided either at home or through an accredited hospice care agency.

**Hospital Services and Supplies.** Semi-private room and board expenses in a recognized Hospital or approved rehabilitative facility. If you stay in a private room because your doctor establishes that isolation is Medically Necessary, the Medical Plan covers the private room and board expenses.

Covered Hospital expenses include (see also "Surgery"):

- Services of a surgeon

- Preoperative and postoperative care

- Administration of anesthesia

- Ambulance services to the first Hospital where you receive treatment and transfers when Medically Necessary

- X-rays, laboratory and pathology services

- Maternity services — professional fees for delivery made by either an obstetrician or a midwife; approved, licensed birthing centers (see "Key Point — Women's Health and Cancer Rights Act and Newborns' and Mothers' Health Protection Act")

- Inpatient prescription drugs

- Other outpatient services and supplies billed by the Hospital, and

- Hospital charges for outpatient services, other than those included as covered Hospital expenses.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Hospital Alternatives** are alternatives to hospitalization that can provide the same quality care in a way that is often more convenient and suitable to the patient. The following alternative care facilities are covered:

- ***Ambulatory Surgical Centers and Other Outpatient Facilities.*** Special surgical facilities have been established in many parts of the country to allow patients to have surgery and be released within one day. The facility must be licensed and accredited by the state. The facility must also be operated under the supervision of a Physician, staffed with full-time R.N.s, equipped with diagnostic X-ray and lab facilities (or have a written agreement with a Hospital to supply these facilities). The facility must also keep medical records for each patient showing diagnosis, operative notes and a discharge summary. In addition, a written agreement must be in existence between the facility with a Hospital to provide postoperative confinement if needed and to handle complications.

- ***Birthing Facilities.*** These must be licensed by the state.

- ***Skilled Nursing Facilities.*** A facility operated under the supervision of a Physician and staffed with full-time nurses. Benefits are covered for up to 120 days per calendar year when Medically Necessary and certified by the Claims Administrator.

---

### KEY POINT — COVERAGE FOR INTERNATIONAL TRAVEL

If you travel outside of the U.S. on business, out-of-country medical expense coverage will be provided under the terms of the Business Travel Accident Plan, as described in the *Merck Business Travel Accident Plan Including Supplemental Out-Of-Country Medical Expense Coverage SPD*. Your travel itinerary will include information about whom to contact for help with health benefits during your trip.

In addition, your Merck PPO medical coverage includes access to doctors and hospitals around the world, so if you're traveling for personal reasons, you also have resources available to you in case you experience a health emergency. For information or assistance, contact Horizon BCBS:

- **Online:** Visit their Blue Cross Blue Shield Global Core℠ program at **www.bcbsglobalcore.com** or use the Blue Cross Blue Shield Global Core app for Android or iPhone.

- **By phone:** Call the Blue Cross Blue Shield Global Core Service Center at **877-663-7258** or call collect at **804-673-1177**, 24 hours a day, seven days a week.

---

**Laboratory Tests/X-rays**

- Charges for laboratory tests and X-ray examinations (other than those for which benefits are payable as covered Hospital and alternative care expenses), and

- Diagnostic X-rays and laboratory tests (including Pre-Admission Testing).

**Note:** Precertification is highly recommended for High Tech imaging. There is no penalty if you fail to precertify your lab or radiology services; however, if your care is not Medically Necessary it will not be covered under the Plan. Horizon BCBS members should have their providers contact AIM for assistance in determining the best course of treatment, tests and precertification required. For more information about AIM, please contact Horizon BCBS at **877‑663‑7258**.

**Morbid Obesity Surgical Expenses,** including charges made by a Hospital or a Physician for the surgical treatment of morbid obesity of a covered person. Coverage includes the following expenses as long as they are incurred within a two-year period:

- One morbid obesity surgical procedure including complications directly related to the surgery

- Pre-surgical visits

- Related outpatient services, and

- One follow-up visit.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

This two-year period begins with the date of the first morbid obesity surgical procedure unless a multi-stage procedure is planned. Complications, other than those directly related to the surgery, will be covered under the related medical Plan's covered medical expenses, subject to Plan limitations and maximums.

**Nutritional Counseling** is covered for chronic disease states in which dietary adjustments have a therapeutic role, when prescribed by a Physician. Nutritional Counseling is limited to 26 visits per benefit period; however additional visits may be approved by Horizon when medically necessary.

**Obesity Treatment,** including charges made by a Physician, licensed or certified dietician, nutritionist or Hospital for the non-surgical treatment of obesity for the following outpatient weight management services:

- An initial medical history and physical exam

- Diagnostic tests given or ordered during the first exam

- Preventive counseling visits and/or risk factor reduction intervention

- Nutrition counseling, and

- Healthy diet counseling visits provided in connection with Hyperlipidemia (high cholesterol) and other known risk factors for cardiovascular and diet-related chronic disease.

For preventive and nutrition counseling visits, Merck follows the Health Care Reform preventive guidelines. For specific details on limits, contact Horizon Health Guide.

*Limitations.* Unless specified above, not covered under this benefit are charges incurred for:

- Weight control services including surgical procedures, medical treatments, weight control/loss programs, dietary regimens and supplements, food or food supplements, appetite suppressants and other medications; exercise programs, exercise or other equipment; and other services and supplies that are primarily intended to control weight or treat obesity, including morbid obesity, or for the purpose of weight reduction, regardless of the existence of comorbid conditions, except as provided in this SPD

- Services that are covered to any extent under any other part of this Plan, and

- Bariatric surgery, unless performed at a Center of Excellence.

**Obstetrical/Gynecological (OB/GYN) Services** covered under the Medical Plan include:

- One routine wellness exam, including Pap smear (one per calendar year)

- Mammography screenings — one screening every year; additional screenings are covered if prescribed by your Physician as Medically Necessary

- Follow-up gynecological care

- Obstetrical care

- Prenatal care, and

- Care for gynecological-related problems.

---

**KEY POINT — WOMEN'S HEALTH AND CANCER RIGHTS ACT AND NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT**

For information about the Women's Health and Cancer Rights Act of 1998 and the Newborns' and Mothers' Health Protection Act, go to page 102.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Physician Services,** including care or treatment by a licensed Physician.

**Preventive Care** services are covered as determined by the Claims Administrator in accordance with the recommendations established by the U.S. Preventive Services Task Force and guidelines established by the American Medical Association (AMA), provided they are designated by your Physician as preventive and meet certain guidelines. All preventive services to be covered by the Merck Medical Plan pursuant to the PPACA will be covered by the Merck Medical Plan with no cost-sharing requirement if services are performed by an In-Network provider. For additional information about these preventive services, contact the Claims Administrator of your Medical Plan option.

Covered preventive care services include:

- Routine doctor visits and examinations, maximum of one routine physical per calendar year, over age six
- Well-child care visits up to age six, unlimited visits
- Routine immunizations and inoculations
- Hearing exam, one exam every 24 months
- Eye exam, one exam every 24 months
- Cancer screenings (see "Cancer Screenings")
- Cholesterol testing
- Routine fecal occult blood testing
- Routine preventive counseling for tobacco and alcohol/drug use and contraceptives
- Routine sigmoidoscopy and colonoscopy
- Routine mammograms (see "Obstetrical/Gynecological (OB/GYN) Services")
- Routine OB/GYN and Pap (see "Obstetrical/Gynecological (OB/GYN) Services")
- Routine prostate specific antigen (PSA) test and digital rectal exam, and
- Routine Osteoporosis Screening (Bone Mass Density Testing)

The following services are not considered preventive services:

- Services which are for diagnosis or treatment of a suspected or identified illness or injury
- Exams given during your Hospital stay for medical care
- Services not given by a Physician or under the Physician's direction, or
- Psychiatric, psychological, personality or emotional testing or exams

**Professional Services of a Registered Nurse (R.N.),** or a Licensed Practical Nurse (L.P.N.) when an R.N. is unavailable.

**Prosthetic Devices,** including charges made for the first internal and external prosthetic devices and specialist appliances, whether temporary or permanent, if the device or appliance improves or restores body part function that has been lost or damaged by illness, injury or congenital defect. Covered expenses also include instruction and incidental supplies need to use a covered prosthetic device. Covered devices include, but are not limited to:

- An artificial arm, leg, hip, knee or eye
- Eye lens
- Cochlear implants
- An external breast prosthesis and the first bra made solely for use with it after a mastectomy

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- A breast implant after mastectomy
- Ostomy supplies, urinary catheters and external urinary collection devices
- Speech generating device
- A cardiac pacemaker and pacemaker defibrillators, and
- A durable brace that is custom made for and fitted for you.

Replacement of a device is included if:

- The replacement is needed because of a change in your physical condition, or because of normal growth or wear and tear
- It is likely to cost less to buy a new one than to repair the existing one, or
- The existing one cannot be made serviceable.

**Short-Term Rehabilitation Therapy.** Short-term rehabilitation means physical, occupational and speech therapy for a limited period based on medical necessity if required to restore a function that was lost due to illness or injury or for the treatment of developmental delays, including a diagnosis of autism. Coverage for developmental delays, including Applied Behavioral Analysis (ABA), is available for children based on medical necessity, and pre-authorization is required. Contact the Claims Administrator for coverage details and precertification requirements.

**Surgery,** including inpatient and outpatient Hospital and surgical treatment for an illness or injury. The Medical Plan also covers:

- Bariatric surgery subject to precertification and the Claims Administrator's policy, and must be performed at a Center of Excellence, and
- Surgery associated with reconstructive surgery following a mastectomy, expenses for reconstructive surgery on the other breast to achieve symmetry, the cost of prostheses and the costs for treatment of physical complications at any stage of the mastectomy including lymphedemas, as required by federal law (see "Women's Health and Cancer Rights Act"). Normal Plan Deductibles, Coinsurances and Medical Plan Out-of-Pocket Maximums will apply.

**Telehealth**[1] covers visits with a Physician via telecommunication using a computer, tablet or smart phone. Telehealth does not provide additional covered services (or benefits) under the Medical Plan. Telehealth is a covered benefit only when provided through a Horizon BCBS designated telehealth provider for Merck PPO participants.

**Transgender Care** includes a comprehensive range of services and procedures required due to a diagnosis of gender dysphoria. Coverage follows guidelines from the World Professional Association of Transgender Health (WPATH) and includes GnRH agonists (i.e., hormone/puberty blockers) Gender Confirmation Surgery, other masculinization and feminization services or procedures, and behavioral health related to gender dysphoria. For details and more information, contact a Horizon Health Guide at **877-663-7258**.

---

[1]   Telehealth networks are different and less broad then the ordinary networks under the Medical Plan. For example, if you use a virtual visit with your doctor, it may not be considered a telehealth service unless they participate in the designated telehealth network. Telehealth services provided by doctors who are not part of the medical plan's telehealth network will not be covered.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| KEY POINT — TRANSGENDER CARE |
| --- |
| Transgender Care follows guidelines based on the latest Standards of Care by the World Professional Association for Transgender Health (WPATH), available at https://wpath.org/publications/soc. Transgender Care is available to employees and/or their dependents enrolled in the Medical Plan who have a diagnosis of gender dysphoria. Because the treatment of gender dysphoria is specialized and limited to a small network of highly-credentialed physicians and behavioral therapists, gender dysphoria-related services and procedures are covered at 80% after you meet the Deductible, even when using Out-of-Network providers. For more information, contact a Horizon Health Guide Transgender Specialist at **877-663-7258**. |

**Transportation and Lodging** assistance is available in situations where Plan members need treatment that is legal and covered under the Medical Plan, but is not available In-Network within 100 miles of the member's primary residence, for the following services:

- Bariatric surgery
- Cardiovascular or neurovascular surgery
- Cellular gene therapy
- Specialized pediatric care
- Congenital anomalies within 24 months from birth
- Inpatient or intensive mental health and substance use disorder treatment
- Oncology
- Pregnancy related issues
- Transgender Care (available In- or Out-of-Network)
- Transplants

Transportation and lodging expenses are reimbursable for Plan members, and one companion, up to a maximum of $3,000 per member per calendar year with the following limits:

- Transportation: Reimbursement for transportation between the member's home and provider's office or treatment facility for economy class air, train or bus fares. Mileage, parking and tolls are reimbursed if traveling by automobile and are subject to IRS guidelines for medical mileage reimbursement. Note: Medical transportation services (e.g., ambulance transportation) are a covered medical service and are not reimbursable by the transportation and lodging assistance benefit.
- Lodging: Up to $50 per night per person (maximum of $100 per night total). Incidentals are not reimbursable and are defined but not limited to:
  - Alcohol/tobacco
  - Car rental
  - Entertainment (e.g., movies, visits to museums, additional mileage for sightseeing, etc.)
  - Lodging at a family member's or friend's home
  - Expenses for persons other than the patient and their covered companion
  - Costs for pets or animals, other than service animals
  - Meals
  - Personal care items (e.g., shampoo, deodorant, toothbrush, etc.)

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

    –   Souvenirs (e.g., T-shirts, sweatshirts, toys, etc.)

    –   Internet service or telephone calls

Plan members must contact a Horizon Health Guide to apply for transportation and lodging assistance in advance. Reimbursements are made after services have been completed and may be subject to tax withholding. All transportation and lodging assistance benefits require the use of In-Network providers and/or facilities with the exception of Transgender Care. Note: Reimbursements for a companion are subject to the annual maximum and are not reimbursable directly to the companion even if they are enrolled in the Merck PPO Plan.

| KEY POINT — TRAVEL AND LODGING FOR TRANSGENDER CARE |
| --- |
| Transportation and lodging assistance is available for both In- and Out-of-Network Transgender Care if the provider/facility is more than 100 miles from the member's home. |

**Vision Care** services covered under the Medical Plan include:

- Eye exams when Medically Necessary due to vision impairment as a side effect of prescribed medication

- Charges for a routine eye exam once every 24 months, and

- Discounts on eyeglasses and contact lenses. For more information about Horizon BCBS's Discount Program call **855-511-2583** or visit **www.horizonblue.com/merck**.

- Contact lenses and eyeglasses are excluded except if the Claims Administrator determines that they are Medically Necessary as a prosthetic device following cataract surgery in lieu of intraocular lenses. Coverage, if any, is provided in accordance with the applicable clinical policy of the Claims Administrator.

**Voluntary Sterilization** covers tubal ligation and vasectomy; reversals are excluded.

**Wigs** or hairpieces when prescribed by a Physician for hair loss due to injury, chemotherapy or otherwise provided under the clinical policies of the Claims Administrator, up to one wig or hairpiece every two years.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# SERVICES NOT COVERED

## WHAT'S NOT COVERED

This section provides a list of services and supplies that are not covered by the Medical Plan PPO. Services that are not deemed Medically Necessary (other than those for certain specified preventive care) are not covered expenses (these include, but are not limited to, services that are deemed maintenance or custodial). In addition, certain services that may be deemed Medically Necessary may not be covered expenses. The PPO offers basic plan components including prescription drug and behavioral health care benefits. Clinical policies, which may affect coverage determination, are determined by the Claims Administrator.

For additional information regarding what is not covered or to verify coverage of a medical service or device, contact the Claims Administrator (Horizon BCBS).

Please note this section does not apply to the Health Plan Plus Hawaii HMO. For more information on what is covered under these options, contact the Plans directly.

In general, the following services and supplies are not covered under the Medical Plan options:

- Services and supplies for which there would be no charge if the employee were not covered under the Medical Plan.

- Charges for expenses incurred while covered under the No Coverage option.

- Service, treatment or supplies not generally accepted in medical practice for the prevention, diagnosis or treatment of an illness or injury.

- Any charges for care or treatment not recommended and approved by a licensed Physician.

Additional Medical expenses *not covered* under the Medical Plan include, but are not limited to:

- Auto Insurance benefits

- Expenses where benefits are payable under no-fault automobile insurance policies.

- Expenses payable under your (or your covered Eligible Dependents') automobile insurance policy's personal injury policy, whether or not elected by you or your Eligible Dependents.

**Claims submitted more than 24 months after date of service**, unless it is shown that it was not reasonably possible to furnish the claims within the time limit.

**Cosmetic procedure charges** that are not Medically Necessary or are not required because of an accident or disease or are not correcting a child's birth defect that caused a functional disorder.

**Counseling services and treatment** for marriage, religious, family, career, social adjustment, pastoral or financial problems.

**Court ordered services,** including those required as a condition of parole or release.

**Custodial or maintenance care** (including chiropractic maintenance therapy).

**Dental work charges**, except as listed in "Covered Services." Oral surgery performed in a dental office, whether dental or medical in nature, will not be considered for payment under the Medical Plan.

**Disposable outpatient supplies.** Any outpatient disposable supply or device, including sheaths, bags, elastic garments, support hose, bandages, bedpans, syringes, blood or urine testing supplies, and other home test kits; and splints, neck braces, compresses and other devices not intended for reuse by another patient.

**Educational treatments** or treatments provided primarily for research.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Excess of plan limits charges for care**, whether provided In-Network or Out-of-Network, including:

- Routine physical exams in excess of one exam every calendar year

- Routine OB/GYN exams in excess of one exam every calendar year

- Routine Mammography screenings in excess of one exam every calendar year

- Eye exams in excess of one every 24 months

- Hearing exams in excess of one every 24 months, and

- Charge for bone mass density (office visit and test), fecal occult blood tests and sigmoidoscopy/colonoscopy in excess of the guidelines established by the U.S. Preventive Services Task Force.

**Experimental or Investigational** drugs, devices, treatments or procedures are not covered unless *all* of the following conditions are met:

- You have been diagnosed with cancer or a condition likely to cause death within one year or less.

- Standard therapies have not been effective or are inappropriate.

- The Claims Administrator determines, based on at least two documents of medical and scientific evidence, that you would likely benefit from the treatment, and

- There is an ongoing clinical trial. You are enrolled in a clinical trial that meets these criteria:

  - The drug, device, treatment or procedure to be investigated has been granted investigational new drug (IND) or Group c/treatment IND status

  - The clinical trial has passed independent scientific scrutiny and has been approved by an Institutional Review Board that will oversee the investigation

  - The clinical trial is sponsored by the National Cancer Institute (NCI) or similar national organization (such as the Food & Drug Administration or the Department of Defense) and conforms to the NCI standards

  - The clinical trial is not a single institution or investigator study unless the clinical trial is performed at an NCI-designated cancer center, and

  - You are treated in accordance with protocol

  OR

  - Your doctor has prescribed KEYTRUDA (pembrolizumab) because in the doctor's opinion it may offer some effective therapy and your doctor certifies that it is medically appropriate

  - Standard therapies have not been effective or are inappropriate, and

  - You are not eligible for an ongoing clinical trial or the doctor certifies that clinical trials are not a viable option for you, in which case, treatment with KEYTRUDA is covered.

For the avoidance of doubt, all other Merck- or Organon-brand drugs used as experimental or investigational treatment are not covered unless the conditions described before the word "or" above are satisfied.

**Eyeglasses or contact lenses**, including their purchase or fitting, other than discounts offered through the Claims Administrators' vision discount program.

**Eye surgery** that is primarily intended to allow you to see better without glasses or contact lenses, including vision-correcting surgery, such as radial and photo refracture surgery, keratotomy and laser surgery are not covered by the Medical Plan.

**Facility charges** for care services or supplies provided in:

- Rest homes

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Assisted living facilities
- Similar institutions serving as an individual's primary residence or providing primarily custodial care or rest care
- Health resorts
- Spas and sanitariums, or
- Infirmaries at schools, colleges or camps

**Fertility benefits** in excess of the lifetime maximum. In addition, the following specific advanced reproductive treatment (ART) and/or artificial insemination (AI) services are not covered, including but not limited to:

- Any charges for the purchase of donor sperm or incurred by the donor for the storage of sperm
- Any charge associated with the purchase of donor eggs or for care of the donor required for donor egg retrievals or transfer
- Charges associated with cryopreservation or storage of cryopreserved sperm, eggs or embryos (e.g., charges for office, Hospital, ultrasounds, laboratory tests, etc.), except when medically necessary
- Any charges for the services of, or provided to, a gestational carrier or a surrogate or associated with a gestational carrier program or surrogate parenting, in each case, for the purpose of becoming pregnant and delivering a child for a Covered Employee or a Covered Dependent as the intended parent
- Any compensation fees paid to a donor, gestational carrier or surrogate
- Treatments and medical services provided to eligible members for the purpose of surrogacy under which such member will not be a legal parent
- Treatment and medical services provided to third-party gestational carriers, egg donors and sperm donors (provided such individuals are not members on the medical plan)
- Costs derived from embryo donation, as the embryo is genetically unrelated to the intended parents, and
- Procedures and expenses related to third party individuals, including medical services, recruitment and selection of donors, ovarian stimulation of donors, collection of oocytes from donors, and screening and storage of donor oocytes.
- A gestational carrier is a carrier with no genetic connection to the embryo. A surrogate is a carrier with a genetic connection to the embryo.

Some services that are not covered under the Medical Plan may be covered under the Adoption/Surrogacy Assistance Program.

**Foot orthotics used only for comfort or support** or for the treatment of flat feet, pronation, corns, calluses and hammertoes. Examples of items *not* considered as a foot orthotic because they lack rigid construction are:

- Inner soles (foam rubber, leather, flexible, etc.), and
- Corn plasters (pads, etc.) and foot padding (adhesive moleskin, etc.)

Arch supports are not covered for anyone other than for treatment of children with pes cavus, pes planus and pes varus. Orthopedic shoes are covered, subject to medical necessity, for children under age 12. For anyone age 12 or older, up to one pair of orthopedic shoes is covered per calendar year.

**Foot treatment services, including treatment of corns, calluses or toenails,** except the removal of nail roots and necessary services in the treatment of metabolic or peripheral-vascular disease.

**Foot treatments services, including treatment of weak, strained, flat, unstable or unbalanced feet, metatarsalgia or bunion**, except open cutting operations.

**Funeral** arrangements and services.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Government-operated facility charges.** Charges resulting from confinement or treatment in any Hospital or other facility owned, operated by or contracted by the United States government, any agency of the government or by a state or political subdivision of a state, unless there is an unconditional requirement to pay the charges.

**Health examinations (other than an annual preventive care exam)**

- Required by a third party, including examinations and treatments required to obtain or maintain employment, or which an employer is required to provide under a labor agreement

- Required by any law of a government, securing insurance or school admissions, or professional or other licenses

- Required to travel, attend a school, camp or sporting event or participate in a sport or other recreational activity, and

- Any special medical reports not directly related to treatment except when provided as part of a covered service

**Hearing aids**

- Expenses in excess of the Plan maximum, and

- Batteries or cords (these are covered only when supplied with the purchase of a hearing aid)

(See Prosthetic Devices for information on cochlear implants.)

**Home Health Care Plan** services or supplies not included in the Home Health Care Plan, including nursing or home health aide services provided outside of the home (such as in conjunction with school, vacation, work or recreational activities).

**Home and mobility**, any addition or alteration to a home, workplace or other environment, or vehicle and any related equipment or device, such as:

- Purchase or rental of exercise equipment, air purifiers, central or unit air conditioners, water purifiers, waterbeds and swimming pools

- Exercise and training devices, whirlpools, portable whirlpool pumps, sauna baths or massage devices

- Equipment or supplies to aid sleeping or sitting, including non-Hospital electric and air beds, water beds, pillows, sheets, blankets, warming or cooling devices, bed tables and reclining chairs

- Equipment installed in your home, workplace or other environment, including stair-glides, elevators, wheelchair ramps, or equipment to alter air quality, humidity or temperature

- Other additions or alterations to your home, workplace or other environment, including room additions, changes in cabinets, countertops, doorways, lighting, wiring, furniture, communication aids, wireless alert systems or home monitoring

- Services and supplies furnished mainly to provide a surrounding free from exposure that can worsen your illness or injury

- Removal from your home, worksite or other environment of carpeting, hypo-allergenic pillows, mattresses, paint, mold, asbestos, fiberglass, dust, pet dander, pests or other potential sources of allergies or illness, and

- Transportation devices, including stair-climbing wheelchairs, personal transporters, bicycles, automobiles, vans or trucks, or alterations to any vehicle or transportation device

**Home births**, any services and supplies related to births occurring in the home or in a place not licensed to perform deliveries.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Hospice Care Services** of a certain nature such as**:**

- Services and supplies that are not usual, reasonable and necessary for palliative (pain relief) or supportive care of the patient, and

- More than one visit by the hospice or home health care team or any member of the team in any one day (for a description of covered hospice benefits, see "What's Covered").

**Legal or financial** services or counseling.

**Medicare Parts A or B payable expenses** when Medicare is the primary payer of benefits, or would be the primary payer of benefits had you and/or your covered Eligible Dependents enrolled in Medicare Parts A and B as soon as eligible for Medicare.

**Mental Health** treatments, certain types including the following:

- Treatment of impulse control disorders such as pathological gambling, kleptomania, pedophilia, caffeine or nicotine use

- Treatment in wilderness programs or other similar programs

- Any services or supplies related to education, training or retraining services or testing, including: special education, remedial education, job training and job hardening programs

- Evaluation or treatment of learning disabilities, communication disorders, behavioral disorders, training or cognitive rehabilitation, regardless of the underlying cause

- Services, treatment and educational testing and training related to behavioral (conduct) problems and learning disabilities

- Other than an annual preventive care exam, any health examinations:

  - Required by a third party, including examinations and treatments required to obtain or maintain employment, or which an employer is required to provide under a labor agreement

  - Required by any law of a government, securing insurance or school admissions, or professional or other licenses

  - Required to travel, attend a school, camp, or sporting event or participate in a sport or other recreational activity, and

  - Any special medical reports not directly related to treatment except when provided as part of a covered service.

- Therapies and tests: Any of the following treatments or procedures:

  - Aromatherapy

  - Biofeedback and bioenergetic therapy

  - Carbon dioxide therapy

  - Chelation therapy (except for heavy metal poisoning)

  - Computer-aided tomography (CAT) scanning of the entire body

  - Educational therapy

  - Gastric irrigation

  - Hair analysis

  - Hyperbaric therapy, except for the treatment of decompression or to promote healing of wounds

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Hypnosis and hypnotherapy, except when performed by a Physician as a form of anesthesia in connection with covered surgery
- Lovaas therapy
- Massage therapy
- Megavitamin therapy
- Primal therapy
- Psychodrama
- Purging
- Recreational therapy
- Rolfing
- Sensory or auditory integration therapy
- Sleep therapy, and
- Thermograms and thermography

**Miscellaneous charges for services or supplies including:**

- Annual or other charges to be in a Physician's practice
- Charges to have preferred access to a Physician's services such as boutique or concierge Physician practices, or
- Cancelled or missed appointment charges or charges to complete claim forms.

**Personal comfort and convenience items**, any service or supply primarily for your convenience and personal comfort or that of a third party, including: telephone, television, internet, barber or beauty service or other guest services; housekeeping, cooking, cleaning, shopping, monitoring, security or other home services; and travel, transportation, or living expenses, rest cures, recreational or diversional therapy.

**Private Hospital room charges** in excess of the highest daily rate charged by the Hospital for a semi-private room, unless your doctor establishes that isolation is Medically Necessary.

**Reversal of sterilization.**

**Service providers**, certain types, such as: homemakers, a nurse who ordinarily resides in your home or who is a member of your family or your Spouse's/Domestic Partner's immediate family, a person who lives in your home, and volunteers or persons who do not usually charge for their services.

**Surrogacy pregnancy**, such as charges for (i) compensation fees paid to a gestational carrier or a surrogate and (ii) charges for the services of, or provided to, a gestational carrier or a surrogate or (iii) charges associated with a gestational carrier program or surrogate parenting, in each case, for the purpose of becoming pregnant and delivering a child for a Covered Employee or a Covered Dependent as the intended parent. A gestational carrier is a carrier with no genetic connection to the embryo. A surrogate is a carrier with a genetic connection to the embryo. See also other exclusions under "Fertility benefits."

**Transportation costs**, including ambulance services for routine transportation to receive outpatient or inpatient services except as described in the "Covered Services" section.

**Workers' Compensation.** Medical expenses resulting from an accidental bodily injury or sickness arising from the treatment of work-related illness or injury.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# HAWAII HMO

This section contains information about the Health Plan Hawaii Plus HMO.

If you are an Eligible Employee residing in Hawaii, you are eligible for the Health Plan Hawaii Plus HMO or you may choose the No Coverage option. If you choose the No Coverage option, you will be required to complete a waiver of coverage form in compliance with Hawaii state law. You are not eligible to participate in the Merck PPO.

## FOR MORE INFORMATION

All coverage, limitations and exclusions for the Health Plan Hawaii Plus HMO are listed in the HMO member brochure and contract. The member brochure is considered part of this SPD. The HMO will supply you with the written materials concerning:

- The nature of services provided to members
- Conditions pertaining to eligibility to receive services (other than general conditions pertaining to eligibility for participation in the Merck Medical Plan) and circumstances under which services may be denied, and
- The procedures to be followed in obtaining such services.

The Health Plan Hawaii Plus HMO generally requires the designation of a primary care provider. You have the right to designate any primary care provider who participates in the Health Plan Hawaii Plus HMO network and who is available to accept you or your family members. For children, you may designate a pediatrician as the primary care provider.

You do not need prior authorization from the Health Plan Hawaii Plus HMO or from any other person (including a primary care provider) in order to obtain access to obstetrical or gynecological care from a health care professional in the Health Plan Hawaii Plus HMO network who specializes in obstetrics or gynecology. The health care professional, however, may be required to comply with certain procedures, including obtaining prior authorization for certain services, following a pre-approved treatment plan or procedures for making referrals.

For information on how to select a primary care provider, a list of the participating primary care providers or for more information, contact Health Plan Hawaii Plus HMO at **808-948-6372** or visit **www.hmsa.com**.

## HOW TO FILE A CLAIM

If you visit a participating HMO provider, you do not have to submit a claim form. You simply pay your Copay at the time of service. If you have a medical Emergency and visit a non-participating provider, you or your covered family member must notify HMO as soon as possible after the treatment was received.

### Appealing a Claim

If you believe you are entitled to a benefit, or to a greater amount of benefits under the HMO than the amount you have received or are receiving, either in whole or in part, you have the right to file a claim with the applicable Claims Administrator. For more information, see "Claims and Appeals."

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# MANAGED PRESCRIPTION DRUG PROGRAM

While you are covered under any option under the Medical Plan, except the No Coverage option, you are covered automatically in the Merck Managed Prescription Drug Program. There is no separate charge for this program. It is included as part of the cost of the option you select under the Medical Plan. The Merck Managed Prescription Drug Program is administered by Express Scripts, the Plan's Pharmacy Benefit Manager and the Program's Claims Administrator. Shortly after you enroll in the Medical Plan, you will receive a separate prescription drug ID card from Express Scripts.

### KEY POINT — COVERAGE FOR ORGANON-BRAND DRUGS

Organon was spun off from Merck on June 2, 2021, and is focused on women's health as well as biosimilars and established medications. Under the Merck Medical Plan and Merck Managed Prescription Drug Program, certain Organon-brand drugs are eligible for $0 Copay until Dec. 31, 2023, provided there is no generic alternative.

### KEY POINT — MERCK'S $0 COPAY LIST

You pay $0 Copay for Merck drugs without a generic equivalent and Organon-brand drugs that transferred from Merck during the corporate spin-off in 2021 without a generic equivalent. Merck- and Organon-brand drugs that have a generic equivalent are not offered at a $0 Copay. Instead, they follow the same cost sharing provisions as other brand name drugs with a generic equivalent. However, if the clinical review is approved for a Merck- or Organon-brand drug, the applicable lower coinsurance is not $0 — it is the coinsurance applicable to non-Merck or non-Organon brand drugs without a generic equivalent.

Merck- and Organon-brand drugs that come off patent during 2023 will remain on the $0 Copay drug listing through Dec. 31, 2023.

### KEY POINT — 100% COVERAGE FOR WOMEN'SCONTRACEPTIVES

As a result of health care reform, women's contraceptives are covered at 100%.

### KEY POINT — 100% COVERAGE FOR CERTAIN BREAST CANCER PREVENTIVE DRUGS

As a result of health care reform, some breast cancer preventive drugs are covered at 100% for patients who are at least age 35. To check drug coverage and copay information, call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)** or log on to **www.Express-Scripts.com**.

### KEY POINT — TRANSGENDER HORMONE THERAPY DRUGS

- Drugs used for transgender hormone therapy are covered under the pharmacy benefit.
- Some medications may require a coverage management review.
- To check whether a drug is covered, subject to prior authorization or other coverage review processes, call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**. To obtain prior authorization, you, your doctor or your pharmacist must call Express Scripts at **800-753-2851**.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## ABOUT THE MANAGED PRESCRIPTION DRUG PROGRAM

The Managed Prescription Drug Program provides you and your Covered Dependents with coverage for certain Medically Necessary outpatient drugs that are prescribed by a licensed prescriber. Drugs provided inpatient are not covered under the Managed Prescription Drug Program but may be covered under the Medical Plan option in which you are enrolled. Drugs provided outpatient that are administered in an ambulatory facility or doctor's office or provided by a doctor for use at home are not covered under the Managed Prescription Drug Program (but may be covered under the Medical Plan option in which you are enrolled) except as follows:

- They are subject to the Specialty Pharmacy Program managed by Accredo Health Group, Inc., a subsidiary of Express Scripts[1]

- They are picked up at a retail pharmacy and delivered to the provider for administration,[2] or

- They are mail-ordered and delivered to the provider's office or your home — ordered by you or on your behalf — for administration in the provider's office.[2]

Drugs that are subject to the Specialty Pharmacy Program are generally not covered under the Medical Plan option in which you are enrolled. Your cost for prescription drugs depends on the type of medication (generic, Merck-brand or Organon-brand when generic is not available, non-Merck or non-Organon brand when generic is not available, Merck brand when generic is available). Specialty drugs must be filled through Accredo, Express Scripts' specialty pharmacy, or they will not be covered under the plan.

**KEY POINT — BRAND DRUGS**

The amount you pay for certain brand-name prescription drugs, when a generic equivalent is available, is subject to the provisions of the Managed Prescription Drug Program, managed by Express Scripts.

There may be rare instances where a member has an adverse reaction, allergy or sensitivity to the generic equivalent, or there may be another medical reason the generic drug cannot be used. In such case, the member or Physician may submit a request for a clinical coverage review to the clinical review department of Express Scripts. The clinical review staff will reach out to the Physician for the information necessary to determine if the brand drug can be covered at the lower Coinsurance level that is applicable to brand drugs that do not have a generic equivalent. If Express Scripts denies the claim for use of the brand medication at the lower Coinsurance, the participant may appeal this denial in accordance with the Medical Plan's claim procedures.

There are three ways to purchase outpatient prescription drugs:

- At an Express Scripts participating retail pharmacy
- Through the Express Scripts Pharmacy™ home delivery service (within the U.S. only), and
- At a non-participating retail pharmacy.

## MANAGED PRESCRIPTION DRUG PROGRAM AT A GLANCE

The following chart summarizes prescription drug costs for 2023. Please note that all the medical options (except the No Coverage option) under the Merck Medical Plan offer the same prescription drug coverage through Express Scripts, the Plan's pharmacy benefit manager.

---

[1]   See the section "Express Scripts' Specialty Pharmacy Program" for coverage details.

[2]   Please note that these drugs will still be subject to the applicable prescription benefit cost sharing under the Managed Prescription Drug Program and may also be subject to a fee for administration by the provider. The administration fee is not covered under the Managed Prescription Drug Program but under certain circumstances may be covered under the Medical Plan option in which the patient is enrolled.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| | Participating Retail Pharmacies up to a 30-Day Supply[1,2] | Express Scripts Pharmacy™ (Home Delivery Service), Accredo or Smart90 Retail up to a 90-Day Supply[3] |
|---|---|---|
| **Annual Out-of-Pocket Maximum**[4] (individual/family maximum) | $1,500/$3,000 (combined retail and home delivery service) | |
| **Non-Diabetic Medications**[5] | | |
| **Generic Drugs** | $10 | $20 |
| **Brand Drugs** when generic equivalent is NOT available <br> • Merck-Brand Drugs <br> • Organon-Brand Drugs <br> • Non-Merck and non-Organon Brand Drugs | $0 <br> $0 <br> 20% of discounted price, up to $50 maximum (per prescription) | $0 <br> $0 <br> 20% of discounted price, up to $100 maximum (per prescription) |
| **Brand Drugs** when a generic equivalent is available <br> • Merck/Non-Merck Brand Drugs | 40% of discounted price, up to $100 maximum (per prescription) | 40% of discounted price, up to $200 maximum (per prescription) |
| **Diabetic Medications and Supplies** | | |
| **Generic and Merck-Brand Diabetes Medications and Supplies** | $0 | $0 |
| **Non-Merck Brand Diabetes Drugs and Supplies** | $10 | $20 |
| **Features** | | |
| When to Use | For short-term, immediate medication needs | • Express Scripts Pharmacy Home Delivery Service/Smart90: For long-term, maintenance prescriptions <br> • Accredo: For specialty medications (home delivery only) |
| Claim Forms | Not applicable when you use your ID card at a participating pharmacy <br><br> You must file a claim if you do not present your ID card or if you use a non-participating pharmacy | Not applicable |

---

[1]   Certain prescription medications are covered only by home delivery service through Express Scripts Pharmacy™ or Accredo, a subsidiary of Express Scripts.

[2]   Prescriptions filled at non-participating pharmacies will be reimbursed based on the network-negotiated price of the medication, minus the applicable Copay and/or Coinsurance. Employees are responsible for any drug costs in excess of network-negotiated fees. Any costs in excess of network-negotiated fees do not count toward the Prescription Drug Out-of-Pocket Maximum limit.

[3]   Male erectile dysfunction medications (MEDs) are covered only by home delivery service through Express Scripts Pharmacy.

[4]   Other than non-Organon brand fertility medications.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

---

**KEY POINT — BRAND NAME AND GENERIC BRAND DRUGS**

**Brand-name (prescription drug).** A drug protected by a patent issued to the original innovator or marketer. The patent prohibits the manufacture of the drug by other companies as long as the patent remains in effect.

**Generic Brand (prescription drug).** A drug that is equal in therapeutic power to the brand-name original because they contain identical active ingredients at the same doses. Fillers and dyes may vary.

---

**KEY POINT — REDUCED COSTS FOR DIABETES MEDICATIONS AND SUPPLIES**

In order to encourage diabetics to follow their treatment plan, all generic and Merck-brand diabetes medications and supplies, as well as Merck-brand drugs, will be provided at no cost to you. In addition, the cost for non-Merck brand diabetic drugs and supplies will be reduced to the generic Copay rate ($10 at retail pharmacies for a 30-day supply; $20 at home delivery for a 90-day supply).

## HOW TO GET YOUR PRESCRIPTION FILLED

### Participating Pharmacies

Most of the retail pharmacies in the United States participate in the Express Scripts network. These pharmacies agree to accept lower negotiated fees. You can call Express Scripts at **800-RX-MERCK (800-796-3725)** or go online at **www.Express-Scripts.com** to find a network pharmacy near you or to find out if your current pharmacy is in the network.

When you need a prescription filled, simply present your Express Scripts ID card at a participating pharmacy and pay the applicable cost-sharing amount. (The Express Scripts ID card is separate from your Medical Plan option ID card.) You may purchase up to a 30-day supply of covered medication. The participating pharmacy will handle the claim for you.

### Non-Participating Pharmacies

If you choose to have a prescription filled at a pharmacy that does not participate in Express Scripts' network (a non-participating pharmacy), you must pay 100% of the pharmacy's regular charge at the time you receive your medication. You then file a claim for reimbursement. If you use a non-participating pharmacy, you may receive more than a 30-day supply of medication, but Express Scripts will only reimburse you for a 30-day supply.

You will be reimbursed based on the network negotiated price of your covered medication offered by participating pharmacies minus the applicable Copay and/or Coinsurance. You are responsible for any drug costs in excess of network-negotiated fees. Any costs in excess of network-negotiated fees at a non-participating pharmacy do not count toward the Prescription Drug Out-of-Pocket Maximum limit. Your reimbursement check will be mailed approximately two weeks after the date your claim is received.

### How to File a Claim for Non-Participating Pharmacy Benefits

Complete a *Direct Claim Reimbursement Form* and submit it together with a receipt for the medication to:

Express Scripts
P.O. Box 14711
Lexington, KY 40512

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Claim Forms are available on Express Scripts' website at **www.Express-Scripts.com** or by calling Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**. You can also submit your direct claim via **www.Express-Scripts.com**.You must file a claim within one year of when the prescription for which you are filing a claim was written by the Physician, unless you can show that it was not reasonably possible to submit the claim within the time limit. If your claim for benefits is denied, in whole or in part, you or your authorized representative may appeal the denial. For more information on appealing a denied claim, see "Claims and Appeals" in the "Administrative Information" section of this SPD.

## Home Delivery Service and Smart90 Retail

If you require maintenance medications or have an ongoing condition, you have a choice of how to purchase prescription drugs. You may order up to a 90-day supply of your medication at a time.

### Home Delivery Service

Through the Express Scripts Pharmacy, you can have prescriptions sent to your home, which can help you save both time and money. In addition, certain medications are covered only through the Express Scripts Pharmacy (See "Covered Medications and Supplies.")

The Express Scripts Pharmacy is not available outside the United States.

To order a prescription by mail:

- Obtain a prescription for ongoing medication — for up to a 90-day supply, plus refills.

- Complete the Patient Information section of the *Express Scripts Order Form*, available through the Benefits Service Center or Express Scripts website at **www.Express-Scripts.com**. This information alerts the mail order pharmacy to any potential drug interactions. Your Patient Profile and prescription history are strictly confidential.

- Mail your original prescriptions or refill slips together with the completed *Express Scripts Order Form* and applicable payment to:

  Express Scripts
  Home Delivery Service
  P.O. Box 66577
  St. Louis, MO 63166-6577

If you mail more than one prescription in the same envelope, be sure to include one payment for each. Express Scripts will promptly process your order and send your medications to your door within approximately 14 days through U.S. mail or United Parcel Service (UPS), along with instructions for refills.

## How to Order Refills

- **To order by phone,** call **800-796-3725** to use the automated system. Be sure to have your member ID number (shown on your ID card) and refill slip with the prescription information ready.

- **To order online,** log on to **www.Express-Scripts.com** and have your member ID and a prescription number available. (If you are a first-time visitor to the site, please take a moment to register.)

- Express Scripts will process your order and send your medications to your home via U.S. mail or UPS, along with instructions for refills.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**KEY POINT — LARGER PRESCRIPTION SUPPLIES FOR SPECIAL CIRCUMSTANCES**

Express Scripts, in its discretion, may authorize prescriptions in excess of the 30-day or 90-day supply under certain special circumstances, such as extended travel outside the U.S., provided you have a Physician's written prescription.

For more information or to request an extended supply, contact Express Scripts at **800-RX-MERCK (800-796-3725)**.

**KEY POINT — EXPRESS SCRIPTS' REVIEW PROCESS**

Express Scripts continually monitors new prescription drugs and reviews new clinical studies. Therefore, this list of covered drugs, non-covered drugs and coverage management programs and processes is subject to change. As new drugs become available, they will be considered for coverage under the Managed Prescription Drug Program as they are introduced. Merck will review recommendations by Express Scripts to determine possible coverage as well as any coverage limitations or restrictions.

**Smart90 Retail Program Through CVS or Walgreens**

You also have the option to purchase 90-day prescriptions of eligible maintenance medications (prescription drugs that treat an ongoing condition) at any CVS or Walgreens retail pharmacy that participates in the Smart90 network. This program enables you to obtain a 90-day supply at a retail pharmacy for the same low Coinsurance as the home delivery program. Note that certain medications are covered only through the Express Scripts Pharmacy. (See "Covered Medications and Supplies.")

## EXPRESS SCRIPTS' PRESCRIPTION DRUG MANAGEMENT PROGRAMS

### Prior Authorization Program

Prior authorization monitors both cost and safety. If a pharmacist tells a member that a prescription requires prior authorization, Express Scripts will need to communicate with the doctor to be sure that the medicine or supply is right and will verify that the Plan covers the drug or supply. This is similar to when a healthcare plan authorizes a medical procedure in advance.

When a prescription requires prior authorization, the doctor can call Express Scripts or prescribe a different medicine that is covered by the Plan. Only doctors can give Express Scripts the information needed to determine if the drug or supply may be covered. Express Scripts answers its prior authorization phone lines 24/7, and a determination can be made right away. If the medicine or supply is covered, the member will pay the normal copay. If the medication or supply is not covered but the member wants to take it, the member will pay the full price.

**KEY POINT — LIST OF DRUGS REQUIRING PRIOR AUTHORIZATION IS SUBJECT TO CHANGE**

The list of medications and supplies that require prior authorization is subject to change. To confirm if a drug or supply is covered, subject to dispensing limits, age limits or other coverage review processes, call Express Scripts' Member Services at **800-RX MERCK (800-796-3725)**.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

The following list of drug classes, medications and supplies will be subject to the Prior Authorization Program.

**Note:** This list of drug classes, medications and supplies that require prior authorization is subject to change and not exhaustive. To check whether a drug or supply is covered, subject to prior authorization or other coverage review processes, call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**. To obtain prior authorization, you, your doctor or your pharmacist must call Express Scripts at **800-753-2851**.

- Alpha1 Proteinase Inhibitors (e.g., Prolastin, Prolastin C, Aralast, Glassia, Zemaira, etc.)
- Anti-Fungal injections
- Anti-Infective Injections
- Anabolic steroids and androgens (e.g,. Androderm, Androgel, Aveed, Deletestryl, testosterone)
- Anorexiants and anti-obesity medication (e.g., Adipex, Belviq, Contrave, Phentermine, Qysmia, Saxendra, etc.)
- Antinarcoleptic agents (e.g., Provigil, Nuvigil, Xyrem, etc.)
- Asthma (e.g., Cinqair, Dupixent, Fasenra, Nucala, Xolair, etc.)
- Continuous glucose monitors
- Cost Watch PA list
- CNS stimulants/amphetamines (e.g., Ritalin, Focalin, Adderall, etc.)
- Dermatological Agents (e.g., Protopic, Tazarotene products, Tretinoin products, Dupixient, Protopic, etc.)
- Erythroid stimulants (e.g., Epogen, Procrit and Aranesp, etc.)
- Gonadotropin Releasing Hormone (e.g., Eligard, Leuprolide, Lupron,Tripodur, etc.)
- Growth hormones (e.g., Genotropin, Humatrope, Increlex, Norditropin, Omnitrope, Zorbitive, etc.)
- Hyaluronic Acid Derivatives (e.g., Euflexxa, Hyalgan, Synvisc, Synvisc-One, Gel-One, Supartz, Orthovisc, etc.)
- Immune Globulin (IVIG) Agents (e.g., Hizentra, Privigen, Vivaglobin, etc.)
- Inflammatory Condition agents (e.g., Actemra. Cosentyx, Enbrel, Humira, Otezla, Simponi, Stelara, etc.)
- Interferon agents (e.g., Actimmune, Intron A, Peg-Intron, etc.)
- Macular Degeneration (e.g., Eylea, Lucentis, Macugen, etc.)
- Multiple sclerosis medications (e.g., Ampyra, Avonex, Betaseron, Copaxone, etc.)
- Myeloid stimulants (e.g., Neupogen, Zarxio, Leukine, Neulasta, etc.)
- Omnipod kit
- Osteoporosis (e.g., Boniva injection, Prolia, Reclast, etc.)
- Pain medications (e.g., Actiq, Fentora, Lidoderm Patch, Oxycontin, Solaraze, etc.)
- Pulmonary arterial hypertension agents (e.g., Adempas, Opsumit, Retatio, Adcira, etc.)
- Tetracyclines (e.g., Solodyn)
- Vancomycin
- Xyrem/Xywav

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**KEY POINT — CERTAIN COMPOUND DRUGS NO LONGER COVERED**

Effective Jan. 1, 2016, the Managed Prescription Drug Program no longer covers prescriptions for most Compound Medications and some medications provided in the form of a pain patch unless your doctor contacts and receives approval from Express Scripts. Your doctor can initiate a coverage review with Express Scripts by calling **800-417-1764**. If you use a Compound Medication and your doctor has not called Express Scripts and received prior authorization, you will be responsible for the full cost of the medication.

The U.S. Food and Drug Administration (FDA) defines a Compound Medication as one that requires a licensed pharmacist to combine, mix or alter the ingredients of a medication when filling a prescription. The FDA does not verify the quantity, safety and/or effectiveness of Compound Medications.

## Managed Rx Program

Certain medications and supplies are not covered unless you receive prior authorization. The Managed Rx Program may contact your Physician and/or pharmacist to ensure that a prescribed drug or supply is being used in a clinically appropriate way or your doctor can prescribe a different medication or supply that is covered by the Plan. And, Express Scripts may offer recommendations and place limits on current and future prescriptions of these medications and supplies.

The following list of drug classes, medications and supplies will be subject to the Managed Rx Program. **Note:** This list of drug classes, medications and supplies that require prior authorization is subject to change and not exhaustive. To check whether a drug or supply is covered, subject to prior authorization, subject to dispensing limits, age limits or other coverage review processes, call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**. To obtain prior authorization, you, your doctor or your pharmacist must call Express Scripts at **800-753-2851**.

- Absorica
- Beta Blockers
- Dipeptidyl Peptidase-4 (DPP-4) inhibitors
- Expendable drugs
- Gabapentin
- Glucagon-Like Peptide 1 (GLP-1)
- Interleukin (IL)-5 Antagonist (e.g., Cinqair)
- Long-acting opioids (e.g., Avinza, Duragesic, MS Contin, Oxycontin, etc.)
- Male erectile dysfunction medications (e.g., Viagra®, Muse®, Edex®, Cialis®, Caverject®). Prescriptions must be filled through the Express Scripts Pharmacy home delivery service
- Market Events (e.g., Alcortin A, Auvi-Q, Endari, Epi-Pen, Gocovri, Niacor, Novacort, Osmolex, Treximet, Viagra, etc.)
- Metformin (generic)
- NSAID (generic)
- Ophthalmic Antiallergy
- Ophthalmic Prostaglandins
- Pain relief medications (e.g., Actiq®, Avinza, Fentora®, Exalgo, Kadian, Nucynta, Ultram)
- Plaque psoriasis (e.g., Enbrel®/Humira®)

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- PPI (generic)
- Short-acting opioids limited to a 7-day supply on initial prescription (e.g., Nucynta, Percocet, Ultram, Vicodin, etc.)
- Sleep aids and hypnotic medications (e.g., Ambien®, Belsomra, Sonata®)
- Topical acne (generic)
- Topical antifungal (generic)
- Topical Doxepin
- Topiramate
- Uloric, and
- Wake Promoting Agents

## Drug Quantity Management Program

Drug Quantity Management (DQM) makes sure that members are getting the right amount of medication and that it's prescribed in the most efficient way. For example, the doctor may say, "take two 20mg pills each morning." If that medication is also available in 40mg pills, Express Scripts will contact the doctor about prescribing one 40mg pill a day instead of two 20mg pills. In addition, if the doctor writes the original prescription for 30 pills (a 15-day supply), the new prescription for 30 pills will last a full month — and the members will have just one copayment, not two.

DQM also makes sure that a member's prescriptions don't exceed the amount of medication that the Plan covers. If the prescription is for too large a quantity, the pharmacist can fill the prescription for the amount that the Plan covers or contact the doctor to discuss other options, such as increasing the strength or getting a prior authorization for the quantity originally prescribed.

The following list of drug classes and medications will be subject to the Drug Quantity Management Program. **Note:** The list of drug classes and medications that require dispensing limits is subject to change. To check whether a drug is subject to dispensing limits or other coverage review processes, call Express Scripts' Member Services at **800-RX-MERCK (800-796-3725)**. To obtain prior authorization, you, your doctor or your pharmacist must call Express Scripts at **800-753-2851.**

- Allergies
- Anaphylaxis
- Anti-Fungal
- Anti-Infective
- Anti-Influenza
- Asthma/COPD/Respiratory Conditions
- Benzodiazepines
- Birth Control (Contraceptives)
- Blood Cell Deficiency
- Bone Conditions
- Constipation
- Depression
- Diabetes

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Duragesic (fentanyl) transdermal patches
- Electrolyte Imbalance
- Endocrine Disorders
- Eye Conditions
- Fertility
- Gabapentin
- Heart Failure
- Hepatitis C
- High Blood Cholesterol
- High Blood Pressure
- Hormone Supplementation
- Impotence
- Inflammatory Conditions
- Mental/Neurological Disorders
- Migraine Headaches
- Migraine Prevention
- Multiple Sclerosis
- Muscle Relaxants
- Nausea/Vomiting
- Opioids
- Overactive Bladder
- Pain
- Pulmonary Hypertension
- Sleep Disorders
- Topical Inflammatory Conditions
- Topical Pain
- Ulcer
- Wake Promoting Agents, and
- Wounds

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Express Scripts' Specialty Pharmacy Program Managed by Accredo Health Group, Inc.

Accredo Health Group, Inc.'s staff is dedicated to providing comprehensive support for members who use specialty medications and their prescribing Physicians. The Specialty Pharmacy staff consists of patient care representatives, pharmacists and nurses, all of whom are specifically trained to provide services and support to patients on specialty medications to:

- Promote the safe and effective use of specialty medications
- Provide patients with therapeutic-centric training, education and clinical support, across both specialty and traditional medications
- Provide Physicians with evidence-based practice guidelines and actionable patient information
- Ensure coverage is consistent with Plan provisions, and
- Encourage patient adherence and persistence

The clinical services offered through Accredo, a subsidiary of Express Scripts, are designed to support the Physician's therapy regimen and any coordination being conducted by health plan case managers. The majority of medications administered or obtained through a Physician's office must be pre-ordered by your Physician from Accredo. All specialty medications should be initiated by calling Accredo at **800-803-2523**.

Specialty drugs include, but are not limited to, medications used to treat the following conditions:

- Blood modifying agents (e.g., Epogen, Procrit)
- Growth hormones and related disorders (e.g., Genotropin, Humatrope, Increlex, Zorbitive)
- Hemophilia and related bleeding disorders (e.g., Advate, Alphanate, Benefix, Hemophil, Humate-P)
- Hepatitis C medications (e.g., Zepatier, Viekira Pak)
- Immune deficiency medication — Actimmune
- Multiple sclerosis medications (e.g., Avonex, Betaseron, Copaxone)
- Oral oncology agents (e.g., Gleevec, Temodar, Xeloda)
- Psoriasis medication (e.g., Stelara)
- Pulmonary disorders (e.g., Pulmozyme, Tobi)
- Pulmonary hypertension medication (e.g., Tracleer, Letairis), and
- Rheumatoid arthritis agents (e.g., Enbrel, Humira)

Prescriptions are express-delivered to the location of choice (home, Physician's office, vacation destination, etc.). The Specialty Drug Program also provides claims assistance and access to pharmacists for information. To fill a prescription for a specialty medication, or if you have questions regarding the Specialty Program, please contact Accredo at **800-803-2523**. Drugs that are subject to the Specialty Pharmacy Program are not generally covered under the Medical Plan option in which you are enrolled.

## Specialty Drug

Specialty medications are drugs that are used to treat complex conditions, such as cancer, growth hormone deficiency, hemophilia, hepatitis C, immune deficiency, multiple sclerosis and rheumatoid arthritis. Express Scripts' dedicated specialty pharmacy, Accredo Health Group, Inc., is composed of therapy-specific teams that provide an enhanced level of personalized service to patients with special therapy needs. Whether they're administered by a health care professional, self-injected or taken by mouth, specialty medications require an enhanced level of service. By ordering your specialty medications through Accredo, you can receive:

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Toll-free access to specialty-trained pharmacists and nurses 24hours a day, seven days a week
- Expedited, scheduled delivery of your medications at no additional charge
- Necessary supplies, such as needles and syringes, provided with your medications
- Safety checks to help prevent potential drug interactions
- Refill reminders, and
- Health and safety monitoring

**KEY POINT — SPECIALTY MEDICATIONS ONLY AVAILABLE THROUGH HOME DELIVERY SERVICE**

Certain specialty medications are only available through home delivery service through Accredo Health Group, Inc., Express Scripts' specialty pharmacy. If you are taking a specialty medication, contact Accredo at **800-803-2523** for details.

For more information about Accredo or to order your specialty medications, please call **800-803-2523**.

## COVERED MEDICATIONS AND SUPPLIES

The following prescription drugs are covered under the Managed Prescription Drug Program:

- All injectable vaccines, subject to FDA label requirements for use
- Anti-smoking aids requiring a prescription, including over-the-counter anti-smoking aids when written on a prescription by your prescriber are covered at 100%
- Certain breast cancer preventive drugs covered at 100% for female patients who are at least age 35 pursuant to the PPACA
- Certain over-the-counter medications that are considered preventive and are required to be covered at 100% pursuant to the PPACA
- Contraceptives (covered at 100% persuant to PPACA)
- Emergency contraceptives
- Federal legend vitamins (e.g., vitamins that require a prescription)
- Fluoride vitamins for children through age 16
- Inhaler assisted devices
- Insulin
- Medication for which prior authorization is required and obtained.
- Needles and syringes
- Ostomy supplies
- Over-the-counter diabetes supplies (except insulin pumps)
- Prescribed federal legend drugs (other than those identified as not covered)[1]

---

[1] There is limited coverage for prescriptions filled outside of the U.S. Retirees and Eligible Employees and their Covered Dependents who are living or traveling outside the U.S. and who fill a prescription outside the U.S. should contact Express Scripts for information pertaining to applicable coverage and claims submission.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Prescribed injectable drugs (other than those identified as not covered)
- Retin-A® covered up to age 35
- State restricted drugs
- Tussi-Organidin® DM NR with medical necessity, and
- Vaccines

For specific drug coverage and to determine the applicable payment associated with a prescription drug, contact Express Scripts at **www.Express-Scripts.com** or call **800-RX-MERCK (800-796-3725)**.

## MEDICATIONS AND SUPPLIES THAT ARE NOT COVERED

The following prescription drugs are *not* covered under the Managed Prescription Drug Program:

- All injectable vaccines administered outside of FDA label requirements for use
- Anti-smoking aids that are not dispensed at a pharmacy from a written prescription by your prescriber
- Any prescription filled before the patient's prior-filled 30-day or 90-day supply of medication is scheduled to be exhausted unless special circumstances exist and are authorized by Express Scripts
- Any prescription refilled in excess of the number of refills specified by the Physician, or any prescription or refill dispensed after one year from the Physician's original order
- Cosamine® DS
- Dental fluoride products
- Drugs labeled "Caution — limited by federal law to investigational use," or Experimental drugs, even though a charge is made to the individual
- Drugs whose sole purpose is to stimulate hair growth
- Fluoride vitamins for children age 17 and over
- Immunizing agents, biological blood or blood plasma
- Limbrel®
- Medications for which prior authorization is required and not obtained
- Medication for which the cost is recoverable under any Workers' Compensation or Occupational Disease Law or any state or government agency, or medication furnished by any other drug or medical service for which no charge is made to the participant
- Medication that is taken by or administered to an individual, in whole or in part, while a patient in a licensed Hospital, rest home, sanitarium, extended care facility, Skilled Nursing Facility, convalescent Hospital, nursing home or similar institution that operates on its premises or allows to be operated on its premises, or a facility for dispensing pharmaceuticals
- Medication that is taken or administered in an ambulatory surgical facility or in a doctor's office or is provided by a doctor for use at home
- Mifeprex®
- Most Compound Medications, unless your doctor contacts and receives approval from Express Scripts
- Non-federal legend drugs
- Over-the-counter medications that are not considered preventive and are not required to be covered at 100% pursuant to the PPACA

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Therapeutic devices or appliances, and

- Zestril® or Zestoretic® (Merck's identical products, PRINIVIL® and PRINZIDE®, are covered)

Please note that outpatient drugs and supplies that are not covered under the Managed Prescription Drug Program are generally not covered under the Medical Plan option in which you are enrolled.

## CLAIMS AND APPEALS

If you, your beneficiary or your authorized representative feels that Express Scripts has made an error concerning your benefits, you, your beneficiary or your authorized representative has the right to request reconsideration under the Plan in accordance with the following procedure. For more information, see "Claims and Appeals" on page 106.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

# BEHAVIORAL HEALTH

Horizon Behavioral Health administers behavioral health care benefits if you are enrolled in the Merck PPO. For In-Network providers and additional information, visit **www.horizonblue.com/merck** (or call **877-663-7258**). Representatives are available Monday through Friday between 8:00 a.m. and 8:00 p.m. (all time zones).

## HOW BEHAVIORAL HEALTH WORKS

The Behavioral Health Care program uses the Horizon BCBS provider network. When you select In-Network providers, your claims are filed by the provider and your cost is generally lower. Each time you need care, you can choose to see a provider who does not participate in the network. However, if you use an Out-of-Network provider, you usually pay more for treatment and you may also be responsible for submitting your own claims and for amounts in excess of R&C Limits.

Before seeing a provider, contact Horizon BCBS (**877-663-7258** or **www.horizonblue.com/merck**) to see if the provider participates in the network.

Treatment received through the Lyra provider network is also considered in-network by the Medical Plan. Lyra providers are licensed in certain types of therapy and medication management and may not be appropriate for all treatment needs. To find a provider, call **844-737-9423** or visit **merck.lyrahealth.com**.

Please note that all treatments for behavioral health and substance abuse must be Medically Necessary to be covered under the Plan. The Medical Plan will not pay benefits (In-Network or Out-of-Network) if the applicable Claims Administrator determines that treatment is not Medically Necessary. If you obtain care Out-of-Network, R&C Limits apply.

Please refer to the applicable "at a Glance" chart for information regarding Deductibles, Coinsurance and Out-of-Pocket Maximums applicable to behavioral health care benefits under the Merck PPO.

### In Case of an Emergency

If you or a Covered Dependent has a behavioral health Emergency, you should call 911 or immediately go to the nearest emergency room. You or your representative should contact Horizon Behavioral Health within 24 hours of admission to the emergency room.

---

**KEY POINT — INPATIENT PRECERTIFICATION**

Certain services, such as inpatient stays, require precertification by your provider. Precertification is a process that helps you and your Physician determine whether the services being recommended are covered expenses under the Plan. It also allows the administrator (Horizon Behavioral Health) to help your provider coordinate your transition from an inpatient setting to an outpatient setting (called discharge planning), and to register you for specialized programs or case management when appropriate.

You do not need to precertify services provided by an In-Network provider. In-Network providers will be responsible for obtaining necessary precertification for you. Since precertification is the provider's responsibility, there is no additional Medical Plan out-of-pocket cost to you as a result of an In-Network provider's failure to precertify services.

When you go to an Out-of-Network provider, it is your responsibility to obtain precertification from the administrator (Horizon Behavioral Health). There is no penalty if you fail to precertify. However, if your care is not Medically Necessity it will not be covered under the Plan.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## BEHAVIORAL HEALTH COVERED SERVICES

The Plan covers Medically Necessary services and supplies needed for Mental Health and Substance Abuse Care. Services and supplies that are not deemed Medically Necessary, as determined by Horizon BCBS, are not covered expenses. In addition, certain services and supplies that may be deemed Medically Necessary may not be covered expenses. Determinations of Medically Necessary services and supplies are made by Horizon BCBS as Plan Administrator, and Horizon Behavioral Health, in its sole discretion, will make such determinations (which are final and binding). See "Behavioral Health Services Not Covered" below or contact Horizon Behavioral Health directly for more details.

The plan covers:

**Mental Health and Substance Abuse Outpatient Services** that are provided in an outpatient provider's office or center, where a patient can seek brief periods of treatment for diagnosable mental health or substance abuse conditions but where the patient is not confined to a Hospital bed or receiving inpatient services. Intensive outpatient care and partial hospitalization are considered outpatient services and are subject to the medical necessity review process.

**Mental Health and Substance Abuse Inpatient Care** for diagnosable mental health or substance abuse conditions that consist of more intensive types of treatment, including acute inpatient and residential treatment, are considered inpatient treatment modalities, that are more intensive than outpatient care, and therefore, fall under the inpatient benefit claims adjudication and medical necessity review process. All Inpatient care, whether In-Network or Out-of-Network, must be precertified by Horizon Behavioral Health and undergo medical necessity review.

## BEHAVIORAL HEALTH SERVICES NOT COVERED

This section provides a list of services and supplies that are not covered by the Plan. Services that are not deemed Medically Necessary, as determined by Horizon Behavioral Health, are not covered expenses. These include, but are not limited to, services that are deemed maintenance or custodial. In addition, certain services that may be deemed Medically Necessary may not be covered expenses. To verify coverage of a medical service or device, contact Horizon Behavioral Health.

Some types of treatment are *not covered*, including, but not limited to:

- Custodial care, educational rehabilitation or treatment of learning disabilities, regardless of the setting in which the services are provided

- State Hospital treatment, except when determined by Horizon Behavioral Health to be Medically Necessary

- Treatment for personal or professional growth, development, training or professional certification

- Evaluations, consultations or therapy for educational or professional training or for investigational purposes relating to employment

- Treatment in wilderness programs or other similar programs

- Psychiatric or psychological examinations, testing or treatments that Horizon Behavioral Health determines are not Medically Necessary, but may be required for purposes of obtaining or maintaining employment or medical coverage related to judicial or administrative proceedings

- Academic education during residential treatment

- Any testing, therapy, service, supply, or treatment which does not meet national standards for mental health professional practice, or which have not been found to be efficacious or beneficial by one or more of the Plans or its designees or authorized management entity's clinical quality or review committees based on a review of peer reviewed literature and clinical information available. Examples may include Erhard/The Forum, primal therapy, bioenergetic therapy and crystal healing therapy.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Experimental or investigative testing, therapy, service, supply or treatment, defined as an unproven therapy or treatment which may or may not be superior to a current "gold standard" therapy and that meets one or more of the following criteria:

  – Not generally accepted by the medical community as effective and proven

  – Not recognized by professional medical organizations as conforming to accepted medical practice

  – Not approved by the FDA or other requisite government body

  – In clinical trials or need further study, or

  – Rarely used, novel, or unknown and lacking authoritative evidence of safety and efficacy

- Court-ordered psychiatric or substance abuse treatment, unless Horizon Behavioral Health determines that such services are Medically Necessary for the treatment of a condition included in The Diagnostic and Statistical Manual of Mental Disorders according to established clinical criteria and clinical policies of the Plan

- Psychological testing, except when conducted for purposes of diagnosing a mental disorder or when rendered in connection with treatment of the mental disorder (all psychological testing requires precertification by Horizon Behavioral Health)

- Services to treat conditions that are identified by The Diagnostic and Statistical Manual of Mental Disorders as not being attributable to a mental disorder (i.e., V Codes)

- Any testing, therapy, service, supply, or treatment of organic disorders, dementia and primary neurologic/ neurodevelopment/neurocognitive disorders, except for associated treatable and acute behavioral manifestations

- Marriage counseling, except when rendered in connection with a The Diagnostic and Statistical Manual of Mental Disorders mental disorder, except where otherwise specified as covered by Lyra

- Treatment of stress, except when rendered in connection with a The Diagnostic and Statistical Manual of Mental Disorders mental disorder

- Treatment for smoking cessation, weight reduction, obesity, stammering or stuttering

- Aversion therapy

- Treatment for chronic pain, except when rendered in connection with treatment of a The Diagnostic and Statistical Manual of Mental Disorders mental disorder

- Services, treatment or supplies provided as a result of any Workers' Compensation law or similar legislation, or obtained through, or required by, any governmental agency or program, whether federal, state or any subdivision thereof, or caused by the conduct or omission of a third party for which you or your dependent has a claim for damages or relief, unless you provide Horizon Behavioral Health with a lien against the claim for damages or relief in a form and manner satisfactory to Horizon Behavioral Health

- Treatment or consultations provided by the patient's parents, siblings, children, current or former Spouse or live-in partner

- Prometa

- Hypnosis

- Vagus Nerve Stimulation

- Biofeedback, except for the primary treatment of anxiety disorders

- Applied Behavioral Analysis (ABA), unless services have been pre-authorized, are for an Eligible Employee or Covered Dependent with a diagnosis of autism spectrum disorder and services meet medical necessity as deemed by the health plan's clinical policy. In addition, services for ABA must be rendered by a provider who is

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

87

both licensed and certified to provide pre-approved ABA services. Services that do not meet the criteria or those that are deemed not Medically Necessary will not be covered, and

- Therapies for the treatment of delays in development, unless resulting from acute illness or injury, or congenital defects amenable to surgical repair (such as cleft lip/palate), or otherwise specified are not covered. Examples of non-covered diagnoses include Down Syndrome and Cerebral Palsy, as they are considered both developmental and/or chronic in nature.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# IMPORTANT INFORMATION ABOUT THE PLAN

## ADMINISTRATIVE INFORMATION

This section contains information on the administration and funding for the Medical Plan, as well as your rights as a Medical Plan participant. While you may not need this information for day-to-day participation in the Medical Plan, you should read through this section. It is important for you to understand your rights, the procedures you need to follow and the appropriate contacts you may need in certain situations.

### Coordination of Benefits

If you or your Eligible Dependents are covered by the Medical Plan and certain other types of coverage, the Medical Plan will coordinate your benefits with other coverage. The Medical Plan coordinates benefits with these types of coverage:

- Group insurance (e.g., group coverage sponsored by another employer, a college, an association, etc.) whether the coverage:
    - Pays benefits on an insured or uninsured basis, or
    - Provides benefits on a prepaid or managed care basis (e.g., PPO) or an indemnity basis
    - Coverage for students that is sponsored by, or provided through, a school or other educational institution, except for accident-type coverage for grammar and high school students
    - No fault auto insurance, and
    - Medicare

If you have a medical expense that is covered by two or more plans:

- One plan, the primary plan, will pay your claim first, and
- The other plan(s), the secondary plan(s), may then pay some of the difference between what the primary plan paid and the total covered expenses

Keep in mind that in most cases, you and your Covered Dependents will not receive 100% reimbursement for expenses when you have two or more coverages.

If the primary plan covers a certain service or supply at the same level as the secondary plan, the secondary plan may not pay any additional benefits for that service or supply. As a result, it may not be to your advantage to be covered by two medical plans. For example, if your Spouse/Domestic Partner is covered under your Spouse's/Domestic Partner's employer's plan and as a Covered Dependent under the Medical Plan, the Medical Plan is secondary. If your Spouse/Domestic Partner submits expenses to the Medical Plan, and the amount payable by the Medical Plan is less than or equal to what your Spouse's/ Domestic Partner's plan would have paid, the Medical Plan will pay nothing.

---

**KEY POINT — MAXIMUM BENEFIT PAID WHEN COORDINATING COVERAGE**

The Medical Plan never pays more than the amount that, when added to the amount paid by the primary coverage, equals the amount the Medical Plan would have paid had it been the primary plan.

---

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Coverage Under Another Family Member's Plan

Eligible Employees may choose the No Coverage option. However, if you choose the No Coverage option because you intend to enroll in alternate coverage (such as a dependent through your parent's or Spouse's/Domestic Partner's employer), be sure to check the rules of the other plan in advance. Some employers will not allow an employee to cover a Spouse/Domestic Partner or dependent child if the Spouse/Domestic Partner or dependent child can obtain coverage through that person's own employer.

## Coordinating Benefits in General

The Medical Plan coordinates benefits with other coverage in accordance with the rules of the National Association of Insurance Companies. Following are some examples of those rules:

- The plan that covers you as an employee pays first, and the plan that covers you as a dependent or COBRA participant pays second.

- If Dependent Children are covered by both parents, the "birthday rule" applies, unless the parents are divorced or separated. Under the "birthday rule," the plan of the parent whose birthday falls earlier in the year pays first.

- If children of separated or divorced parents are covered by the plans of both parents, the plan of the parent with custody pays first. The plan of the parent without custody pays next.

- The plan that covers you as an active employee pays first, and the plan that covers you as a Retiree pays second.

- Automobile insurance coverage will always pay first, including for states that allow the selection of private medical coverage over automatic medical coverage (e.g., New Jersey).

A court may establish financial responsibility for all medical care of a Covered Dependent. In that case, the plan of the parent assigned financial responsibility will pay benefits first without regard to these rules.

## Coordinating Benefits When Another Managed Care Plan Is Primary

***If you elected the Merck PPO (including if you are seeking benefits under the Behavioral Health Care Program):*** If the primary plan was paid on an In-Network basis (i.e., the member followed that plan's requirements for In-Network coverage under that plan), then the Medical Plan will pay an amount which, when added to the amount paid by the primary plan, equals the amount the Medical Plan would have paid had it been primary on an In-Network basis. If the primary plan paid on an Out-of-Network basis, the Medical Plan would pay an amount which, when added to the amount paid by the primary plan, equals the amount the Medical Plan would have paid had it been primary on an Out-of-Network basis.

## Coordinating Benefits with No Fault Automobile Insurance

Even if the Medical Plan is your primary or secondary plan, in states with no fault automobile insurance, the automobile insurance carrier is the primary insurance for injuries resulting from an automobile accident. In no fault states, all medical expenses related to an automobile accident must be submitted to the automobile insurance carrier first. The Medical Plan will pay covered expenses not payable under the no fault automobile insurance according to the coordination of benefit rules discussed above. Then, you can submit claims under another plan, such as your Spouse's employer's plan, for any expenses not paid by the Medical Plan. Depending on the coordination of benefit provisions of the other plan, you may or may not receive additional benefits. **Note:** However, that in states where personal injury coverage is available under an automobile insurance policy (e.g., New Jersey), the Medical Plan will assume that you and your Covered Dependents elected such personal injury coverage. As a result, the Medical Plan will not pay expenses payable under such coverage, whether or not such coverage was actually elected.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Coordinating Benefits with Medicare

The Medical Plan coordinates with Medicare as primary whenever it is legally permitted to do so. Generally, you become eligible for Medicare coverage on the 1st of the month that precedes your 65th birthday (e.g., if your birthday is March 15, you are eligible for Medicare coverage on March 1). If your birthday falls on the first of the month, you will be eligible for Medicare coverage the first of the prior month (e.g., if your birthday is March 1, you are eligible for Medicare coverage Feb. 1). If you are or become disabled and receive Social Security Disability Income (SSDI) benefits (generally 29 months after you become disabled OR 24 months from the date you begin receiving SSDI payments), you are eligible for Medicare. As long as you remain an active employee receiving a salary from Merck, the Medical Plan pays benefits first — before Medicare, unless you are not active due to disability. If you are not an active employee due to disability (or otherwise) for at least six months, or terminate employment (including retirement), and if you are eligible for medical coverage under the Medical Plan, then Medicare becomes the primary plan and all bills should be submitted to Medicare first.

**Note:** If you are an LTD Employee and have been out on disability leave for at least six months, you are not considered an active employee. Once you are eligible for Medicare for any reason (e.g., due to disability), Medicare becomes the primary payer for you and your Covered Dependents who qualify for Medicare and the Medical Plan is the secondary payer. In this case, the Medical Plan will coordinate benefits with Medicare.

Also note that if you or your Covered Dependents are continuing coverage under COBRA or otherwise, including any subsidized coverage that may be provided to you as part of a severance package or continuation coverage under COBRA (or otherwise) provided to your surviving Eligible Dependents, and you or your Covered Dependents are or become eligible for Medicare and the coverage under COBRA is not otherwise terminated as permitted by law, Medicare becomes the primary payer for you and your Covered Dependents who qualify for Medicare and the Medical Plan is the secondary payer. In this case, the Medical Plan will coordinate benefits with Medicare.

All of the Medical Plan options available to you require you and your Covered Dependents who are eligible for Medicare to enroll in Medicare — Parts A and B — when you are first eligible. The Medical Plan options will coordinate coverage with Medicare Parts A and B, even if you fail to enroll. Accordingly, to avoid a gap in coverage and also ensure you are not subject to Medicare late enrollment penalties you should make sure to enroll in Medicare. While participation in Medicare Parts A and B is required, participation in Medicare Part D prescription drug coverage is voluntary and the Company does not require that you or your Covered Dependents sign up for Medicare Part D.

The same holds true for your other Covered Dependents if they have no other group insurance coverage. If your Spouse and/or Covered Dependents are eligible for Medicare, the Medical Plan pays benefits primary before Medicare as long as you remain an active employee. After you retire or are not an active employee, Medicare becomes the primary plan for your Spouse and other Covered Dependents — even if you are not covered by Medicare. Different rules apply if your Spouse or other Covered Dependent has group insurance coverage.

Different rules also apply if your Covered Dependent is a Domestic Partner. Medicare does not recognize a Domestic Partner relationship. Medicare allows an employer plan to coordinate with Medicare as primary payor for a Covered Dependent who is a Medicare-eligible Domestic Partner whether the employee is active or inactive. If your Covered Dependent is a Domestic Partner who is Medicare-eligible for any reason (e.g., due to age or disability), the Medical Plan will coordinate with Medicare Parts A and B as the primary payor (and the Medical Plan as the secondary payor) whether you are an active or inactive employee and regardless of your Medicare status. Your Domestic Partner needs to sign up for Medicare Parts A and B as soon as the Domestic Partner is eligible because the Medical Plan will coordinate with Medicare coverage, even if your Domestic Partner does not enroll in Medicare. Your Domestic Partner should enroll in Medicare as soon as he or she is eligible to avoid a gap in coverage and Medicare late enrollment penalties.

If you or an Eligible Dependent becomes eligible for Medicare coverage under circumstances where Medicare is primary, the Medical Plan will assume full Medicare Parts A and B coverage has been elected as soon as you or your Covered Dependents are eligible for Medicare coverage. Should you or your dependent elect anything other than full

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Medicare Parts A and B coverage, the Medical Plan will reduce benefits to reflect whatever Medicare would have paid had you elected the full Medicare Parts A and B coverage.

Note that you are responsible for paying the premium required by Medicare to Medicare in addition to any contribution you are required to pay to Merck to continue your coverage under the Medical Plan.

For purposes of the Plan, it is assumed that your doctor accepts Medicare payments. When a doctor opts out of Medicare, the Plan continues to pay benefits as if the doctor accepts Medicare payments. If your doctor has opted out of Medicare, you will not receive reimbursement from the Plan for charges that would have been covered by Medicare.

You are eligible for Medicare if you:

- Are age 65 or over

- Suffer from end-stage renal disease for 30 months or more, or

  – Have been receiving Social Security Disability Insurance benefits for two or more years

If you or your covered dependent has end-stage renal disease, the Medical Plan pays primary during the first 30 months of dialysis or the first 30 months of treatment in connection with a kidney transplant. Thereafter, Medicare becomes primary. If you or your covered dependent has end-stage renal disease and Medicare becomes primary, you must enroll in Medicare because Merck medical coverage will pay secondary after the first 30 months, even if you do not enroll in Medicare. Contact your local Social Security Administration office for more information about enrolling in Medicare.

### Medicare B Reimbursement

The Company does not provide Medicare Part B reimbursements. The Company does not reimburse Part B premiums for Covered Dependents.

## Recovery Provisions

The Claims Administrator can exchange benefit information with other employers, administrators and insurers to determine responsibility for benefits between the Medical Plan and other coverage.

### Overpayment of Benefits

The Claims Administrator has the right to recover any overpayment or make adjustments to the payment of future claims to meet the coordination of benefit provisions or otherwise.

### Subrogation and Right of Recovery Provision

The provisions of this section apply to all current or former Plan participants and also to the parents, guardians or other representatives of a dependent child who incurs claims and is or has been covered by the Plan. The Plan's right to recover (whether by subrogation or reimbursement) shall apply to the personal representative of your estate, your decedents, minors, and incompetent or disabled persons. "You" or "your" includes anyone on whose behalf the Plan pays benefits. No adult covered person hereunder may assign any rights that it may have to recover medical expenses from any tortfeasor or other person or entity to any minor child or children of said adult covered person without the prior express written consent of the Plan.

The Plan's right of subrogation or reimbursement, as set forth below, extends to all insurance coverage available to you due to an injury, illness or condition for which the Plan has paid medical claims (including, but not limited to, liability coverage, uninsured motorist coverage, underinsured motorist coverage, personal umbrella coverage, medical payments coverage, workers' compensation coverage, no-fault automobile coverage or any first party insurance coverage).

Your Medical Plan is always secondary to automobile no-fault coverage, personal injury protection coverage or medical payments coverage.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

No disbursement of any settlement proceeds or other recovery funds from any insurance coverage or other source will be made until the Medical Plan's subrogation and reimbursement interests are fully satisfied.

## Subrogation

The right of subrogation means the Plan is entitled to pursue any claims that you may have in order to recover the benefits paid by the Plan. Immediately upon paying or providing any benefit under the Plan, the Plan shall be subrogated to (stand in the place of) all rights of recovery with respect to any claim or potential claim against any party, due to an injury, illness or condition to the full extent of benefits provided or to be provided by the Plan. The Plan may assert a claim or file suit in your name and take appropriate action to assert its subrogation claim, with or without your consent. The Plan is not required to pay you part of any recovery it may obtain, even if it files suit in your name.

## Reimbursement

If you receive any payment as a result of an injury, illness or condition, you agree to reimburse the Plan first from such payment for all amounts the Plan has paid and will pay as a result of that injury, illness or condition, up to and including the full amount of your recovery.

## Constructive Trust

By accepting benefits (whether the payment of such benefits is made to you or made on your behalf to any provider) you agree that if you receive any payment as a result of an injury, illness or condition, you will serve as a constructive trustee over those funds. Failure to hold such funds in trust will be deemed a breach of your fiduciary duty to the Plan. No disbursement of any settlement proceeds or other recovery funds from any insurance coverage or other source will be made until the Medical Plan's subrogation and reimbursement interest are fully satisfied.

## Lien Rights

Further, the Plan will automatically have a lien to the extent of benefits paid by the Plan for the treatment of the **illness**, **injury** or condition upon any recovery whether by settlement, judgment or otherwise, related to treatment for any **illness**, **injury** or condition for which the Plan paid benefits. The lien may be enforced against any party who possesses funds or proceeds representing the amount of benefits paid by the Plan including, but not limited to, you, your representative or agent, and/or any other source that possessed or will possess funds representing the amount of benefits paid by the Plan.

## Assignment

In order to secure the Plan's recovery rights, you agree to assign to the Plan any benefits or claims or rights of recovery you have under any automobile policy or other coverage, to the full extent of the Plan's subrogation and reimbursement claims. This assignment allows the Plan to pursue any claim you may have, whether or not you choose to pursue the claim.

## First-Priority Claim

By accepting benefits from the Plan, you acknowledge that the Plan's recovery rights are a first priority claim and are to be repaid to the Plan before you receive any recovery for your damages. The Plan shall be entitled to full reimbursement on a first-dollar basis from any payments, even if such payment to the Plan will result in a recovery that is insufficient to make you whole or to compensate you in part or in whole for the damages sustained. The Plan is not required to participate in or pay your court costs or attorney fees to any attorney you hire to pursue your damage claim.

## Applicability to All Settlements and Judgments

The terms of this entire subrogation and right of recovery provision shall apply and the Plan is entitled to full recovery regardless of whether any liability for payment is admitted and regardless of whether the settlement or judgment

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

identifies the medical benefits the Plan provided or purports to allocate any portion of such settlement or judgment to payment of expenses other than medical expenses. The Plan is entitled to recover from any and all settlements or judgments, even those designated as pain and suffering, non-economic damages, and/or general damages only. The Plan's claim will not be reduced due to your own negligence.

## Cooperation

You agree to cooperate fully with the Plan's efforts to recover benefits paid. It is your duty to notify the Plan within 30 days of the date when any notice is given to any party, including an insurance company or attorney, of your intention to pursue or investigate a claim to recover damages or obtain compensation due to your injury, illness or condition. You and your agents agree to provide the Plan or its representatives notice of any recovery you or your agents obtain prior to receipt of such recovery funds or within five days if no notice was given prior to receipt. Further, you and your agents agree to provide notice prior to any disbursement of settlement or any other recovery funds obtained. You and your agents shall provide all information requested by the Plan, the Claims Administrator or its representative including, but not limited to, completing and submitting any applications or other forms or statements as the Plan may reasonably request and all documents related to or filed in personal injury litigation. Failure to provide this information, failure to assist the Plan in pursuit of its subrogation rights, or failure to reimburse the Plan from any settlement or recovery you receive may result in the denial of future benefit payments or claim until the Plan is reimbursed in full, termination of your health benefits or the institution of court proceedings against you.

You shall do nothing to prejudice the Plan's subrogation or recovery interest or to prejudice the Plan's ability to enforce the terms of this Plan provision. This includes, but is not limited to, refraining from making any settlement or recovery that attempts to reduce or exclude the full cost of all benefits provided by the Plan or disbursement of any settlement proceeds or other recovery prior to fully satisfying the Medical Plan's subrogation and reimbursement interest.

You acknowledge that the Plan has the right to conduct an investigation regarding the injury, illness or condition to identify potential sources of recovery. The Plan reserves the right to notify all parties and his/ her agents of its lien. Agents include, but are not limited to, insurance companies and attorneys.

You acknowledge that the Plan has notified you that it has the right pursuant to the Health Insurance Portability & Accountability Act ("HIPAA"), 42 U.S.C. Section 1301 et seq, to share your personal health information in exercising its subrogation and reimbursement rights.

## Interpretation

In the event that any claim is made that any part of this subrogation and right of recovery provision is ambiguous or questions arise concerning the meaning or intent of any of its terms, the Claims Administrator for the Plan shall have the sole authority and discretion to resolve all disputes regarding the interpretation of this provision.

## Jurisdiction

By accepting benefits from the Plan, you agree that any court proceeding with respect to this provision may be brought in any court of competent jurisdiction as the Plan may elect. By accepting such benefits, you hereby submit to each such jurisdiction, waiving whatever rights may correspond by reason of your present or future domicile. By accepting such benefits, you also agree to pay all attorneys' fees the Plan incurs in successful attempts to recover amounts the Plan is entitled to under this section.

# COBRA

A federal law, the Consolidated Omnibus Budget Reconciliation Act (COBRA) requires that the Medical Plan offer Covered Employees and their Eligible Dependents the opportunity for a temporary extension of health coverage (called COBRA coverage) at group rates in certain instances where coverage under the Plan would otherwise end (qualifying events). The following information is intended to inform you of your rights and obligations under COBRA.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Please note that although existing federal law does not extend COBRA coverage rights to your Domestic Partner and their Covered Dependent Children, the Plan Sponsor offers continuation of medical coverage in certain cases. For continuation of coverage options available to covered Domestic Partners, see "Continuation of Health Care Coverage for Domestic Partners" for more information.

---

**KEY POINT — HEALTH INSURANCE MARKETPLACE AS AN ALTERNATIVE TO COBRA**

**You may have other options available to you when you lose group health coverage.** For example, you may be eligible to buy individual medical coverage (but not dental, vision or health care FSA coverage) through the Health Insurance Marketplace. By enrolling in coverage through the Marketplace, you may qualify for lower costs on your monthly medical coverage premiums and lower out-of-pocket costs for medical care. Additionally, you may qualify for a 30-day special enrollment period for another group health plan for which you are eligible (such as a Spouse's plan), even if that plan doesn't generally accept late enrollees.

For more information about the Marketplace, visit **www.healthcare.gov**.

---

You do not have to show that you are insurable to choose COBRA coverage. However, you will have to pay the entire contribution for your COBRA coverage plus a 2% administrative fee. There is a 30-day grace period for the payment of the regularly scheduled contribution (other than the initial contribution which must be paid by its due date). You should be aware that in some of the situations outlined in this SPD, the Plan Sponsor automatically extends coverage at no cost to you or your Covered Dependents for a period after coverage under the Medical Plan would otherwise end (e.g., coverage provided to surviving Covered Dependents under certain circumstances, coverage provided as part of a separation package, etc.). If your employment ended before Jan. 1, 2023, this coverage is included in the period for which you or your Covered Dependents may be eligible for continuation coverage under COBRA. If your employment ends on or after Jan. 1, 2023, this coverage is **not** included in the period for which you or your Covered Dependents may be eligible for continuation coverage under COBRA. Your eligibility for COBRA coverage begins at the end of your benefits continuation period offered by the Company.

---

**KEY POINT — YOUR COVERAGE OPTION UNDER COBRA**

When you elect COBRA, you are only able to continue the Medical Plan option in which you are enrolled, unless the option is no longer available to you (e.g., you moved). You can make a change during the next annual enrollment period for coverage effective the following Jan. 1, or you may make a mid-year change if you experience a Life Event that allows you to make a Permitted Plan Change.

---

## Who May Elect COBRA Coverage

*If you are an Eligible Employee* covered by the Medical Plan on the day before the qualifying event, you are a Qualified Beneficiary and have a right to choose COBRA coverage if you lose your Medical Plan coverage because of a reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part). An end of employment or reduction in hours that results in the loss of Medical Plan coverage is a qualifying event under COBRA. Even if you do not lose your coverage completely, a reduction in hours is a qualifying event if it results in an increase in the cost of your Plan coverage. Special rules may apply if you are offered other medical coverage as an alternative to COBRA coverage. For more information, contact the Benefits Service Center.

*If you are the Spouse of an Eligible Employee* and are covered by the Merck Medical Plan as a Covered Dependent on the day before a qualifying event, you are a Qualified Beneficiary and have the right to choose COBRA coverage for yourself if you lose coverage under the Merck Medical Plan for any of the following reasons (qualifying events):

- The death of your Spouse

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- The termination of your Spouse's employment (for reasons other than gross misconduct) or reduction in your Spouse's hours of employment

- Divorce or legal separation from your Spouse (in states where legal separation equals divorce), or

- Your Spouse becoming enrolled in Medicare.

***If you are an Eligible Dependent Child of an Eligible Employee*** and were covered by the Plan on the day before the qualifying event, you also are a Qualified Beneficiary and have the right to COBRA coverage if your coverage under the Merck Medical Plan is lost for any of the following five reasons (qualifying events):

- The death of the employee

- The termination of the employee's employment (for reasons other than gross misconduct) or reduction in the employee's hours of employment

- The divorce or legal separation (in states where legal separation equals divorce) of the employee or Retiree

- The employee becoming enrolled in Medicare, or

- The dependent ceasing to be eligible for coverage under the Plan.

***If you have a newborn or newly adopted child during your COBRA coverage period*** and you are an Eligible Employee who elected COBRA, the new child will have an independent right to elect COBRA coverage. To elect this coverage, the COBRA Administrator must be notified by phone, online or in writing within 31 days after the new child's birth or adoption, or the date the Covered Employee becomes legally obligated to provide support for the child in anticipation of adoption. If the COBRA Administrator is not notified within the 31-day period, then the new child will not be offered the option to elect COBRA coverage.

***If you have taken a leave of absence under the Family and Medical Leave Act (FMLA)*** and you do not return to work at the end of your FMLA leave, you may elect COBRA coverage. In this situation, you will experience a qualifying event on the last day of your FMLA leave, which is the earliest of:

- When you unequivocally inform the Employer that you are not returning at the end of the leave

- The end of the leave, assuming you do not return, or

- When the FMLA entitlement ends.

For purposes of an FMLA leave, you will be eligible for COBRA coverage only if:

- You or your Eligible Dependents are covered by the Merck Medical Plan on the day before your FMLA leave begins

- You do not return to employment at the end of the FMLA leave, and

- You or your Covered Dependents lose coverage under the Merck Medical Plan before the end of what would be the maximum COBRA continuation period.

***If you are illegally denied medical care coverage,*** you may elect COBRA coverage after what would have been a qualifying event.

***If you, your Spouse or other Eligible Dependents lose coverage in anticipation of a qualifying event described earlier,*** then that individual is a Qualified Beneficiary and may elect to receive COBRA coverage. This may occur, for example, if you eliminate a Spouse's coverage in anticipation of divorce or separation, or if the Employer ends your coverage in the Medical Plan in anticipation of your end of employment.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| KEY POINT — IN THE EVENT OF YOUR DEATH |
|---|

If the enrolled, eligible employee died before Jan. 1, 2017, while they were a participant in the Medical Plan:

- Their Covered Dependents may have been eligible to continue to receive medical coverage under the Plan. This coverage ran concurrent with COBRA coverage. For information, see "Coverage for Dependents Who Were Covered Dependents Upon the Date of Death — *Eligible Employees Who Died Before Jan. 1, 2017.*"

If the enrolled, eligible employee dies on or after Jan. 1, 2017, while they are a participant in the Medical Plan:

- Their surviving Covered Dependents on the date of the enrolled, eligible employee's death are eligible to continue coverage under the Medical Plan as described in "Coverage for Dependents — Eligible Employees Who *Die on or After Jan. 1, 2017.*"

## Your Duties Under the Law

You or your Covered Dependent has the responsibility of informing the Benefits Service Center (the COBRA Administrator) of a divorce, legal separation or a child losing dependent status under the Medical Plan. This notice *must* be provided within 60 days from the date of the divorce, legal separation or a child losing dependent status (or, if later, the date coverage would normally be lost because of the event). If you, or a Covered Dependent, fail to provide this notice to the Plan Administrator during this 60-day notice period, any Covered Dependent who loses coverage will *not* be offered the option to elect COBRA coverage.

To notify the Plan Administrator of a Covered Dependent losing coverage due to divorce, legal separation or a child losing dependent status, contact the Benefits Service Center online or by phone.

For your Spouse and each child, the following information is required to enroll in COBRA coverage:

- Full name
- Mailing address
- Date of birth
- Relationship to you, and
- Social Security number.

Once you or your Covered Dependent has notified the Benefits Service Center of the event resulting in the loss of coverage, COBRA information and an election form for continuation coverage will be mailed within 14 days by the COBRA Administrator. After you receive the information and election form, you and your Covered Dependents then have 60 days from the date coverage ends or the date this information package is mailed to you (whichever is later) to accept or decline continuation coverage.

Please note that the timeframes referenced in this section may be extended until the end of the COVID-19 national public health emergency.

If you or your Covered Dependents fail to notify the Benefits Service Center of a divorce, legal separation or a child losing dependent status and any claims are mistakenly paid for expenses incurred after the date coverage would normally be lost due to the event, then you and your Covered Dependents will be required to reimburse the Plan for any claims mistakenly paid.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**KEY POINT — IF YOU MOVE**

To ensure that you receive the most up-to-date benefits information — and have access to appropriate coverage options — you must notify the Benefits Service Center any time you have a change in address.

## Merck's Duties Under the Law

The Employer will cause the COBRA Administrator to notify Qualified Beneficiaries of the right to elect continued coverage automatically (without any action required by you or a Covered Dependent) if any of the following events occur that result in a loss of coverage:

- Your death
- Termination of employment (for reasons other than gross misconduct) or reduction in hours, or
- If you lose benefits because of entitlement to Medicare.

## Electing COBRA Coverage

### Time Period for Elections

Under the law, a Qualified Beneficiary must elect COBRA coverage within 60 days from the date the Qualified Beneficiary would lose coverage because of one of the events described earlier, or, if later, 60 days after the COBRA Administrator provides the Qualified Beneficiary with notice of the right to elect COBRA coverage. A third party, such as a health care provider, also may elect and pay for coverage on behalf of a Qualified Beneficiary. *If COBRA coverage is not elected within the time period described above, the Qualified Beneficiary will lose the right to elect COBRA coverage.*

A Qualified Beneficiary may change or revoke an election to receive COBRA coverage until the election period expires. If a Qualified Beneficiary waives COBRA coverage prior to the end of the election period, the Qualified Beneficiary will be permitted to revoke the waiver and elect coverage at any time before the election period ends. In that case, COBRA coverage shall begin with the date the waiver is revoked, which will be considered the COBRA election date.

### Separate Elections

Each Qualified Beneficiary has an independent election right to elect COBRA coverage. For example, if there is a choice among types of coverage under the Plan, each Qualified Beneficiary who is eligible for COBRA coverage is entitled to make a separate election among the types of coverage. Thus, a Spouse or Dependent Child is entitled to elect COBRA coverage even if you do not make that election. Similarly, a Spouse or dependent child may elect different coverage from the coverage you elect.

## Types of Coverage You Will Receive and Changes to Coverage

If you choose COBRA coverage, the Company is required to give you coverage that is identical to the coverage provided under the Plan to similarly situated non-COBRA beneficiaries/Retirees or Covered Dependents. If the coverage for similarly situated non-COBRA beneficiaries/Retirees or Covered Dependents is modified, your coverage will be modified in the same manner. "Similarly situated non-COBRA beneficiaries" means the individuals receiving coverage under the Plan who are receiving coverage for a reason other than due to the rights under COBRA and who, based on all the facts and circumstances, are most similarly situated to the situation of the Qualified Beneficiary immediately before the qualifying event.

As a Qualified Beneficiary, you will have the same opportunity to change your benefit elections as similarly situated non-COBRA beneficiaries. This means that you will be eligible to participate in the Plan's annual enrollment and you are

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

subject to the Plan's rules regarding mid-year changes. You also have the same right as active Eligible Employees to enroll Eligible Dependents.

If the Company discontinues the Plan or benefit option you elected as COBRA coverage, you may be entitled to receive different coverage from the Company. In addition, if you move out of a network service area for your coverage option, the Company must offer you coverage available to other employees of an Employer in the new geographic area (or coverage available to employees of related companies, if there are no employees of an Employer in the area). If there is no other coverage available for that area, then the Company must offer you other existing coverage that may extend to that area.

## Duration of COBRA Coverage

### End of Employment or Reduction in Hours

The law requires that you be afforded the opportunity to purchase COBRA coverage for 18 months following a qualifying event that is a termination of employment or reduction in hours. For purposes of this rule, a qualifying event includes an increase in the cost of coverage following your end of employment or reduction in hours.

If you experience an end of employment or reduction in hours following Medicare enrollment, however, your Covered Dependents who are Qualified Beneficiaries may elect COBRA for up to 36 months from the date of Medicare enrollment or 18 months from the employee's termination or reduction in hours, whichever is greater.

### Other Qualifying Events

A period of up to 36 months of coverage applies to Covered Dependents who are Qualified Beneficiaries who experience qualifying events other than due to your termination of employment or reduction in hours. This longer period applies to a loss of coverage due to:

- Your death
- Divorce or legal separation of you and your Spouse (in states where legal separation is recognized)
- If you lose benefits because of entitlement to Medicare (your Covered Dependents may elect COBRA coverage for up to 36 months from the date you became enrolled in Medicare), or
- Your Eligible Dependent becoming no longer eligible for coverage under the Medical Plan

### Second Qualifying Events

A period of up to 36 months also applies if one of these qualifying events occurs during the initial 18-month COBRA period described above, or during a 29-month COBRA period applicable to disabilities, described below. These events can result in an extension of an 18-month COBRA period to 36 months from the date of your end of employment or reduction in hours. You must notify the COBRA Administrator within 60 days of the second qualifying event in order to be eligible for the 36-month COBRA period.

### Special Rules for Disability

The initial 18 months of COBRA coverage due to end of employment or reduction in hours may be extended to 29 months if you or a Covered Dependent is disabled (for Social Security disability purposes) at any time during the first 60 days of COBRA coverage, as determined by the Social Security Administration. This 11-month extension is available to all Covered Dependents who are Qualified Beneficiaries due to termination of employment or reduction in hours, even those who are not disabled. It also applies to children born to, or adopted by, you after the initial qualifying event, who are determined to be disabled within the first 60 days of being covered under COBRA.

To benefit from the 11-month disability extension, you or a Covered Dependent must provide the COBRA Administrator with a copy of the determination by the Social Security Administration that you or a Covered Dependent who is a Qualified Beneficiary was disabled during the 60-day period after your termination of employment or reduction in hours. You must provide this notice to the COBRA Administrator within 60 days of the later of the date (a) such determination

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

is made, (b) the qualifying event date or (c) the loss of Plan coverage and before the end of the original 18-month COBRA coverage period.

If, during the COBRA coverage period, the Social Security Administration determines that you or a Covered Dependent is no longer disabled, the individual must inform the Plan Administrator of this new determination within 30 days after the date it is made.

If you or a Covered Dependent is disabled and another qualifying event occurs within the 29-month COBRA period, then the COBRA coverage period is 36 months after the termination of employment or reduction in hours.

## Early Termination of COBRA Coverage

The law provides that your COBRA coverage may be cut short prior to the expiration of the 18-month, 29-month or 36-month period for any of the following five reasons:

- The Company (and its affiliates) no longer provides group health coverage to any of its employees.

- The contribution for COBRA coverage is not paid within 30 days of the due date, or the initial contribution is not paid within 45 days after the initial election.

- The Qualified Beneficiary becomes entitled to Medicare after the date COBRA is elected. (COBRA coverage ends only for the person entitled to Medicare.) The Qualified Beneficiary must enroll in Medicare Parts A and B when first eligible in order to avoid a gap in coverage and Medicare late enrollment penalty.

- Coverage has been extended for up to 29 months due to disability and there has been a final determination that the individual is no longer disabled. (Coverage for all Qualified Beneficiaries who received the extension due to disability may end as of the first day of the month that is more than 30 days after such final determination, provided that the termination date is after the end of the initial 18-month period of COBRA coverage.)

- The Qualified Beneficiary becomes covered — after the date COBRA is elected — under another group health plan.

If your COBRA coverage ends before the maximum period of coverage expires, you will receive a notice regarding the termination of COBRA coverage.

COBRA coverage is provided subject to your eligibility for such coverage. The Plan Administrator reserves the right to terminate your coverage retroactively in the event it is determined that you are ineligible for COBRA.

## Paying for COBRA Coverage

You do not have to show that you are insurable to choose COBRA coverage. However, under the law, you may be required to pay the full amount of the cost of covering an active employee (and their Covered Dependents, if applicable), plus a 2% administrative fee (for a total of 102% of the cost of coverage). If your coverage is extended from 18 to 29 months for disability, you may be required to pay up to 150% of the cost of covering an active employee (and their Eligible Dependents, as applicable) beginning with the 19th month of COBRA coverage, provided that the disabled individual is one of the individuals that elected the disability extension. The cost of group health coverage periodically changes. If you elect COBRA coverage, the COBRA Administrator will notify you of any changes in the cost.

***COBRA coverage will not take effect until you elect COBRA and make the required payment.*** You have an initial grace period of 45 days from the date of your election, to make the first contribution payment. Thereafter, payments for COBRA coverage are due by the first day of each month to which the payments apply (payments must be postmarked on or before the end of the 30-day grace period). If you pay part but not all of the contribution, and the amount you paid is not significantly less than the full amount due, then the COBRA Administrator may inform you of the amount of the underpayment and allow you a reasonable period of time to pay the outstanding amount due (such as 30 days).

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Please note that the timeframes referenced in this section may be extended until the end of the COVID-19 national public health emergency.

If you do not make payments on a timely basis as described above, COBRA coverage will terminate as of the last day of the month for which you made timely payment.

Your COBRA contributions may change in certain circumstances, for example, if the COBRA Administrator has been charging you less than the maximum permissible amount, if you add Eligible Dependents or drop Covered Dependents as permitted under the Plans, or in the case of a disability extension described above.

### COBRA Administration/Notices

If you have any questions about COBRA coverage or the application of the law, please contact the COBRA Administrator at the address listed below. Also, if your marital or Domestic Partnership status has changed, or you or your Covered Dependents have changed addresses, or a Covered Dependent Child ceases to be eligible for coverage under the terms of the Plan, you must notify the COBRA Administrator in writing immediately, as provided in this section, at the address listed below. Fidelity Investments is the COBRA Administrator. If you have questions about your COBRA rights, call the Benefits Service Center.

All notices and other communications regarding COBRA and the Merck Medical Plan should be directed to the following address:

> Merck Benefits Service Center
> P.O. Box 770001
> Cincinnati, OH 45277-0020

### Medicare and COBRA

In general, if you don't enroll in Medicare Part A or B during your initial Medicare enrollment period, because you are still employed, you will have an 8-month special enrollment period to sign up for Medicare Part A or B, beginning on the earlier of:

- The month after your employment ends, or
- The month after group health plan coverage based on current employment ends.

If you do not enroll in Medicare during that special enrollment period and instead elect to continue coverage under COBRA, you may have a gap in coverage if you decide you want Part B later. This is because there is no special enrollment period for Medicare after COBRA coverage ends and you may have to wait for the next general Medicare enrollment period to enroll. In addition, you may have to pay a Medicare Part B late enrollment penalty. If you elect COBRA continuation coverage and later enroll in Medicare Part A or B before the COBRA continuation coverage ends, the Plan may terminate your continuation coverage. However, if Medicare Part A or B is effective on or before the date of the COBRA election, COBRA coverage may not be discontinued on account of Medicare entitlement, even if you enroll in the other part of Medicare after the date of the election of COBRA coverage.

Note that these rules also apply to your Medicare-eligible Covered Dependent who does not enroll in Medicare during their initial Medicare enrollment period because you are still employed.

If you or your Covered Dependent are enrolled in Medicare and also continue coverage under COBRA, the Plan generally will pay secondary and Medicare will be primary. If you or your Covered Dependent are or become Medicare-eligible but do not enroll in Medicare, the Plan will assume full Medicare Parts A and B coverage has been elected as soon as you or your Covered Dependents became eligible for Medicare coverage. Should you or your Covered Dependents elect anything other than full Medicare Parts A and B coverage, the Plan will reduce benefits to reflect whatever Medicare would have paid had you elected the full Medicare Parts A and B coverage. There is no reduction to the contribution that you are required to pay to continue coverage under COBRA if you and/or your Covered

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Dependents are enrolled in Medicare. See the "Coordinating Benefits with Medicare" section of this SPD for more information.

## COBRA and Retiree Medical

If you and/or your Covered Dependents are eligible to continue coverage under COBRA under the Medical Plan and are also eligible for group retiree medical coverage under the Merck Retiree Medical Plan or are eligible to participate in the Merck Retiree Health Reimbursement Account Plan, you cannot participate in both COBRA and retiree coverage at the same time. If you want to participate in retiree coverage, you must waive your medical coverage under COBRA.

# Continuation of Health Care Coverage for Domestic Partners

Although existing federal law does not extend rights to COBRA coverage to your Domestic Partner and their Covered Dependent Children, the Plan Sponsor offers continuation of medical coverage in certain cases. Your Domestic Partner and their Covered Dependent Children will be eligible to elect and pay for continuation of coverage if their benefits are lost under certain circumstances. And, just like COBRA benefits, this continuation of coverage:

- Is available for a maximum of 18, 29 or 36 months, and
- Must be paid for on a monthly basis — with contributions based on the full cost of coverage, plus 2% for administrative costs.

Continuation of coverage benefits generally follows the same rules as COBRA. The Continuation of Medical Coverage Summary for Domestic Partners chart below summarizes the events that trigger continuation of coverage benefits for your Domestic Partner and/or their Covered Dependent Children.

For purposes of these COBRA-like benefits, your Domestic Partner and their eligible Dependent Children who lose medical coverage as a result of certain events (listed in the Continuation of Medical Coverage Summary for Domestic Partners chart) will be treated as if they were Qualified Beneficiaries.

To be eligible for continuation of coverage, you must notify the Benefits Service Center within 60 days of certain events, as shown in the chart below, and you must follow the enrollment instructions (and the enrollment timeframes) provided by the Benefits Service Center. You and/or your Covered Dependents will not be eligible for continuation of coverage benefits if the Benefits Service Center is not notified within the 60-day period or if you do not enroll for continuation coverage in accordance with the instructions and timeframe required by the Benefits Service Center.

## Continuation of Medical Coverage Summary for Domestic Partners

You must notify the Benefits Service Center within 60 days of these events for your Domestic Partner and/or their Covered Dependent Children to be eligible for continuation of coverage benefits:

| Event | Domestic Partner | Employee's/Domestic Partner's Covered Dependent Children |
|---|---|---|
| **MAXIMUM CONTINUATION OF COVERAGE PERIOD** | | |
| Employee terminates employment for any reason (except gross misconduct) | 18 months[1] | 18 months[1] |
| Employee dies | 36 months | 36 months |
| Domestic Partnership ends | 36 months | 36 months |

---

[1] May be extended to 29 months if your Covered Dependent is determined — by Social Security — to be disabled at any time within the first 60 days of continuation of coverage.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

| Event | Domestic Partner | Employee's/Domestic Partner's Covered Dependent Children |
|---|---|---|
| Disabled employee becomes entitled to Medicare (and dependents lose coverage) | 36 months | 36 months |
| Child is no longer an Eligible Dependent under the Company's Plans | Not applicable | 36 months |

## Your Rights Under Newborns' and Mothers' Health Protection Act

The Newborns' and Mothers' Health Protection Act (NMHPA) provides that group health plans and health insurance issuers generally may not, under federal law, restrict benefits for any Hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a Cesarean section. However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours, as applicable). In any case, plans and issuers may not, under federal law, require that the provider obtain authorization from the Plan or the insurance issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

## Your Rights Under Women's Health and Cancer Rights Act

The Women's Health and Cancer Rights Act (WHCRA) requires that all group health plans that provide medical and surgical benefits with respect to a mastectomy provide coverage for:

- Reconstruction of the breast on which the mastectomy has been performed
- Surgery and reconstruction of the other breast to produce a symmetrical appearance, and
- Prostheses and treatment of physical complications of all stages of mastectomy, including lymphedema.

These services must be provided in a manner determined in consultation with the attending Physician and the patient. This coverage may be subject to Annual Deductibles, Copays and Coinsurance provisions applicable to other such medical and surgical benefits provided under the applicable medical option. Please refer to the applicable "at a Glance" chart for information regarding Deductibles, Copays and Coinsurance under the Merck Medical Plan option in which you are enrolled. If you would like more information on the Women's Health and Cancer Rights Act benefits, call the Benefits Service Center.

## Your Rights Under USERRA

The Medical Plan is subject to the "continuation coverage" requirements of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") and will be administered in accordance with USERRA and the military leave rules established by the Plan Administrator. As a result, you will be entitled to continue coverage for yourself and your Eligible Dependents under the Medical Plan during your military leave while you are an employee of an Employer for at least a period of twenty-four (24) months. You do not need to take any action to continue coverage under the Medical Plan for yourself and your Covered Dependents when you begin your military leave. However, if you want to drop or otherwise change your coverage under the Medical Plan when you begin your military leave, you must contact the Benefits Service Center within 30 days after your leave begins. If you do not contact the Benefits Service Center within that 30-day period, your coverage under the Medical Plan will continue as described below.

**If you are eligible to continue to receive Base Pay from the Employer during your military leave,** coverage will continue in accordance with the Medical Plan's terms and conditions applicable to an employee on a paid leave of absence. Employee contributions at the active employee rate will continue to be deducted from your pay; to the extent your pay is insufficient to pay the required contributions, unpaid contributions will be accumulated and be payable by you when you return to active employee status. You may drop or otherwise change your coverage during your military

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

leave only during annual enrollment (for coverage changes effective the following Jan. 1) or mid-year if you have a life event that allows you to make a Permitted Plan Change and you timely notify the Benefits Service Center.

**If you are not eligible to continue to receive Base Pay from the Employer during your military leave,** coverage will continue while you are an employee of an Employer in accordance with the Medical Plan's terms and conditions applicable to an employee on an unpaid leave of absence. You will have the option when your leave begins to cancel coverage or continue coverage under the Medical Plan during your leave. If you would like to cancel coverage, you must make an election within 30 days of your leave of absence date. If you elect to continue coverage, you will receive a monthly invoice directly from the Benefit Service Center showing the amount of your employee contribution at the active employee rate required to continue coverage. If you do not pay the required monthly employee contribution in the time and manner specified on the invoice, coverage will terminate as of the last day of the month for which employee contributions have been timely received. You will not thereafter be eligible to enroll for coverage until the next annual enrollment period (for coverage effective the following Jan. 1) or mid-year if you have a Life Event that allows you to make a Permitted Plan Change and you timely notify the Benefits Service Center.

If you elect not to continue coverage during a paid or unpaid military leave, you will be entitled to reinstatement of coverage upon your return to active employee status provided you make such election within 30 days of your return. Coverage provided under USERRA will run concurrently with any coverage provided under COBRA. For more information regarding your rights during a military leave contact the Benefits Service Center or refer to Merck's Military Leave Policy, available on Sync or by request to the Merck My Support Center.

## Your Rights Under ERISA

As a participant in the Merck Medical Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants will be entitled to the following.

### Receive Information About Your Plan and Benefits

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Merck Medical Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated SPD. The administrator may charge a reasonable fee for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Continue Group Health Care

Continue health care coverage for yourself, your Spouse or Covered Dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You, your Spouse or Covered Dependents may have to pay for such coverage. Review this SPD and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

## Enforcing Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge and to appeal any denial, all within certain time schedules. For more information, see "Claims and Appeals."

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you a fine that accrues on a daily basis (based on amounts set by the Department of Labor) from the time the materials were due to you until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court after you exhaust your administrative remedies described above (for more information, see "Claims and Appeals"). In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court. If it should happen that the Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

## Assistance with Your Questions

If you have any questions about the Merck Medical Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance of the Employee Benefits Security Administration at:

> Division of Technical Assistance/Employee Benefits Security Administration
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Washington, DC 20210

You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration at **866-444-3272** or accessing their website at **www.dol.gov/ebsa. For more information about health insurance options available through a Health Insurance Marketplace, visit http://www.healthcare.gov.**

# Your Rights and Protections Against Surprise Medical Bills

**KEY POINT — SURPRISE OR BALANCE BILLING**

When you get emergency care or get treated by a out-of-network provider at an in-network hospital or ambulatory surgical center, you are protected from surprise billing or balance billing.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Case: 1:24-cv-12517 Document #: 1 Filed: 12/05/24 Page 214 of 273 PageID #:214

105

### What is "balance billing" (sometimes called "surprise billing")?

When you see a doctor or other health care provider, you may owe certain out-of-pocket costs, such as a copay, coinsurance and/or a deductible. You may have other costs or have to pay the entire bill if you see a provider or visit a health care facility that isn't in your health plan's network.

"Out-of-network" describes providers and facilities that haven't signed a contract with your health plan. Out-of-network providers may be permitted to bill you for the difference between what your plan agreed to pay and the full amount charged for a service. This is called "balance billing." This amount is likely more than in-network costs for the same service and might not count toward your annual out-of-pocket maximum.

"Surprise billing" is an unexpected balance bill. This can happen when you can't control who is involved in your care — like when you have an emergency or when you schedule a visit at an in-network facility but are unexpectedly treated by a out-of-network provider.

### You are protected from balance billing for:

**Emergency services**
If you have an emergency medical condition and get emergency services from a out-of-network provider or facility, the most the provider or facility may bill you is your plan's in-network cost-sharing amount (such as copayments and coinsurance). You **can't** be balance billed for these emergency services, including air ambulance. This includes services you may get after you're in stable condition, unless you give written consent and give up your protections not to be balanced billed for these post-stabilization services.

**Certain services at an in-network hospital or ambulatory surgical center**
When you get services from an in-network hospital or ambulatory surgical center, certain providers there may not be in your health plan's network. In these cases, the most those out-of-network providers may bill you is your plan's in-network cost-sharing amount (e.g., copays and coinsurance). This applies to emergency medicine, anesthesia, pathology, radiology, laboratory, neonatology, assistant surgeon, hospitalist, or intensivist services. These providers **can't** balance bill you and may **not** ask you to give up your protections not to be balance billed.

If you get other services at these in-network facilities, out-of-network providers **can't** balance bill you, unless you give written consent and give up your protections.

**You're <u>never</u> required to give up your protections from balance billing. You also aren't required to get out-of-network care. You can choose a provider or facility in your plan's network.**

### When balance billing isn't allowed, you also have the following protections:

- You are only responsible for paying your share of the cost (like the copays, coinsurance and deductibles that you would pay if the provider or facility was in-network). Your health plan will pay out-of-network providers and facilities directly.

- Your health plan generally must:

  - Cover emergency services without requiring you to get approval for services in advance (prior authorization)

  - Cover emergency services by out-of-network providers

  - Base what you owe the provider or facility (cost-sharing) on what it would pay an in-network provider or facility and show that amount in your explanation of benefits

  - Count any amount you pay for emergency services or out-of-network services toward your deductible and out-of-pocket maximum

**If you believe you've been wrongly billed,** contact the federal surprise billing hotline at **1-800-985-3059**. Visit **www.cms.gov/nosurprises/consumers** for more information about your rights under federal law.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# CLAIMS AND APPEALS

## How to File a Claim

Please note that the timeframes referenced in this section may be extended until the end of the COVID-19 national public health emergency.

### In-Network Care

If you receive care from an In-Network provider, either inpatient or outpatient, you do not have to file any claims. Your In-Network provider bills the Medical Plan directly for its share of the cost of your care. Subsequently, your In-Network provider bills you for your remaining share of the cost of your care (e.g., Deductible and Coinsurance).

### Out-of-Network Care

When you receive care from an Out-of-Network provider you generally pay for services up front and then file a claim for reimbursement for the share of the cost covered by the Medical Plan.

For instructions on how to file a claim under the Managed Prescription Drug Program, see "How to File a Claim for Non-Participating Pharmacy Benefits."

### Inpatient

Claim forms are available online at **http://netbenefits.com/merck** or on Sync > HR. Hard copies are available by calling the Benefits Service Center. Horizon BCBS is the claims payer for inpatient Out-of-Network claims, which are submitted to Horizon BCBS for payment.

### Outpatient

Go to **www.horizonblue.com/merck** to download a Health Insurance Claim Form. Complete the claim form and send it together with an itemized bill from your provider to the Claims Administrator at the address listed on the bottom of the form. If you prefer, you can work with a Horizon Health Guide who can assist you with your claim for submission. Call **877-663-7258** to be connected.

## Appealing a Claim

If you or your Covered Dependent or authorized representative feels that the Claims Administrator has made an error concerning your benefits, you, your Covered Dependent or authorized representative has the right to request reconsideration under the Plan in accordance with the following procedure. Please note that all requests for reconsideration will be submitted in writing to the Claims Administrator. See "Contact Information for Written Appeals" for address information.

For this purpose, an "adverse benefit determination" will mean a denial, reduction, or termination of, or a failure to provide or make payment in whole or in part (a "denial") for a benefit, including where such denial is based on a determination of a participant's or beneficiary's eligibility to participate in a plan. An adverse benefit determination also means a claim denial based on a utilization review or a determination that a treatment is Experimental or Investigational or not Medically Necessary or appropriate or a retroactive termination of coverage due to fraud or intentional misconduct (a "rescission").

Upon receipt of a claim denial, you may request information regarding any diagnosis codes and treatment codes applicable to your claim and their corresponding meaning. Upon such a request, the diagnosis and treatment codes and their meaning will be provided as soon as possible, but will not be considered a request for review of an adverse benefit determination or a request for external review.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

### Initial Claim

The Claims Administrator is responsible for evaluating all benefit claims. The Claims Administrator will review your claim in accordance with its standard claims procedures, as required by ERISA. The Claims Administrator has the right to secure independent medical advice and to require other evidence as it deems necessary in order to decide the status of your claim.

There are four categories of claims: urgent health claims, pre-service health claims, post-service health claims and concurrent health claims. Each category has different claims procedures. For many of these procedures, your health care provider may work directly with the Claims Administrator.

**"Urgent" health claims.** These are claims that if not processed quickly (within 72 hours), the life or health of the patient is jeopardized. The Claims Administrator will notify you or your doctor of the Plan's decision no later than 72 hours after your claim is received, unless you fail to provide sufficient information to determine whether, or to what extent, benefits are covered or payable under the Plan.

**"Pre-service" health claims.** These are claims that must be decided before a patient will be allowed access to health care (for example, pre-authorization requests or referrals). The Claims Administrator will notify you or your doctor of the decision no later than 15 days after your claim is received. This 15-day period may be extended by another 15 days in certain circumstances.

**"Post-service" health claims.** These are claims involving the payment or reimbursement of costs for care that has already been provided. For non-urgent, post-service health claims, the Claims Administrator has up to 30 days to evaluate and respond to claims for benefits. The 30-day period begins on the date the claim is first filed. This 30-day period may be extended by 15 days, in certain circumstances.

**"Concurrent" health claims.** These are claims for which the Claims Administrator has previously approved a course of treatment over a period of time or for a specific number of treatments, and the Plan later reduces or terminates coverage for those treatments. Concurrent care claims may fall under any of the above three categories, depending on when the appeal is made. However, the Plan must give you enough advance notice to appeal the claim before a concurrent care decision takes effect.

### If Your Claim Is Denied

If the Claims Administrator does not fully agree with your claim, you will receive an "adverse benefit determination." For this purpose, an "adverse benefit determination" will mean a denial, reduction, or termination of, or a failure to provide or make payment in whole or in part (a "denial") for a benefit, including where such denial is based on a determination of a participant's or beneficiary's eligibility to participate in a plan. An adverse benefit determination also means a claim denial based on a utilization review or a determination that a treatment is Experimental, Investigational or not Medically Necessary or appropriate or a retroactive termination of coverage due to fraud or intentional misconduct (a "rescission").

You will receive notice of a denial, which will include:

- Information sufficient to identify the claim involved, including the date of service, identification of the health care provider, the claim amount (if applicable); a statement indicating that the diagnosis codes, treatment codes and their corresponding meaning are available upon request

- The specific reasons for the denial, including the applicable denial code and its meaning

- If applicable, a description of the standard used by the Plan to deny the claim

- A reference to the specific Plan provisions on which the denial is based

- A description of any additional material or information needed to reconsider the claim and an explanation of why such material or information is necessary

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- A description of the Plan's internal and external review procedures, including the time limits applicable to such procedures; and contact information for any applicable office of health insurance consumer assistance or ombudsman that will assist you with such procedures

- A statement of your right to bring a civil action under Section 502(a) of ERISA following a denial on review

- Any internal rules, guidelines, protocols or other similar criteria that were used for the basis of the denial, either the specific rule, guideline, protocol or criterion, or a statement that a copy of such information will be made available free of charge to you upon request

- For a denial based on medical necessity or an Experimental treatment or other similar exclusion or limit, an explanation of the scientific or clinical judgment used in the decision, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided free of charge upon request, and

- For a denial involving urgent care, a description of the expedited review process applicable to such claims. Also, in the case of denial concerning a claim involving urgent care, the information set out in this section may be provided orally within the timeframes provided in the section above entitled "Urgent health claims." If an oral notice is provided, a written notification that meets all the requirements of this section will be furnished within three days of the oral notice.

## Level One Appeal of a Claim

If your claim for benefits is denied, in whole or in part, you or your authorized representative may appeal the denial within 180 days of the receipt of the written or electronic notice of denial. If you choose to appeal your claim, your appeal should be in writing and should explain why you believe the claim should be paid. See "Contact Information for Written Appeals."

Upon your request, you will have access to, and the right to obtain copies of, all documents, records and information relevant to your claim free of charge. You also have the right to receive any additional evidence used to evaluate your claim or any additional rationale applied to your claim. If the Plan receives any additional evidence regarding your claim or applies a new rationale, you will be provided with the additional evidence and the rationale and given an opportunity to respond before the final claim determination is issued.

You may submit with your appeal any written comments, documents, records and any other information relating to your claim, even if you didn't include that information with your original claim. See "Contact Information for Written Appeals." Reviewers must take all the information into account, even if it was not submitted or considered in the initial decision. The review will not afford any deference to the initial claim determination.

A qualified individual who was not involved in the previous claim determination (and is not that person's subordinate) will decide your appeal. If your appeal involves a medical judgment — including whether a treatment, drug or other item is Experimental, Investigational or not Medically Necessary or appropriate — the review will be done in consultation with a health care professional who has appropriate training and experience in the relevant field of medicine involved in the medical judgment, who was not consulted in connection with the previous adverse claim determination and who is not that person's subordinate.

After receiving your appeal, the Claims Administrator will provide notice of its decision within the following timeframes:

- *Urgent care appeals.* You or your authorized representative should contact the Claims Administrator as soon as possible. You can request an expedited appeal process orally or in writing. In this case, all necessary information, including the Claims Administrator's benefits determination on review, shall be relayed to you or your representative by telephone, fax or other similarly expeditious method. The Claims Administrator will provide notice of the appeal decision as soon as possible, taking into account the seriousness of your condition, but no later than 72 hours after receipt of your appeal.

- *Pre-service appeals.* The Claims Administrator will provide notice of the appeal within 15 days following receipt of your appeal.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- *Post-service appeals.* The Claims Administrator will provide notice of the appeal decision within 30 days following receipt of your appeal.

You will receive written or electronic notification of the determination of your appeal. If the claim on appeal is denied in whole or in part, the notice will include:

- Information sufficient to identify the claim involved, including the date of service, identification of the health care provider, the claim amount (if applicable); a statement indicating that the diagnosis codes, treatment codes and their corresponding meaning are available upon request

- The specific reasons for the denial, including the applicable denial code and its meaning

- If applicable, a description of the standard used by the Plan to deny the claim

- A reference to the specific Plan provisions on which the denial is based

- A description of any additional material or information needed to reconsider the claim and an explanation of why such material or information is necessary

- A description of the Plan's internal and external review procedures, including the time limits applicable to such procedures and contact information for any applicable office of health insurance consumer assistance or ombudsman that will assist you with such procedures

- A statement of your right to bring a civil action under Section 502(a) of ERISA following a denial on review

- Any internal rules, guidelines, protocols or other similar criteria that were used for the basis of the denial, either the specific rule, guideline, protocol or criterion, or a statement that a copy of such information will be made available free of charge to you upon request

- For a denial based on medical necessity or an Experimental treatment or other similar exclusion or limit, an explanation of the scientific or clinical judgment used in the decision, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided free of charge upon request, and

- For a denial involving urgent care, a description of the expedited review process applicable to such claims. Also, in the case of denial concerning a claim involving urgent care, the information set out in this section may be provided orally within the timeframes provided in the section above entitled "Urgent health claims." If an oral notice is provided, a written notification that meets all the requirements of this section will be furnished within three days of the oral notice.

## Level Two Appeal of a Claim

If the Claims Administrator upholds an adverse benefit determination at the first level of appeal, you or your authorized representative must file a level two appeal for pre-service and post-service claims. Medical benefit appeals must be submitted within 60 calendar days following the receipt of notice of a level one appeal, or 90 days for Express Scripts appeals.

A level two appeal of an adverse benefit determination of a pre-service health claim, or a post-service health claim shall be provided by Horizon BCBS personnel not involved in making an adverse benefit determination.

*Pre-Service Level Two Appeals.* (May include concurrent care claim reduction or termination.) The Claims Administrator shall issue a decision within 15 calendar days of receipt of the request for the level two appeal.

*Post-Service Level Two Appeals.* The Claims Administrator shall issue a decision within 30 calendar days of receipt of the request for a level two appeal.

The decision on the second level appeal will comply with the requirements listed above for the first level of appeal determination. If you do not agree with the final determination on review, you have the right to bring a civil action, if applicable.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

## Exhaustion of Process

You must exhaust the applicable level one and level two processes of the appeal procedure regarding an alleged breach of the policy terms by the Claims Administrator; or any matter within the scope of the appeals procedure before you commence any:

- Litigation
- Arbitration, or
- Administrative proceeding

**No legal action may be begun against the Plan more than one year after the final decision is rendered by the Claims Administrator on the appeal of a participant's claim for benefits under the Plan. In addition, any time there has been a clear repudiation of any right under the Plan by any Plan fiduciary, no action may be brought more than two years following the date of the repudiation.**

## External Review

The Claims Administrator may deny a claim because it determines that the care is not appropriate, Medically Necessary or that a service or treatment is Experimental or Investigational in nature. In either of these situations, you may request an external review if you or your provider disagrees with the Claims Administrator's decision. An external review is a review by an independent Physician, selected by an External Review Organization, who has expertise in the problem or question involved. An external review can also be requested for recissions of coverage and any adverse benefit determination relating to a surprise medical bill or surprise air ambulance bill.

To request an external review, the following requirements must be met:

- You have received notice of the denial of a claim by the Claims Administrator
- Your claim was denied because the Claims Administrator determined that the care was not Medically Necessary, appropriate or effective or was Experimental or Investigational or your claim was denied due to a rescission of coverage, and
- You have exhausted the applicable internal appeal processes or the process is deemed exhausted due to the failure of the plan to adjudicate your claim in accordance with the procedures set forth herein where such failure is not de-minimis.

The claim denial letter you receive from the Claims Administrator will describe the process to follow if you wish to pursue an external review, including a copy of the *Request for External Review Form*.

You must submit the *Request for External Review Form* to the Claims Administrator within 120 calendar days of the date you received the final claim denial letter. You also must include a copy of the final claim denial letter and all other pertinent information that supports your request.

The Claims Administrator will contact the External Review Organization that will conduct the review of your claim. The External Review Organization will select an independent Physician with appropriate expertise to perform the review. In making a decision, the external reviewer may consider any appropriate credible information that you send along with the *Request for External Review Form* and will follow the Claims Administrator's contractual documents and plan criteria governing the benefits. You will be notified of the decision of the External Review Organization usually within 45 calendar days of the Claims Administrator's receipt of your request form and all necessary information. A quicker review is possible if your Physician certifies (by telephone or on a separate *Request for External Review Form*) that a delay in receiving the service would endanger your health. Expedited reviews are decided within 72 hours after the Claims Administrator receives the request.

The Claims Administrator, the Company and the Health Plan will abide by the decision of the External Review Organization, except where the Claims Administrator can show conflict of interest, bias or fraud.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

You are responsible for the cost of compiling and sending the information that you wish to be reviewed by the External Review Organization to the Claims Administrator. The Claims Administrator is responsible for the cost of sending this information to the External Review Organization and for the cost of the external review.

For more information about the Claims Administrator's External Review process, call the toll-free Customer Service telephone number shown on your ID card.

## Claims and Appeals for Eligibility to Participate in the Merck Medical Plan

If you, your beneficiary or your authorized representative feels that an error has been made concerning your eligibility to participate in the Plan (e.g., your eligibility to elect a particular coverage option, Coverage Tier, add a dependent, etc.), you, your beneficiary or your authorized representative may request reconsideration under the Plan. All requests for reconsideration shall be submitted in writing to the Plan Administrator at the following address:

> Merck Sharp & Dohme LLC
> Attn: Plan Administrator
> c/o Merck Benefits Service Center at Fidelity
> P.O. Box 770003
> Cincinnati, OH 45277-1060

Express mail address:

> Merck Sharp & Dohme LLC
> Attn: Plan Administrator
> c/o Merck Benefits Service Center at Fidelity
> Mail Zone KC1F-L
> 100 Crosby Parkway
> Covington, KY 41015

The Plan Administrator will review your claim and respond to you with a determination. The decision of the Plan Administrator is final and binding.

If your claim for eligibility involves whether an incapacitated child is eligible to participate in the Plan as an Eligible Dependent, you need to follow the claims and appeals procedure for the Medical Plan option in which you are enrolled. Please note that all requests for reconsideration regarding participation by the incapacitated child must be submitted in writing to the Claims Administrator for the option in which you are enrolled. See "Contact Information for Written Appeals" for address information.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

## Contact Information for Written Appeals

The following chart lists the appeals address for each of the available Merck Medical Plan PPO and/or benefit features of the Plan. For the Hawaii HMO option, refer to your certificate of coverage.

| If a Claim Is Denied | Send Your Written Appeal to: |
|---|---|
| **Benefit Appeals** | |
| Merck PPO | Claims Administrator and fiduciary for the Medical Plan: <br><br> Merck Dedicated Service Team <br> Horizon BCBS <br> P.O. Box 18 <br> Newark, NJ 07101-0018 |
| **Eligibility Appeals** | |
| For All Plan options | Plan Administrator for the Medical Plan: <br><br> Merck Sharp & Dohme LLC <br> Attn: Plan Administrator <br> c/o Merck Benefits Service Center at Fidelity <br> P.O. Box 770003 <br> Cincinnati, OH 45277-1060 <br><br> Express mail address: <br><br> Merck Sharp & Dohme LLC <br> Attn: Plan Administrator <br> c/o Merck Benefits Service Center at Fidelity <br> Mail Zone KC1F-L <br> 100 Crosby Parkway <br> Covington, KY 41015 |
| **Medical Precertification Appeals** | |
| Merck PPO | Claims Administrator and fiduciary for the Medical Plan: <br><br> Horizon BCBSNJ Utilization Management Appeals <br> Mail Station PP-12E <br> PO Box 420 <br> Newark, NJ 07101-0420 |
| **Behavioral Health Care Appeals (including behavioral health precertification)** | |
| Merck PPO | Horizon BCBSNJ Behavioral Health <br> Utilization Management Appeals <br> Mail Station PP-12J <br> PO Box 110 <br> Newark, NJ 07101-0110 |
| **Managed Prescription Drug Appeals** | |
| Managed Prescription Drug Program | Claims Administrator and fiduciary for the Managed Prescription Drug Program: <br><br> Express Scripts <br> Benefit Appeals Unit <br> 8111 Royal Ridge Parkway <br> Irving, TX 75063 <br> Attn: Clinical Appeals |

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

# Plan Disclosure Information

## Employer/Sponsor

Merck Sharp & Dohme LLC sponsors the Merck Medical, Dental, Life Insurance and Long Term Disability Plan. The employer identification number assigned to Merck Sharp & Dohme LLC by the IRS is #22-1261880.

The address and phone number for Merck Sharp & Dohme LLC is:

>Merck Sharp & Dohme LLC
>Attn: Plan Administrator
>c/o Merck Benefits Service Center at Fidelity
>P.O. Box 770003
>Cincinnati, OH 45277-0065

Express mail address:

>Merck Sharp & Dohme LLC
>Attn: Plan Administrator
>c/o Merck Benefits Service Center at Fidelity
>Mail Zone KC1F-L
>100 Crosby Parkway
>Covington, KY 41015

Telephone: **866-MERCK-HD (866-637-2543)**

For U.S. employees calling from outside of the United States: **+1-908-423-HELP (+1-908-423-4357)**

## Plan Administrator/Claims Administrator

The Plan Administrator for the Merck Medical, Dental, Life Insurance and Long Term Disability Plan is Merck Sharp & Dohme LLC. Administration of the Merck Medical, Dental, Life Insurance and Long Term Disability Plan is the responsibility of the Plan Administrator. The Claims Administrators determine eligibility for Medical benefits under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan in accordance with the official plan documents. For the list of Claims Administrators, see the "Plan Funding and Administration chart."

The Plan Administrator has the exclusive discretion to construe and interpret the terms of the Medical Plan as follows:

- To adopt such rules for the administration of the Plan as it considers desirable
- To make factual determinations, interpret and construe the Plan, correct defects, supply omissions and reconcile inconsistencies to the extent necessary to effectuate the Plan, resolve all questions arising in the administration, interpretation and application of the Plan, and such action will be conclusive upon the Company, the Plan, participants, employees, their dependents and beneficiaries
- To decide all questions of eligibility and participation
- To prescribe procedures and election forms to be followed by participants to make elections to this Plan
- To accept, modify or reject elections under the Plan
- To authorize disbursements on behalf of the Plan
- To prepare and distribute to participants information explaining the Plan and the benefits available hereunder in such a manner as the Plan Administrator deems appropriate
- To settle any lawsuit against the Plan or Plan Administrator, and
- To request and receive from all participants such information as the Plan Administrator will from time to time determine to be necessary for the proper administration of the Plan.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

The Plan Administrator has reserved the right to delegate all or any portion of its authority described above to a representative. The Plan Administrator has delegated all of its authority described above with respect to authorizing disbursements for claims, adjudicating claims and appeals for benefits (and handling any resulting lawsuits) under the Medical Plan to the Claims Administrators. That means that the Claims Administrator has the sole authority to determine such matters under the Plan and the Plan Administrator will not and cannot substitute its judgment for that of the Claims Administrators on such matters. It also means the Claims Administrator has all of the discretion described above to the extent it relates to the Claims Administrator's duties under the Medical Plan, for example regarding eligibility for benefits, according to the broad discretion set forth above.

The amounts paid to the Claims Administrator by the Company and the Plan are designed to, and do, ensure that the Claims Administrator is not subject to influence by the Plan Sponsor or its subsidiaries, including but not limited to financial influence, as the Claims Administrator acts as a fiduciary for the Plan and the Plan participants. The Plan Sponsor designed this structure to ensure that any court reviewing determinations made by the Claims Administrator will defer to the Claims Administrator's decisions unless the court finds that the determination was both arbitrary and capricious, a highly deferential standard.

Contact the Plan Administrator if you have any questions about the Medical Plan other than routine questions or questions about the filing or status of claims under the Plan. For routine questions, call the Benefits Service Center. For questions about the filing status of claims, contact the Claims Administrator at the address listed in "Contact Information for Written Appeals."

## Agent for Service of Legal Process

If, for any reason, you want to seek legal action against the Medical Plan, you can serve legal process on Merck Sharp & Dohme LLC by directing such service to the following address:

Before Jan. 1, 2023, use:

> Merck Sharp & Dohme LLC
> Attn: Benefits and Executive Compensation Legal Group
> 2000 Galloping Hill Road
> Building K-1, 3rd Floor
> Kenilworth, NJ 07033

On or after Jan. 1, 2023, use:

> Merck Sharp & Dohme LLC
> Attn: Benefits and Executive Compensation Legal Group
> 126 E. Lincoln Avenue
> P.O. Box 2000
> Mail Stop RY60-258
> Rahway, NJ 07065

Service of legal process may also be made upon the Plan Administrator or the trustee.

## Plan Funding and Administration

The Medical Plan is funded and administered through various sources. The Medical Plan is financed by contributions from the Employer (and/or certain of its affiliates) and participating Eligible Employees and certain other participants in the plan such as surviving dependents, COBRA participants, etc. Funds may be held in a trust and used to pay benefits, insurance premiums and certain Medical Plan expenses. Medical Plan expenses are paid from the trust unless otherwise paid by the Plan Sponsor or its affiliates from the general assets.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
http://netbenefits.com/merck

The trustee is:

> The Bank of New York Mellon Corporation
> AIM 102-1200
> One Wall Street
> New York, NY 10286

Merck & Co., Inc. is responsible for the funding policy of the trusts and for determining the amount of contributions. The trusts are intended to be tax-exempt under the Internal Revenue Code of 1986, as amended. Merck & Co, Inc. or its subsidiaries may fund additional benefits through the trust(s) at a later time. If a trust is terminated, the assets in the trust will be used to pay all existing liabilities. Any remaining assets may then be used to provide other benefits for employees in accordance with Internal Revenue Code guidelines.

In the case of certain highly compensated employees, a portion of benefits payable under the Medical Plan may be paid out of the general assets of the Company.

## Plan Funding and Administration Chart

| Official Plan Name and Plan Type | Plan Number | Benefits Type | Claims Administrator | Type of Administration | Insured or Self-Insured |
|---|---|---|---|---|---|
| The Merck Medical, Dental, Life Insurance and Long Term Disability Plan<br><br>Plan type: Employee welfare program providing group medical coverage | 502 | Merck PPO | Horizon BCBS | Contract Administration | Self-insured by the Company[1] |
| | | Health Plan Plus Hawaii HMO | HMSA | Insured Administration | Insured by HMSA |
| | | COBRA | Fidelity Investments (Benefits Service Center) | Contract Administration | N/A |
| | | Managed Prescription Drug Program | Express Scripts | Contract Administration | Self-insured by the Company[1] |
| | | Behavioral Health Care Program for Employees enrolled in the Merck PPO | Horizon Behavioral Health | Contract Administration | Self-insured by the Company[1] |

## No Right to Employment

Nothing in this SPD represents or is considered an employment contract, and neither the existence of the Medical Plan nor any statements made by or on behalf of an Employer shall be construed to create any promise or contractual right to employment or to the benefits of employment. The Employer or you may terminate the employment relationship without notice at any time and for any reason.

## Plan Amendment or Termination

The Plan Sponsor reserves the right to amend the Medical Plan in whole or in part or to completely discontinue the Medical Plan or any benefits or eligibility for any benefits at any time. However, following a "change in control," as defined in the Merck & Co., Inc. Change in Control Separation Benefits Plan ("the Separation Benefits Plan"), certain limitations apply to the ability of Merck & Co., Inc., or its subsidiaries to amend or terminate the Medical Plan.

---

[1]  These benefits are self-insured by the Plan Sponsor (and certain affiliates of the Plan Sponsor) and are governed by and subject to the Employee Retirement Income Security Act of 1974 (ERISA), as amended (see "Your Rights Under ERISA"). State insurance law does not apply to these benefits. As a result, state-mandated benefits do not apply to these benefits.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Amendments may be retroactive; however, no amendment or termination shall reduce the amount of any benefit otherwise payable under the Medical Plan for charges incurred prior to the effective date of such amendment or termination.

The Medical Plan is not and cannot be amended by any verbal representation.

If a benefit is terminated and surplus Plan assets, as determined under ERISA, remain after all liabilities have been paid, such surplus shall revert to the Company to the extent permitted under applicable law, unless otherwise stated in the applicable Plan document. If a benefit is terminated and amounts remain which are not ERISA Plan assets, such surplus shall revert to the Plan Sponsor.

For two years following a "change in control" (as defined in the Separation Benefits Plan) the material terms of the Medical Plan (including terms relating to eligibility, benefit calculation, benefit accrual, cost to participants, subsidies and rates of employee contributions) may not be modified in a manner that is materially adverse to Covered Employees and Covered Dependents in the Plan immediately before the "change in control." During that two-year period, the Company will pay the legal fees and expenses of any participant that prevails on their claim for relief in an action regarding an impermissible amendment (other than ordinary claims for benefits).

## Plan Documents

This SPD is intended as merely a summary of the official Plan documents and should be retained as part of your permanent records. It does not describe every Plan or program provision in full detail and it does not alter the Plan or program or any legal instrument related to the Plan's or program's creation, operations, funding or benefit payment obligations. Every effort has been made to ensure that this SPD accurately reflects relevant Plan or program provisions currently in effect. However, if there is any conflict or inconsistency between the Plan or program documents, which may include insurance contracts and other written agreements with service providers (each of which are held on file with the Company), any verbal representation, or with respect to any provision not discussed in this SPD, it is the Plan Administrator's responsibility to interpret the confliction provisions and determine what benefits will be provided under the Plan.

## Plan Year

The Plan Year for the Medical Plan begins on Jan. 1 and ends on Dec. 31 of each year. The financial records of the Medical Plan are kept on a calendar-year basis.

## Rescission

The Plan Administrator may retroactively terminate your Plan coverage, or the coverage of your Covered Dependent, as applicable, if you or your Covered Dependents fraudulently or intentionally misrepresent any fact material to the Plan, including but not limited to enrollment information, including dependent data, or benefit claims. The Plan Administrator may terminate your coverage and/or the coverage of your Covered Dependents if you provide false or misleading information material to the Plan.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# GLOSSARY

This section defines key words that are frequently used in the SPD. These terms are capitalized throughout the SPD.

**Acquisition Company** — A unit of information contained in the Merck & Co., Inc. Human Resources employee data system which reflects your legacy company designation as determined by the Plan Administrator in its sole discretion.

**After-Tax** — Contributions for benefits coverage that are deducted from an employee's pay after federal and certain state income and employment taxes are deducted.

**Ambulatory Surgical Center** — A specialized facility that is established, equipped, operated and staffed primarily for the purpose of performing surgical procedures and that fully meets one of the following two tests:

- It is licensed as an Ambulatory Surgical Center by the regulatory authority having responsibility for the licensing under the laws of the jurisdiction in which it is located, or

- Where licensing is not required, it meets all of the following requirements:

  - It is operated under the supervision of a licensed doctor of medicine (M.D.) or doctor of osteopathy (D.O.) who devotes full time to supervision and permits a surgical procedure to be performed only by a duly qualified Physician who, at the time the procedure is performed, is privileged to perform the procedure in at least one Hospital in the area.

  - It requires, in all cases except those requiring only local infiltration anesthetics, that a licensed anesthesiologist administer the anesthetic or supervise an anesthetist who administers the anesthetic and that the anesthesiologist or anesthetist remains present throughout the surgical procedure.

  - It provides at least two operating rooms and at least one post-anesthesia recovery room.

  - It is equipped to perform diagnostic X-ray and laboratory examinations or has an arrangement to obtain these services.

  - It has trained personnel and necessary equipment to handle Emergency situations.

  - It has immediate access to a blood bank or blood supplies.

  - It provides the full-time services of one or more registered graduate nurses (R.N.) for patient care in the operating rooms and in the post-anesthesia recovery room.

  - It maintains an adequate medical record for each patient that includes an admitting diagnosis for all patients except those undergoing a procedure under local anesthesia, a preoperative examination report, medical history, laboratory tests and/or X-rays, an operative report and a discharge summary.

An Ambulatory Surgical Center that is part of a Hospital, as defined under this Retiree Medical Plan, will be considered an Ambulatory Surgical Center for the purposes of the Retiree Medical Plan.

**Annual Deductible** — See definition of Deductible.

**Applied Behavior Analysis** — An education service that includes a process of interventions to systematically change behavior and create an observable improvement in behavior. See the "Covered Services" and "Services Not Covered" sections for details.

**Base Pay** — Your annual rate of compensation before any Before-Tax deductions, excluding bonuses, overtime, shift differential, incentives, lump-sum merit increases, non-recurring incentives, commissions and sales cash incentives, and other forms of special compensation or other extra pay as determined by the Company in its sole discretion. For employees of covered collective bargaining units, Base Pay includes cost of living adjustments (COLA). For Regular Part-Time Employees, Base Pay reflects your regularly scheduled hours. For example, if the annual pay for the position is $100,000 for a 40-hour work week, if your regularly scheduled hours are 24 hours per week, your Base Pay is $60,000.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Before-Tax** — Contributions for benefits coverage that are deducted from an employee's pay before federal and certain state income and employment taxes are deducted.

**Behavioral Health Claims Administrator** — For the Merck PPO, the Behavioral Health Claims Administrator is Horizon Behavioral Health.

**Birthing Center** — A specialized facility that is primarily a place for delivery of children following a normal, uncomplicated pregnancy and that fully meets one of the following two tests:

- It is licensed by the regulatory authority having responsibility for the licensing under the laws of the jurisdiction in which it is located, or

- It meets all of the following requirements:

  - It is operated and equipped in accordance with any applicable state law.

  - It is equipped to perform routine diagnostic and laboratory examinations such as hematocrit and urinalysis for glucose, protein, bacteria and specific gravity.

  - It has trained personnel and necessary equipment available to handle foreseeable emergencies, including but not limited to oxygen, positive pressure mask, suction, intravenous equipment, equipment for maintaining infant temperature and ventilation and blood expanders.

  - It is operated under the full-time supervision of a licensed doctor of medicine (M.D.) or doctor of osteopathy (D.O.).

  - It maintains a written agreement with at least one Hospital in the area for immediate acceptance of patients who develop complications.

  - It maintains an adequate medical record for each patient that contains prenatal history, prenatal examination, any laboratory or diagnostic tests and a postpartum summary.

  - It is expected to discharge or transfer patients within 48 hours following delivery.

A Birthing Center that is part of a Hospital, as defined under the Retiree Medical Plan, will be considered a Birthing Center for the purposes of the Retiree Medical Plan.

**Casual Employee** — A person who may be called by an Employer at any time for employment in the U.S. on a non-scheduled and non-recurring basis, and becomes an employee of an Employer only after reporting to work for the period of time during which the person is working and who is not classified as a Regular Full-Time Employee, Regular Part-Time Employee or a Merck Temporary Employee in the Company's employee database.

**Center of Excellence** — A facility designated by Horizon BCBS to treat transplants, bariatric surgery and other specific complex conditions. For Horizon BCBS, Blue Distinction Centers or Blue Distinction Centers+ are considered Centers of Excellence.

**Claims Administrator** — Depends on the option under which you are covered; see the "Plan Funding and Administration Chart."

**COBRA Administrator** — Merck Benefits Service Center administered by Fidelity Investments.

**Coinsurance** — The percentage of covered expenses that you are required to pay after you have met your Deductible.

**Company** — Merck & Co., Inc. and its wholly owned subsidiaries.

**Compound Medication** — Requires a licensed pharmacist to combine, mix or alter the ingredients of a medication when filling a prescription. The FDA does not verify the quality, safety and/or effectiveness of Compound Medications.

**Copay** — A flat-dollar amount that you pay for certain services when you use a participating network provider.

**Coverage Tiers** — Individually and collectively, the following levels of coverage:

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- Employee Only
- Employee + Spouse/Domestic Partner
- Employee + Child(ren), and
- Employee + Spouse/Domestic Partner + Child(ren)

**Covered Dependents** — Your Eligible Dependents whom you have enrolled for coverage under the Medical Plan in the time and manner specified by the Plan Administrator. See "Eligible Dependents" in the "About Medical Coverage" section of this SPD.

**Covered Employees** — Eligible Employees who have enrolled for coverage under the Medical Plan in the time and manner specified by the Plan Administrator.

**Deductible** —

*Annual Deductible.*
The amount of money you pay each year before the Medical Plan begins to pay benefits for covered medical expenses for you and your Covered Dependents. Amounts that are higher than Reasonable and Customary (R&C) Limits and non-covered expenses *do not* count toward your Annual Deductible. There are two types of Annual Deductibles: individual and family. The Individual and Family Deductibles are based on the option you elect under the Medical Plan. See the "at a Glance" charts in each Medical Plan option section for specific details.

Under the Merck PPO, there are different Deductibles for In-Network and Out-of-Network expenses. Your Out-of-Network expenses will be credited toward both your Out-of-Network and In-Network Deductible. Your In-Network expenses will be credited toward both your In-Network and Out-of-Network Deductible.

The Annual Deductible does not apply to certain preventive services covered under the Medical Plan, whether In-Network or Out-of-Network. Age and other restrictions apply.

*Individual Deductible.*
The amount of money you and each Covered Dependent pay each year before the Medical Plan begins to pay benefits for covered medical expenses for that covered family member. Once a covered family member has met their Individual Deductible, the Medical Plan pays the Coinsurance percentage of the cost of most covered medical expenses, and you pay the rest.

*Family Deductible.*
A ceiling on what a family contributes toward the Deductible. If a number of covered family members' expenses add up to the Family Deductible, then the Individual Deductibles are deemed "satisfied" for all covered family members for the year. Once you meet the Family Deductible, all other expenses for any covered family member will be paid by the Medical Plan based on the option you select. However, if one person in the family reaches the Individual Deductible, then the Medical Plan will start to pay the Coinsurance for that person's covered expenses.

---

**KEY POINT — EXAMPLE OF HOW THE FAMILY DEDUCTIBLE IS MET**

Let's say that your family of three chooses the Merck PPO. Under that option, your In-Network Individual Deductible is $500, and your In-Network Family Deductible is $1,000. Assume that your In-Network covered expenses equal $400, your Spouse's/Domestic Partner's equal $400 and your child's equal $300 — totaling $1,100. No one has met the $500 Individual Deductible, but together you have met the $1,000 Family Deductible. Therefore, the Medical Plan will pay 80% of eligible In-Network covered expenses for all covered family members for the remainder of the calendar year.

---

**Dependent Children** — See Eligible Dependents.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Domestic Partner/Domestic Partnership** — Two people in a Spouse-like relationship who share an ongoing, exclusive, emotionally committed relationship (and intend to do so indefinitely) and meet all of the following criteria:

- Are at least age 18 and mentally competent to enter into a legal contract
- Are not related by blood or adoption to a degree closer than permitted by state law for marriage
- Are not married to another person under statutory or common law of the United States nor in a domestic partnership with another person
- Are jointly responsible for each other's welfare, financial and other obligations, and
- Reside together in the same household — and have done so for at least 12 months.

**Eligible Dependents** —

- Your Spouse or Domestic Partner — If your Spouse/Domestic Partner is a Non-Eligible Union Employee, then your Spouse/Domestic Partner does not qualify as a dependent.
- Your Dependent Children up to the end of the month in which they reach age 26. Dependent Children mean your:
  - Biological children
  - Stepchildren, including your Spouse's/Domestic Partner's biological children, foster children, legally adopted children and children for whom your Spouse/Domestic Partner is legal guardian, in each case who are not also your biological children, foster children, legally adopted children and children for whom you are legal guardian
  - Foster children
  - Legally adopted children (eligibility begins on the date of placement for adoption or commencement of legal obligation to provide support in anticipation of adoption)
  - Children for whom you are legal guardian, and
  - Children for whom coverage is required by a Qualified Medical Child Support Order (QMCSO)

While coverage is extended to your children through the last day of the month they reach age 26, your child's Spouse/Domestic Partner or your child's children are not your Eligible Dependents, unless they would otherwise meet the definition of Eligible Dependents.

If you or your Spouse/Domestic Partner (or your former Spouse/Domestic Partner or their Spouse/Domestic Partner) work (or worked) for the Company, special provisions apply. See "Merck Couples."

*If You Have a Child with a Disability*

If your dependent child is physically or mentally disabled, coverage for the child may continue beyond age 26, provided the child's disability begins before the date the child reaches the age at which coverage would otherwise end. You will need to provide proof of your child's disability to the Claims Administrator at least 60 days before the date coverage is scheduled to end and annually thereafter. To continue coverage, the Claims Administrator also reserves the right to have a Physician of its choice examine your child once a year. For more information on how to contact the Claims Administrator, see the "Administrative Information" section.

*Qualified Medical Child Support Order*

If a Qualified Medical Child Support Order (QMCSO) requires you to provide coverage, Dependent Children may also include children for who you do not provide financial support. You may obtain a copy of the Plan Administrator's procedures governing QMCSO determinations, free of charge, by contacting the Benefits Service Center.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

*Spouses/Domestic Partners Who Work for Merck*

If you or your Spouse/Domestic Partner (or your former Spouse/ Domestic Partner or their Spouse/Domestic Partner) work (or worked) for an Employer, special provisions apply when enrolling Eligible Dependents for coverage. See "Merck Couples Enrollment Rules."

| KEY POINT — SPOUSE AND CHILDREN OF COVERED CHILDREN ARE NOT ELIGIBLE FOR COVERAGE |
|---|
| While coverage is extended to your children up to age 26, this coverage does not extend to your child's Spouse/Domestic Partner or your child's children, unless they would otherwise meet the definition of Eligible Dependents. |

**Eligible Employees** — Regular Full-Time Employees, Regular Part-Time Employees, Merck Temporary Employees, Eligible Union Employees, U.S. Territory Employees and LTD Employees, in each case, who are not Excluded Employees or Excluded Persons.

**Eligible Union Employees** — All U.S.-based employees of an Employer who are members of a collective bargaining unit identified in Exhibit A.

**Emergency** — A medical condition manifesting itself by acute symptoms of sufficient severity that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate attention could result in:

- Placing the health of the individual (or, with respect to a pregnant person, the health of the person or their unborn child) in serious jeopardy
- Serious impairment to bodily functions, or
- Serious dysfunction of a bodily organ

Emergencies include, but are not limited to:

- Severe pain
- Psychiatric disturbances, and/or
- Symptoms of substance abuse

With respect to a pregnant person who is having contractions, an Emergency exists where:

- There is inadequate time to effect a safe transfer to another Hospital before delivery, or
- The transfer may pose a threat to the health or safety of the person or the unborn child.

Specific examples of Emergencies include but are not limited to heart attacks, strokes, convulsions, severe burns, obvious bone fractures, wounds requiring sutures, poisoning and loss of consciousness.

**Employer** — The wholly owned U.S. subsidiaries of Merck & Co., Inc. other than the following entities which are excluded: Antimicrobial Stewardship, LLC and Merck Global Health Innovation Fund, LLC and each of their subsidiaries.

**ERISA** — Employee Retirement Income Security Act of 1974, as amended.

**Excluded Employees** — Casual Employees, U.S. Expatriates (other than those who are U.S. Territory Employees)[1], Intern/Graduate/Cooperative Student Associates, Non-Eligible Union Employees, employees of Antimicrobial

---

[1] U.S. Expatriates (other than those who are U.S. Territory Employees) and employees based outside the U.S. on assignment outside their home country but in the U.S. (other than U.S. Territory Employees) are not eligible for the medical coverage under the Medical Plan described in this SPD. However, they are eligible for medical coverage under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan through a program insured by Cigna Global Health Benefits.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

Stewardship, LLC and Merck Global Health Innovation Fund, LLC and each of their subsidiaries, and employees based outside the U.S. on assignment outside their home country but in the U.S. (other than U.S. Territory Employees)[1].

**Excluded Persons** — A person who is an independent contractor, or agrees or has agreed to be an independent contractor, or has any agreement or understanding with an Employer, or any of its affiliates, not to be an employee or an Eligible Employee, even if previously an employee or Eligible Employee or is employed by a temporary or other employment agency, regardless of the amount of control, supervision or training provided by an Employer or its affiliates, or is a "leased employee" as defined under Section 414(n) of the Internal Revenue Code of 1986, as amended. An Excluded Person is not eligible to participate in the Medical Plan even if a court, agency or other authority rules that this person is a common-law employee of an Employer or its affiliates.

**Experimental or Investigational** — A drug, device, procedure or treatment will be determined to be "Experimental or Investigational" if:

- There are insufficient outcomes data available from controlled clinical trials published in the peer-reviewed literature to substantiate its safety and effectiveness for the illness or injury involved

- Approval required by the FDA has not been granted for marketing

- A recognized national medical or dental society or regulatory agency has determined, in writing, that it is Experimental or Investigational, or for research purposes

- It is a type of drug, device or treatment that is the subject of a Phase I or Phase II clinical trial or the experimental or research arm of a Phase III clinical trial, using the definition of "phases" indicated in regulations and other official actions and publications of the FDA and Department of Health and Human Services, or

- The written protocol or protocols used by the treating facility, or the protocol or protocols of any other facility studying substantially the same drug, device, procedure, or treatment, or the written informed consent used by the treating facility or by another facility studying the same drug, device, procedure, or treatment states that it is Experimental or Investigational, or for research purposes.

**External Review Organization** — An independent review organization contracted with the Claims Administrator to choose an independent Physician review (or reviewers, if necessary or required by applicable law) to examine a case.

**Home Health Care Agency** — An agency or organization that provides a program of home health care and that meets one of the following three tests:

- It is approved under Medicare.

- It is established and operated in accordance with applicable licensing and other laws.

- It meets all of the following tests:
  - It has the primary purpose of providing a home health care delivery system bringing supportive services to the home
  - It has a full-time administrator
  - It maintains written records of services provided to the patient
  - Its staff includes at least one registered graduate nurse (R.N.), or it has nursing care by a registered graduate nurse (R.N.) available, and
  - Its employees are bonded, and it maintains malpractice insurance.

**Hospice** — An agency that provides counseling and incidental medical services for a terminally ill individual. Room and Board may be provided. The agency must meet one of the following three tests:

- It is approved by Medicare as a Hospice.

- It is licensed in accordance with any applicable state laws.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

- It meets the following criteria:
  - It provides service 24/7
  - It is under the direct supervision of a duly qualified Physician
  - It has a nurse coordinator who is a registered graduate nurse (R.N.) with four years of full-time clinical experience. Two of these years must involve caring for terminally ill patients
  - The main purpose of the agency is to provide Hospice services
  - It has a full-time administrator
  - It maintains written records of services given to the patient, and
  - It maintains malpractice insurance coverage.

A Hospice that is part of a Hospital, as defined under the Retiree Medical Plan, will be considered a Hospice for the purposes of the Retiree Medical Plan.

**Hospital** — An institution that is engaged primarily in providing medical care and treatment of ill and injured persons on an inpatient basis at the patient's expense and that fully meets one of the following three tests:

- It is accredited as a Hospital by the Joint Commission on the Accreditation of Healthcare Organizations
- It is approved by Medicare as a Hospital, or
- It meets all of the following tests:
  - It maintains on-the-premises diagnostic and therapeutic facilities for surgical and medical diagnosis and treatment of ill and injured persons by, or under the supervision of, a staff of duly qualified Physicians
  - It continuously provides on-the-premises 24-hour-a-day nursing services by, or under the supervision of, registered graduate nurses (R.N.s), and
  - It is operated continuously with organized facilities for operative surgery on the premises.

**Initial Enrollment Period** — The 30-day period that starts when you are hired, rehired or transferred (if you qualify as a Transferred Employee), as applicable; or the date of the cover letter provided in your enrollment materials from the Benefits Service Center, whichever is later.

**In-Network** — A provider, or the covered services and supplies provided by a provider, who has an agreement with the Claims Administrator, for the coverage option in which you are enrolled under the Plan, for the applicable benefit to furnish covered services or supplies.

**Intern/Graduate/Cooperative Student Associate** — A student hired by an Employer as a participant in the Company Intern/Graduate/Cooperative Associate Program. The student must be designated as a participant in that program at least annually by the Company.

**Legacy Merck LTD Employee** — An LTD Employee who is coded in the employee database of Merck & Co., Inc. under Acquisition Company with a blank indicator or as Legacy Inspire.

**Legacy OBS LTD Employee** — An LTD Employee who is coded in the employee database of Merck & Co., Inc. as Legacy Organon, Legacy Intervet or Legacy Nobilon under Acquisition Company.

**Legacy Schering LTD Employee** — An LTD Employee who is coded in the employee database of Merck & Co., Inc. as Legacy Schering under Acquisition Company or who is a Legacy OBS LTD Employee.

**Life Event** — Certain events in your life that may allow you to change some of your benefit choices or coverage levels during the year (e.g., marriage, divorce, birth or adoption of a child, etc.). For more information about Life Events — and Permitted Plan Changes — see "When Life Changes" in the "About Medical Coverage" section of this SPD or contact the Benefits Service Center.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Lifetime Benefit Maximum** — The maximum amount of benefits you and your Covered Dependents can receive under the Medical Plan. The Medical Plan options do not have Lifetime Benefit Maximums other than for fertility-related medical and pharmacy services.

**Localized Employees** — Former U.S.-based[1] employees of the wholly owned U.S. subsidiaries of Merck & Co., Inc. (excluding Antimicrobial Stewardship, LLC and Merck Global Health Innovation Fund, LLC and each of their subsidiaries) who are employed outside the U.S. by Merck & Co., Inc. or its wholly owned subsidiaries as local employees either at the end of their assignment as a U.S. Expatriate or due to a one-way transfer from the U.S. who are not Excluded Persons and who are participants in the Retirement Plan for Salaried Employees of MSD, the Retirement Plan for Hourly Employees of MSD, the Legacy Schering Retirement Plan or the Retirement Account Plan for the Organon BioSciences U.S. Affiliates, or any successor to such plans.

**LTD Benefits** — Income replacement benefits provided under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan.

**LTD Employee** — An employee who is receiving LTD Benefits who on the day that employee became eligible for LTD Benefits was considered by an Employer to be a Regular Full-Time Employee, Regular Part-Time Employee, Eligible Union Employee, Merck Temporary Employee or a U.S. Expatriate and not an Excluded Employee or an Excluded Person. LTD Employees shall be eligible for coverage as described in this SPD, but eligibility for this coverage may be amended by Merck at any time. For the avoidance of doubt, an LTD Employee shall no longer be considered an LTD Employee in the event the LTD Employee's employment with the Company is terminated for any reason.

**Medical Plan/Merck Medical Plan** — The medical benefits, including prescription drug and behavioral health care benefits, provided to Eligible Employees under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan.

**Medically Necessary** — A service or supply is Medically Necessary if it is:

- Reasonably required for the treatment or management of the medical condition
- Commonly and customarily recognized by Physicians as appropriate treatment or management of the medical condition, and
- Other than educational or Experimental in nature.

A Hospital confinement is Medically Necessary if:

- The medical condition requires confinement, and
- Safe and effective treatment cannot be provided on an outpatient basis.

The Claims Administrator has the final authority for determining medical necessity and may use its clinical policies (which are incorporated into this SPD by reference) to determine medical necessity.

**Mental Health/Substance Abuse Treatment** — Mental Health/Substance Abuse Treatment is treatment for both of the following:

- Any illness that is identified in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), including a psychological and/or physiological dependence or addiction to alcohol or psychiatric drugs or medications, regardless of any underlying physical or organic cause, and
- Any illness where the treatment is primarily the use of psychotherapy or other psychotherapist methods.

All inpatient services, including Room and Board, given by a mental health facility or area of a Hospital that provides Mental Health or Substance Abuse Treatment for an illness identified in the DSM, are considered Mental Health/Substance Abuse Treatment, except in the case of multiple diagnoses.

[1] U.S.-based excludes employees based in U.S. territories (e.g., Puerto Rico, Guam, U.S. Virgin Islands).

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

If there are multiple diagnoses, only the treatment for the illness that is identified in the DSM is considered Mental Health/Substance Abuse Treatment.

Detoxification services given prior to and independent of a course of psychotherapy or Substance Abuse Treatment are not considered Mental Health/Substance Abuse Treatment.

Prescription drugs are not considered Mental Health/Substance Abuse Treatment.

**Merck Group Retiree Medical Plan** — The group retiree medical coverage component of the Merck Retiree Medical Plan, which applies to eligible Retirees and their Eligible Dependents who are not yet age 65 or not Medicare-eligible as described in the *Merck Group Retiree Medical Plan SPD*.

**Merck Retiree Health Reimbursement Account** — The health reimbursement account component of the Merck Retiree Medical Plan, which applies to subsidy-eligible Retirees and their Eligible Dependents who are age 65 or older and Medicare-eligible as described in the *Merck Retiree Health Reimbursement Account SPD*.

**Merck Retiree Medical Plan** — The Merck Retiree Medical Plan, which consists of the Merck Group Retiree Medical Plan and the Merck Retiree Health Reimbursement Account.

**Merck** — Merck & Co., Inc. and its wholly owned subsidiaries.

**Merck-brand drug** — Those drugs identified by the Plan Sponsor to Express Scripts as Merck prescriptions eligible for $0 Copay (except for when a generic is equivalent), subject to change from time to time at the Plan Sponsor's discretion.

**Merck PPO Out-of-Pocket Maximum** — The most that you and your Covered Dependents are required to pay for expenses covered by the PPO in a year after your Deductibles have been met. The Merck PPO maximum is calculated using your Base Pay as of the Nov. 1 immediately before the beginning of the given calendar year. The Out-of-Pocket Maximum protects you against paying extraordinary medical bills in a given year. Certain expenses are not credited toward your Merck PPO Out-of-Pocket Maximum including:

- Expenses for services and supplies not covered by the Medical Plan, and
- Charges in excess of Reasonable and Customary(R&C) Limits.

Under the Merck PPO, there are different Out-of-Pocket Maximums for In-Network and Out-of-Network expenses. Your Out-of-Network expenses will be credited toward both your Out-of-Network and In-Network Out-of-Pocket Maximums. Your In-Network expenses will be credited toward both your In-Network and Out-of-Network Out-of-Pocket Maximums.

If your covered expenses under the Merck PPO reach the Out-of-Pocket Maximum, the Medical Plan pays 100% of any additional covered expenses for the rest of the calendar year. If an individual in the family reaches the Out-of-Pocket Maximum, then the Medical Plan will pay 100% of any additional covered expenses for that individual even if the Family Out-of-Pocket Maximum has not been met and the individual is enrolled in family coverage.

**Merck Temporary Employee** — An employee hired and paid by an Employer (rather than an agency) for a specific position in the United States for a designated length of time which is normally not more than 24 consecutive months in duration, who is committed to leave the Employer at the end of that time who is not classified as a Regular Full-Time Employee, Regular Part-Time Employee or Casual Employee in the Company's employee data and who is not an Excluded Employee or an Excluded Person.

**Non-Eligible Union Employee** — An employee of the Company who is a member of the United Steelworkers Union Local 10-00086.

**Non-Merck brand Drug** — Those drugs identified by the Plan Sponsor to Express Scripts as non-Merck prescriptions not eligible for $0 Copay, subject to change from time to time at the Plan Sponsor's discretion.

**Non-Organon brand Drug** — Those drugs identified by the Plan Sponsor to Express Scripts as non-Organon prescriptions not eligible for $0 Copay, subject to change from time to time at the Plan Sponsor's discretion.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Organon** — Organon LLC and its wholly owned subsidiaries. Organon was spun off from Merck on June 2, 2021.

**Organon-brand drug** — Those drugs identified by the Plan Sponsor to Express Scripts as Organon prescriptions eligible for $0 Copay (except for when a generic is equivalent), subject to change from time to time at the Plan Sponsor's discretion.

**Out-of-Network** — A provider, or the services and supplies provided by a provider, who does not have an agreement with the Claims Administrator, for the coverage option in which you are enrolled, for the applicable benefit to provide covered services or supplies.

**Out-of-Pocket Maximum** — See either the Merck PPO Out-of-Pocket Maximum or the Prescription Drug Out-of-Pocket Maximum.

**Parent Company** — Merck & Co., Inc.

**Patient Protection and Affordable Care Act (PPACA)** — A federal statute signed into law by President Barack Obama in March 2010 with the goal of health care reform. The legislation includes provisions for extending insurance coverage to many uninsured Americans and improving benefits provided by employers (such as increasing coverage for preventive services and eliminating certain dollar limits on benefits.)

**Permitted Plan Change** — Changes in benefit choices or coverage levels during the year that are consistent with a Life Event and comply with applicable regulations under the Internal Revenue Code and the guidelines established by the Plan Administrator (subject to periodic change). For more information about Permitted Plan Changes — and related Life Events — see "When Life Changes" in the "About Medical Coverage" section of this SPD or contact the Benefits Service Center.

**Physician** — Legally qualified as one of the following:

- Doctor of Medicine (M.D.)
- Doctor of Chiropody (D.P.M., D.S.C.)
- Doctor of Chiropractic (D.C.)
- Doctor of Dental Surgery (D.D.S.)
- Doctor of Medical Dentistry (D.M.D.)
- Doctor of Osteopathy (D.O.), or
- Doctor of Podiatry (D.P.M.)

**Plan** — See definition of Medical Plan.

**Plan Administrator** — Merck Sharp & Dohme LLC or its delegate.

**Plan Sponsor** — Merck Sharp & Dohme LLC

**Plan Year** — The calendar year, Jan. 1 through Dec. 31, on which the records of the Plan are kept.

**Pre-Admission Tests** — Tests performed on a covered individual in a Hospital before confinement as a resident inpatient, provided the tests meet all of the following requirements:

- The tests are related to the performance of scheduled surgery
- The tests have been ordered by a Physician after a condition requiring surgery has been diagnosed and Hospital admission for surgery has been requested by the Physician and confirmed by the Hospital, and
- The covered individual subsequently is admitted to the Hospital, or the confinement is cancelled or postponed because a Hospital bed is unavailable or because there is a change in the covered individual's condition that precludes the surgery

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Prescription Drug Out-of-Pocket Maximum** — The most that you and your Covered Dependents are required to pay for Prescription Drug Program expenses in the Plan Year after your prescription Deductibles have been met. The Out-of-Pocket Maximum protects you against paying extraordinary prescription drug bills in a given calendar year. The Prescription Drug Program has an Out-of-Pocket Maximum of $1,500 per member, $3,000 family maximum. If a member's covered expenses under the Prescription Drug Program reach $1,500, the Prescription Drug Program pays 100% of any additional covered expenses for the rest of the calendar year.

**Qualified Beneficiary** — For the purposes of COBRA:

- An employee, former employee and their associated Spouse and Eligible Dependents who are eligible for continuation coverage under COBRA because of their status on the day before a qualifying event, and

- An individual covered by a group health plan, or a dependent of such an individual, as of the day before a qualifying event takes place

**Qualified Medical Child Support Order (QMCSO)** — Any judgment, decree or order issued (including a settlement established under state law, which has the force and effect of law in that state) that creates, recognizes or assigns to a child the right to receive benefits for which you are eligible under the Medical Plan and that the Plan Administrator determines to be qualified under applicable law.

**Reasonable and Customary (R&C) Limit** — An amount determined by the Claims Administrator, in accordance with its internal processes and procedures, taking into account all pertinent factors including:

- The complexity of the service

- The range of services provided, and

- The geographic area where the provider is located.

How R&C is calculated varies depending on which plan option you are enrolled in. Contact your Claims Administrator for more details.

If your doctor has recommended a surgical or diagnostic procedure, you can call your Horizon Health Guide at **877-663-7258** to see if the fee to be charged is more than the R&C Limit. If it is more, Horizon BCBS will give you the R&C Limit so that you can discuss the reasonableness of the fee with your doctor in advance. If it is less, Horizon BCBS will confirm that the fee to be charged is less than the R&C Limit, but will not disclose the R&C Limit. When you call Horizon BCBS, you will need the name and description of the procedure, the "procedure code" and the fee, all of which your doctor can provide.

**Regular Full-Time Employee** — An employee employed by an Employer in the United States on a scheduled basis for a normal work week, who is not classified as a Regular Part-Time Employee, a Merck Temporary Employee or a Casual Employee in the Company's employee database and who is not an Excluded Employee or an Excluded Person.

**Regular Part-Time Employee** — An employee employed by an Employer in the United States on a scheduled basis for less than the number of regularly scheduled hours for their site who is not classified as a Regular Part-Time Employee, Merck Temporary Employee or Casual Employee in the Company's employee database and who is not an Excluded Employee or an Excluded Person.

**Retiree** — An Eligible Employee, Non-Eligible Union Employee or Localized Employee who when employment ends (or ended), satisfies the age, service and other requirements to be eligible for subsidized or unsubsidized group retiree medical benefits under the Merck Group Retiree Medical Plan or to participate in the Merck Retiree Health Reimbursement Account under the Merck Retiree Medical Plan. A more complete definition is provided in the *Merck Group Retiree Medical Plan SPD* and the *Merck Retiree Health Reimbursement Account SPD.*

**Room and Board** — Room, board, general duty nursing, intensive nursing care by whatever name called and any other services regularly furnished by the Hospital as a condition of occupancy of the class of accommodations occupied, but not including professional services of Physicians or special nursing services rendered outside of an intensive care unit by whatever name called.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

**Skilled Nursing Facility** — If the facility is approved by Medicare as a Skilled Nursing Facility, then it is covered by the Retiree Medical Plan.

If the facility is not approved by Medicare, it may be covered if it meets all of the following tests:

- It is operated under applicable licensing and other laws
- It is under the supervision of a licensed Physician or registered graduate nurse (R.N.) who devotes full time to supervision
- It regularly is engaged in providing Room and Board and continuously provides 24-hour-a-day skilled nursing care of ill and injured persons at the patient's expense during the convalescent stage of an injury or illness
- It maintains a daily medical record of each patient who is under the care of a licensed Physician
- It is authorized to administer medication to patients on the order of a licensed Physician, and
- It is not, other than incidentally, a home for the aged, the blind or the deaf, a hotel, a domiciliary care home, a maternity home or a home for alcoholics, drug addicts or the mentally ill

**Spouse** — The person recognized as your legal spouse under statutory or common law of the United States.

**Surviving Eligible Dependents** — The Eligible Dependents of an Eligible Employee on the Eligible Employee's date of death.

**Surviving Covered Dependents** — The Surviving Eligible Dependents who are Covered Dependents of a Covered Employee on the Covered Employee's date of death.

**Tax-Qualified Domestic Partner** — A Domestic Partner who qualifies as the Eligible Employee's dependent under federal income tax rules.

**Transfer Date** — The date a Transferred Employee becomes a Regular Full-Time Employee or a Regular Part-Time Employee.

**Transferred Employee** — An employee of Merck & Co., Inc. (or its subsidiaries) who transfers to a position as an Eligible Employee, and who on the day before was not an Eligible Employee.

**U.S. Expatriate** — A U.S. citizen or individual with U.S. Permanent Resident status who is employed by a foreign subsidiary of the Parent Company, as a foreign service employee, provided that the individual has not elected coverage under any retirement plan of the foreign subsidiary if the subsidiary is covered by an agreement entered into by the Parent Company (or one of its subsidiaries), under Section 3121(l) of the Internal Revenue Code (dealing with Social Security benefits) and who is not an Excluded Person.

**U.S. Territory Employees** — U.S. Expatriates who are on assignment in a U.S. territory (such as Puerto Rico, Guam, the U.S. Virgin Islands, etc.) and employees of the Company who are resident in a U.S. territory who are on assignment in the U.S.

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

# EXHIBIT A

This section lists the collective bargaining units whose members are eligible to participate in medical benefits under the Merck Medical, Dental, Life Insurance and Long Term Disability Plan as described in this SPD.

- International Association of Machinists and Aerospace Workers, District 15, Lodge 315 (Summit, Kenilworth/Union, New Jersey)

- International Chemical Workers Union Council of the United Food and Commercial Workers Union, Local 194-C (Memphis, TN) (only with respect to employees receiving LTD Benefits as of the date of the closing of the sale of Merck's consumer care business to Bayer AG)

- International Brotherhood of Teamsters, Local 107 (West Point, PA)

- United Steelworkers Union, Local 4-575 (Rahway, NJ)

- International Chemical Workers Union Council of the United Food and Commercial Workers Union, Local 94C (Elkton, VA)

- Mid-Atlantic Regional Joint Board, Workers United, Local 1398 (Elkton, VA)

- The Office and Professional Employees International Union, Local 1937, AFL-CIO, CLC (West Point, PA)

- United Steelworkers, Local 10-580 (Danville, PA)

- International Union of Operating Engineers, Local 68 (Rahway, NJ)

- United Steelworkers Local Union 10-00086 (West Point, PA) (only with respect to (a) "LTD-like" benefits for certain disability retirees who retired before Jan. 1, 2018, and their eligible surviving dependents and (b) survivor benefits for Eligible Employees who died before Jan. 1, 2018)

Merck Medical Plan (Employees) SPD
Effective Jan. 1, 2023
Released Oct. 4, 2022

Merck Benefits Service Center at Fidelity
800-66-MERCK (800-666-3725)
**http://netbenefits.com/merck**

The information contained herein has been provided by Merck & Co., Inc. and is solely the responsibility of Merck & Co., Inc. (and its subsidiaries).

3.MK-H-554BB.116



# EXHIBIT C

**Attachment 1**

**Statement of Work and Services**

**THE SERVICES**

Entity will provide Company with an integrated health care cost containment program to produce savings for Company, its customers and/or its Members. The program will utilize proprietary and non-proprietary cost savings methods which include: Entity Network(s), Negotiation Services, Network Management Services inclusive of claims pricing and Electronic Data Interchange ("EDI") routing. Claims information will be transmitted between Company and Entity via a third party EDI connection.

Company will provide certain of its Members (as designated by Company) with access to the Entity's Primary PHCS Network, and/or HealthEOS by MultiPlan Network within any of the 50 states. Company shall utilize the HealthEOS by MultiPlan Network as its primary Network within designated portions of Wisconsin.

In addition, commencing January 1, 2011 through November 16, 2013 Company shall have access, for its groups purchasing NAP, to the Complementary Network in the 13 states designated in Attachment 8. Beginning November 17, 2013, the Complementary Networks in the states of California, New Jersey, Oklahoma, Texas and Utah shall not be accessed by Company on a logo'd basis. To the extent required by law or by Network Provider Agreements, Company will make reasonable efforts, using the logo approved by Entity, to logo all identification cards for Members with NAP that reside in the applicable states on applicable products. Pursuant to Section 3.4 of the Agreement, during the Initial Term of this Agreement, Entity will be the first network positioned after Company's own network to be offered by Company to its Members in connection with NAP in the states listed in Attachment 8. Entity acknowledges that Company's customers have the option not to purchase NAP and that Company guarantees no minimum level of revenue or Membership under this Agreement. Furthermore, Company may exclude any number of Participating Entity Providers as set forth in Section 7.4.

The Services herein will be utilized by Company for the entire term of this Agreement, and as outlined in the following Schedules and Attachments.

Entity shall give Company a minimum of eighteen (18) months prior notice if Entity requests a logo change on Company's Member ID cards. If Entity requests a logo change prior to eighteen (18) months notice, Entity shall be liable for the mutually agreed upon cost of producing and distributing the ID cards.

1

**Attachment 1**

**Schedule 1.1**

**Complementary and Primary Network Access**

**Entity's Role:**

1.  Entity will reprice eligible claims sent to it by Company for Covered Services referred by Company using the Entity Network.

2.  Entity's provider agreement templates with Participating Entity Providers shall require the Participating Entity Provider to accept the Negotiated Rate as payment in full for Covered Services and to prohibit balance-billing the Member for any savings resulting from the agreement.

3.  Entity will reprice and return to Company all referred Clean Claims in accordance with turnaround times set forth in Attachment 3 except where extensions of time are granted by Company in writing.

4.  For each Clean Claim that is repriced and returned, Entity will submit to Company the following:

    a.  Appropriate claim identification information;
    b.  Repricing outcome (i.e., revised claim amount, savings obtained, no discount available);
    c.  Network name; and
    d.  Other information as mutually agreed to by Entity and Company in writing.

5.  Entity is not responsible for and will not be liable for payment of Covered Services, claims payment decisions regarding coverage or determinations of eligibility for benefits.

6.  Entity will close and return to Company all referred Non-Clean Claims in accordance with turnaround times set forth in Attachment 3 except where extensions of time are granted by Company in writing.

7.  Entity shall perform such Services in accordance with the terms of Attachment 3.

**Company's Role:**

1.  Company will forward, in a mutually agreed upon format and within the quality parameters mutually agreed upon in writing by the parties, claims to Entity that have been initially reviewed to verify eligibility and coverage by Company and that meet the criteria for referral mutually agreed upon in writing by the parties.

2.  For all claims Repriced using an Entity Network, Company agrees to identify on its EOBs the applicable network name or logo as specified by Entity.

3.  For Complementary Network access, to the extent accessed, Company must apply the Negotiated Rate to a claim for services rendered by a Participating Entity Provider unless a Company Proprietary Network or Primary Rental Network contracted rate is available with that Participating Entity Provider or Company has advised Entity that a particular Participating Entity Provider shall not be considered by Company to be included in the Complementary Network in accordance with Section 7.4 of the Agreement..  Company shall calculate Member Deductibles and Coinsurance based on the Negotiated Rate(s).

4.  It is understood that if a Participating Entity Provider disputes a Negotiated Rate  based on the fact that the name or logo identified by Entity to Company is not present on the front or back of the Member ID card subject to Section 9.1.4 of the Agreement, Entity will attempt to preserve that discount on behalf of Company.  However, if Participating Entity Provider is still unwilling to accept the Negotiated Rate on behalf of Company, Company agrees to reprocess the claim at the Company's normal out of network adjudication process and Entity agrees to refund any Entity Fees for that claim unless the Network Provider Agreement requires otherwise.

5.  Company will provide 30 days advance written notice to Entity prior to adding any newly acquired Affiliates to the use of the Entity Network.

2

6.  Entity's Participating Entity Provider Negotiated Rates are Proprietary Information as defined by Section 6.2 of the Agreement.  Company will not use such Proprietary Information to solicit Participating Entity Providers provided, however, that nothing herein prohibits Company from contracting with Participating Entity Providers in its ordinary course of business.

7.  Company shall provide monthly, in a mutually agreed upon format, all Entity repriced claims for which Company utilized the Negotiated Rate.

8.  To access certain PHCS Network Provider Agreement(s), Company hereby appoints Entity as Company's agent solely for the limited purposes of taking actions necessary to contract with affected Participating Entity Providers as contemplated hereunder, without prior approval of Company, including but not limited to executing, terminating, and/or amending, said PHCS Network Provider Agreements.  Company may revoke the authority granted herein upon ninety (90) days prior written notice, and that upon the effective date of such notice, Company's access to those certain PHCS Participating Entity Providers will terminate.  This provision does not create any Company ownership interest in the Network or in any Network Provider Agreements.

9.  Company shall utilize Entity's Primary Network as its primary network within designated markets set forth on Attachment 8.  For access to the Primary Network, Company shall issue to Members identification cards, at Company's expense, containing the following information:

    - Name of Company
    - Claims Submission Address
    - Employer Group Name and Plan Number
    - Name of Primary Rental Network as specified by Entity
    - Co-payment amount, if any
    - Telephone number(s) for the following:  Company – Employer Eligibility/Benefits Coverage, Utilization Management, and Provider Information

10. Company must include the following financial incentives to encourage utilization of Entity's Primary Network:

    - In and out of network benefit design; and

    - Payment of Covered Services rendered in connection with this Agreement at the in-network level; and at Negotiated Rates; and

    - A minimum ten percent (10%) benefit differential between in-network and out-of-network coinsurance rates to seek Covered Services from a Participating Entity Provider in the Primary Network.

Multiplan Inc Statement of Work 15

**Attachment 1**

**Schedule 1.2**

**ADDITIONAL PROVISIONS APPLICABLE TO**
**HEALTHEOS BY MULTIPLAN NETWORK SERVICES**

1. .  <u>Access to UHC.</u>  For the purposes of access to University of Wisconsin Hospitals and Clinics Authority and the University of Wisconsin Medical Foundation ("UHC Providers"), the following additional provisions shall apply which may modify other sections of this Agreement:

    <u>(a)</u>.  Clean Claim shall mean a completed HCFA 1500 or UB-92, or other standard billing format containing all information necessary to identify the UHC Provider, Company, Member, and the services provided.

    <u>(b)</u>.  Company shall make payment at Negotiated Rates directly to UHC Providers for Covered Services rendered to Members **within thirty (30) days of the UHC Provider's filing** of a Clean Claim.  UHC Providers will **not be required to honor the Negotiated Rate** regarding any Clean Claim paid later than thirty (30) days after filing.  The need for itemized billings, coordination of benefits, pre-existing condition determination, audits or stop-loss determinations and payments will **not** extend the payment time frames.  Notwithstanding the foregoing, UHC Providers shall cooperate with timely requests for itemized billings (i.e. requests made within thirty (30) days of the UHC Provider's filing of the Clean Claim.  Following written notice, UHC Providers shall promptly refund documented over-payments.

4

**Attachment 1**

**Schedule 1.3**

**NEGOTIATION SERVICES**

**A.    DESCRIPTION OF SERVICES –NEGOTIATION SERVICES.**

1.    When requested by Company and on behalf of Company, Entity will attempt to negotiate with healthcare providers reduced reimbursement amounts on claims for services and supplies rendered by those healthcare providers to Members.  These negotiated reimbursement amounts will be based on prevailing market reimbursement amounts.  Subject to agreement of Company, healthcare providers may be offered accelerated claims payment by Company, in consideration of acceptance of the negotiated amount.

2.    Upon a healthcare provider's consent to accept a proposed negotiated reimbursement amount as payment-in-full, Entity will obtain a written agreement from the healthcare provider documenting acceptance of the proposed negotiated reimbursement amount for the given claim ("Entity Negotiation Agreement").  Entity assumes the primary role in handling any provider questions or disputes with respect to questions about the negotiated reimbursement amounts.

3.    In the event that the healthcare provider refuses to accept a proposed negotiated reimbursement amount within a timeframe mutually determined by Entity and Company, Entity will take no further action, and will return the claim to Company for handling.

4.    Fee negotiation thresholds shall be mutually agreed upon and as of the Effective Date, such thresholds are subject to capture claims with Billed Charges between $25.00 and $4,000.

**B.    RESPONSIBILITIES OF CLIENT.**

1.    Explanation of Benefits.  Company agrees to indicate on both Member and healthcare provider EOBs reflecting the negotiated reimbursement amount was taken in accordance with the Entity Negotiation Agreement in order to ensure proper identification of Savings realized by Company and/or Member.

2.    Payment.  Company shall pay the healthcare provider in accordance with the terms and negotiated reimbursement amounts negotiated by Entity taking into account deductibles, coinsurance, and other non-covered items as outlined in the Plan policies and provisions.

5

Attachment 1

**Schedule 1.4**

**NETWORK MANAGEMENT and EDI EXTERNAL REPRICING SERVICES**

A. **Network Management Services:** Entity will perform the following Network Management and External Repricing Services as outlined in this Attachment 2, Schedule 4.

1. Demographics Services.

    Monthly Database Maintenance. Entity will provide Company with such Primary Rental Network and Company Contracted NAP Network Participating Entity Provider demographic data submission in a mutually agreed upon extract format. Entity will provide data monthly based upon Company's established schedule.

2. Claims Pricing. Entity will Reprice Participating Entity Provider claims received from Company and delivered to Company and will transmit such Repriced claims back to Company. All claims will be transmitted between Entity and Company via EDI transmissions.

    Entity will electronically return to Company all non-Clean Claims still needing additional information or processing, with the appropriate reject code.

    Entity will not be responsible for manually Repricing non-Clean Claims, or manually investigating claims.

    Claims that need to be manually investigated for provider matching are also considered non-Clean Claims. Entity will not be responsible for manual investigation of provider matching issues. Entity will only take on this responsibility at its sole discretion and such Services will be subject to additional fees proposed by Entity to the Company except if the provider matching issue relates to an Entity owned Network.

3. Reporting Services. Entity or its Affiliate Viant, Inc. will provide the following standard reports to Company, as mutually agreed upon by the parties in writing or as set forth in the Viant Agreement, at no additional charge:

    (a) Claims Reconciliation Report – provided daily with the claim file;

    (b) Monthly and Weekly – All Claims and Clean Claims turnaround time reports

    (c) Entity Primary Rental Network and Entity Contracted NAP Network Monthly Volume and Savings Report – provided by Entity monthly; this report will be at the Company's aggregate level. These reports will detail the monthly savings and claim volume applied to Entity NAP Network and Primary Rental Networks.

    (d) Claim Inventory Reconciliation Report – provided by Entity on a weekly basis.

    At Company's written request, Entity may provide additional or customized reports to Company in the format and at the fee mutually agreed to by the parties in writing. Entity shall provide up to 240 hours of technical and professional consulting at no charge annually throughout the term of this Agreement to Company for purposes of customizing or creating new reports.

    Entity will cooperate with Company's reasonable requests for additional reports required in connection with audits required by Company customers or applicable governmental authorities.

4. Company Support Services. Entity will provide Company with a designated Account Manager responsible for coordinating the Entity/Company relationship and addressing ongoing support needs. If a Company support issue arises, the following chain of contact should be followed by Company:

    (a) Initial contact should be with the Entity Account Executive assigned to Company;

6

(b) If further assistance is required or if the issue is not resolved to Company's satisfaction the Vice President, Sales and Account Management is Company's next point of contact;

(c) Customer Service Requirements will be outlined based on a mutually agreed upon process, to include but not be limited to, research and resolution for claim and network operations. This may include a dedicated 1-800 Number, as well as a dedicated Company email box to facilitate customer service to Company and to Company's staff for research and resolution for claim and network operations issues under this Agreement.

(d) Entity will support any Company requests for reasonable changes or enhancements by providing development proposals and possible high-level cost estimates, if applicable. This does not include the development of detailed business requirements and conceptual designs.

5. <u>Technical Operations:</u> Entity will provide the following technical operational standards to Company:

(a) <u>Data Backup and Retrieval.</u> Entity will back up its servers being used for Company Services with full backups on a monthly and quarterly basis. Incremental backups will be performed nightly. All Oracle databases will be backed up nightly with full incremental RMAN backups. Nightly backups will be sent offsite for a two-week period after which the media will be returned to the data center for reuse. Weekly full backups will be retained for 90 days. Monthly and annual backups will be retained for 84 months or such longer period that may be required by law or regulations.

(b) <u>Disaster Recovery.</u> Entity will maintain during the term of the Agreement disaster recovery plans in order to minimize to a commercially reasonable extent any disruption of its ability to perform under the Agreement. Entity shall provide Company with a copy of the synopsis of its disaster recovery plans in effect as of the Effective Date and shall promptly provide Company with a copy of the complete disaster recovery plans, and any update or amendment to such synopsis or plans, upon request by Company.

(c) <u>Scheduled Maintenance Performance.</u> Scheduled maintenance and other Entity data center support and upgrading activities will be done as often as commercially reasonable during scheduled downtime. Claim data can be sent and returned 6 days a week. Scheduled downtime is limited to Sundays and holidays unless other notifications and arrangements have been made prior to scheduled downtime. The Entity data center and all software shall have an uptime of at least 99.0% exclusive of scheduled downtime. This uptime measurement is computed on a 12 month rolling average.

(d) <u>Entity Days/Hours of Operation.</u> Entity will maintain normal business hours of 8:30 am to 5:30 pm (EST) during normal business days. Entity will have the appropriate staff on call during other hours to respond to claims transmission and other system operating problems. Upon Entity's identification of a transmission or other system operating problem that materially adversely affects Entity's performance under the Performance Standards set forth in Attachment 3, or receipt of written notice from Company of such a problem, Entity will work diligently to correct such problem on a 24 hours per day, 7 days per week basis until such problem has been corrected.

(e) Entity file transmission times are based on a 24/6 schedule and specific file transmission times between Company and Entity will be outlined in the Business Requirements.

6. <u>DOCFIND.</u> Entity will provide, in a mutually agreed upon manner, a means of supporting Company's provider lookup tool ("DocFind") application website for Members with NAP to search and find Providers available to Members for the entire NAP Program, inclusive of Participating Entity Providers including Company Contracted NAP Networks who agree to supply Entity with the required demographic data for their network providers. Entity will retain ownership, including any copyrights or patents, of all software development work, products, processes and software developed or purchased by Entity to perform these Services.

7. Provider Education and Communication
- Entity agrees to orient Participating Entity Providers in the Entity Owned Network and Entity Contracted Networks to the specific healthcare products, policies and procedures of Company relevant to the obligations under this Agreement. Orientation will be performed on a mutually agreed upon "as needed basis".

7

- Electronic Entity Newsletter: Existing quarterly Entity newsletters or other paper or electronic communication mechanisms, with references highlighting Company programs and policies applicable to Entity's obligations under this Agreement will be produced as needed as agreed upon by Company and Entity and posted on Entity's internet site. Copies of such communications shall be provided to Company.
- Annual Entity Contracted Network Training as targeted by Entity: Entity will perform Entity Contracted Network training (train the trainer) where Entity does not have a direct relationship with the providers and Company is accessing such Entity Contracted Network under this Agreement. Training will be annually, as well as on an "as needed basis". Entity will provide a comprehensive list of Entity Contracted Networks to Company's Entity Liaison. Entity Contracted Network Training may be conducted via telephone or a webcast.
- Education of Direct Providers:
  - Company will maintain and disseminate on its internet website a comprehensive provider training package applicable to Entity's obligations under this Agreement, including Company-specific information. Entity will disseminate Company specific-information upon request from Participating Entity Providers in the Entity Owned Network in new/existing geographic areas. Company will be listed on Entity's website as Entity's customer.
  - Company and Entity will agree on listing of Participating Entity Providers in the Entity Owned Network requiring Training in a mutually-agreed upon method by Entity. For purposes of this Performance Standard, "Training" includes phone and webcast training. This listing of such providers that require Training will be the basis upon which the NAP Fee Performance Criteria is measured to determine whether Entity has met the threshold Training. In the event that additional Entity Owned Network Participating Entity Providers are added to the listing of providers requiring Training, then Company and Entity will agree as to the applicability of these additional providers being included in the measurement period.
- Entity Personnel Training: Entity will administer on-site or telephonic training sessions of its staff as mutually agreed to by Company and Entity. Company will provide a designated Company Entity Network Manager to support Entity training as mutually agreed upon. Company will provide Entity with informal feedback on Entity personnel's knowledge.

8. Claim Routing Services
- Entity will provide routing and support needed for First Health, even if Company rolls out additional states beyond the initial five states of CA, NJ, OK, TX and UT. There is no additional fee for this claim routing and support during the Initial Term of this Agreement.
- Until Company's transition to PHCS Network is complete on December 31, 2013, Entity will continue to provide the Viant Primary Solutions as set forth in the Viant Agreement with no additional fee.


(9) Company Obligations.

(a) Claims. Company will have the following responsibilities for all claims that are furnished to Entity for Repricing:

(i) Company is responsible for the cost of all transmissions to or from Company. Each party is responsible for providing its own connectivity of sufficient bandwidth to efficiently receive and transmit the required data. All claims that Company transmits to Entity will include all of the UB-92, HCFA 1500 or other appropriate governmental standard claim form data fields and data required by regulation or law.

(ii) Company is responsible for the cost of all claims transmissions, click fees, and, if Entity will utilize an EDI connection for claims Repricing, any associated EDI fees charged by a Primary Rental Network or a Company Contracted NAP Network.

(iii) Each claim that Company transmits will be in a format mutually agreed upon in writing by the parties, and will include the fields assigned by Company which are required to identify specific claims and the appropriate network(s) and/or Participating Entity Provider.

(c) Staffing. Company will provide adequate professional staffing and resources to assist Entity in the management of the Services provided under this Agreement.

8

**Attachment 2**

**Sample Entity Provider Agreements**

*(to be provided)*

**Attachment 3**

**Service Level Agreement**

**A.  Performance Standards.**

Company believes that measuring the activities described below are important indicators of how well Entity is performing for Company and Company's Payors and Members.  To reinforce Company's confidence in Entity's ability to deliver Services, Entity agrees to the following performance standards ("Performance Standards"):

Newly acquired or purchased networks by Entity are not subject to measurement under these Performance Standards until 12 months after the close of the acquisition by Entity.

- Repricing Turnaround Time (TAT)
- Company Service Manager Guarantee
- Data Submission Guarantee
- Network and Non Network Claim and Charge Volume Penetration, Average Discount Achieved, and Overall Savings Generated
- Claim Accuracy

**B.  Performance Standards Guarantee Periods**

The Performance Standards described herein will be effective commencing on the Effective Date.  The guarantee period will run on an annual basis thereafter ("Performance Guarantee Period").  Either Party may request to negotiate a change to the Performance Standards with 90 days written notice to the other Party prior to the end of the Initial Guarantee Period, or 90 days prior to any Performance Guarantee Period thereafter.

**C.  Performance Standards Guarantee Periods Calculation Method**

Company shall be responsible for the accumulation and final calculation of the Performance Standards.  The costs associated with monitoring and measuring are the responsibility of Entity and Company as noted in the each of the Performance Standards below.  All Performance Standards shall have a cure period equal to one performance measurement, i.e.: if in default in Q1 but meet the standards in Q2, the performance penalty for Q1 is waived, understanding that in the event Q2 does not meet the standards the performance penalty is applied to both periods.

The amount of NAP Fees at risk based on the results achieved for a Performance Standard is noted in each of the Performance Standards below.  If a Performance Standard is not met, the amount owed by Entity to Company will be calculated using the total NAP Fees paid during the applicable measurement period for that Performance Standard.  However, the total penalties due and payable in any calendar year shall never exceed twenty percent (20%) of the total annual NAP Fees payable to Entity by Company during that calendar year up to a maximum of six hundred and fifty thousand dollars ($650,000.00) even if the total of the individual penalties below exceed such twenty percent (20%) or six hundred and fifty thousand dollars ($650,000.00), whichever is less.

**D.  Performance Standards Details**

**1.  Company Service Manager Guarantee**

**Standard**

The Company Services Manager Tool will be used to evaluate the performance of the Entity's Company Service Manager.  A Company Service Manager is defined as a dedicated manager for all of Entity's service areas that Entity makes available to Company and Company has chosen to use (the "Service Area").

**Measurement Criteria**

- The Company Entity Network Manager(s) that oversee the Service Area will be asked to fill out the Account Management Evaluation Tool (attached as Attachment 4) on a semi-annual basis (a copy of which has been shared with Entity).  Company's Entity Network Manager(s) will fill out the Company Services Manager Tool.  Input will be solicited from other Company functional areas that interface with

10

Entity (e.g., Provider Data Maintenance and IT). There is a series of questions for the Company Entity Network Manager(s) to fill out under the following headings: Knowledge, Professionalism, Proactive Management, Accessibility, and Responsiveness. Once completed, Company will add up all of the points and compare it to a total of 120 possible points. Company and Entity must mutually agree on the basis for the final score and the financial penalty imposed due to the score.

- Company agrees to make Entity aware of possible sources of dissatisfaction throughout the Performance Standard measurement period, including the semi-annual evaluation tool process.

**2. Data Submission Guarantee**

The Data Submission Guarantee is specific to the Entity Network(s), Company Contracted NAP Networks, and Primary Rental Networks where Entity is supplying the data to Company only.

**Standard**

Entity will submit Participating Entity Provider demographics, negotiated rates, and other mutually agreed upon required network information according to Company standard format and timeframes defined in this document and for only those provider types requested by Company in the Service Area. Standard format means paper or electronic submission of provider demographics/network information in automated EPDB provider load and/or EPDB approved Entity record layout as agreed upon by Company and Entity.

**Measurement Criteria**

- Entity will submit data to Company according to the standards set forth in Company's proprietary layout, as mutually agreed upon.
- Entity will verify and correct monthly rejections and submit corrected record in the following AEPL file or remove submission from following AEPL file.
- Entity will develop and monitor a process with Entity Contracted Networks to ensure data is "cleansed" and submission standards are met. Entity will provide written documentation of such process.
- Entity shall use commercially reasonable efforts to provide thirty (30) days notice for any fee schedule changes and to minimize the submission of any retroactive termination of providers or changes in providers' fee schedules.
- Entity will use commercially reasonably efforts to submit Negotiated Rate information no less than thirty (30) business days prior to the effective date of new negotiated rate information.
- Entity will provide only the provider types that Company is requesting as part of this Agreement.
- Entity will participate in calls with designated Entity Network staff to define and resolve Participating Entity Provider data issues, including implementation of electronic submission of data and timeliness of updates.

**NAP/Primary Rental Fee Performance Criteria**

- Measurement Period: Company will track and report on data submission rejection and verification levels quarterly, and on rate submission annually. As these standards are critical to operational success, measurement is continuous and based upon both objective and subjective measurement criteria noted below. Performance levels will be evaluated for all criteria; however, only the quantifiable criteria below will be tied to NAP Fee adjustments. If Company is dissatisfied with Entity efforts, and it is evident that the appropriate action steps to improve areas of dissatisfaction have not been taken, Company will inform the Entity's "Client Service Manager" and its Executive Directors in writing regarding Company's continued dissatisfaction. At the end of the measurement period, Company and Entity will compile guarantee results of the objective.
- Service Area: All

|  | **BELOW THRESHOLD** | **THRESHOLD** |
|---|---|---|
| **Average quarterly data rejection percentage for NAP** | >3% | $\leq$3% |
| **Average quarterly data rejection for Primary Rental** | >3% | <3% |

| Fee Guarantee | 3% of NAP Fees | None |
| | 3% of Primary Rental Fees | None |

**The average quarterly data rejection will be the total number of all data rejections divided by the total number of all data records sent to Company by Entity.**

Data rejections for any networks that the Entity does not own or contract with, that Company contracts with but that Entity manages on behalf of Company will not be subject to this penalty if rejections are considered to be the fault of the network that is contracted with Company

3. **Claim Pricing Accuracy**

Entity will maintain a Financial Pricing Accuracy Rate of ninety-eight and three-tenths percent (98.3%) and a Procedural Pricing Accuracy Rate of ninety-eight percent (98%). Entity will establish and provide Company with claim audit policies and procedures for monitoring accuracy. Financial Pricing Accuracy is measured as follows: the percentage of the number of claims Repriced correctly compared to the total number of claims Repriced. The application of the Financial Pricing Accuracy Performance Standard will apply on the first day of the third month following the final implementation of the applicable Primary Rental Network or applicable Network not Entity Owned or Entity Contracted that is priced on behalf of Company, at Company's desire. The calculations will be made based on average monthly performance

Networks that price for themselves or are EDI pass-through are not subject to this Performance Standard.

**Procedural Pricing Accuracy Formula:** Entity will calculate Entity Procedural Pricing Accuracy by pulling all claims under networks subject to this Performance Standard that were reversed. Only those reversals due to Entity fault will be measured against total priced claim volume for such networks.

Entity will have the right to review the results of Company's audits and appeal any results that it believes to be incorrect. In the event that the audit results are the subject of a good faith appeal by Entity, any credit to which Company would be entitled will be suspended until the resolution of the appeal.

Claim Pricing Accuracy only relates to the claims that Entity is responsible for pricing utilizing its owned pricing systems and databases.

Claim Pricing Accuracy excludes the data Entity receives from a Primary Rental Network or Company Contracted NAP Network and the claim data that Entity receives from the Company or Company's third party vendors, such as Primary Rental Networks and Company Contracted NAP Networks. Entity will not be responsible for a failure to meet the Claim Pricing Accuracy Performance Standard that is the fault of a Primary Rental Network or Company Contracted NAP Network due to data inaccuracies, or the fault of the Company or Company's third party vendors due to claim data inaccuracies.

**NAP Fee Performance Criteria**

| | Not Met | Met |
|---|---|---|
| Claim Financial Pricing Accuracy | 3.0% of NAP Fees | 0% |
| Claim Procedural Accuracy | 3.0% of NAP Fees | 0% |

Measurement Period:

Company will track monthly. Measurement of failure or pass will be based on the aggregate total for one quarter. Penalties will be assessed quarterly for the measurement period.

4. **Claim TAT**

**Measurement Criteria**

**Clean Claim Pricing Turnaround Time**:

The turnaround times will be applicable to Clean Claims priced on Entity's applications only; Sundays, scheduled system down time, weather or utility failure times, claims sent to Professional Negotiation Services

12

and holidays are excluded.  Turnaround times are calculated from the time the file is received by Entity to the time the file is returned to Company.  Entity will produce a weekly report of Clean Claims turnaround time for the previous week.  Claims will be managed to the provided "Drop Dead Date" provided on the claim record received from Company.  Company will return claim back to Entity by the Drop Dead Date identified on the claim per the requirements mutually agreed upon by the parties.

Entity holidays are as follows:

New Years Day

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Friday after Thanksgiving Day

Christmas Day

Turnaround Times are only applicable from the time Entity receives a claim through the agreed upon FTP transmission guidelines, to the time Entity extracts a claim from its system and transmits it to Company through the agreed upon FTP transmission guidelines.

In the event that Entity will be transmitting claims via EDI to Primary Rental Networks or Company Contracted NAP Network for pricing, the Primary Rental Network's or Company Contracted NAP Network's turnaround time will not be factored into the turnaround time of Entity, provided, however, that turnaround time for any Entity-owned Network will be factored into the turnaround time of Entity.  A Primary Rental Network's or Company Contracted NAP Network's turnaround time will be measured from the Primary Rental Network's or Company Contracted NAP Network's receipt of the claim from Entity to Entity's receipt of the claim back from the Primary Rental Network or Company Contracted NAP Network, as applicable.

EDI Schedules with outside entities will be detailed in the Business Requirements.

**Access Fee Performance Criteria**

**Clean Claim Pricing Turnaround Time**:

(1)  97% of Clean Claims returned within 24 hours of receipt, excluding Sundays and holidays
(2)  100% of Clean Claims returned within 48 hours of receipt excluding Sundays and holidays.

Claims that are not returned within such 24 and 48 hour timeframes will be returned within the Drop Dead Date and will not be included in the Claim Pricing Turnaround Time performance standard.  The Drop Dead Date shall be defined in the Business Requirements document and will be specified by Company in each claim referred by Company to Entity.  For purposes of this Performance Standard, percentages will be rounded to the nearest hundredth.

**Claims Routing Turnaround Time:  For Claims EDI routed to Entity's Primary Rental Network.  The EDI Business Requirements will outline the claim processing and routing schedules.**

(1)  100% of claims furnished by Company to Entity for Claims Routing Services sent to the Primary Rental Network or Company Contracted NAP Network within twenty-four (24) hours of receipt from Company and Entity

(2)  99.25 % of Repriced claims returned to Company within 24 hours of receipt by Entity from the applicable Primary Rental Network or Company Contracted NAP Network

Claims that are not returned within such 24 hour timeframes will be returned within the Drop Dead Date and will not be included in the Claim Pricing Turnaround Time performance standard.

For purposes of this Performance Standard, percentages will be rounded to the nearest hundredth

Measurement Period:

Company will track monthly.  Measurement of failure or pass will be based on the aggregate total for one

quarter. Penalties will be assessed quarterly for the measurement period.

|  | Not Met | Met |
|---|---|---|
| Claim Pricing | 5.0% of NAP Fee | 0% |
| Claim Routing | 5.0% of NAP Fee | 0% |

**5.** **Application of Negotiated Rates**

**Standard**

Subject to the terms of this Agreement, Company shall Reprice claims for Covered Services rendered to Members by Participating Entity Providers at Negotiated Rates as submitted to Company.

**Measurement Criteria**

- Company shall have access to all Negotiated Rates submitted to Company. Company will maintain a file of the claims that need to be reprocessed due to the Participating Entity Provider refusing to extend the Negotiated Rate reported to Company by Entity.
- Entity shall make commercially reasonable efforts to correctly report Negotiated Rates to Company. Company shall track the claims reprocessed due to the wrong rate communicated to Company.
- Entity will be held accountable for Re-Work Adjustment Projects, being defined as more than 100 claims per provider. Company will allow for 3 projects per measurement period. However, this allowance will not include Re-Work due to lawsuits or Re-Work due to Retroactive Contract Changes. Projects related to Lawsuits and Retroactive Contract Changes are counted and/or measurable.
- Entity will be held accountable for Adjustment Projects related to the following.
  - Re-Work Large Adjustment processes where the provider has a contract dispute for access at the end of the day.
  - Re-Work due to lawsuits that require large projects.
  - Re-Work of Re-Work, e.g where an issue is identified and the system is said to be corrected. Company submits the claims again and there are still errors, causing the claims to be Re-Worked again.

**Access Fee Performance Criteria**

- Measurement Period: Quarterly
- Service Area: All

|  | BELOW THRESHOLD | THRESHOLD |
|---|---|---|
| Performance Level | Per Claim Reprocessed | 100% Correct |
| Fee Guarantee | $20 per claim | None |

**6.** **Technical Issue Management:**

IT Technical Support Service Levels: Company's calls for IT service will be responded to in accordance with the terms and conditions set forth below. Company shall provide the severity level of the IT problem when Company places a call or communicates to Entity. Entity will use qualified technical personnel with the appropriate technical experience to assist in the resolution of the IT problem.

**Priority Definitions – classification of errors with associated priority levels**

Level 1/Severity 1/Critical Priority: An error/issue that causes production to go down and Company is unable to use the Entity application or an error or condition that causes performance degradation and critically impacts operations resulting in critical impact to Company operations. No obvious work-around is available.

Level 2/Severity 2/High Priority: An error/issue that is not a Critical Priority, but is a reproducible error in the Entity application that materially adversely affects Company's usage of the Entity applications or data integrity. Operational workarounds may be employed and are deemed acceptable for the short term but are unacceptable for the long term. Will consider a patch for the current generally available release or will provide the fix in the next release.

Level 3/Severity 3/Medium Priority:  An issue that is not Critical or High, but minimally adversely affects Company's usage of Entity applications or data integrity.  Operational workarounds may be employed and are deemed acceptable for the short term and long term.  Will consider a patch for the next release.

Level 4/Severity 4/Standard Priority: An issue that is of a cosmetic nature, a matter of style, efficiency or convenience, or usage clarification that does not interfere with the operation of Company's business.  Work-arounds if necessary are acceptable, consideration for future product releases will be driven by market indicators.

**Timeframe for Response, Follow-up and Escalation:**

| Case Priority | Initial Response from receipt of service call | Follow-Up | Escalation Time** |
|---|---|---|---|
| Critical | 30minutes* | Every hour until resolved or next follow-up time scheduled with Company | 4 hours |
| High | 2 business hours* (if call is received prior to 4:30 p.m. Eastern Time) Excluding Sunday | Every four business hours or next follow-up time scheduled with Company | 8 hours |
| Medium | 1 business day (if call is received prior to 3:00 p.m. Eastern Time) Excluding Sundays | Next follow-up time scheduled with Company | 2 business days |
| Standard | 3 business days Excluding Sundays | Next follow-up time scheduled with Company, if applicable | |

* Critical and High priority issues must be phoned into the Entity help line to receive these response times.  Critical and High priority issues that are reported electronically will be responded to as if they are a Medium priority.

** For each level of priority (Standard, Medium, High, and Critical), the protocol under which Product Support will escalate an issue if not resolved includes:
Escalation within Product Support (that is, Application Support to Technical Support)
Escalation to other internal organizations (for example, Development)
Escalation to Executive Sponsor

Entity shall use reasonable efforts to notify Company of any Severity level 1 or 2 defects or malfunctions in the Entity applications that may materially adversely impact Company's use of the Entity applications.

If Company reaches a recorded message when it makes the service call, Entity must respond back to Company by personal telephone call within the Response Timeframe to notify Company that Entity received the call and Entity is working on a resolution.  If Entity reaches a recorded message when it responds to Company within the required response timeframe, the response time obligation of Entity shall be deemed satisfied.

**Sunday Operations:** Entity uses Sunday for maintenance and release management activities.  The maintenance window typically lasts from 8 to 10 hours.  Files received on Sunday during the maintenance window will be automatically processed on completion of the maintenance.  The planned maintenance window will not be included for the purposes of measuring systems availability.  Entity will provide details of regular maintenance windows on a quarterly basis.  Entity's IT support team will be available on call to address any Severity 1 failures that occur outside the maintenance window.

**Performance Credits.**

Entity and Company agree that the damage resulting from a failure of the Entity applications to perform, which rises to the level of a Severity Level 1 issue, as defined herein, may be difficult to calculate.  In the event that Entity is unable to correct a Severity Level 1 issue within eight (8) hours of receipt of a service call from Company, Entity shall credit Company one thousand dollars ($1,000) for each hour beyond the eight (8) hour time period that the Severity Level 1 issue remains unresolved (the "Performance Credit").  By way of example only, if Company calls Entity's help line at 8:00 p.m. with a Severity Level 1 issue, and the Entity applications problem remains unresolved until 6:00 a.m. the following day, Company shall receive a two

15

thousand dollar ($2,000) Performance Credit. Performance Credits will not exceed two hundred forty thousand dollars ($240,000) annually, and Entity shall apply any such Performance Credits to future payments owed by Company to Entity under this Agreement.

Notwithstanding the foregoing, in the event Company is not using the Entity application on a required environment in accordance with the terms of any applicable systems release documentation, Entity shall be under no obligation to pay such Performance Credit. Errors to a Entity application that cause a Severity Level 1 issue that are demonstrated by Entity to be caused by Company's or a third party's operating system, hardware configuration, or other actions must be remedied by Company or the third party prior to Entity's correction or remedying of the issue and shall delay the start of the eight (8) hour time period referenced above. Company shall give Entity reasonable assistance in remedying an IT problem, including, but not limited to remote (electronic or telephonic) access to the following: (1) to the equipment upon which the Entity applications resides; (2) to the Entity applications itself; and (3) to qualified Company staff who can provide information, documentation and records related to the issue.

16

**Attachment 4**

**ACCOUNT MANAGEMENT EVALUATION TOOL**

| | TOTAL POINTS | % SCORE | UNACCEPTABLE <90 POINTS | BELOW THRESHOLD 90-99 POINTS | THRESHOLD 100-120 POINTS |
|---|---|---|---|---|---|
| | 100.00 | 83.33% | FALSE | FALSE | TRUE |
| **KNOWLEDGE** (45 pts poss) | SUB-TOTAL 33 | For any "Disagree" or "Strongly Disagree" responses, please provide specific comments in the area below. Ranking of categories will be from 15, (strongly agree) to 1, (strongly disagree). | | | |
| **understands Aetna's business needs** | 13 | | | | |
| **understands Aetna's service expectations** | 13 | | | | |
| **clearly explains Vendor data** | 7 | | | | |
| **PROFESSIONALISM** (10 pts possible) | SUB-TOTAL 7 | For any "Disagree" or "Strongly Disagree" responses, please provide specific comments in the area below. Ranking of categories will be from 10, (strongly agree) to 1, (strongly disagree). | | | |
| **provides appropriate written communication** | 7 | | | | |
| **PROACTIVE MANAGEMENT** (20 pts poss) | SUB-TOTAL 20 | For any "Disagree" or "Strongly Disagree" responses, please provide specific comments in the area below. Ranking of categories will be from 5, (strongly agree) to 1, (strongly disagree). | | | |
| **communicates potential problematic issues** | 5 | | | | |
| **provides viable alternatives to meet your business needs** | 5 | | | | |
| **sets realistic expectations regarding turnaround time** | 5 | | | | |
| **sets realistic expectations regarding provider contracted rates** | 5 | | | | |
| **ACCESSIBILITY** (25 pts poss) | SUB-TOTAL 25 | For any "Disagree" or "Strongly Disagree" responses, please provide specific comments in the area below. Ranking of categories will be from 5, (strongly agree) to 1, (strongly disagree). | | | |
| **is available to you** | 5 | | | | |
| **allocates appropriate time when meeting with you** | 5 | | | | |
| **demonstrates flexibility with regard to schedule changes** | 5 | | | | |
| **provides/communicates alternate contacts in the event of their absence** | 5 | . | | | |
| **advises you of schedule limitations** | 5 | | | | |
| **RESPONSIVENESS** (20 pts poss) | SUB-TOTAL 15 | For any "Disagree" or "Strongly Disagree" responses, please provide specific comments in the area below. Ranking of categories will be from 5, (strongly agree) to 1, (strongly disagree). | | | |
| **responds to your inquiries in a timely manner** | 4 | | | | |
| **provides thorough responses to your inquiries** | 3 | | | | |
| **follows through regarding outstanding issues/items** | 4 | | | | |
| **solicits the assistance of Aetna product experts when needed** | 4 | | | | |

Multiplan Inc Statement of Work 15

**ATTACHMENT 5**

**Health Insurance Portability and Accountability Act**

**THIS ATTACHMENT** is to the Agreement between Aetna Health Management, LLC. (the "Covered Entity") and MultiPlan, Inc. (the "Business Associate"). In conformity with the regulations at 45 C.F.R. Parts 160-164 (the "Privacy and Security Rules"), Covered Entity will provide Business Associate with access to, or have Business Associate create, maintain, transmit and/or receive certain Protected Health Information (as defined below) in conjunction with the services being provided under the Agreement, thus necessitating a written agreement that meets the applicable requirements of the Privacy and Security Rules. Covered Entity and Business Associate agree as follows:

**NOW THEREFORE**, Covered Entity and Business Associate agree as follows:

1. <u>Definitions</u>. The following terms shall have the meaning set forth below:
   (a) <u>ARRA</u>. "ARRA" means the American Recovery and Reinvestment Act of 2009
   (b) <u>C. F. R.</u> "C.F. R." means the Code of Federal Regulations.
   (c) <u>Designated Record Set</u>. "Designated Record Set" has the meaning assigned to such term in 45 C. F. R. 160.501.
   (d) <u>Discovery</u>. "Discovery" shall mean the first day on which a Security Breach is known to Business Associate (including any person, other than the individual committing the breach, that is an employee, officer, or other agent of Business Associate), or should reasonably have been known to Business Associate, to have occurred.
   (e) <u>Electronic Health Record</u>. "Electronic Health Record" means an electronic record of health-related information on an individual that is created, gathered, managed and consulted by authorized health care clinicians and staff.
   (f) <u>Electronic Protected Health Information</u>. "Electronic Protected Health Information" means information that comes within paragraphs 1 (i) or 1 (ii) of the definition of "Protected Health Information", as defined in 45 C. F. R. 160.103.
   (g) <u>Individual</u>. "Individual" shall have the same meaning as the term "individual" in 45 C. F. R. 160.103 and shall include a person who qualifies as personal representative in accordance with 45 C. F. R. 164.502 (g).
   (h) <u>Protected Health Information</u>. "Protected Health Information" shall have the same meaning as the term "Protected Health Information", as defined by 45 C. F. R. 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.
   (i) <u>Required by Law</u>. "Required by Law" shall have the same meaning as the term "required by law" in 45 C. F. R. 164.103.
   (j) <u>Secretary</u>. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.
   (k) <u>Security Breach</u>. "Security Breach" means the unauthorized acquisition, access, use or disclosure of Protected Health Information which compromises the security or privacy of such information, except where an unauthorized person to whom such information is disclosed would not reasonably have been able to retain such information. Security Breach does not include:
   (i) any unintentional acquisition, access, or use of Protected Health Information by an employee or individual acting under the authority of Business Associate if:
   I. such acquisition, access or use was made in good faith and within the course and scope of the employment or other professional relationship of such employee or individual, respectively, with Business Associate; and
   II. such information is not further acquired, accessed, used or disclosed by any person; or
   (ii) any inadvertent disclosure from an individual who is otherwise authorized to access Protected Health Information at a facility operated by Business Associate to another similarly situated individual at the same facility; and
   (iii) any such information received as a result of such disclosure is not further acquired, accessed, used or disclosed without authorization by any person.
   (l) <u>Security Breach Compliance Date</u>. "Security Breach Compliance Date" means the date that is thirty (30) days after the Secretary publishes interim final regulations to carry out the provisions of Section 13402 of Subtitle D (Privacy) of ARRA.
   (m) <u>Security Incident</u>. "Security Incident" shall have the same meaning as the term "security incident" in 45 C. F. R. 164.304.
   (n) <u>Standard Transactions</u>. "Standard Transactions" means the electronic health care transactions for which HIPAA standards have been established, as set forth in 45 C. F. R., Parts 160-162.

18

(o) <u>Unsecured Protected Health Information</u>. "Unsecured Protected Health Information" means Protected Health Information that is not secured through the use of a technology or methodology specified by guidance issued by the Secretary from time to time.

2. <u>Obligations and Activities of Business Associate</u>

(a) Business Associate agrees to not use or further disclose Protected Health Information other than as permitted or required by this Exhibit or as Required by Law. Business Associate shall also comply with any further limitations on uses and disclosures agreed by Covered Entity in accordance with 45 C.F.R. 164.522 provided that such agreed upon limitations have been communicated to Business Associate in accordance with Section 4.1(c) of this Exhibit.

(b) Business Associate agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by this Exhibit.

(c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Exhibit.

(d) Business Associate agrees to report to Covered Entity any use or disclosure of the Protected Health Information not provided for by this Exhibit of which it becomes aware.

(e) Beginning on the later of the Effective Date of this Exhibit or the Security Breach Compliance Date, Business Associate agrees to report to Covered Entity any Security Breach of Unsecured Protected Health Information without unreasonable delay and in no case later than sixty (60) calendar days after Discovery of a Security Breach. Such notice shall include the identification of each individual whose Unsecured Protected Health Information has been, or is reasonably believed by Business Associate, to have been, accessed, acquired, or disclosed in connection with such Security Breach. In addition, Business Associate shall provide any additional information reasonably requested by Covered Entity for purposes of investigating the Security Breach. Business Associate's notification of a Security Breach under this section shall comply in all respects with each applicable provision of Section 13400 of Subtitle D (Privacy) of ARRA and related guidance issued by the Secretary from time to time.

(f) Business Associate agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity agrees to the same restrictions and conditions that apply through this Exhibit to Business Associate with respect to such information. Unless otherwise set forth in Section 5.5 of the agreement in no event shall Business Associate, without Covered Entity's prior written approval, provide Protected Health Information received from, or created or received by Business Associate on behalf of Covered Entity to any employee or agent, including a subcontractor, if such employee, agent or subcontractor receives, processes or otherwise has access to the Protected Health Information outside of the United States.

(g) Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by Covered Entity, to Protected Health Information in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 C.F.R. 164.524. Covered Entity's determination of what constitutes "Protected Health Information" or a "Designated Record Set" shall be final and conclusive. If Business Associate provides copies or summaries of Protected Health Information to an Individual it may impose a reasonable, cost-based fee in accordance with 45 C.F.R. 164.524 (c)(4).

(h) Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 C.F.R. 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by Covered Entity. Business Associate shall not charge any fee for fulfilling requests for amendment. Covered Entity's determination of what Protected Health Information is subject to amendments pursuant to 45 C.F.R. 164.526 shall be final and conclusive.

(i) Business Associate agrees to make (i) internal practices, books, and records, including policies and procedures, relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity, and (ii) policies, procedures, and documentation relating to the safeguarding of Electronic Protected Health Information available to the Covered Entity, or at the request of the Covered Entity to the Secretary, in a time and manner designated by the Covered Entity or the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy and Security Rules.

(j) Business Associate agrees to document such disclosures of Protected Health Information as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528.

(k) Business Associate agrees to provide to Covered Entity, in the time and manner described below, the information collected in accordance with Section 2(i) of this Exhibit, to permit Covered Entity to respond to a

19

request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528. Business Associate agrees to provide such information to Covered Entity through a quarterly report. In addition, with respect to information contained in an Electronic Health Record, Business Associate shall document, and maintain such documentation for three (3) years from date of disclosure, such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of information contained in an Electronic Health Record, as required by Section 13405(c) of Subtitle D (Privacy) of ARRA and related regulations issued by the Secretary from time to time.

(l)   Business Associate acknowledges that it shall request from the Covered Entity and so disclose to its affiliates, agents and subcontractors or other third parties, (i) the information contained in a "limited data set," as such term is defined at 45 C.F.R. 164.514(e)(2), or, (ii) if needed by Business Associate, to the minimum necessary to accomplish the intended purpose of such requests or disclosures. In all cases, Business Associate shall request and disclose Protected Health Information only in a manner that is consistent with guidance issued by the Secretary from time to time

(m)   With respect to Electronic Protected Health Information, Business Associate shall implement and comply with (and ensure that its subcontractors implement and comply with) the administrative safeguards set forth at 45 C.F.R. 164.308, the physical safeguards set forth at 45 C.F.R. 310, the technical safeguards set forth at 45 C.F.R. 164.312, and the policies and procedures set forth at 45 C.F.R. 164.316 to reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity. Business Associate acknowledges that, (i) the foregoing safeguard, policies and procedures requirements shall apply to Business Associate in the same manner that such requirements apply to Covered Entity, and (ii) Business Associate shall be liable under the civil and criminal enforcement provisions set forth at 42 U.S.C. 1320d-5 and 1320d-6, as amended from time to time, for failure to comply with the safeguard, policies and procedures requirements and any guidance issued by the Secretary from time to time with respect to such requirements.

(n)   With respect to Electronic Protected Health Information, Business Associate shall ensure that any agent, including a subcontractor, to whom it provides Electronic Protected Health Information, agrees to implement reasonable and appropriate safeguards to protect it.

(o)   Business Associate shall report to Covered Entity any Security Incident of which it becomes aware.

(p)   If Business Associate conducts any Standard Transactions on behalf of Covered Entity, Business Associate shall comply with the applicable requirements of 45 C.F.R. Parts 160-162.

(q)   During the term of the Exhibit, Business Associate may be asked to complete a security survey and/or attestation document designed to assist Covered Entity in understanding and documenting Business Associate's security procedures and compliance with the requirements contained herein. Business Associate's failure to complete either of these documents within the reasonable timeframe specified by Covered Entity shall constitute a material breach of the Exhibit.

(r)   Business Associate acknowledges that, as of the Effective Date of this Exhibit, it shall be liable under the civil and criminal enforcement provisions set forth at 42 U.S.C. 1320d-5 and 1320d-6, as amended from time to time, for failure to comply with any of the use and disclosure requirements of this Exhibit and any guidance issued by the Secretary from time to time with respect to such use and disclosure requirements.

3.   Permitted Uses and Disclosures by Business Associate

3.1   General Use and Disclosure. Except as otherwise limited in this Exhibit, Business Associate may use or disclose Protected Health Information to perform its obligations and services to Covered Entity, provided that such use or disclosure would not violate the Privacy and Security Rules if done by Covered Entity or the minimum necessary policies and procedures of the Covered Entity.

3.2   Specific Use and Disclosure Provisions

(a)   Except as otherwise prohibited by this Exhibit, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(b)   Except as otherwise prohibited by this Exhibit, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are Required By Law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached in accordance with the Security Breach and Security Incident notifications requirements of this Exhibit.

Multiplan Inc Statement of Work 15

(c) Business Associate shall not directly or indirectly receive remuneration in exchange for any Protected Health Information of an individual without Covered Entity's prior written approval and notice from Covered Entity that it has obtained from the individual, in accordance with 45 C.F.R. 164.508, a valid authorization that includes a specification of whether the Protected Health Information can be further exchanged for remuneration by Business Associate. The foregoing shall not apply to Covered Entity's payments to Business Associate for services delivered by Business Associate to Covered Entity.

(d) Except as otherwise prohibited by this Exhibit, Business Associate may use Protected Health Information to provide data aggregation services to Covered Entity as permitted by 42 C.F.R. 164.504(e)(2)(i)(B).

(e) Business Associate may use Protected Health Information to report violation of law to appropriate Federal and State authorities, consistent with 164.502 (j)(1).

4.  Obligations of Covered Entity.

    4.1 Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions
    (a) Covered Entity shall notify Business Associate of any limitation(s) in Covered Entity's notice of privacy practices that Covered Entity produces in accordance with 45 C.F.R. 164.520 (as well as any changes to that notice), to the extent that such limitation(s) may affect Business Associate's use or disclosure of Protected Health Information.
    (b) Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes affect Business Associate's use or disclosure of Protected Health Information.
    (c) Covered Entity shall notify Business Associate of any restriction to the use or disclosure of Protected Health Information that Covered Entity has agreed to in accordance with 45 C.F.R. 164.522 to the extent that such restriction may affect Business Associate's use or disclosure of Protected Health Information.

    4.2 Permissible Requests by Covered Entity. Except as may be set forth in Section 3.2, Covered Entity shall not request Business Associate to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy and Security Rules if done by Covered Entity.

5.  Term and Termination
    (a) Term. The provisions of this Exhibit shall take effect on the Effective Date of the Agreement and shall terminate when all of the Protected Health Information provided by Covered Entity to Business Associate, or created, maintained, transmitted or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, in accordance with Section 5(c)(2).
    (b) Termination for Cause. Without limiting the termination rights of the Parties pursuant to the Agreement and upon Covered Entity's knowledge of a material breach of this Exhibit by Business Associate, Covered Entity shall either:
        (i) Provide an opportunity for Business Associate to cure the breach or end the violation, or terminate the Agreement if Business Associate does not cure the breach or end the violation within the time specified by Covered Entity,
        (ii) Immediately terminate the Agreement, if cure of such breach is not possible.
    (c) Effect of Termination.
        (1) Except as provided in Section 5(c), upon termination of this Exhibit, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created, maintained, transmitted or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.
        (2) In the event the Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, per Section 5 (a) above, Business Associate shall continue to extend the protection of this Exhibit to such Protected Health Information and limit further uses and disclosures of such Protected Health Information for so long as Business Associate maintains such Protected Health Information.

6.  Indemnification. Business Associate shall indemnify and hold harmless Covered Entity and any of Covered Entity's affiliates, directors, officers, employees and agents from and against any claim, cause of action, liability, damage, cost or expense (including reasonable attorneys' fees) arising out of or relating to any non-permitted use or disclosure of Protected Health Information, failure to safeguard Electronic Protected Health Information or other

Multiplan Inc Statement of Work 15

breach of this Exhibit by Business Associate or any affiliate, director, officer, employee, agent or subcontractor of Business Associate.

7.  <u>Notices</u>.
    Any notices or communications to be given under this Exhibit shall be made to the address and/or fax to the fax numbers given below:

To Business Associate:    **MultiPlan, Inc.**         To Covered Entity:    **Aetna Legal Support Services**
                    11100 Winter Street                                151 Farmington Avenue
                    Waltham, MA  02451-1440                      Hartford, CT 06156
                    Attention: <u>Legal Department</u>                Attn: W121
                                                                Aetna Legal Support Services
                                                                       Fax:  (860) 907-3017

                    E-mail Address:  hipaa@multiplan.com

Each Party named above may change its address upon thirty (30) days written notice to the other Party.

8.  <u>Miscellaneous</u>
    (a) <u>Regulatory References</u>.  A reference in this Exhibit to a section in the Privacy and Security Rules means the section as in effect or as amended, and for which compliance is required.
    (b) <u>Amendment</u>.  Upon the enactment of any law or regulation affecting the use or disclosure of Protected Health Information or the safeguarding of Electronic Protected Health Information, or the publication of any decision of a court of the United States or any state relating to any such law or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, either Party may, by written notice to the other Party, amend the Agreement and this Exhibit in such manner as such Party determines necessary to comply with such law or regulation.  If the other Party disagrees with such amendment, it shall so notify the first Party in writing within thirty (30) days of the notice.  If the Parties are unable to agree on an amendment within thirty (30) days thereafter, then either of the Parties may terminate the Agreement on thirty (30) days written notice to the other Party.
    (c) <u>Survival</u>.  The respective rights and obligations of Business Associate under Sections 5(c) and 6 of this Exhibit shall survive the termination of this Exhibit.
    (d) <u>Interpretation</u>.  Any ambiguity in this Exhibit shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy and Security Rules.  In the event of any inconsistency or conflict between this Exhibit and the Agreement, the terms, provisions and conditions of this Exhibit shall govern and control.
    (e) <u>No third party beneficiary</u>.  Nothing express or implied in this Exhibit or in the Agreement is intended to confer, nor shall anything herein confer, upon any person other than the Parties and the respective successors or assigns of the Parties, any rights, remedies, obligations, or liabilities whatsoever.
    (f) <u>Governing Law</u>.  This Exhibit shall be governed by and construed in accordance with the same internal laws as that of the Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Exhibit to the Agreement.

**Aetna Life Insurance Company**                  **MultiPlan, Inc.**

By:                                             By:

(Authorized Signature)                    (Authorized Signature)
Name:                                             Name:

(Print Name)                               (Print Name)
Title:                                              Title:

Date:                                             Date:

22

Multiplan Inc Statement of Work 15

**ATTACHMENT 6**
Gramm-Leach-Bliley Act

**THIS ATTACHMENT** is to the Agreement between Aetna Health Management, LLC. (the "GLBA Licensee") and MultiPlan, Inc. (the "Service Provider"). In conformity with the federal Gramm-Leach-Bliley Act ("GLBA"), Service Provider will have access to, create, maintain, transmit and/or receive certain Customer Information in conjunction with the work being provided under the Agreement, thus necessitating a written exhibit that meets the applicable requirements of GLBA and the Safeguard Rules, which GLBA Licensee is required to comply with. GLBA Licensee and Service Provider agree as follows:

1.  <u>Definitions</u>.  The following terms shall have the meanings set forth below:
    (a) <u>Customer Information</u>.  "Customer Information" means nonpublic personal financial and health information about a customer, whether in paper, electronic or other form, received from, or created or received by Service Provider on behalf of, GLBA Licensee.  Customer Information includes any such information provided by the customer as part of a request for information about, or an application for, a GLBA Licensee insurance product or service, even if no such insurance product or service is subsequently provided to the customer.
    (b) <u>DOI</u>.  "DOI" means various state departments of insurance.
    (c) <u>Safeguard Rules</u>.  The "Safeguard Rules" means regulations promulgated by various state insurance departments regarding the safeguarding of certain Customer Information.

2.  <u>Obligations of Service Provider</u>.
    (a) Service Provider represents and warrants that it has implemented a comprehensive written information security program that includes administrative, technical and physical safeguards for the protection of Customer Information that are appropriate to Service Provider's size, complexity, nature and scope of activities, and that is designed to:
        (i)   ensure the integrity and confidentiality of Customer Information;
        (ii)  protect against any anticipated threats or hazards to the security or integrity of Customer Information; and
        (iii) protect against unauthorized access to, or use of, Customer Information that could result in substantial harm or inconvenience to any customer.
    (b) Service Provider agrees to ensure that any agent, including a subcontractor, to whom it provides Customer Information agrees to the same restrictions and conditions that apply through this Exhibit to Service Provider with respect to such Customer Information.
    (c) Unless otherwise set forth in Section 5.5 of the Agreement, in no event shall Service Provider, without GLBA Licensee's prior written approval, provide Customer Information (received from, or created or received by Service Provider on behalf of GLBA Licensee) to any employee or agent, including a subcontractor, if such employee, agent or subcontractor receives, processes, or otherwise has access to the Customer Information outside of the United States.
    (d) Service Provider agrees to make policies, procedures, and documentation relating to the safeguarding of Customer Information available to the GLBA Licensee, or at the request of the GLBA Licensee to a DOI, in a time and manner designated by the GLBA Licensee or DOI, for purposes of the DOI determining GLBA Licensee's compliance with GLBA.
    (e) Service Provider agrees to affirm in writing, upon request from GLBA Licensee from time to time, Service Provider's continued compliance with its representations, warranties and obligations under this Exhibit.
    (f) During the term of the Exhibit, Service Provider may be asked to complete a security survey and/or attestation document designed to assist GLBA Licensee in understanding and documenting Service Provider's security procedures and compliance with the requirements contained herein.  Service Provider's failure to complete either of these documents within the reasonable timeframe specified by GLBA Licensee shall constitute a material breach of the Exhibit.

3.  <u>Term and Termination</u>
    (a) <u>Term</u>.  The provisions of this Exhibit shall take effect on the Agreement's Effective Date and shall terminate when all of the Customer Information provided by GLBA Licensee to Service Provider, or maintained, processed or otherwise accessed by Service Provider, is destroyed or returned to GLBA Licensee, or, in accordance with Section 3(c)(ii).
    (b) <u>Termination for Cause</u>.  Without limiting the termination rights of the parties pursuant to the Agreement and upon GLBA Licensee's knowledge of a material breach of this Exhibit by Service Provider, GLBA Licensee shall either:

23

      (i)  Provide an opportunity for Service Provider to cure the breach or end the violation, or terminate the Agreement if Service Provider does not cure the breach or end the violation within the time specified by GLBA Licensee,

      (ii) Immediately terminate the Agreement, if cure of such breach is not possible.

  (c)  <u>Effect of Termination</u>.

      (i)  Except as provided in Section 3(c), upon termination of the Agreement, for any reason, Service Provider shall return or destroy all Customer Information received from GLBA Licensee, or maintained, processed or otherwise accessed on behalf of GLBA Licensee.  This provision shall apply to Customer Information that is in the possession of subcontractors or agents of Service Provider. Service Provider shall retain no copies of the Customer Information.

      (ii) In the event the Service Provider determines that returning or destroying the Customer Information is infeasible, Service Provider shall provide to GLBA Licensee notification of the conditions that make return or destruction infeasible and the purposes of Service Provider's continued use.  Upon mutual agreement of the Parties that return or destruction of Customer Information is infeasible and Service Provider has a legitimate purpose in continued use of the Customer Information, Service Provider shall extend the protection of this Exhibit to such Customer Information and limit further uses and disclosures of such Customer Information to those purposes that make the return or destruction infeasible for so long as Service Provider maintains such Customer Information.

4.   <u>Indemnification</u>.  Service Provider shall indemnify and hold harmless GLBA Licensee and any of GLBA Licensee's affiliates, directors, officers, employees and agents from and against any claim, cause of action, liability, damage, cost or expense (including reasonable attorneys' fees) arising out of or relating to any failure to safeguard Customer Information, or other breach of this Agreement by Service Provider or any affiliate, director, officer, employee, agent or subcontractor of Service Provider.

5.   <u>Notices</u>.  Any notices or communications to be given under this Exhibit shall be made to the address and/or fax to the fax numbers given below:

To Service Provider:    **MultiPlan, Inc.**              To GLBA Licensee:    **Aetna Legal Support Services**
                     11100 Winter Street                                   151 Farmington Avenue
                     Waltham, MA 02451-1440                          Hartford, CT 06156
                     Attention: <u>Legal Department</u>                    Attn: W121
                                                      Aetna Legal Support Services
                                                      Fax:  (860) 907-3017

                     E-mail Address:
                     <u>hipaa@multiplan.com</u>

Each Party named above may change its address upon thirty (30) days written notice to the other party.

6.   <u>Miscellaneous</u>.

  (a)  <u>Regulatory References</u>.  A reference in this Exhibit to a section in GLBA means the section as in effect or as amended, and for which compliance is required.

  (b)  <u>Amendment</u>.  Upon the enactment of any law or regulation affecting the safeguarding of Customer Information, or the publication of any decision of a court of the United States or any state relating to any such law or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, either Party may, by written notice to the other Party, amend this Exhibit in such manner as such Party determines necessary to comply with such law or regulation.  If the other Party disagrees with such amendment, it shall so notify the first Party in writing within thirty (30) days of the notice.  If the Parties are unable to agree on an amendment within thirty (30) days thereafter, then either of the Parties may terminate the Agreement on thirty (30) days written notice to the other Party.

  (c)  <u>Survival</u>.  The respective rights and obligations of Service Provider under Sections 3(c) and 4 of this Exhibit shall survive the termination of this Exhibit.

  (d)  <u>Interpretation</u>.  Any ambiguity in this Exhibit shall be resolved to permit GLBA Licensee to comply with GLBA and the Safeguard Rules.  In the event of any inconsistency or conflict between this Exhibit and the Agreement, the terms, provisions and conditions of this Exhibit shall govern and control.

  (e)  <u>No third party beneficiary</u>.  Nothing express or implied in this Exhibit is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

Multiplan Inc Statement of Work 15

(f)  <u>Governing Law</u>.  This Exhibit shall be governed by and construed in accordance with the same internal laws as that of the Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Exhibit to the Agreement.

AETNA LIFE INSURANCE COMPANY          MULTIPLAN, INC.

By: _____     By: _____
     (Authorized Signature)                 (Authorized Signature)
Name: _____   Name: _____
Title: _____     Title: _____
Date: _____    Date: _____

Multiplan Inc Statement of Work 15

**Attachment 7**

**COMPENSATION SCHEDULE**

1.0   <u>Fees</u>.  For the Services performed under this Agreement, Company will pay Entity in accordance with the amounts and other terms and conditions set forth in this Attachment 7.  There will be no increase to any fee during the Initial Term of the Agreement.

2.0   <u>Fees and Savings</u>.  Fees set forth shall be payable commencing on the Effective Date.  As compensation for the Complementary Network Services provided by Entity under the Agreement for Company's NAP Program, Company shall pay Entity an access fee (hereinafter referred to as the "NAP Fee").  The NAP Fee is calculated based upon the applicable percentage as set forth in the charts below ("Applicable Percentage of Savings") multiplied by the Net Entity Savings.  "Net Entity Savings" is the difference between (i) the amount that would have been paid by Company without the benefit of Entity's Services for eligible Covered Services after adjustments for coordination of benefits, re-bundling of services, claim reversals and other similar adjudicative processes including maximum reimbursable charge benefit limitations ("Maximum Reimbursement Methodology"), and (ii) the amount allowed by reason of Entity Services.  If there is a Material Change in the Maximum Reimbursement Methodology, Company will notify Entity.  Company and Entity have mutually agreed that MultiPlan will remain in first position after any proprietary or newly owned contracts.  Any additional proprietary or newly owned contracts by Company will not change the fee calculation methodology (will not move to billed charges).

As compensation for the Negotiation Services provided by Entity under the Agreement, Company shall pay Entity an access fee (hereinafter referred to as the "NS Fee").  The NS Fee is calculated based upon the applicable percentage as set forth in the charts below ("Applicable Percentage of Savings") multiplied by the Net Entity Negotiated Savings.  "Net Entity Negotiated Savings" is the difference between (i) the amount that would have been paid by Company without the benefit of Entity's Services for eligible Covered Services after adjustments for coordination of benefits, re-bundling of services, claim reversals and other similar adjudicative processes including Maximum Reimbursement Methodology, and (ii) the amount allowed by reason of Entity Negotiation Services.

As compensation for the Primary Network (including HealthEOS by MultiPlan) Services, Company shall pay Entity an access fee(s) as set forth below.

<u>NAP FEE:  APPLICABLE PERCENTAGE OF SAVINGS</u>

ENTITY NETWORKS THAT ARE ENTITY OWNED NETWORKS

| <u>Time Period</u> | <u>Applicable Percentage of Net Entity Savings</u> |
|---|---|
|  |  |
| 1/1/10 – 9/30/10 | 10% |
| 10/1/10 – 9/30/11 | 7.75% |
| 10/1/11 – 12/31/11 | 6.61% |
| 1/1/12 | 6.35% |
| 12/1/13 and after (see next line for more information) | 8.3% |
| 1/1/17 and thereafter | 6.35%, 7.3%, 8.3%, 9.5% or 10% |
| * Effective in 2016 calendar year and thereafter for each calendar year, if claim volume  sent to Entity decreases by 20 to 40% compared to the 2014 calendar year, the fee to be paid to Entity shall be 9.5% for the following calendar year.  In the event that claim volume sent to Entity decreases by greater than 40% compared to claim volume for the 2014 calendar year, the fee to be paid to entity shall be 10% for the following calendar year.  Effective in 2016 calendar year and thereafter for each calendar year, if claim volume sent to Entity increases by 20% to 40% compared to the 2014 calendar year, the fee to be paid to Entity shall be 7.3% for the following calendar year.  In the event that claim volume sent to Entity increases by greater than 40% compared to claim volume for the 2014 calendar year, the fee to be paid to Entity shall be 6.35% for the following calendar year. ||

26

> For example, the 2017 fee will be increased to 9.5% if the comparison of Jan-Dec 2016 claims volume to Jan-Dec 2014 claim volume shows that claims volume has decreased by 29%. The 2017 fee will remain at 8.3% if the claim volume does not decrease or increase by at least 20% in the previous calendar year.
>
> For example, the 2018 fee will be decreased to 6.35% if the comparisons of Jan-Dec 2017 claim volume to Jan-Dec 2014 claim volume shows that claims volume has increased by 44%. The fee will remain at the fee in effect in for the previous calendar year if the claim volume does not decrease or increase by at least 20% compared to Jan-Dec 2014 claim volume.

NEGOTIATION SERVICES – NS FEE APPLICABLE PERCENTAGE OF SAVINGS

| Time Period | Applicable Percentage of Negotiated Savings |
|---|---|
| | |
| 1/1/10 – 12/31/10 | 10% |
| 1/1/11 – 12/31/11 | 10% |
| 1/1/12 and after | 10% |

ENTITY NETWORKS THAT ARE LEASED NETWORKS are addressed in the existing Viant Agreement.

PRIMARY NETWORK SERVICES

| Service | Applicable Per Covered Employee* Per Month Fee |
|---|---|
| Primary Network and HealthEOS by MultiPlan Services | $2.25 |

*"Covered Employee" shall mean an individual cardholder or head of household eligible for coverage under a Plan.

It is understood and acknowledged by Entity that Company does not guarantee the volume of claims that may be Repriced under this Agreement, subject to Section 3.4 of the Agreement.

3.0 **Payment of Fees**. Company shall prepare a file that includes details on the claims processed and the Net Entity Savings associated with each claim paid ("Clean Claim File"). Based on a review of the Clean Claim File, Entity shall, by the 10th business day of each month, submit an invoice to Company of the total NAP Fees to be paid by Company to Entity based on the Applicable Percentage of Savings for all claims Repriced according to the Agreement in the prior month. This invoice shall include detail sufficient to enable Company to calculate and/or verify the NAP Fee payable for that month. Company shall pay the NAP Fee payable to Entity within 60 days of receipt of the monthly invoice from Entity or applicable billing process.

For each calendar month during the Initial Term and any Successive Term and for the Primary Network Services, Company shall pay the Fee set forth above for the Primary Network Services by the end of the month following the month in which such Service is rendered and on a Self-Reported basis. To pay on a Self-Reported basis, also referred to as "Self Reported Enrollment Fees", Company shall calculate such Self Reported Enrollment Fees on the basis of: (a) the number of Covered Employees residing in and assigned to the Service Area that are eligible to access the Primary Network Services as of the 16th day of the previous month, multiplied by (b) the fee set forth above. In the event that Company cannot calculate the actual number of Covered Employees for any calendar month, Company shall estimate that month's Covered Employee enrollment based upon the Company's prior month's Covered Employee enrollment. In no event shall Company withhold payment of the Self Reported Enrollment Fees due to the failure of Company's Plans or Payors to pay Company for their enrollment and services provided by Company. Company may subsequently adjust payment in the event it does not receive payment from its payors.

Company shall provide Entity with the Clean Claim File on a weekly basis. The Clean Claim File shall include the information relating to Repricing of Participating Entity Provider claims hereunder including amount of payment, applicable dates of service, the name and tax identification number associated with the payment, the address with zip code of the Participating Entity Provider, and any other mutually agreed upon information necessary in order for Entity to verify for Participating Entity Providers the savings reported.

27

4.0   <u>Taxes.</u>  Certain services provided by Entity may be subject to state and/or local sales and use taxes. Entity shall inform Company of any such taxes that it believes Company is responsible for payment. Company is responsible for payment of such taxes to the extent required by law to be assessed on a customer of Entity. Alternatively, if the Company wishes to claim a valid exemption from the tax or purchase for resale of Entity services, Company will provide additional exemption documentation in lieu of payment of the tax. Such documentation will be in the form of a valid resale and/or exemption certificate in the form and format as required in each relevant jurisdiction.

5.0   <u>Audit.</u>  Each party will keep complete and accurate books and records that support the payments owed and paid hereunder. These records will be retained for a period of at least 3 years from the date of the applicable payment or report, notwithstanding the expiration or other termination of this Agreement. Upon request, Company will submit a report certifying Company's payments made. Prompt adjustments will be made to compensate for undisputed errors and/or omissions.

6.0   <u>NAP Fee Credits.</u>  Through its self billing process, Company shall provide Entity with information, at the claim level on adjustments taken by Company on a weekly basis. Adjustments shall be captured within two (2) business days of when the claim is adjusted or cancelled within the claim processing system. The NAP repository is the application that creates the weekly self bill reports, ultimately resulting in payment made to Entity on a monthly basis. The NAP Repository is the application used for the ACAS Claim System – it is not used for the HMO or Affiliate processing.

    A.   In addition, Company also shall monthly account for projects that are completed by the provider/member service area and are not for an entire TIN. The adjustments or cancellations for these claims shall be reflected in the self billing file, posted once a month, and reflected in the weekly self-billing cycle they are processed within.

    B.   At no time will Company seek credit for claims with a date of service more than three hundred and sixty-five (365) days old. Company has a "rework policy" which limits retroactive terminations to one hundred and eighty (180) days from the appeal. Retroactive rate reviews are also held to one hundred and eighty (180) days for Beech Street, and three hundred and sixty-five (365) days for MultiPlan, unless otherwise mandated by state regulations or Network Provider Agreements.

7.0   <u>Retroactive Adjustments to Fees.</u>  Company is required to report retroactive changes to previously reported enrollment and/or paid fees. In the event that Company reports such changes during the timeframes set forth below, any fees payable hereunder shall be adjusted accordingly by Entity to reflect such retroactive changes. However, if such retroactive changes result in a reduction to previously paid fees, such changes must be reported by Company within six (6) months following the month for which such adjustment is being requested.

    A.   Retroactive increases or decreases to previously paid fees will be calculated using the price paid in the enrollment and/or service month being adjusted.

    B.   Nothing contained in this Section will limit the ability of Entity to obtain retroactive adjustments to any fees paid or owed under this Agreement should any audit conducted by Entity or its designee, reveal discrepancies in the enrollment data or other information by which such fees contained in this Agreement were calculated. Any adjustments in fees owed by Company to Entity shall be subject to the late payment fees set forth above

Multiplan Inc Statement of Work 15

**Attachment 8**

**NETWORK SERVICE AREAS**

To the extent permitted under applicable law, Company will provide its Members with access to the Entity Network to customers who purchase the NAP Program in the following states:

MultiPlan - Arkansas, Arizona, Connecticut, Georgia, Indiana, Massachusetts, Michigan, Mississippi, Nebraska, Pennsylvania, Tennessee, Washington

Beech Street – Alaska, Alabama, Colorado, DC, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Vermont, Virginia, West Virginia, Wisconsin, Wyoming

First Health (not an-Entity Network) – California, New Jersey, Oklahoma, Texas, Utah

**Primary Network Service Areas**
**PHCS Rental and Rural**
**Effective January 1, 2011**

AK Rural: Haines, Wrangell-Petersburg
AL Rural: Barbour, Butler
AR Rural: Ashley, Desha, Drew, Hempstead, Howard, Izard, Lafayette, Nevada, Pike, Searcy, Sevier, Van Buren
CA Rural: Mendocino
FL Rural: De Soto, Franklin, Glades, Hamilton, Jackson, Madison
ID Rural: Clearwater, Idaho, Lemhi
IL Primary: Bureau, Crawford, Effingham, Jefferson, Macon, Marion, McDonough, Mclean, Stephenson, Whiteside
IL Rural: Adams, Carroll, Dewitt, Hancock, Pike, Shelby
KS Rural: Barber, Edwards, Jackson, Mitchell, Nemaha, Norton, Rawlins, Sherman, Wabaunsee
KY Rural: Bath, Clay, Fleming, Knox, Laurel, Montgomery, Nicholas, Powell, Rockcastle, Rowan, Wolfe
LA Rural: Vernon
MA Rural: Nantucket
MN Rural: Cook
MO Rental: Cape Girardeau
MO Rural: Butler, Carter, Dunklin, Howell, Iron, Johnson, Marion, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Pike, Reynolds, Ripley, Scott, Shelby, Stoddard, Wayne
MS Rural: Choctaw, Jasper, Jefferson, Montgomery, Wilkinson, Winston
ND Rural: Adams, Bowman, Williams
NM Rental: Dona Ana, Luna, Otero
NM Rural: Colfax, Curry, De Baca, Eddy, Grant, Guadalupe, Lincoln, McKinley, Mora, Quay, Rio Arriba, Roosevelt, San Miguel, Sierra, Socorro, Taos, Union
NV Rural: Eureka
OR Rural: Klamath, Wallowa
SD Rural: Beadle, Brookings, Brown, Brule, Charles Mix, Clark, Codington, Davison, Day, Deuel, Gregory, Hughes, Hutchinson, Jackson, Kingsbury, Lake, Marshall, McCook, Miner, Moody, Perkins, Roberts, Walworth
VA Rural: Accomack, Augusta, Brunswick, Greene, Greensville, Halifax, Madison, Mecklenburg, Northampton, Page, Staunton City, Waynesboro City
WV Rural: Grant, Hardy, Pendleton, Randolph

**Primary Network Service Areas**
**PHCS Rental and Rural**
Service Area Changes and their effective dates

The following states and counties are added:
CA: Del Norte, Glenn Lassen, Mariposa, Modoc, Mono, Plumas, Siskiyou and Trinity effective January 1, 2014
TN: Monroe, Polk and Rhea effective January 1, 2014

Multiplan Inc Statement of Work 15

The following states and counties are removed:

AK Rural: Haines, Wrangell-Petersburg termed July 1, 2013
AR: Drew, termed October 1, 2012
FL Rural: Franklin termed April 1, 2013, Hamilton termed July 1, 2013 Jackson termed September 1, 2013, Glades terminated 1-1-14. Desoto and Madison terminated January 1, 2015
IL Primary: Macon and Mclean termed April 1, 2013. Bureau, Crawford, Effingham, Jefferson, Marion, McDonough, Stephenson, and Whiteside terminated January 1, 2014.
IL Rural: Carroll and Hancock termed July 1, 2014 Adams, Dewitt, Pike, and Shelby terminated January 1, 2015.
KS Rural: Barber, Edwards, Jackson, Mitchell, Nemaha, Norton, Rawlins, Sherman, Wabaunsee termed April 1, 2014
KY Rural: Montgomery terminated January 1, 2015.
MO Rural: Howell, termed July 1, 2012 and Johnson terminated July 1, 2014. Butler, Carter, Dunklin, Iron, Marion, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Pike, Reynolds, Ripley, Scott, Shelby, Stoddard, and Wayne terminated on January 1, 2015.
MO Rental: Cape Girardeau terminated January 1, 2015.
TN Primary: Monroe, Polk and Rhea terminated September 1, 2014
VA Rural: Accomack, Augusta, Brunswick, Greene, Greensville, Halifax, Madison, Mecklenburg, Northampton, Page, Staunton City, Waynesboro City termed April 1, 2014
WV Rural: Grant, Hardy, Pendleton, Randolph terminated April 1, 2015.

## Primary Network Services HealthEOS

WISCONSIN: Adams, Brown, Calumet, Clark, Columbia, Crawford, Dane, Dodge, Door, Florence, Fond Du Lac, Forest, Grant, Green, Green Lake, Iowa, Iron, Jackson, Juneau, Kewaunee, La Crosse, Lafayette, Langlade, Lincoln, Manitowoc, Marathon, Marinette, Marquette, Menominee, Monroe, Oconto, Oneida, Outagamie, Portage, Price, Richland, Rock, Sauk, Shawano, Taylor, Vernon, Vilas, Waupaca, Waushara, Winnebago, Wood.


Company will provide its Members with access to Entity's Primary Network in those geographic areas as mutually agreed upon by the parties.

In the event Company wishes to add or terminate access to a Service Area under this Agreement, Company may do so by submitting written notification to Entity at least sixty (60) days prior to the effective date of the modification date of that Service Area.


To the extent permitted under applicable law, Entity will provide Negotiation Services in all states.

Multiplan Inc Statement of Work 15

**Attachment 9**

**ACKNOWLEDGEMENT**

**Acknowledgement**

As a condition for Aetna Health Management, LLC on behalf of itself and its Affiliates ("Payor") to access the payment rates under the Amended and Restated Hospital Services Agreement dated effective September 15, 2011, as may be amended from time to time hereafter (the "Baylor Agreement"), between the hospitals and related health care facilities of Baylor Scott & WhiteHealth ("Baylor") and MultiPlan, Inc. ("MultiPlan"), the Payor hereby acknowledges the following obligations as a prerequisite and continuing condition of access to the Baylor Agreement by Payor. [1]

In order to access the payment rates under the Baylor Agreement, the Payor hereby acknowledges and agrees to comply with and be bound by the terms of the Baylor Agreement, including, without limitation, the payment provisions in Article IV and the dispute resolution procedures described in Article VII. Payor further acknowledges that it has been provided with a copy of the Baylor Agreement and that it understands its duties and obligations as a Payor, as set forth therein. MultiPlan shall be obligated to provide Payor any amendments to the Baylor Agreement and Payor shall be bound to all such amendments as of the effective date of such amendments.

Payor represents and warrants that Payor shall use the reimbursement rates in the Baylor Agreement solely to pay for Covered Services rendered to Members covered under a Health Plan which utilizes the MultiPlan provider network and in which Baylor is a Participating Provider.

Payor agrees to comply with all laws and regulations governing the Payor's responsibilities under the Baylor Agreement, including, but not limited to, obtaining and maintaining in effect all applicable licenses, registrations and certifications necessary for that purpose. To the extent applicable to Payor, Payor agrees to act in conformance with the rules and laws of the State of Texas and the Texas Department of Insurance, as may from time to time be amended.

Payor agrees that Baylor is a third party beneficiary to this Acknowledgment. Nothing contained herein will be construed as, or be deemed to create, any rights or remedies in any party other than MultiPlan, Payor or Baylor.

Nothing in this Acknowledgment shall be construed as altering, limiting or superseding any duties or obligations imposed on a Payor under the Baylor Agreement. In the event of a conflict between the terms of this Acknowledgment and the terms of the Baylor Agreement, as applicable to Payor, Payor agrees that the terms of the Baylor Agreement shall control and govern. In the event of a conflict between the terms of this Acknowledgement and any agreement between MultiPlan and Payor, MultiPlan and Payor agree that the terms of this Acknowledgement shall control and govern.

Aetna Health Management, LLC on behalf of itself and its Affiliates:

By: _____

Name: _____

Title: _____

Principal Address: _____

_____

_____

Facsimile Number: _____

Marketing Name(s) that will be used by Payor
or its health plan(s) on identification cards and/or
Explanation of Benefits forms (EOBs):

_____

Date: _____

| TO BE COMPLETED BY MULTIPLAN: |
|---|
| ACCESS GRANTED ON: |

---

[1] Unless otherwise defined herein, capitalized terms shall have the meaning ascribed to them in the Baylor Agreement.

31

Multiplan Inc Statement of Work 15

**Attachment 10**

**STATE LAW COORDINATING PROVISIONS**

I. <u>Scope.</u>

In the event of a conflict between the other terms and conditions of this Agreement and these provisions, the provisions set forth on this Attachment 10 shall apply:

II. <u>Illinois.</u>

For those Services subject to Illinois laws and regulations, the following state law coordinating provisions apply:

A. As required by the Illinois Department of Insurance, the defined term "Member" in Section 11.0 Definitions, is deleted in its entirety and replaced with the following:

<u>Covered Policyholder</u> shall mean the group consisting of an individual, and his or her covered dependents, if any, which (i) is entitled to receive benefits under Healthcare Plans; and (ii) is eligible to receive the Services from Entity. For individual medical plans, Covered Policyholder shall mean the group consisting of the policyholder of the individual health policy and his or her covered dependents.

B. As required by the Illinois Department of Insurance, the defined term "Plan" in Section 11.0 Definitions, is deleted in its entirety and replaced with the following:

<u>Healthcare Plan</u> means health care benefits provided through either a group plan or an individual plan, whether insured, self-funded, or a combination thereof, which plan is underwritten, administered, which includes, but is not limited to, the adjudication of claims, issued, offered, or managed by Company or any member of the Company group and includes a financial incentive or steerage, such as an out-of-pocket savings by the Covered Policyholder, an example of which would be a lower deductible amount, to encourage Covered Policyholder to choose treatment from Participating Entity Providers. Healthcare Plan does not mean benefits provided primarily for dental, vision and auditory services or disability.

C. As required by 50 Illinois Administrative Code §2051.260, Company and Entity shall comply with the applicable network access and availability requirements of 50 Illinois Administrative Code §2051.310.

D. As required by 50 Illinois Administrative Code §2051.280, Company shall include the Primary PPO Network's or Complementary PPO Network's, as applicable, toll free telephone number and name and/or logo on the Covered Policyholder's ID card.

E. As required by 50 Illinois Administrative Code §2051.280, in the event that a Participating Entity Provider finds it medically necessary to refer a Covered Policyholder to a non-Participating Entity Provider, Company shall ensure that the Covered Policyholder not incur any greater out of pocket liability than had the Covered Policyholder been referred to a Participating Entity Provider. If the Covered Policyholder willfully accesses a non-Participating Entity Provider, the Covered Policyholder, may be subject to financial penalties, pursuant to his or her Healthcare Plan.

F. As required by 50 Illinois Administrative Code §2051.280, if Company is a payor, as defined by 50 Illinois Administrative Code §2051.220, only such Company may assume any underwriting risk when that risk of part of the delivery of services.

G. As required by 50 Illinois Administrative Code §2051.300, if Company is subject to 50 Illinois Administrative Code §2051.210 et seq. or any other provision of the Illinois Insurance Code, Company warrants and represents that it is properly registered under the applicable provisions of 50 Illinois Administrative Code §2051.210 et seq., or is otherwise appropriately licensed under the Illinois Insurance Code.

H. As required by 50 Illinois Administrative Code §2051.310 (6) (H), the following provisions shall apply to the Agreement:

Multiplan Inc Statement of Work 15

1. In the event a Covered Policyholder has made a good faith effort to utilize a Participating Entity Provider for Covered Services and the Primary PPO Network or Complementary PPO Network, as applicable, does not have the necessary provider due to insufficient number, type, or distance, the Covered Policyholder will be provided the Covered Services at no greater cost than if the Covered Services had been provided by a Participating Entity Provider; and

2. Company shall assure a Covered Policyholder's access to Covered Services when the Covered Policyholder has a medical emergency, whether within or outside the Network service area.

Multiplan Inc Statement of Work 15